**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-10141-03-EFM |
| | ) | |
| GAVIN WAYNE WRIGHT, | ) | **FILED UNDER SEAL** |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR BOND**

In support of Mr. Wright's Motion for Reconsideration of Pre-Trial Detention Order, the defendant states the following:

**FACTS AND PROCEDURAL HISTORY**

The United States indicted Mr. Wright on October 19, 2016 with co-defendants Patrick Stein and Curtis Allen for one count of conspiracy to use a weapon of mass destruction against people and property within the United States in violation of 18 U.S.C. §§ 2, 2332a(a)(2). (Doc. 25). The United States filed a superseding indictment on December 14, 2016, that did not impact Mr. Wright's charges. The United States filed a second superseding indictment on March 16, 2017, further charging Mr. Wright with one count of knowingly and willfully conspiring with others to injure, oppress, threaten and intimidate others in the free exercise and enjoyment of their legal rights and privileges because of race, national origin and religion in violation of 18 U.S.C. § 241, and with one count of making false statements. 18 U.S.C. § 1001.

The United States filed a motion for pre-trial detention on October 20, 2016. (Doc. 26). Mr. Wright waived his right to have a detention hearing on October 21, 2016, reserving his right to apply to the court for pretrial release should his circumstances change. (Doc. 31). Mr. Wright did not seek bond at that time because of concerns that his family, especially his school-aged son

over whom he has sole custody, would be targeted for harassment, violence, or both by persons-of-interest in the government's investigation as well as members of the public who learned about the investigation from the publicity of Mr. Wright's arrest. Since then, Mr. Wright's circumstances have changed in the following ways:

1.      Mr. Wright has heard of no harassment, violence or threats of violence against his family, nor has he received any personally. This is evidence that there has been a "cooling off" period for the community, and he believes there are no longer any safety concerns for himself or his family.

2.      Mr. Wright had, and continues to have, sole custody over his minor son. After Mr. Wright's arrest and initial detention in this case, his son was released to Mr. Wright's ex-wife (whose custody was previously revoked). Unfortunately, after his arrest, Mr. Wright's ex-wife suffered massive and sudden medical complications that resulted in her hospitalization. She remains incompetent to care for Mr. Wright's minor child. While Mr. Wright made arrangements with other family to care for his son by executing powers of attorney, Mr. Wright's minor child has *no legal custodian or natural parent* in a position to provide custodial care.

3.      Mr. Wright's family, specifically his mother, step-father and brother (who is also his business partner) no longer reside in Garden City, Kansas (the locus of the alleged offense) or in Liberal, Kansas (the community where Mr. Wright feared harassment or violence might originate from persons-of-interest in the law enforcement investigation).

4.      Mr. Wright's business, G & G Homes in Liberal, Kansas is now closed.

5.      Mr. Wright and his counsel have received tens of thousands of megabytes of discovery in the form of documents, transcripts, audio recordings, video recordings and

photographs produced by the Government since October 21, 2016 which he believes impact any decision this Court shall make with regard to his bond.

6.       Mr. Wright's counsel has had reasonable opportunity to conduct its own independent investigation into these matters, and has uncovered information which will impact any decision this Court shall make with regard to his bond.

Mr. Wright now chooses to exercise his reserved right to apply to the court for pretrial release based on the change in these circumstances.

## I.       Mr. Wright's Proffer of Procedural History and Facts of the Investigation.

Beginning in Winter 2015/2016, the Government began investigating extremist militia activity in southwestern Kansas.[1] Beginning as late as January 2016, the FBI began paying a man named ▓▓▓▓▓ to act as a "confidential human source" ("CHS"). Prior to becoming a paid Government informant, the CHS in good faith joined a conservative constitutionalist movement self-styled the Liberation Restoration Committee ("LRC"), as well as the Kansas Security Force ("KSF"), a citizen militia operating across the state of Kansas. Many people involved in the LRC movement were also members or associates of the KSF in southwest Kansas. Those people included others involved in this investigation, as well as Mr. Wright and the co-defendants. While Mr. Wright expressed some interest in joining the KSF, he never became a member because he was more interested in learning prepping and survival skills rather than joining an organized militia. However, he did have contact with members and other associates.

In Spring 2016, there was a question among several of the persons involved in this case whether they should continue to serve in the KSF, or whether they should form a split-off militia.

---

[1] T. 1D1-track 0003 at 1 (attached and referred to as **Exhibit A**)(Date 04/19/2016); FBI Case Update Report 14 October 2016 at 4 (attached and referred to as **Exhibit B**)("since April 2016").

This "split-off" group became the larger group on which the Government focused, and included Mr. Wright, the co-defendants and others. This group was predominantly made up of former members and associates of the KSF who lived in southwest Kansas, and so Mr. Wright continued to associate with the split-off group for one reason: they were the people in his peer group. They lived in the same communities. They knew the same people. The same news affected them the same way. They were the only peers he had after having moved to the rural area around Liberal from the large college town of Manhattan, *infra*.

People in this group shared similar fears, which was the impetus for their banding together. They feared that then-President Obama was corrupt and in league with the Muslim Brotherhood, which was perceived by the group as a terrorist organization. They feared that the United Nations, China and Cuba were formulating an invasion of the United States that would have to be repelled by American partisans, such as themselves. They feared that then-President Obama would declare martial law if Donald Trump won the election. They feared massive social unrest would occur regardless of the outcome of the presidential election of 2016. They feared that the Islamic State in Syria (ISIS) was planting terrorist sleeper cells in the United States, and more specifically southwest Kansas, prompted by rumors that ISIS had posted recruiting flyers in the Finney County library.[2]

To the extent that these groups were organized, they communicated commonly across multiple social media/digital media and user-generated content Internet sites and applications. First among those mediums was Zello[3], a push-button walkie-talkie application and Facebook. While

---

[2] Michael Maresh, "Rumors of ISIS message at local library false." The Garden City Telegram, July 24, 2015 (available at: <http://www.gctelegram.com/b4285774-8299-59e9-82a0-f4dcfec1f6fd.html>)(last accessed August 15, 2017).

[3] Zello is a push-to-talk walkie-talkie mobile application for group communications popular among protest groups across the world, including constitutionally-protected citizen militia groups like the Oath Keepers in the United States. Linda Wertheimer, *Zello App Gains Popularity With World's Protesters*, www.nper.org/2014/03/05/286126479/zello-

using the Zello application, the persons involved in this case commonly used code names for each other. The Government, through the CHS, monitored and recorded several communications, including multiple Zello conversations and telephone calls. The Government also equipped the CHS with a "wire" to record meetings that took place in person, and provided the recorded calls and transcripts of those calls. However, it is unclear how reliable the Government's transcripts are as they are not merely internally inconsistent, but expressly state within them that the transcriber in multiple places was unable to distinguish Mr. Wright's voice from others.[4]

In Spring 2016, the Government began its surveillance of the co-defendants in this case. On June 14, 2016, Patrick Stein organized a meeting of several individuals who were members and associates of the Kansas Security Force ("KSF") allegedly "to discuss forming a plan to kill Muslims . . . at a secluded location to prevent law enforcement detection."[5] However, Mr. Wright was not present at the meeting.[6] Mr. Wright's absence and non-participation in actual activities would become a theme throughout his relationship with the co-defendants, including his absence

---

app-gains-popularity-with-worlds-protestors (last accessed June 28, 2017); *see also* Oath Keepers, *Oath Keepers Regular Membership*, https://www.oathkeepers.org/regular-membership/ (last accessed June 28, 2017)("Here are your member benefits . . . Access to our members only communication system (Zello chat...)"); *see also* Oath Keepers, *Help Us Restore Our Republic College Oath Keepers Join Today*, https://www.oathkeepers.org/college/ (last accessed June 28, 2017)("Here are your member benefits . . . Access to our members only communication system (Zello chat...)"); *see also* Oath Keepers, *Calling All Patriot Truckers! Oath Keepers Needs You to Be Our Eyes and Ears on the Road*, https://www.oathkeepers.org/truckers-program/ (last accessed June 28, 2017)("You will be given access to an Oath Keepers members-only (and password protected) Zello OK Trucker chat channel for the region of the U.S. you live in and those regions you travel through regularly. Zello is a smart phone app that functions like a walkie talkie and is available for Android and iOS").

[4] *See e.g.* T. 1D3-track 1 at p. 1 (attached and referred to herein as **Exhibit C**)(" ▇▇▇▇▇ (sounds similar to Allen)" and "WRIGHT▇▇▇▇▇ (?)"). This continues throughout the transcript where an alleged "Wright" replies to his own question or statement, *id.* at 1, or where an alleged "Allen" appears to reply to his own question or statement, *id.* at 3.

[5] **Ex. B** (FBI Report 10-14-2016) at 5.

[6] T. 1D7 at 1, 26 (attached and referred to herein as **Exhibit D**)(from caption and context).

at the alleged gun-buy between Stein and undercover FBI agents, Mr. Wright "being tasked" with obtaining equipment and never taking serious actions to follow through.

Mr. Wright was, however, present at his regular Sunday group which started on July 31, 2016,[7] what the Government would eventually call "the Crusaders."[8] Throughout pre-trial litigation, the Government has mischaracterized the meetings at G & G as being specifically for the purpose of plotting a bombing. However, Mr. Wright, the CHS and the co-defendants had a regularly scheduled meeting every week on Sunday mornings at 10:00 a.m., to, as Mr. Wright would say, "shoot the bull." Mr. Wright proffers that there was never any agenda set for such meetings, though they often devolved into the venting of frustrations about police corruption, then-President Obama, what would happen if Hillary Clinton were elected president, immigration policy, refugee policy and, yes, Somali refugees living in southwest Kansas. Their conversations would eventually run toward hypotheticals about how to make explosives, destroy bridges and other things of that nature in the event "shit hit the fan" – no different than what the screenwriters of *Red Dawn* may have discussed while contemplating a hypothetical invasion of the United States. However, it was the CHS that turned discussions specifically to the targeting of the Muslim community at an apartment complex at 312 West Mary Street in Garden City, Kansas.

The CHS described black duffle bags being removed from what he called the Mary Street "mosque" – a unit in the apartment complex used for religious services by the refugee community residing at the complex. The CHS described money being wired from a local Western Union, implying that the funds were sent to Islamic extremist terrorist organizations in the Middle East. The CHS stated that – as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – he supervised Somali

---

[7] *See* T. 1D15 CCR_0001 at 2 (attached and herein referred to as **Exhibit E**)(Allen provides CHS with directions to G & G Homes, indicating CHS had never been to G & G before; therefore this was the first of those meetings).

[8] **Exh. B** (FBI Report 10-14-2016) at 5.

refugees and stated they had connections to the Mexican Mafia and were using drug proceeds to help finance jihad in the United States. While Mr. Wright accepted the CHS' statements as "banter," *infra*, the CHS – a government agent – was actively radicalizing Stein and Allen without understanding what he was doing. Mr. Wright agreed that they should be prepared *if* members of the Muslim community in Garden City ever became an actual threat, but it was the CHS who suggested taking pre-emptive action.

Allen worked with Mr. Wright at G & G Homes with Mr. Wright. On October 10, 2016, Allen's girlfriend, � ▬▬▬▬▬▬▬▬▬▬▬▬, contacted the Liberal Police Department to report Allen for alleged domestic battery.[9] As Mr. Wright and Allen left G & G Homes that evening, officers stopped both and took them into custody. While in custody, law enforcement officers on the scene told Mr. Wright that ▬▬ "says that [Allen]'s making bombs."[10] Mr. Wright did not believe it, accusing ▬▬ of making up lies.[11] That night, Mr. Wright told Stein that he no longer wanted anything to do with Stein. That night, Mr. Wright also told ▬▬▬▬▬ that he no longer wanted anything to do with the Zello group. And that same night, Mr. Wright expressed complete surprise that Stein and Allen were allegedly implementing a plot to *actually* kill people, *infra*.[12] The next morning, on October 12, Mr. Wright voluntarily presented himself to the FBI to clear up any issues regarding his arrest and to answer questions regarding his relationship with Allen and Stein[13] while,

---

[9] Jason Ott, Affidavit and Application for Search Warrant, Oct. 12, 2016 at 2 (attached and herein referred to as **Exhibit F**).

[10] T. 1D51 Track 244 at 4 (attached and herein referred to as **Exhibit G**).

[11] **Exh. G** (T. 1D51 Track 244); T. 1D51 Track 247 (attached and herein referred to as **Exhibit H**).

[12] **Exh. G** (T. 1D51 Track 244), **Exh. H** (T. 1D51 Track 247).

[13] T. 1A64 (attached and herein referred to as **Exhibit I**).

unbeknownst to Mr. Wright, the CHS and Stein allegedly met with undercover FBI agents during a controlled buy of unlawful weapons.[14]

Despite the Government's possession of evidence that Mr. Wright never wanted anything to do with any plans to hurt anybody, the Government arrested Mr. Wright and Mr. Stein on October 14, 2016, and charged them in this case. Mr. Wright has been held in federal custody since then.

## II.    Mr. Wright's history, characteristics and nature.

Mr. Wright was born and raised in western Kansas. He was raised with his brother, Garrett, and his half-brother. Their father made sure that Mr. Wright and his siblings grew up with an appreciation for firearms, and passed his enjoyment of hunting and shooting (as well as several rifles and pistols) to Mr. Wright and his brothers. Throughout their childhood, Mr. Wright developed a close relationship with Garrett, but his relationship with his half-brother was strained due to his half-brother's substance abuse. Today, Garrett lives with his wife in Deerfield, Kansas. He continues to run D & H Homes, another modular home business, in Garden City, Kansas. Mr. Wright's mother and her husband also live in Deerfield, Kansas.

As an adult, Mr. Wright has been married twice. With his first wife he had a daughter, now an adult, who currently resides in Oklahoma with her wife. Though divorced, Mr. Wright continues to have friendly relations with his first wife and considers her a confidant. With his second wife, he has two sons. His adult son lives in Kansas. Upon divorcing, the Kansas state court granted Mr. Wright sole and exclusive custody of his youngest son, who is still a minor of high school age. Mr. Wright's relationship with his second wife is strained, at best. After his arrest and detention in this case, Mr. Wright learned that his minor son ended up living with his second wife. However, she

---

[14] *Generally* T. 1D39 006 (attached and herein referred to as **Exhibit J**).

suffered a sudden illness and was hospitalized in February 2017. In March 2017, Mr. Wright voluntarily executed a power of attorney giving his second wife's cousins authority to care for his son in the absence of both Mr. Wright and the boy's mother. Mr. Wright's youngest son continues to live with the cousins in Kansas, pending resolution of this case or restoration of Mr. Wright's second wife's competency.

Mr. Wright has resided in Kansas nearly his entire adult life. He is a trained and licensed tradesman; an electrician. Prior to moving to Liberal, for nearly twenty years he owned and operated a successful electrical contracting company in Manhattan, Kansas.[15] His company, Phase Electric, Inc., employed nine other people[16] and held several contracts with the City of Manhattan as well as military installations in and around the Manhattan/Junction City area. He had several close friends in Manhattan. Mr. Wright rented space in his home to a single father – an immigrant of the Muslim faith who was studying at Kansas State University (who was raising his own son). Mr. Wright and his son often had dinner with his tenant and his son. Mr. Wright was not at all concerned that his son and his boarder's son spent time together and became friends. Mr. Wright and his boarder even contemplated a business relationship, as both had interest in electricianship and electrical engineering. Mr. Wright was generally a well-liked and respected member of the community.

While living in Manhattan with his youngest son, Mr. Wright's father died. Mr. Wright's brother, Garrett, asked him if he would return to western Kansas to help with the family business selling and setting modular homes.[17] Mr. Wright took his brother up on the offer, and in

---

[15] **Exh. I** (T. 1A64) at 6.

[16] **Exh. I** (T. 1A64) at 6.

[17] **Exh. I** (T. 1A64) at 6.

Winter/Spring 2015, Mr. Wright moved with his school aged son to the Liberal area to take over G & G Home Center on the outskirts of town. Mr. Wright purchased a homestead less than twenty minutes from Liberal, Kansas, in rural Beaver County, Oklahoma.

At this time, Mr. Wright became interested in survival training and prepping, which he considers two different – though related – activities.[18] He engaged in conduct common to these communities, including stockpiling food and ammunition, purchasing firearms, practicing outdoorsmanship skills and marksmanship, and using publicly-available materials to learn skills, tactics and strategies that might be necessary in a "SHTF," "TEOTWAWKI" or "WROL" world.[19] Mr. Wright proffers that this community is no longer associable solely with the "radical right wing" because prepping and survival is mainstreamed by people across the whole political and socio-economic spectrum.[20] He further proffers that while members of these two communities may *also* belong to militias, the motives of militias and prepper/survivalist groups differ.[21] Furthermore, being a member of these communities does not categorically make Mr. Wright a racist or violent.

---

[18] *See* Pat Henry, "What is the difference between a Survivalist and a Prepper?" The Prepper Journal, May 30, 2013 (available at: < http://www.theprepperjournal.com/2013/05/30/what-is-the-difference-between-a-survivalist-and-a-prepper/>)(last accessed July 19, 2017); *see also* Guest Author, "The Differences Between Survivalists and Preppers." American Prepper Network, April 12, 2015 (available at: <http://americanpreppersnetwork.com/2015/04/the-differences-between-survivalists-and-preppers.html>)(last accessed July 19, 2017).

[19] These phrases are commonly used in the prepping/survival communities and connote a total breakdown of civilization and social order. Ron D., "SHTF." TheUrbanDictionary.com, July 10, 2005 (available at: <http://www.urbandictionary.com/define.php?term=SHTF>)(last accessed July 19, 2017). "SHTF" means "shit hits/hitting the fan;" "TEOTWAWKI" means "the end of the world as we know it;" "WROL" means "without rule of law." Pat Henry, "What Would a WROL World Look Like?" The Prepper Journal, May 18, 2015 (available at: <http://www.theprepperjournal.com/2015/05/18/what-would-a-wrol-world-look-like/>)(last accessed July 24, 2017).

[20] *Doomsday Preppers*, "Into the Spider Hole" (National Geographic Channel Mar. 13, 2012) (TV Series)("Hippies" convert missile silos near Topeka); Evan Osnos, "Doomsday Prep for the Super-Rich." The New Yorker, Jan. 30, 2017 (available at: <http://www.newyorker.com/magazine/2017/01/30/doomsday-prep-for-the-super-rich>)(last accessed July 19, 2017)(Wall Street and Silicon Valley CEOs spend their weekends and fortunes preparing for the end of the world as we know it).

[21] Sarge, "Prepper group or Militia, what's the difference? Some people just don't know!" American Prepper Network, March 3, 2016 (available at: <https://www.americanpreppersonline.com/prepper-group-militia-whats-difference-people-just-dont-know/>)(last accessed July 19, 2017; *also e.g.* "Survival Groups vs Militia Groups?" SurvivalistBoards.com (available at: <http://www.survivalistboards.com/showthread.php?t=89371>)(last accessed

Though Mr. Wright grew up in and was generally familiar with southwest Kansas in his youth, he had few friends in the area when he moved to Liberal many years later. With the exception of his son, he had no family in the area. Liberal is located in rural Seward County, Kansas. It is a town with a population of only 20,000 people. And Mr. Wright operated G & G by himself, conducting both sales as well as physically setting multiple modular homes a month in Kansas, Oklahoma and Texas. Mr. Wright led a lonely existence because, with few exceptions, the only people Mr. Wright interacted with on a daily basis were his son and his customers – not exactly a generous social circle for a twice-married, single father in his late forties. So, by the time he met Curtis Allen – a single man around Mr. Wright's age who shared some of Mr. Wright's political beliefs and an interest in survivalism/prepping – Mr. Wright had become desperate to find friends in his new surroundings.

Soon after moving to Liberal, around April 2015, Mr. Wright met Curtis Allen.[22] Allen, a salesman specializing in security systems, offered to put in a security system at G & G Homes. This began an acquaintanceship that over time became a more general friendship. Eventually Allen began to stop by G & G more often to chat. Over the course of these chats and what Mr. Wright believed was a growing friendship, Mr. Wright discovered that Allen shared much (though not all) of his politics and beliefs, an affinity for firearms and shooting, as well as an interest in prepping and survival training. Soon thereafter, Allen introduced Mr. Wright to a group of people associated with the Kansas Security Force citizen militia who lived in southwest Kansas, including the CHS and Patrick Stein. This group conversed over Zello about their fears, prepping, survivalism, and

July 19, 2017); *see also* Pat Henry, "Should You Join a Militia?" The Prepper Journal, August 3, 2015 (available at: <http://www.theprepperjournal.com/2015/08/03/should-you-join-a-militia/>)(last accessed July 19, 2017).

**22** **Exh. I** (T. 1A64) at 5.

training for when SHTF. And at some point, Mr. Wright began having regular Sunday morning coffee at G & G with some of the men from the Zello group, including the CHS, Stein and Allen. While Mr. Wright put on a smile and a laugh when it came to Stein and his ever-more extreme rhetoric, he did not like Stein. But he figured that Stein was just full of bluster. Mr. Wright did not want to rock the boat with Allen because for the first time since moving to Liberal, he had a "crowd." And so he put on a façade for Stein and the rest of the group.

Mr. Wright certainly had concerns about the political leadership of his country, and had strong feelings about immigration and refugee policy in this nation. But he did not share the fears of his new social group. While his new friends feared President Obama, the Muslim Brotherhood, a United Nations invasion of the United States, and martial law, Mr. Wright had a much more fundamental and human fear: isolation and loneliness. So, when the Sunday group talk turned to undesirable topics, Mr. Wright went along with the talk to get along. But Mr. Wright describes such talk as "banter" that he never took seriously. Mr. Wright proffers that the members of the Sunday group – including himself – tried "to make themselves out to be more than they really were."

Unbeknownst to Mr. Wright, Allen, Stein and the CHS were purportedly putting into action what Mr. Wright believed were hypothetical plans. Mr. Wright thought Stein and the CHS were engaged in hyperbole when they said they were conducting surveillance of a Somali Muslim refugee community that lived at an apartment complex on Mary Street in Garden City, Kansas. But Mr. Wright had no reason to believe them. After all, Mr. Wright never went on any of these "surveillance missions." Mr. Wright thought Stein was "puffing" himself up about his knowledge of drugs, but had no reason to believe Stein could actually manufacture them. It was not until Mr. Wright's arrest on October 11 that he received information that made him believe Stein and Allen

might actually turn their words into actions. And it was law enforcement that gave Mr. Wright hard evidence and a basis for believing that perhaps Allen and Stein were taking things beyond the "bluster" and "bitching" he'd believed he was engaging in up to that point. As he stated to the CHS that night: "I want to be part of changin' this country *constitutionally*. . . . but I don't want to be involved in *that!*"[23] It was the first time that Mr. Wright had a basis to believe that Allen might actually be as extremist as he was being accused of: "Curtis never once acted like he was f***** whacked out or anything as far as I'm concerned."[24]

## PROPOSED PRE-TRIAL RELEASE PLAN

Mr. Wright proposes the following plan in order to ensure that during the pre-trial and trial period, Mr. Wright will pose no flight risk, nor pose a risk of danger to the community, and especially to the Muslim and refugee community in Kansas:

1.      Mr. Wright will live in Deerfield, Kansas with his mother and step-father. (Mr. Wright's brother and sister-in-law live next door). Furthermore, Mr. Wright will work with his brother for D & H Homes in a capacity that would allow him to conform to the conditions of his bond.

2.      Mr. Wright will be outfitted with a GPS ankle monitor for 24 hour monitoring.

3.      Mr. Wright will be allowed to travel for the following purposes, so long as such travel is conducted with prior permission and knowledge of United States Probation:

        a.      To travel to and from court in Wichita, Sedgwick County, Kansas.

        b.      To stay overnight in or reasonably near Wichita, Sedgwick County, Kansas when court scheduling would make it practically unreasonable to travel back-and-forth from Deerfield to the federal district courthouse in Wichita, Kansas. Mr. Wright proffers that he has access to a trailer owned by his family outside the city limits of Wichita, Kansas. The added benefit of using this for overnight stays due to the court's schedule is that it would place him a reasonable distance from the Muslim and refugee community in Wichita in order to assure the Muslim community and refugee communities that Mr. Wright will remain a safe distance

---

[23] **Exh. H** (T. 1D51 Track 247) at 2.

[24] **Exh. G** (T. 1D51 Track 244) at 3.

from them and provide law enforcement and U.S. Probation ample time to intervene if necessary.

c. To travel for activities related to his work at D & H Homes.

d. Under no circumstances will Mr. Wright be granted permission to travel within a half-mile of the apartment complex at 312 West Mary Street in Garden City, Kansas, except that he may use U.S. Highway 54/400 to travel to and from court dates in Wichita, Kansas. On such occasions, Mr. Wright shall notify United States Probation of his court date as well as travel plans. He will call United States Probation while in commute immediately prior to entering any portion of U.S. Highway 54/400 that passes through Garden City limits, and he will call United States Probation immediately upon exiting any portion of U.S. Highway 54/400 that passes through Garden City limits. The purpose for such phone calls is to give Mr. Wright a direct route to Wichita for court dates, but also to ameliorate concerns that he could use such instances as an opportunity to achieve mischief or harm against any person or persons in Garden City, Kansas which encompasses a portion of U.S. Highway 54/400.

e. To check on his home in Beaver County, Oklahoma. On these occasions, Mr. Wright will be permitted to leave the District of Kansas so long as he gives advance notice to United States Probation and the Beaver County Sheriff's Department.

4. If Mr. Wright violates any movement restrictions, United States Probation will issue a warrant and have him promptly detained. Mr. Wright proffers that the combined resources of law enforcement, United States Probation and the GPS monitoring service are sufficient to ensure that should he violate any movement restrictions that they would be able to locate and arrest him promptly.

5. In the interest of providing the immediate ability to detain Mr. Wright, should he attempt to travel outside his restrictions, Mr. Wright will contract with a GPS monitoring company to provide a GPS monitor that has locations in Wichita and western Kansas near Deerfield, such as Axis which has locations in Wichita and Dodge City. The monitoring company will monitor Mr. Wright's location twenty-four hours per day, seven days per week, 365 days per year. Should he travel outside the boundaries, the company will immediately notify the Kearny County Sheriff's Department, which has offices in Lakin, Kansas, which is less than 8 miles from Deerfield, Kansas and the Finney County Sheriff's Department, which has offices in Garden City, Kansas, which is 16 miles from Deerfield, Kansas. Deerfield sits in between both Lakin and Garden City on U.S. Highway 54. The monitoring company will also immediately notify the FBI office in Garden City, Kansas. GPS devices can be set to "ping" Mr. Wright's location every 15 seconds. If Mr. Wright cuts the monitor, the monitoring company will immediately notify the Kearny County and Finney County Sheriffs' Departments, as well as the FBI.

6.      To the extent allowed by law and the Constitution, Mr. Wright will waive any requirement for any law enforcement agency to obtain a warrant before arresting him if he travels without permission outside of his permitted area without permission from United States Probation.

7.      To the extent allowed by law and the Constitution, Mr. Wright will not contact his co-defendants, the CHS, other persons of interest in the Government's investigation, and any and all persons known by Mr. Wright to be a member or associate of the Kansas Security Force. Should any contact Mr. Wright, he will state to them that he is unable to speak with them and he will notify his counsel of such contact, who shall take appropriate measures with regard to notifying the Government. Mr. Wright will comply with any additional requirements in furtherance of this condition set by the Court, including social media restrictions.

8.      Though Mr. Wright is not a prohibited person and remains innocent until proven guilty in this case, Mr. Wright will not possess or use any firearm, explosive or destructive device, or knowingly engage in activities or be present at facilities where such devices are reasonably likely to be *e.g.* hunting, shooting ranges, etc.

9.      Mr. Wright will agree to any further conditions that the Court and United States Probation deem necessary to ensure his appearance and to ensure he does not present a danger to the community, which may include:

      a.      Submission to supervision by United States Probation;

      b.      No possession of firearms, destructive devices or other weapons;

      c.      Refraining from alcohol and unlawful substance use;

      d.      No possession of drugs unless prescribed by doctors;

      e.      Submission to drug and alcohol testing;

      f.      Submission to search of his residence at any time;

      g.      Other conditions which the Court may deem necessary.

## ARGUMENT AND AUTHORITY.

**I.      Mr. Wright is presumed innocent of the charges against him.**

*See* 18 U.S.C. § 3142(j); *also Estelle v. Williams*, 425 U.S. 501, 503 (1976)("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice"). For this reason, "it is critical to keep in mind that in our society liberty is the norm" and detention is an extreme exception to that norm. *See United States v. James*, 2001 U.S. Dist. LEXIS 5684 at *2 (D. Kan. 2001)(citing *United States v. Salerno*, 481 U.S. 739, 755 (1987)).

**II.     Authority to Re-Open Detention Hearing; Standard of Review.**

A detention hearing may be reopened at any time before trial

if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f). In this case, the movant, Mr. Wright, has much information that was unavailable to him at the time of the original hearing on October 20, 2016. To wit, such information includes the following which form the basis for his motion for pre-trial release:

1.      The failure of any harassment, threats or violence against his family;

2.      The illness and hospitalization of his ex-wife which has resulted in his minor son having no parent or custodian in a position to care for him;

3.      The move of his family, who would be the foundation of any release plan, outside of the community which was allegedly targeted and outside of the community which led to the associations of persons-of-interest in this case.

4.      The 20 terabytes of data that the Government has produced to Mr. Wright during the discovery process; and

5.      The independent investigation and discovery of information by Mr. Wright's counsel that forms – at least in part – the basis for his proffer that he poses

no danger of flight or criminal activity such that no conditions can ameliorate such concerns.

Due to Mr. Wright's lack of such information at the time of his detention waiver and the fact that such waiver was conditioned on his reservation of the right to seek bond presently, this Court should reopen and reconsider the pre-trial detention of Mr. Wright pending a resolution of the charges.

Because this Court is asked to review and revoke a United States magistrate's pretrial detention order, this Court must review the facts *de novo* and determine on its own whether or not detention is proper. *See United States v. Taylor*, 602 Fed. Appx. 713, 714-715 (10th Cir. 2015)(Court reviewed district court's review of magistrate's detention order); *United States v. McNeal*, 960 F. Supp. 245 (D. Kan. 1997); *see United States v. Baca*, 2017 U.S. Dist. LEXIS 56697 at *18 (D.N.M. April 13, 2017); *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985); *United States v. Delker*, 757 F.2d 1390, 1394-1395 (3d Cir. 1985); *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992); *United States v. Maull*, 773 F.2d 1479 (8th Cir. 1985)(en banc).

**III.    The Bail Reform Act requires this Court to order pre-trial release unless the Government can demonstrate by clear-and-convincing evidence that Mr. Wright poses either a risk of flight or a risk of danger to the community, and that absolutely *no* condition(s) can ensure his appearance at court or safety of the community.**

This Court "<u>shall</u> order the pretrial release of [Mr. Wright] . . . <u>unless</u>" the Court determines that such release "will not reasonably assure the appearance of" Mr. Wright, "or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b) (emphasis added). Such release must be subject "to the least restrictive . . . combination of conditions . . . that [are] reasonably necessary to assure the appearance of [Mr. Wright] as required and to assure the safety of any other person and the community," which may include such conditions outlined in 18 U.S.C. § 3142(c)(1)(B)(i)-(xiii). 18 U.S.C. § 3142(c)(1)(B)(xiv). This Court may order further detention

only if the Court "finds that <u>no</u> condition or combination of conditions will reasonably assure the appearance of [Mr. Wright] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). If this Court chooses to impose conditions, such conditions must relate specifically to the risk of flight or danger posed by the defendant. *See United States v. Crowell*, 2006 WL 3541736 (W.D.N.Y. 2006).

There exists a rebuttable presumption of both a risk of flight and a danger to the community when a defendant is charged with conspiring to use a weapon of mass destruction. 18 U.S.C. § 3142(e)(3)(C); 18 U.S.C. § 2332b(g)(5). However, Mr. Wright overcomes the presumption if he produces just "some" evidence warranting release. *United States v. Stricklin*, 932 F.2d 1353, 1354-1355 (10th Cir. 1991)("Once the presumption is invoked, the burden of *production* shifts to the defendant. However, the burden of *persuasion* . . . remains with the government"). This requirement is minimal because any greater onus would require the defendant to prove a negative *i.e.* that he is *not* a flight risk or danger to the community which would unconstitutionally violate due process. This minimal requirement of "some" evidence conforms to the Bail Reform Act's mandate that this Court must find that *absolutely zero* conditions or combination of conditions will assure Mr. Wright's appearance and the safety of the community, *supra*. When Mr. Wright presents such minimal evidence, *infra*, the burden shifts back to the Government to demonstrate flight risk, danger to the community, or both by clear-and-convincing evidence. [25] *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003); *see also* 18 U.S.C. § 3142(b), (c) and (e).

---

[25] Mr. Wright acknowledges that persuasive authority in this district holds that flight risk must be demonstrated by the lesser standard of preponderance of the evidence. *United States v. Burks*, 141 F.Supp.2d 1283, 1286 (D.Kan. 2001). However, such authority is not binding and, indeed, is erroneous. Flight risk is authorized as exactly one of two co-equal factors justifying pre-trial detention under the Bail Reform Act, the other being danger to community. Congress and the Bail Reform Act are conspicuously silent on which evidentiary burden the government must meet to prove that Mr. Wright poses such a serious flight risk as to deny him his liberty prior to trial. However, Congress and the Bail Reform Act speak with express clarity on which evidentiary burden the Government must meet to prove that Mr. Wright poses a danger to the community in order to impose pre-trial detention: clear-and-convincing evidence. Under the Bail Reform Act, appearance and danger are *equally* justifiable reasons to impose pre-trial detention on a person

**IV.  Mr. Wright poses no risk of flight or danger to the community.**

In determining whether Mr. Wright poses a flight risk or a danger to the community, this

Court shall consider the following factors:

1.      the nature and circumstances of the offense charged;

2.      the weight of the evidence against Mr. Wright;

3.      the history and characteristics of Mr. Wright, including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, . . . record concerning appearance at court proceedings," and whether Mr. Wright was on probation, parole or other release pending other criminal charges at the time of his arrest; and

4.      the nature and seriousness of the danger to any person or the community that would be posed by Mr. Wright's release.

18 U.S.C. § 3142(g)(1)-(4).

---

yet to be found guilty of any crime. To suggest that flight requires a *lesser* burden to take a man's liberty prior to being found guilty would render danger and flight *un*equal factors, though both are treated equally under the black letter of the law. Any other interpretation of the Bail Reform Act would render it unconstitutional. *See United States v. Motamedi*, 767 F.2d 1403, 1409-1416 (9th Cir. 1985)(J. Boochever, concurring and dissenting in part).

Additionally, the *Burks* decision implies that human life is less valuable than the government's right to prosecute criminal activity. Under the black letter of the Bail Reform Act and *Burks*, the Government would have to jump a higher hurdle to prove dangerousness than it would have to clear to prove risk of flight. The practical interpretation would suggest that Congress gives the criminal defendant the benefit of the doubt as to his propensity for violence, but not as to his propensity to flee prosecution. It would be appropriate to assume, therefore, that Congress knowingly values the state's right to prosecute criminal conduct *more than* Congress values the people's rights to life and limb. This would, of course, make no sense. Surely the people's right to their own lives is *equally* valued, if not moreso, than their right to prosecute crime. Does the law place a higher premium on the Government's right to prosecute than it places on citizens' rights to live and live peacefully? If society has a clear fear of danger, would it not make more sense to give the Government a *lower* burden to overcome? Mr. Wright suggests that such notions – that human life is less valuable than the Government's right to prosecute crime – are hateful to Americans' sensibilities and therefor is an unreasonable interpretation of the Bail Reform Act. Because the harms sought to be prevented are *at least* equal to each other (hence the same minimum treatment *i.e.* pre-trial detention), the evidentiary burden on the Government must be *at least* equal as between proving the risk of flight and the risk of danger to the community.

Because the minimal consequence for both appearance and dangerousness is the same: pre-trial detention and denial of Mr. Wright's liberty, the burden by which they are proven must necessarily be the same. And because the Bail Reform Act is silent as to the burden regarding appearance, but clear as to the burden regarding dangerousness, and those are co-equal, the clear burden of dangerousness – clear-and-convincing evidence – must also be the evidentiary standard applied at least equally to flight risk/appearance.

### A. Mr. Wright poses no flight risk.

The Government has already conceded after considering the factors that Mr. Wright poses no flight risk. In its original motion for detention, the Government admitted that Mr. Wright is a "life-long member[] of [his] communit[y] with substantial ties to the area," and conceded the point.[26] Mr. Wright has lived in Kansas nearly his entire life. Two of this three children, including one son still in high school, continue to live in Kansas. Mr. Wright owns a business in Kansas with his brother. His brother and sister-in-law live in Deerfield, Kansas. His mother and step-father live in Deerfield, Kansas. Mr. Wright has owned thriving businesses in communities across Kansas, including in Manhattan and Liberal. Mr. Wright does not have a passport, nor the financial means to leave. Mr. Wright owns real estate in Beaver County, Oklahoma which – while outside the Federal District of Kansas – is a short ten-minute drive from Liberal which connects him to the area. The Government is absolutely correct when it states that Mr. Wright has substantial ties to the area and is, therefore, not a flight risk.

Despite the nature of the charges against Mr. Wright, the Government admits that Mr. Wright poses no flight risk where others – even those innocent – may flee an overzealous prosecution. Furthermore, even after considering the weight of evidence against Mr. Wright - or, perhaps more accurately, the *lack* of evidence against Mr. Wright - the Government yet admits that Mr. Wright poses no flight risk. For these reasons, it is clear that the Government admits that Mr. Wright poses no flight risk – *either* by a preponderance, or by the clear-and-convincing standard – and this is one issue on which Mr. Wright can heartily agree.

---

[26] Doc. 26 at 19.

**B.      Mr. Wright poses no danger to the community.**

Only when there is a "strong probability that a person will commit additional crimes if released" is the community interest in safety sufficiently compelling to overcome the criminal defendant's right to liberty prior to trial. *United States v. Cox*, 635 F. Supp. 1047, 1050 (D. Kan. 1986)(quoting H.R.Rep. at 7, U.S. Code Cong. & Admin.News at 3189, legislative history of the Bail Reform Act); *United States v. Ploof*, 851 F.2d 7, (1st Cir. 1988). To impose pre-trial detention on Mr. Wright, the Bail Reform Act requires this Court to find that <u>no</u> condition or combination of conditions will reasonably assure the safety of any other person and the community. *See* 18 U.S.C. §§ 3142(e)(1), 3142(f); *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003); *also United States v. Gerkin*, 570 Fed. Appx. 819, 822-823 (10th Cir. 2014)("Under § 3142(e)(1), judges can order detention only if they find that no conditions or combination of conditions will reasonably assure community safety and appearance in court"). The mere fact that a defendant is charged with a crime of violence will not satisfy the clear and convincing evidentiary standard. *United States v. Chimurenga*, 760 F.2d 400 (2d Cir. 1985); *United States v. Ridinger*, 623 F. Supp. 1386 (W.D. Mo. 1985). Ownership of guns alone does not constitute clear and convincing evidence of danger, especially when the defendant's possession of guns is not unlawful. *United States v. Jeffries*, 679 F. Supp. 1114 (M.D. Ga. 1988).

The Government has already conceded that Mr. Wright has no criminal history which might be a basis for believing that he would commit crimes – violent or otherwise – while on bond.[27] Furthermore, Mr. Wright has *no* history of violence. He has never been accused of domestic violence. He has never been the subject of any civil claim the basis of which is conduct indicating a propensity for violence or other criminal behavior. While the Government found

---

[27] Doc. 26 at 22.

multiple legally-owned firearms and ammunition at his residence and in his storage unit, Mr. Wright was not a prohibited person at the time of his arrest and was merely exercising his Second Amendment rights. His ownership of firearms bears little – if any – relationship to his propensity for violence and does not constitute clear and convincing evidence that Mr. Wright poses a danger to the community, *supra*. There is simply no evidence of Mr. Wright's character, history or nature that would clearly and convincingly suggest that he poses any danger of crime – violent or otherwise – against any community.

Therefore, the Government is forced to rely almost exclusively on the nature and circumstances of the offenses charged and the weight of the evidence against Mr. Wright. However, while such evidence may tell a tale of a law-abiding man concerned about the direction his nation was headed and his intent to prepare for a hypothetical world in which the worst events would have occurred, it does not paint the picture of a man either motivated or prepared to take violent action against any member of his community in southwest Kansas.

> **1.      Indeed, Mr. Wright specifically speaks to his peaceful purpose, motive and the lengths he was prepared to go – or not go - in protest of this nation's immigration and refugee policies; lengths and methods which demonstrate that he poses no threat.**

Mr. Wright was arrested with Allen on the evening of October 11, 2016 after the Liberal Police Department responded to allegations by Allen's girlfriend, ██████████, that Allen committed acts of domestic violence against her. While he was held, a law enforcement officer told Mr. Wright that ████ "told them [law enforcement] he [Allen] was making bombs."[28] Law enforcement released Mr. Wright later that night, presumably based on the Liberal Police

---

[28] **Exh. I** (T. 1A64) at 14.

Department's belief that it had no grounds at that time on which to hold Mr. Wright (this was prior to the FBI taking charge).

Later that night, the CHS called Mr. Wright under the guise of asking him how he fared after the events of the evening.[29] During the conversation, Mr. Wright explicitly stated that he wanted no communication with anybody involved in the KSF, LRC, the KLRC or any of the people he has associated with regarding the events of this investigation:

CHS:        Hey man, I know you probably don't want to talk very much, but you doing okay?

Gavin:      Oh yeah, I'm fine.

CHS:        Okay.

Gavin:      Yeah, I'm fine. I just. . . I mean, they don't-- I don't know anything [CHS], so I'm just—I'd just *cut ties now*.[30]

He further stated his intent in dissociating with the group, as well as motive for leaving them:

Gavin:      I mean, fuck! I-- I don't have a clue, man. And I just told [                        ] *I'm just cutting ties for now. I don't want to even be in the group. 'Cuz I don't know what's going to happen.*[31]

Mr. Wright later confirmed that he had already spoken with Stein and withdrawn from any further association:

Gavin:      . . . So, I just told XO [Stein] that *I'm quitting everything right now. . . . I mean and I don't want to talk to nobody. I don't need to be involved in this.*[32]

---

[29] **Exh. G** (T. 1D51 Track 244) at 3.

[30] This recitation of the conversation is based on the audio recordings, and deviates from the Government's transposition of the conversation in its verified transcripts. *Contra* **Exh. G** (T. 1D51 Track 244) at 1 ("I'm just, I just (unintelligible)").

[31] **Exh. G** (T. 1D51 Track 244) at 3.

[32] **Exh. G** (T. 1D51 Track 244) at 5-6.

And a third time, as though not to put too fine a point on it, Mr. Wright again stated his intent to withdraw from any further association because he did not know how serious Stein and Allen had been and he was afraid that they would move from mere words to actions:

> Gavin:    . . . I'm like, "you know what? I'm just out of the group," and I deleted everything and I'm done. I don't know nothin' and that's the way I want to keep it.[33]

It is easy to mistake Mr. Wright's intent at this point as motivated by a fear of getting caught. However, this notion presumes that Mr. Wright had a sincere "meeting of the minds" with Stein and Allen; that Mr. Wright merely desired to avoid detection, as opposed to avoiding violence altogether. Even Stein made the same mistake the next day (October 12) while speaking with undercover FBI agents:

> UCE:    Okay, and Gavin is not wantin' to do anything '*cause he's scared*'?

> STEIN:    He-- Yeah. He's just layin' low.[34]

However, such a presumption is incorrect. The Government has produced evidence that Mr. Wright unequivocally and directly stated that he had no intent to take any unlawful action. We know this because Mr. Wright characterized ▓▓▓▓▓ statements as manipulations and lies:

> Gavin:    . . . They should throw her in jail because *whatever she's telling them is a fucking lie*.

> CHS:    She-- yeah, she was. She was telling them about fuckin' bo-- I wonder.

> Gavin:    He was making fuckin' IEDs is what the cop said! He goes "do you know what an IED is?" I go, "I watch the fuckin' news, yeah. I'm not stupid."

> CHS:    Yeah.

---

[33] **Exh. G** (T. 1D51 Track 244) at 7.

[34] **Exh. J** (T. 1D39 006) at 54.

| | |
|---|---|
| Gavin: | I mean, they do 'em over there in Iraq and Iran and-- and Afghanistan all the time. I hear about it all the fuckin' time. Yeah, I know what it is. *Do I know how to make one? Fuck no! Have I seen anybody make one? Fuck no!* |
| | . . . |
| CHS: | I wonder what the fuck they would want him [Allen] for even though, I mean, he's-- |
| Gavin: | Well, *it's the shit that she's making up*, man. I'm telling you. They need to arrest her! |
| CHS: | Right. |
| Gavin: | Yeah, because *she's fuckin' making up shit about him just to get him in trouble*. 'Cuz Curtis never once acted like he was fuckin' whacked out or anything as far as I'm concerned.[35] |

This exchange is an important insight into Mr. Wright's actual state of mind, and thus his propensity for violence and any danger he allegedly presents to the community. At the time of this conversation, Mr. Wright still believed that the CHS was a friend and recalled that the CHS had not only been present, but actively participated in the Sunday group. This raises the natural question: if Mr. Wright knew that the CHS was present during conversations about targets, bombs and how to find or make them, why would Mr. Wright suggest to him that ████ comments about manufacturing explosives and engaging in terrorism was a *fabrication*?

More reasonable for this Court to believe is that a sincere conspirator would suggest to a person he believes to be his sincere co-conspirator that the concern in such a situation is not that a witness is *lying*, but that a witness is *truthful* about unlawful conduct and would tell the truth to law enforcement. However, Mr. Wright tries to convince his all-knowing alleged ally that ████ statements are untrue. Why would Mr. Wright call lies what he allegedly knew his co-conspirator knew factually? Why lie about someone else lying to someone who he believes knows the truth? It confounds logic as well as a reasonable understanding of human nature. The only way Mr.

---

[35] **Exh. G** (T. 1D51 Track 244) at 5-7.

Wright's statements about ▮▮▮▮ statements make sense is if he *sincerely believed* that ▮▮▮▮ was lying, which implies that he must have believed that what he had been a party to was mere puffery and the venting of frustration - *not* that he was involved in a legitimate, serious plot to hurt others.

But perhaps the greatest insight into Mr. Wright's state of mind, and which best exemplifies the utter *lack* of danger he presents to the community, is his explicit adoption of the Liberty Restoration Committee's philosophy. The Government well knows that Mr. Wright was associated throughout the investigation with the CHS, and persons-of-interest including ▮▮▮▮ ▮▮▮▮ These three people were active on the Facebook Page for the Kansas Liberty Restoration Committee.[36] In fact, Mr. Wright became associated with the persons in this case *because* of his interest in the LRC. As Mr. Wright stated to the CHS on October 11 regarding any intent to resort to violence:

Gavin:  Yeah, I'm done so I would just suggest the same thing for now.

CHS:  Right.

Gavin:  I mean, I'm sorry and I-- I'd-- I wanna help—I'd, uh, wanna help the Liberty Restoration Committee and try to change this fuckin' country *but that's not my-- how I wanna change it*. You know what I mean? [37]

The call ends, but Mr. Wright picks up again and continues the conversation with the CHS where he left off, stating almost immediately:

---

[36] SCREENSHOTS - Kansas Liberty Restoration Committee, "The Kansas Liberty Restoration Committee Home Page > ▮▮▮▮ Post" June 23, 2016 (available at: <https://www.facebook.com/The-Kansas-Liberty-Restoration-Committee-1710922642491575/>)(last accessed July 10, 2017)(attached as **Exhibit K**).

[37] This recitation of the conversation is based on the audio recordings, and deviates from the Government's transposition of the conversation in its verified transcripts. *Contra* **Exh. G** (T. 1D51 Track 244) at 1 (transcript: "I don't wanna help the Liberty Restoration Committee," *contrast* to audio: "I (unintelligible) wanna help the Liberty Restoration Committee"). In the context of the totality of the conversation, Mr. Wright's transposition is clearly the only reasonable one.

| Gavin: | Man, I can't tell them anything. I don't know anything, [CHS]. |
|---|---|
| CHS: | Yep, absolutely. |
| Gavin: | I mean I just-- I just want to keep it that way from here on out, so... And I wanted to try to get with the Liberty Restoration Committee and, you know, the whole point behind all this. *But I'm not gonna be part of that* [referring to Stein's alleged plot], so...<br>. . .<br>I'm gonna keep in touch with you guys [the Kansas Liberty Restoration Committee] because I-- I-- Like I said, I wanted to-- I want to be part of changin' this country *constitutionally*.<br>. . .<br>You know what I mean. And- but I- I don't want to be involved in *that*, so...<br>. . .<br>And I know- I know the rest of you guys [the LRC] aren't either. You know what I'm sayin'?[38] |

This question of what does Mr. Wright *mean* when he says that he wants to change the country "constitutionally" is important. The doctrine and philosophy of the LRC was important and relevant enough that the Government submitted a Report of Technical Service as early as April 26, 2016 requesting its computer forensics laboratory to preserve "a copy of the content and links found at www.thelibertypledge.com" in a digital form, saving "[e]ach individual page on the site."[39] The web page preserved is also listed under the "Contact Info" on the KLRC Facebook Page frequented by people like the CHS and �alterederedacted.[40]

It becomes clear that Mr. Wright's methods of dissent were those shared by the Liberty Restoration Committee and *not* the alleged violent methods of Stein and Allen. The LRC is best

---

[38] **Exh. H** (T. 1D51 Track 247) at 1-3.

[39] Heart of America Regional Computer Forensics Laboratory, Request No. HAR-16-146, "Report of Technical Service – Patrick Eugene Stein." April 26, 2016 (attached as **Exhibit L**).

[40] Kansas Liberty Restoration Committee, "Kansas Liberty Restoration Committee About." (available at: <https://www.facebook.com/pg/The-Kansas-Liberty-Restoration-Committee-1710922642491575/about/?ref= page_internal>)(last accessed: July 10, 2017) (attached as **Exhibit M**).

described as a constitutionalist movement, as opposed to a discrete organization, with a presence

across the nation in several states.[41] It was founded by a man named Ernest C. Lee, Jr,[42] who the

Government knows met with Mr. Wright in July 2016 to discuss police corruption.[43] This tends to

corroborate Mr. Wright's later statements to the CHS about his desire to join the LRC movement.

And since Mr. Wright has adopted the LRC's philosophy and message under circumstances where

it would be reasonable to expect that he was sincere, it becomes necessary to examine the words

and philosophies of the LRC.

The LRC is a movement that espouses traditional conservative values on a variety of topics,

including immigration and refugee policy:

> Our borders are not secure. . . . Our Government has devalued our standing by
> allowing lawbreaking aliens to not only remain in our country, shortening our
> supply of jobs, but due to their policies, further burden our limited revenue
> resources with Federal giveaway programs and services to non-citizen lawbreakers
> while American Veteran Heroes die for shortage of staff, services and funding. This
> is not moral or just, it is unforgiveable.

> It is the committee's opinion that as long as there is a single homeless citizen, child
> or veteran in this nation, there is no room for refugees.[44]

The LRC contemplates a revolutionary plan to resolve these, as well as other perceived problems

facing the nation today. However, the LRC's plan is "revolutionary" in its boldness and not in any

violent sense. In fact, the LRC clearly states that its plan for change "is legal and lawful. . . . Overly

simplified the Plan is to petition the State Legislative bodies to dissolve the current compact they

---

[41] Ernest C. Lee, Jr. "Get Connected," The Liberty Restoration Committee (available at: <http://www.thelibertypledge.com/get-connected-.html>)(last accessed July 12, 2017).

[42] Ernest C. Lee, Jr., "Common Sense 2: The Liberty Pledge 2.0," The Liberty Restoration Committee, June 2016 (available at: <http://www.thelibertypledge.com/the-liberty-pledge-.html>)(last accessed July 12, 2017).

[43] **Exh. E** (T. 1D15 CCR_0001).

[44] Ernest C. Lee, Jr. "Declaration of Intent," The Liberty Restoration Committee (available at: <http://www.the libertypledge.com/declaration-of-intent.html>)(last accessed July 12, 2017).

entered into with each other in 1787, our present Constitution, and to then sign an updated compact The Constitution of the United States 2.0 revised."[45] The LRC contemplates an exercise of First Amendment rights to petition legislators through the lawful process embodied in the Constitution. In fact, the LRC explicitly disclaims violence as a means of achieving its aims: "The running theme throughout Common Sense II: The Liberty Pledge is one of revolution. *Not the bullets flying, people dying kind of revolution you might imagine.* . . . The Revolution I propose is constitutional."[46] The sum total of the weight of the evidence and the circumstances of the offense is rooted in Mr. Wright's exercise of his First Amendment rights and nothing more.

It was not until *after* Mr. Wright dissociated from Stein and others that Stein allegedly met with undercover FBI agents in an attempt to purchase firearms and explosives. Mr. Wright had no sincere belief that Stein and/or Allen would go through with any plan to harm others. It was not until he was arrested that law enforcement presented Mr. Wright with information that led him to believe that what Stein and Allen were engaged in might have been more than mere puffery. Mr. Wright participated in what he believed was mere bravado and the venting of frustrations with the political leaders of the United States – that any "plans" were hypothetical at best. When faced with the possibility that real people might get hurt, Mr. Wright made it clear to those he believed might be engaged in such despicable acts – including Stein and the CHS – that he wanted no part of it. Not only did Mr. Wright disclaim any relationship with those who he believed were actually capable of violence, but he explicitly stated that his aims were to be achieved "constitutionally" and "not in *that* way." A further examination of the philosophy he espoused clearly states that the

---

[45] Ernest C. Lee, Jr. "The Plan," The Liberty Restoration Committee (available at: <http://www.thelibertypledge. com/the-plan.html>)(last accessed July 12, 2017).

[46] Ernest C. Lee, Jr. "Common Sense 2: The Liberty Pledge 2.0," The Liberty Restoration Committee (available at: <http://www.thelibertypledge.com/the-liberty-pledge-.html>)(last accessed July 12, 2017).

aim of Mr. Wright would be achieved through lawful processes protected by the First Amendment – not any conduct that would lead to harming others of any nationality or religion. Put simply, Mr. Wright expressed to the Government – without his knowledge – that he wanted to change America, but through peaceful, lawful ways only. To that end, it must be clear that Mr. Wright presents no threat or danger – real or perceived – that conditions of bond cannot abate.

> **2.     The weight of the evidence against Mr. Wright specifically, if any, is slight and tends toward a finding that he is not such a substantial threat to the community that conditions cannot be tailored to prevent such harms – real or perceived.**

It must be stated that there is little – if any – evidence that sincerely links Mr. Wright to any actual plot to cause harm or commit *any* crime against members of the refugee, Somali, Muslim or any other community uncovered during this investigation. This lack of evidence is best exemplified by the Government's own motion for pre-trial detention in which it uses such ambiguous phrasing as "the defendants," "they," "them," "their," "the Crusaders," "others," and "the group" without regard to *who* actually said what, and *who* actually did what. In a 24-page motion, the Government uses such collective references to Mr. Wright no less than 42 times.[47] While the actions of his co-defendants may or may not be admissible at trial, Mr. Wright strenuously suggests that examination of his co-defendants' actions are beyond the scope of this proceeding, which is to examine Mr. Wright's – and *only* Mr. Wright's – propensity to flee prosecution or present a danger of further crime or violence to the community. To that end, regardless of the weight of any evidence against Stein and Allen, the weight of the evidence against Mr. Wright is surprisingly scant.

---

[47] Doc. 26.

In the Government's first detention motion, it attributed specific, articulable and distinguishable conduct and statements to Mr. Wright a grand total of 12 times.[48] Of those instances, however, the Government identifies only five potential "acts" that could remotely be construed as proving his complicity or sincerity. Those specific incidences are as follows:

- "Wright pulled up Google Maps on the computer at G&G and began dropping pins on the map at these various locations using the label 'cockroaches.'"[49]

While Mr. Wright was present at this Sunday meeting, he denies that it was him that dropped "pins" on Google Maps. There is no video, photographic or audio/transcript evidence produced by the Government that can show at all – let alone clearly and convincingly – that Mr. Wright committed the actions alleged. In several instances when Stein would explode with expletive-laden tirades, the word "cockroaches" being well-heeled in his mouth, Mr. Wright would use much more accurate words, describing people as "Somalis" or "Muslims." There is no evidence produced on which to believe this allegation that Mr. Wright "pinned" Places on Google Maps with the label "cockroaches."

- "Prior to the meeting, Wright researched instructions for making explosives and printed off a substantial number of pages."[50]

Again, while Mr. Wright does not want to get into a mini-trial, it bears pointing out that the Government has no basis of knowledge for suggesting *any* conduct Mr. Wright participated in prior to any meeting. By definition, the CHS – the Government's only eyewitness to such meetings – would not have been present *prior* to the meetings, so how could he have witnessed Mr. Wright

---

[48] *Generally* Doc. 26.

[49] Doc. 26 at 6.

[50] Doc. 26 at 6.

"researching instructions for making explosives and printing off a substantial number of pages"
when he was not present to do so? Furthermore, the layout of the G & G office included two
separate rooms, located across from each other at either end of a more-than 25-foot common area.[51]
Mr. Wright's office was located by the main entrance and Allen's office was located across the
common area. There were computers in both offices, neither of which had a locking mechanism
on the door, in addition to a smart TV in the common area, all of which were connected to printers.
Mr. Wright proffers, therefore, that others had access to those computers and printers even when
Mr. Wright was not present in the office during business hours. He proffers there is no evidentiary
basis for the allegation that *he* researched instructions or, to the extent that any "number of pages"
was printed, that it was Mr. Wright who researched and printed those pages. He further proffers
that there is no evidentiary information to identify the type of "explosives" he allegedly researched
instructions for, and that he *has* researched how to make binary explosives – commonly referred
to by the name of a common commercial variety of binary explosive called "Tannerite" – and that
neither the research, nor the production, nor the use of such binary explosives is prohibited by law.
To the extent that such papers and instructions were factually located at G & G, absent an
eyewitness they are no more attributable to Mr. Wright than would the same papers and
instructions be attributable to a judge in whose chambers such papers were found if a judge's clerk,
assistant or secretary shared the same office space.

---

[51] G & G Homes Blueprint (attached as **Exhibit N**). The room identified in the blue-print as "Master Bedroom" was
used by Mr. Wright as his office. The room identified in the blue-print as "3rd Bedroom" was used by Allen as his
office. The distance between the interior wall of both across the space identified as "Living Room" was 25 feet, 7
inches long.

\-      "Wright was tasked with ordering glassware in order to make the bombs."[52]

Again, assuming *arguendo* that Mr. Wright *was factually* (i) tasked with such an errand (ii) for the purpose alleged, there is no evidence of *who* tasked Mr. Wright with this errand, nor is there any evidence that Mr. Wright took *any* steps to obtain such glassware. There is no evidence that if – in fact – he *did* take such steps, that ordering unidentified "glassware" was for the purpose of making bombs, as opposed to a lawful purpose such as making his own Tannerite or making his own black powder/gunpowder for reloading – an activity engaged in by hunters and sportsmen across the United States, and protected by the Second Amendment.

\-      "Wright said he would put it [mortar and pestle] with the rest of the stuff."[53]

Again, Mr. Wright's purpose in having a mortar and pestle with the "stuff" is that in his mind, the "stuff" were things used in a SHTF situation – *not* for the purposes alleged. Additionally, mortar and pestle is commonly used in the manufacture of black powder by people who reload their ammunition (which would be a necessary skill in a SHTF world). Mr. Wright was not a prohibited person. He shared an interest in reloading with both his father and brother. And he clearly had an interest in learning skills for survival. There is no hint that this was an act in furtherance of a sincere plot, except a plot to prepare for a SHTF situation in which reloading his own ammunition might reasonably be necessary.

---

[52] Doc. 26 at 7.

[53] Doc. 26 at 9.

- "Allen and Wright mentioned that they had tested some materials in a sink at G&G."[54]

In the first instance, there is no evidence that if Allen and Wright *had* tested materials, that they were (i) unlawful materials, or (ii) being tested for an unlawful purpose. Mr. Wright and Allen *had* expressed an interest in mixing their own "Tannerite" which commonly is used for target practice.[55] Homemade manufacture of binary explosive is legal,[56] and is typically made using a combination of an oxidizer, such as ammonium nitrate and aluminum powder, which typically creates a white powder. Mr. Wright admits that he had an interest in using Tannerite for lawful purposes *i.e.* target shooting at ranges like the Jetmore City Lake Shooting Range, which permits the use of Tannerite.[57] Mr. Wright proffers that Allen brought a small container of Tannerite to G & G, where Allen poured a small amount onto a piece of paper on the counter in the office kitchen. Mr. Wright witnessed Allen "spark" the roughly thimbleful amount with an open flame (match or lighter) to witness the effect of lighting the binary compound.

> **3.     The nature and circumstances of the offense charged against Mr. Wright are serious, but do not justify - in and of themselves – pre-trial detention when conditions may adequately ensure that Mr. Wright poses no threat – real or perceived – against any community.**

---

[54] Doc. 26 at 9.

[55] *E.g. Top Shot* (History Channel 2010-2013) (TV series); *also e.g. Top Shot*, "The 1,000 Yard Shot" (History Channel April 5, 2011) (TV series); *also e.g.* Fanagt, "One Shot, One Kill – George Reinas on Top Shot." YouTube, April 8, 2011 (available at: <https://www.youtube.com/watch?v=8SUlz-lUiPE>)(last accessed July 20, 2017)(Binary explosive used to confirm bullseye).

[56] Bureau of Alcohol, Tobacco, Firearms and Explosives, "Binary Explosives." ATF Website (available at: <https://www.atf.gov/explosives/binary-explosives>)(last accessed July 20, 2017).

[57] City of Jetmore, "Shooting Range." City of Jetmore Website (available at: <http://www.jetmorekansas.com/community/visit-jetmore/shooting-range/>)(last accessed July 20, 2017)(attached and herein referred to as **Exhibit O**)("TANNERITE: A popular exploding target is known as Tannerite. Please follow these rules when using tannerite *or other like targets*" including home-made binary explosive targets).

Mr. Wright acknowledges that he is charged with terrible crimes. However, simply being charged with crimes such as these is insufficient to find that Mr. Wright poses a danger to the community, *supra*. The majority of the evidence against Mr. Wright comes in exactly one form: words. Mr. Wright proffers that the words that he used throughout this investigation was just that – words. Or, more accurately, he would describe such words as "banter." Puffery. Bravado. Venting. Or, in his words, just plain "bullshitting." It ought to go without saying that the First Amendment protects his right to banter, puff, vent and bullshit. Mr. Wright proffers that throughout his relationship and participation with the Sunday group, he believed they were just a bunch of guys who shared similar political beliefs getting together to vent their frustrations with the political leadership of the United States, in the context of several important policy issues including – yes – immigration and refugee policies of the United States. They also talked about local issues, guns and ammunition, and the well-held view that the "shit" was going to hit the proverbial fan. While executing a search warrant at Mr. Wright's homestead in Beaver County, Oklahoma, law enforcement found guns and ammunition. Mr. Wright was exercising his Second Amendment rights, and was not a prohibited person. Mr. Wright expressed total surprise to learn that Stein and Allen were allegedly turning what Mr. Wright thought were innocent "bitch sessions" into action.

The circumstances of the offense demonstrate that Mr. Wright is a good, law-abiding man, who may be a not-so-good judge of character. The circumstances of the offense demonstrate that Mr. Wright has *no* propensity toward violence or crime of any kind, or that he even had a serious motive to allegedly encourage Allen and Stein to take action beyond mere talk. The circumstances of the offense demonstrate that Mr. Wright exercised his First Amendment rights, at times in distasteful but understandable ways given his loneliness. The circumstances of the offense

demonstrate that Mr. Wright exercised his Second Amendment rights. But the circumstances do *not* demonstrate that he presents a danger of crime or violence to any community. The circumstances demonstrate that the few discrete actions that are *arguably* attributable to him were of such little magnitude that they fail to demonstrate clearly and convincingly that there is a "strong possibility" that Mr. Wright – a man with *no* criminal history, violent or otherwise, and *no* violent history at all – would commit other crimes while on pre-trial release.

**IV.    Assuming, *arguendo*, that the Court finds that Mr. Wright poses a risk of flight or danger, the conditions set forth in the pre-trial release plan, *supra*, are more than sufficient to ensure his appearance at trial and to ensure that he presents no danger to the community.**

Given the lack of evidence demonstrating Mr. Wright's propensity for violence against any person, he avers that the proposed pre-trial release plan is sufficient to ensure his appearance and safety of the community. In the first place, he will be living with and near relatives. His children, brother and mother have a vested interest in making sure that Mr. Wright appears for trial and are an instrumental resource in ensuring that he maintains the no-contact condition which would be ameliorated due to such proximity to his family *i.e.* he would not be dealing with the loneliness that led to his association with men like Stein and Allen in the first place. Furthermore, Mr. Wright has stated that his highest priority is ensuring the safety of his youngest son. Even if released, he will not be lifting the power of attorney unless and until resolution of this case because he does not wish to bring turbulence to his minor child's already so turbulent life. However, regular contact with his son outside of the confines of a detention facility will significantly aid his mental and emotional health which will further mollify any hypothetical designs that would bring Mr. Wright into further negative contact with law enforcement *i.e.* fleeing or engaging in violent conduct. In short, the plan provides not merely punishment for failure to comply, but also greater incentive to do so.

Additionally, he will be under constant monitoring from the time of his release. Mr. Wright proffers that the combination of surveillance, resources and personnel among reputable GPS monitoring companies like Axis, Kearny County Sheriff's Department, the Finney County Sheriff's Department, the Federal Bureau of Investigation and United States Probation is *more than* sufficient to apprehend him within minutes if he violates any provision of a release plan. The only way this Court can accept that this combination of law enforcement resources would be utterly unable to ensure his appearance or the safety of the community is if the Government were to suggest that state and federal law enforcement agencies are so incompetent that their combined efforts cannot reasonably assure his quick arrest, and then present evidence to the same. Mr. Wright, however, has great faith in the combined capabilities of the aforementioned law enforcement agencies to respond to a violation in the course of their duties to the public. This is especially true as his proposed residence sits on the only highway in the area, minutes away from and between the Kearny County Sheriff's Department headquarters in Lakin, Kansas and both the Finney County Sheriff's Department headquarters and a local FBI office in Garden City, Kansas. Mr. Wright is confident that the Government shares this faith in law enforcement's competence.

Importantly, the standard which the Bail Reform Act prescribes is whether Mr. Wright presents an *actual* risk of flight or danger to the community. It would be wholly unlawful for this Court to prejudice its findings with an examination of any risk of flight or danger merely *perceived or presumed to be perceived* by the public. However, Mr. Wright acknowledges that this case is high-profile and that there are members of the community who may be of a perception – unreasonably fomented by media reports of this case which fail to report much of the evidence that would be presented at trial – that Mr. Wright presents a threat to them. Mr. Wright does not wish to cause any member of any community any harm – physical *or* psychological. To that end, he

avers that the conditions set forth in the pre-trial release plan are sufficient to not only ensure his *actual* appearance at trial and to *actually* ensure that he presents no danger to the community, but that they also are sufficient to ameliorate any *perception* that he might pose a danger to any community – immigrant, refugee, southwest Kansas, or otherwise – that could not be abated by his release plan, by law enforcement and by the Government. Unless the Government has so little faith in its agents, believing them to be wholly unable to abate any threat Mr. Wright or any other person may present to the public, Mr. Wright proposes (i) that the Government is unable to demonstrate that *no* conditions will assure his appearance or safety of the community, and (ii) that the proposed conditions go beyond "the least restrictive" conditions necessary to assure his appearance and safety of the community that would require his release. *Supra*; *also* 18 U.S.C. § 3142(c)(1)(B)(xiv).

## CONCLUSION

Mr. Wright has much information regarding the evidence against him and information regarding his family's circumstances that was not available to him at the time of the original detention hearing. This new information justifies a re-examination of the pre-trial detention order of October 20, 2016, especially in light of his character, nature and history, as well as the nature and weight of the evidence against him in this case. The Government has admitted that Mr. Wright poses no flight risk at all, and Mr. Wright agrees. The Government has admitted that Mr. Wright has no criminal history, and Mr. Wright agrees. As any evidence that could demonstrate that Mr. Wright poses *any* danger to the community comes exclusively from this investigation, such evidence is of such small weight and such insignificant nature that this Court cannot be *clearly* convinced that he poses a danger. And while Mr. Wright proclaims his innocence, he understands the perception of his case and is happy to abide by any set of conditions set by this Court in order

to assure the Court and the public that he is neither a flight risk nor a danger. Because such conditions are sufficient to do so, this Court *must* grant Mr. Wright bond if the Government fails to prove by clear and convincing evidence that the conditions proposed, *or any other conditions the Court wishes to impose*, would be insufficient to do so.

Respectfully submitted,

/s/ Kari S. Schmidt
Kari S. Schmidt, #11524
Conlee Schmidt & Emerson LLP
200 W. Douglas, Suite 300
Wichita, Kansas 67202
PH: 316-264-3300
FAX: 316-264-3423
Email: karis@fcse.net
*Counsel for Gavin Wayne Wright*

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above Memorandum in Support of Motion for Bond was filed and served electronically pursuant to the CM/ECF system on August 25, 2017, on all counsel of record.

/s/ Kari S. Schmidt
Kari S. Schmidt