# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

v.                    Case No.  <u>16-CR-10141-03-EFM</u>

GAVIN WAYNE WRIGHT,

        Defendant.

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR BOND
### (Re.:  Doc. 150)

APPEARS NOW the United States of America, by and through Thomas E. Beall, United States Attorney for the District of Kansas; Anthony W. Mattivi, Assistant United States Attorney for the District; David P. Cora, Trial Attorney, Counterterrorism Section of DOJ's National Security Division; and Risa Berkower, Trial Attorney, Criminal Section of DOJ's Civil Rights Division; and offers the following opposition to defendant Gavin Wright's motion, pursuant to 18 U.S.C. § 3142(f), for release pending trial.  The government respectfully submits this Court should deny Wright's motion because no condition or combination of conditions would reasonably assure the safety of the community and the defendant's appearance in Court if the defendant were to be released pre-trial.  Indeed, as detailed below, Wright's motion wholly

mischaracterizes the serious danger he would present if released and the strong weight of the evidence against him.  Accordingly, the Court should deny the defendant's motion and instead order him detained pending trial.

## I.      CASE OVERVIEW

In late summer 2016, the Federal Bureau of Investigation (FBI) learned that the defendants, who were members of the Kansas Security Force militia (KSF), had formed a splinter group that came to be known as "the Crusaders" (based on the name "Crusaders 2.0" that they gave to themselves on a group messaging app on their phones) and were planning to bomb an apartment complex in Garden City, Kansas.  The Crusaders' stated purpose for the attack was to kill Muslims and to put an end to Muslims living in Southwest Kansas, and their target—the apartment complex—houses a large number of Somali-Muslim refugees and a mosque.

The FBI's involvement with this matter first started in February 2016, after an informant (the Confidential Human Source, or CHS) alerted the FBI that defendant Patrick Stein, a key member of KSF (and, later, the Crusaders), had expressed vehement anti-Muslim views and a strong interest in carrying out acts of violence against local Muslims.  Over the next several months, the CHS consensually recorded conversations and meetings of the KSF.  He also consensually recorded conversations of the Crusaders, the sub-group of KSF members that Stein organized in June 2016.   This group consisted of defendants Stein, Wright, and Allen, as well as the CHS.  During hours of conversations that were consensually recorded by the CHS, the Crusaders discussed plans to exact violence against members of the Somali-Muslim refugee community in southwest Kansas, in an effort to put an end to Muslims living in the area.

In August and September 2016, the group's plans for violent action became more specific

and more advanced.  During regular meetings conducted at defendant Wright's business, G&G

Mobile Home Center (G&G), the group selected a target, purchased equipment, and gathered

chemicals and other materials to start making homemade explosives.  During the week of

September 12, 2016, defendants Wright and Allen conducted an experiment at G&G to make a

blasting cap that could be used to trigger a larger explosion.  Given this substantial acceleration in

the group's plans, the FBI had the CHS introduce an undercover FBI employee (UCE) to the

Crusaders, under the ruse that the UCE was a black-market operator who could help the Crusaders

obtain the materials they needed, including automatic weapons and explosives, to carry out their

planned attack.[1]  Upon learning of this potential source for materials, the group, including

defendant Wright, met at G&G to discuss the best way to approach a meeting with him.  They

collectively decided that defendant Stein and the CHS would handle the meeting on behalf of the

group.

        Stein and the CHS met with the UCE twice, in late September and early October, 2016.

Stein also separately communicated with the UCE for several hours over a secure messaging

application on his phone.  During these interactions, defendant Stein told the UCE that the

Crusaders planned to attack Muslims in southwest Kansas.  Stein explained that the purpose of the

attack was to "to take them [the Muslims] out. . . . Every one of them mother fuckers need[s] to be

fucking eradicated."  Transcript, 1D26, at 18, attached as Ex. B.  Stein told the UCE that they were

planning the attack for November 9, 2016, the day after the U.S. general election.  During the

October 2016 in-person meeting, Stein drove with the UCE to Garden City to show him an

---

[1] Given the advanced nature of the defendants' plans, the FBI chose to involve a UCE to prevent the defendants from
obtaining actual, live explosives that would endanger the targets of the defendants' plot, the surrounding community,
and even the defendants themselves.

apartment complex and mosque at 312 West Mary Street that Stein identified as the target for the Crusaders' attack. Stein asked the UCE to provide the Crusaders with various bombs and with prices for automatic weapons that the Crusaders could use to attack the apartment complex and mosque. The UCE agreed to provide the Crusaders with requested explosives. Meanwhile, the FBI began planning to arrest the defendants shortly before they executed their plan.

Unexpectedly, however, on October 11, 2016, defendant Curtis Allen was arrested by the Liberal Police Department for domestic violence. As the local authorities began investigating that charge, they also learned about Allen's involvement in the Crusaders' plot to bomb the West Mary Street apartment complex and mosque. With the Crusaders' members now aware that law enforcement was scrutinizing defendant Allen, the FBI started working with state and local authorities to fully foil the Crusaders' plans for an attack.

Meanwhile, on October 12, 2016, in the immediate aftermath of Allen's arrest, defendant Wright traveled to the Liberal police station and asked to speak to law enforcement authorities about Allen's arrest and about a search warrant that had been executed at G&G for explosives earlier that day. A voluntary joint interview with the FBI and the KBI ensued. During the interview, despite being warned that lying to the FBI was a federal offense, Wright falsely denied knowing anything about Allen, Stein, Wright's own efforts to manufacture homemade explosives at G&G, or the group's bombing plot.

On October 14, 2016, FBI agents arrested Stein during a third meeting with the UCE, shortly after he delivered approximately 300 pounds of urea to the UCE for use in assembling an explosive device. Defendant Wright was arrested later the same day.

## II.   PROCEDURAL HISTORY

On October 19, 2016, a grand jury returned an indictment that charged Stein, Wright, and Allen with one count of conspiracy to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a.  On December 14, 2016, a grand jury returned a superseding indictment that added weapons-related charges against defendant Allen, in violation of 18 U.S.C. § 922(g),[2] and against defendant Stein, in violation of 18 U.S.C. § 924(c).  On March 16, 2017, a grand jury returned a second superseding indictment that added a civil rights conspiracy charge against all three defendants, in violation of 18 U.S.C. § 241, and that added a charge against defendant Wright for lying to the FBI to obstruct its investigation into this matter, in violation of 18 U.S.C. § 1001.  (Doc. 89).

Following defendant Wright's initial arrest and indictment, the government moved on October 20, 2016 to detain him pending trial.  (Doc. 26).  Defendant Wright waived his right to a detention hearing on October 21, 2016, reserving his right to apply to the Court for pretrial release should his circumstances change.  (Doc. 31).

In the months since these charges were first filed, the government has provided the defendants with a substantial quantity of discovery.  This discovery includes hundreds of hours of recorded conversations, rough FBI transcripts for those recordings,[3] numerous witness statements,

---

[2] Based the Tenth Circuit's decision in *United States v. Pauler*, 857 F.3d 1073 (10th Cir. 2017), a decision that post-dated these charges, the Court has since dismissed the § 922(g) charges against defendant Allen.  (Doc. 141).  The government filed an interlocutory appeal of the dismissal on September 12, 2017. (Doc. 152).

[3] As the Court is aware, it is the recordings themselves, and not the FBI's transcripts, that constitute the evidence of what transpired during the CHS's and UCE's consensual recordings.  Given the large volume of the recordings, however, the government provided the defendants with rough transcripts to assist counsel in reviewing the actual recordings.  At the time they were given to the defense, counsel for the government made clear that they were unverified, and that the government would provide verified copies once they were completed.  *See* Ex. C (letter from AUSA Mattivi to defense counsel on this point).  Since that time, the government has provided verified transcripts on a rolling basis.  Moreover, the transcript passages quoted in this memorandum have all been verified.

search warrant results, video surveillance recordings, and expert reports concerning explosives found at defendant Wright's business, G&G Mobile Home Center (G&G), among other materials.

Defendant Wright now asserts that he should be released pending trial because the voluminous discovery in this case, according to him, neither contains incriminating evidence against him, nor shows him to present a risk of flight or a danger to the community. (Doc. 150). Further, he argues that his current family circumstances support his release pending trial. The government opposes Wright's motion on the ground that (1) the defendant has identified no change in circumstance that warrants his release pending trial; and (2) even if he has, the strong evidence against him in this case shows that he presents a substantial danger to the community, and that no condition or combination of conditions can both alleviate this risk and assure his appearance in court.

The Court has set this motion for a hearing on October 4, 2017.

## III.    LEGAL STANDARD

The Bail Reform Act (BRA) governs when a defendant may be released on bond pending trial. 18 U.S.C. § 3142. To detain a defendant pending trial, the Court must find that there is no condition, or combination of conditions, that will ensure the safety of the community and the defendant's appearance in Court. 18 U.S.C. §§ 3142(e)(1), 3142(f). The government must establish flight risk by a preponderance of the evidence, *see United States v. Burks*, 141 F.Supp.2d 1283, 1286 (D. Kans. 2001), and "must prove dangerousness to any other person or to the community by clear and convincing evidence." 18 U.S.C. §3142(b), (c), and (e); *United States v. Cisneros,* 328 F.3d 328 F.3d 610, 616 (10th Cir. 2003). To make this determination, the Court must consider the nature and circumstances of the offense; the weight of the evidence against

the defendant; the history and characteristics of the defendant; and the danger the defendant would present to the community if released.  18 U.S.C. § 3142(g).  The BRA gives a defendant the right to a hearing to assess these factors.  18 U.S.C. §3142(f).

In cases where a defendant is charged with conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a—a charge that defendant Wright faces here—the BRA creates a rebuttable presumption of detention pending trial.  18 U.S.C. §3142(e)(3)(B).  This rebuttable presumption requires the defendant to present "some evidence" warranting his release.  *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991).  Although the burden of persuasion always remains with the government, this presumption favoring detention in these cases "remains a factor for consideration by the district court in determining whether to release or detain . . . [e]ven if a defendant's burden of production is met."  *Id.*

After a Court orders a defendant detained pending trial, the defendant may seek to revisit that order "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f).  Here, as noted above, the government moved for defendant Wright's detention on October 20, 2016, and, the following day, defendant Wright waived his right to seek his pretrial release through a detention hearing. However, defendant Wright now seeks to re-visit his detention pursuant to this provision of § 3142(f).

**IV.   ARGUMENT**

Defendant Wright's motion mischaracterizes his role in this conspiracy.  Voluminous

evidence reveals that defendant Wright shared his co-defendants' anti-Muslim motives, and that he played a key role in both planning the attack and in testing explosives for use in carrying it out. Indeed, when considering the record as a whole, the § 3142(g) factors strongly favor detaining the defendant pending trial. Moreover, Wright's motion identifies no change in his family circumstances—or any other change in circumstance—that justifies his pre-trial release. Accordingly, his motion should be denied.

**A. The Weight and Circumstances of the Offense Strongly Favor Defendant Wright's Pretrial Detention**

Defendant Wright claims there is "little- if any- evidence that sincerely links" him to the charged crimes. (Doc. 150-1, at 30). This is simply not accurate. As detailed below, the weight of the evidence against defendant Wright is extremely strong, and it reveals him to have played an important and active role in the Crusaders' plans to attack the Mary Street apartment complex and mosque. As such, this factor weighs heavily against releasing defendant Wright pending trial.

    1. Wright's Involvement in Early Planning

From an early stage, even before the Crusaders developed a specific plan to attack Muslims, defendant Wright expressed hatred for Muslims, individuals of Somali descent, and immigrants, as well as a belief that violent action was necessary to get rid of Muslims from Southwest Kansas.[4] Throughout the spring and early summer of 2016, Stein, Wright, Allen, and other KSF group members championed violence against local Muslims and Somali refugees during nightly Zello

---

[4] The government has detailed other evidence of the defendants' bias-motive and intent to carry out an attack in its other filings in this case, including materials filed in connection with Stein's pre-trial detention motions. The government incorporates by reference the facts and arguments described in those materials. *See* Doc. 26, 79.

calls.[5]  Although the defendant characterizes these conversations as mere banter, or conversation

protected by the First Amendment,[6] this minimization is belied by the disturbingly shocking

conversations themselves and the defendant's eager participation in them.  For instance, during a

Zello call[7] on June 12, 2016, Stein stated:

> [I]n my mind I'm ready to just start fucking taking them out.  Kick in doors, and I mean just
> start fucking cleaning house.  Go from there. . . . We know where they're at in Garden City, I
> know where they're at in Dodge City, and there's people that know where they're at in
> Liberal, you know?  So, just be a matter of being geared up, ammo'ed up, gunned up.
> Fucking start uh, cleaning house.  Start cleaning this fucking state up. . . .

1D6 160614_0001 at 11, attached as Ex. D.  When challenged by another group member that this

could result in Stein's arrest, Stein responded, "that's fine.  What the hell else we gonna do. . . . Sit

back and just let the [Muslim] mother fuckers keep doing what they're doing?"  Ex. D, at 12.  As

the debate continued, Wright spoke up to support Stein's position:

> STEIN:          I mean, there's got to be a line drawn somewhere, and when that line is
>                 crossed, there has to be some kind of action taken.  I mean, am-am I wrong
>                 in that thought process?
>
> **SPARKY [WRIGHT][8]:  Not in my eyes, XO [Stein].**

*Id*. at 12-13.

A mere two days after this exchange, the group moved past mere conversation and started to

act on these beliefs.  On June 14, 2016, Stein met with Allen, the CHS, and two other individuals in

---

[5] Stein, the de facto leader of the group's plans for violent action, regularly referred to Somalis as "cockroaches" who should be exterminated, and he proudly referred to himself as "Orkinman."

[6] "Mr. Wright proffers that the words used throughout this investigation was just that – words.  Or, more accurately, he would describe such words as 'banter.'  Puffery.  Bravado.  Venting.  Or, in his words, just plain 'bullshitting.'  It ought to go without saying that the First Amendment protects his right to banter, puff, vent, and bullshit."  Doc. 150-1 at 35.

[7] This conversation was recorded through consensual monitoring by the CHS.

[8] KSF members used code names during Zello conversations to conceal their identities from law enforcement.  Wright used the code name "Sparky," and Stein used the code name "XO."

a field near Partridge, Kansas, with the stated intent of avoiding law enforcement detection.  During the meeting, Stein actively recruited the others in attendance to join him in planning and carrying out an unprovoked, violent attack against Muslims in Southwest Kansas:

| | |
|---|---|
| [MALE]: | Well, . . . when the shit hits the fan, where's it gonna hit? |
| [FEMALE]: | Exactly, yeah. |
| STEIN: | Wherever we start it. |
| [FEMALE]: | Well, is that what you're doing? |
| STEIN: | That's what I'm doing. |

Transcript, 1D7, at 80, attached as Ex. E.  Although Wright did not attend this meeting, when the CHS asked Stein about whether Wright wanted to participate in the attack, Stein explained why Wright was missing the meeting and assured the CHS that Wright was "fucking game on" for joining them in the plan.  Ex. E, at 44-45.

Indeed, as the summer went on, Wright continued to vocalize his commitment to the cause of anti-Muslim violence.  Throughout the rest of June, Wright, Stein, and Allen continued to discuss their desire to carry out an attack on Muslims, and they started looking more closely at potential targets in Garden City.  During a June 16, 2016, group Zello call, Stein, Allen, Wright and others discussed surveillance in Garden City at the African Community Center, local mosques, and apartments that housed large numbers of Somali residents, so that the group could put a plan of attack into action.  During another Zello call in late June, the group discussed targeting churches in Garden City that have supported refugees in order to send the message that Muslims were not welcome in the area.  In response to the suggestion that the group should also burn down mosques, defendant Wright said, "Yeah, during prayer time."  Transcript, 1D10, track Z0000002, at 35, attached as Ex. F.

2.   July 2016:  Wright Contributes His Skills, Materials, and Business Location to Advance the Bombing Plot

In July 2016, defendant Wright showed that he was, in fact, "game on" for acting on the Crusaders' anti-Muslim rhetoric.  On July 18, 2016, defendant Wright participated in a meeting during which the group tried to recruit a married couple to join them in planning a violent attack on Muslims.  With everyone (including Wright) assembled in the room, defendant Allen made clear the purpose of the Crusaders' plans:  "killin' people and going to prison for life."  Transcript, 1D13 at 1, attached as Ex. G.  Later on, as the conversation progressed to the skills or materials each group member could contribute to the plot, Wright, a former electrician, explained that he had access to dynamite that the group could use in an attack:

| | |
|---|---|
| CHS: | Can electricians really buy dynamite? |
| **WRIGHT:** | **Oh yeah.** |
| CHS: | I didn't know that. |
| **WRIGHT:** | **Yup, I can, I can get it.  I mean I don't have a license,** |
| CHS: | Right. |
| WRIGHT: | **but I know a guy that does.  (giggles)  And I can get, matter of fact, I've got a whole bunch of M-80's at home.** |

Ex. G, at 27.  In response, defendant Allen noted that he had already started gathering aluminum powder to manufacture homemade explosives.  He and defendant Wright then discussed potential methods to set off an explosion:

| | |
|---|---|
| ALLEN: | We'll make our own. |
| CHS: | Yeah, well, that's what I was… |
| ALLEN: | I got that other shit coming.  That uh, ammonium nitrate. |
| **WRIGHT:** | **[OV] Symtech? Oh.** |
| ALLEN: | No the uh aluminum powder. |
| . . . | |
| **WRIGHT:** | **[OV] Can you build a circuit, on a bomb?** |
| ALLEN: | [OV] I bought 'em already. |
| **WRIGHT:** | **[OV] Huh?** |
| ALLEN: | [OV] I already bought a bunch of 'em years ago, push a button, squibs. |
| **WRIGHT:** | **Oh ok, so they're like little remote circuits.** |
| ALLEN: | Yeah. |
| **WRIGHT:** | **Oh okay.  That would set off the plastics?** |

ALLEN:          Yeah.

*Id.* at 27-28.

By the end of this meeting, the Crusaders decided that they wanted to meet at least weekly in order to continue to plan their attack.  They recognized, however, that they would need to gather in a private location to avoid detection by law enforcement.  Defendant Wright immediately offered up his business, G&G Mobile Home Center (G&G), for future planning sessions:

ALLEN:          You guys wanna try to meet once a week until we get something going, or?
STEIN:          At least once a week maybe uh more if we need to.  I mean, you know.
. . .
ALLEN:          Well ye-yeah, but I don't know where we could all meet where we could openly talk.
[MALE]:         Yeah, cause we couldn't talk like this at the fucking restaurants.
CHS:            [OV] Yeah, that's true.
**WRIGHT:        Then my office. . . . I've got my office unit that fucking we could meet in there any fucking time, I mean.**

*Id.* at 49-50.  The group took Wright up on his offer, and, starting on July 31, 2016, the defendants and the CHS met regularly at G&G, for several hours at a time, to plan the attack.

> 3. <u>August & September, 2016: Wright Takes an Active Role in Planning the Attack and Testing Explosives at G&G</u>

In August and September 2016, Wright continued to demonstrate his commitment to the Crusaders' plans for violent action during the group's regular planning meetings at G&G.  He participated in hours-long debates over which target to attack and how best to send a strong anti-Muslim message that would inspire other, like-minded groups.  Given his background as an electrician, he also proposed that the group make its own explosives.  He downloaded manuals from the internet to learn how to do so, and, during the week of September 12, 2016, he and defendant Allen manufactured the explosive Hexamethylene Triperoxide Diamine (HMTD) for use in a homemade blasting cap that the group could use to start the explosion at the Mary Street apartment.

Throughout these meetings, Wright repeatedly vocalized his commitment to the group's anti-Muslim message.  A summary of the voluminous evidence of defendant Wright's considerable involvement in this stage of the Crusaders' planning follows.[9]

> a.  *August 8, 2016 Meeting at Wright's Business*

On August 8, 2016, the defendants met at G&G for approximately four and a half hours.  At this meeting, the defendants spent substantial time huddled around defendant Wright's computer, as he used Google Earth to identify potential targets for the attack:

| | |
|---|---|
| STEIN: | Can you pull it up here? |
| **WRIGHT:** | **Oh, yeah. It's on that monitor right there.** |
| STGEIN: | Pull it up. |
| **WRIGHT:** | **My computer.** |
| . . . | |
| **WRIGHT:** | **On the bottom.  Google Earth.** |

Transcript, 1D16, at 82, attached as Ex. H.  Wright then pulled up various areas of Southwest Kansas so that the group could examine them and debate the different targets, including an African Mall, a Muslim cemetery, and, on Mary Street in Liberal—the location the group ultimately selected as its target—an apartment complex that contained a mosque.  In order to keep track of these location, Stein directed Wright to drop pins on the map and print off the map for future use:

| | |
|---|---|
| STEIN: | Do you know how to drop pins everywhere that… |
| **WRIGHT:** | **I know we've been doing it a week maybe.  I mean, I'm just figuring it out.** |
| STEIN: | [UI] harder than shit.  What, you just— |
| **WRIGHT:** | **Yeah.** |
| STEIN: | --drop pins ever fucking location where we know them bastards are at. |
| **WRIGHT:** | **Yeah, and print it off.** |
| STEIN: | And then fuck, print it off, got a map exactly where ever fucking, you know, one of them are. |
| **WRIGHT:** | **See if we can pin one of them and print it off.** |
| STEIN: | Go up there to the pin. |
| **WRIGHT:** | **Yeah.** |

---

[9] The transcripts of the meetings summarized in this section comprise nearly 900 pages of material.

| | |
|---|---|
| ALLEN: | Untitled place mark. |
| ALLEN: | Okay. |
| STEIN: | Cockroach. |
| **WRIGHT:** | **Yeah.** |

Ex. H, at 95-96.  The conversation to identify and "pin" various targets on the map lasted for approximately 25 pages of transcript.

At several points during this meeting, the defendants, including Wright, discussed the need to write a manifesto that they could use to explain their anti-Muslim goals and inspire other, like-minded violence.  They also discussed best way to ensure the purpose of the attack would be clearly understood:

| | |
|---|---|
| ALLEN: | We're going to try to trigger the other like-minded people across the nation to fucking stand up and start doing the same thing we're doing. |
| CHS: | Exactly. |
| STEIN: | Against the UN—or the— |
| ALLEN: | Muslims. |
| STEIN: | --cockroaches. |
| ALLEN: | Muslims and Government. |
| **WRIGHT:** | **Yep.** |
| . . . | |
| ALLEN: | But we have to do it in a way to where they don't play it off. |
| **WRIGHT:** | **That's it.** |
| ALLEN: | Or like some fucking nut—fucking redneck with a fucking—with a fucking goddamn hundred pounds of fertilizer just fucking [UI]. |
| **WRIGHT:** | **That's right, that's right.** |
| ALLEN: | [Laughs] you know, hates his wife or something you know.  We need to do it in a where to where with that manifesto-- |
| . . . | |
| **WRIGHT:** | **Well give them a list of targets.** |

*Id.* at 114-15, 123-24.

Several hours into the meeting, Wright suggested that the group build their own explosives to carry out the attack.  He explained that he and Allen had already downloaded detailed how-to instructions from the internet:  **"We printed off 1,000 pages the other day, probably.  Every**

**fucking manual you could think of.  How to build guns. . . make explosives, triggers."**  *Id.* at

183.  When Allen warned Wright that law enforcement could try to use Wright's computer to

connect him to the attack they were planning, Wright explained he had already covered his tracks:

| | |
|---|---|
| ALLEN: | But yeah all of that is still on your computer, I'll guarantee it. |
| **WRIGHT:** | **Nope, I already got rid of it all.** |
| ALLEN: | Oh, did you?  I was going to say. |
| **WRIGHT:** | **Just like I'll do with your fucking Google Earth shit when you leave.** |
| | **Because I don't want that shit on my computer.** |

*Id.*  Wright then proposed that the group manufacture its own explosives to help keep their plot

from being discovered by law enforcement:

| | |
|---|---|
| **WRIGHT:** | **We could make the shit.** |
| ALLEN: | We could make some [UI]. |
| CHS: | That's what I mean. |
| **WRIGHT:** | **Yeah.  Yeah, we'd have to make it.  Because you- you ain't gonna to buy** |
| | **this shit or you're going to get set up.** |
| . . . | |
| **WRIGHT:** | **you got to buy TNT or something, or C-4. . . . Somebody is going to turn** |
| | **your ass in.** |

*Id.* at 190-91.  The group ended the meeting after agreeing to meet again soon at G&G to continue

planning the attack.

> b.  *August 14, 2016 Meeting at Wright's Business*:

The Crusaders next met at G&G on August 14, 2016.  This meeting, which lasted

approximately three and a half hours, culminated with the selection of the Mary Street apartment

complex as the target for their attack.  Before the meeting began, each member of the group put his

cell phone in a separate room to avoid surveillance, and Wright locked G&G's front door so that no

one outside the group could enter.  Transcript, 1D17, at 26, attached as Ex. I (Wright:  **"Fucking**

**locked that front door too I don't want nobody walking in on us."**).  The Crusaders then started

talking about ordering a chemistry set and chemicals to make homemade explosives.  Defendant

Wright contributed his knowledge of chemistry to the discussion:

| | |
|---|---|
| ALLEN: | Okay, somebody's gonna have to cop to buying, the fucking chemistry shit. Ship to their house or not. |
| **WRIGHT:** | **Yeah.** |
| ALLEN: | I don't know, a hundred bucks. |
| STEIN: | Like a, like a kids? |
| ALLEN: | No, man, |
| **WRIGHT:** | **Nah, you can't find,** |
| ALLEN: | Need more stuff than that. |
| **WRIGHT:** | **Yeah, and I have some chemicals like, some uh, oh.** |
| STEIN: | What chemicals we need? |
| **WRIGHT:** | **Oh, you're gonna need sulphate, you're gonna need a whole bunch of shit that.** |
| ALLEN: | Depends on what you're going to build. |
| **WRIGHT:** | **Yeah, yeah.** |
| STEIN: | There's a lot, uh, you can make a lot of your own shit, dude. |
| **WRIGHT:** | **Yeah, but problem is finding it.  You're out here in the sticks** |
| ALLEN: | (unintelligible) Fucking, do all kinds of stuff to it. |
| STEIN: | Well, I know. |
| ALLEN: | You don't like this.  You can turn fucking hydrogen pyroxide into certain stuff but you gotta have (unintelligible) |
| **WRIGHT:** | **You gotta have beakers .** |
| ALLEN: | (unintelligible) cool it, you know, distill it, and that kind of stuff. |
| STIEN: | Right |
| **WRIGHT:** | **This way you don't have to.  This way you just, we need, su-a teaspoon of sulphate in it and then you just, you're done.  I mean.  (laughs) That's, I see his point, just quicker to, I mean.** |
| ALLEN: | Well, it's not quicker, it's just a whole (unintelligible) |
| STEIN: | Are you talking about the material to make it ourselves, or? |
| ALLEN: | Yeah. |
| STEIN: | The ability to just buy it ready to go? |
| ALLEN: | No.  We make it ourself. |
| **WRIGHT:** | **Yeah.** |
| CHS: | It's stuff you can just buy?  Even the electrical? |
| **WRIGHT:** | **Well, it's a, in small amounts.** |
| ALLEN: | You can buy stuff in small amounts but it's fucking expensive, dude. |
| **WRIGHT:** | **Yeah.** |
| ALLEN: | It's like two or three ounces of potassium fluoride is like thirty-eight bucks. |
| CHS: | Shit |
| **WRIGHT:** | **Yeah.** |
| STEIN: | I say when you buy … |
| ALLEN: | Buy a fucking gallon of fucking stump pull or stump grinder, or whatever that shit is, and make, and get a quart of it out of that.  You know?  Stuff like |

16

|  | that. |
|---|---|
| **WRIGHT:** | **Well, and I know that, uh, iodine too is potassium formagnomine, and that shit's expensive when you buy it, but if you go right down here to the fucking Wal-Mart and buy medical, it's cheap.  I mean you can buy fucking big old jar of it for like fucking two bucks.** |
| ALLEN: | But it's not a high enough concentration.  To be used for an explosive. |
| **WRIGHT:** | **I understand, yeah, but you could…** |
| ALLEN: | You've got to distill it down |
| **WRIGHT:** | **Yeah, you could make it a high enough concentration, yeah.** |
| ALLEN: | You have to have a way to do that.  You know, a lot of those chemicals you can't put 'em in an aluminum pan or steel pan, |
| **WRIGHT:** | **Yeah, they got to be stored in something special.** |

Ex. I, at 26-29.  Eventually, to avoid drawing suspicion from law enforcement, Wright offered to

order the chemistry set and have it shipped to G&G, because Allen had already ordered aluminum

powder to his house:

|  |  |
|---|---|
| ALLEN: | But I've been watching a bunch of videos on it.  I don't want it shipped to my house because I already ordered up a bunch of aluminum powder, you know, and sooner or later it's going to be flagged up like this motherfuckers (unintelligible) |
| **WRIGHT:** | **Well, we can order it.  Here is a business too and have them bring it here and then where are they gonna go?  Find us?** |
| ALLEN: | Yeah. |
| **WRIGHT:** | **I mean from here?  Cause I don't have, all of my mail comes here, nobody even knows I live where I live, I mean.** |

*Id*. at 29.

Next, the group turned toward selecting its target, making plans for surveillance,[10] and

determining the best means by which to carry out an attack.  Ultimately, after once again using

Wright's computer to look at various targets on Google Earth,[11] the group selected the Somali-

---

[10] Defendant Wright offered his camera to the CHS to conduct covert surveillance, noting that the camera's high-powered lenses would allow the CHS to take detailed photographs from a long distance away, thereby avoiding detection.  Transcript, 1D17, at 53, attached as Ex. I (Wright: **"It's uh, like a digital thirty five millimeter camera but it has three or four different lens attachments… [The CHS] could go down the highway and pull over and take the picture of the back of the building . . . . Without being right there you know what I'm saying."**).

[11] Just as at their previous meeting, the group pulled up Google Earth on Wright's computer to look at images of potential targets.  *See* Transcript, 1D17, at 78-79, attached as Ex. I (Wright: **"Well, we can pull it up on the Google**

Muslim apartment complex and mosque at 312 West Mary Street as its target.[12]  With the target

identified, defendant Allen proposed parking four cars filled with explosives in the complex's

parking lot, then remotely detonating them.  *Id*. at 68 (Allen:  "That would be cool too.  Pull four

cars up in here and each of them have five hundred pounds in the seat or two hundred fifty pounds

in the trunk.").  Defendant Wright, however, favored an alternate proposal of placing dumpsters

filled with explosives around the complex, then setting off an explosion:

| | |
|---|---|
| ALLEN: | I think that's what we oughtta work on.  Blowin' that motherfucker twice. |
| CHS: | I think you would (unintelligible). |
| ALLEN: | And taking out as many of the out buildings as we can. |
| **WRIGHT:** | **That's it.  I agree.  That center one?** |
| STEIN: | This one right here. |
| **WRIGHT:** | **Yeah** |
| … | |
| ALLEN: | Get one of these big ol' fucking city steel dumpsters with steel lids. |
| **WRIGHT:** | **Yeah.** |
| ALLEN: | Just pack that motherfucker full. |
| **WRIGHT:** | **Park it in the alley.** |
| ALLEN | And fucking, yeah, just have em put a padlock on it. |
| **WRIGHT:** | **That's a good fucking idea cause-** |
| ALLEN: | Nobody can get in there, put the Dodge City or Garden City sign on it- |
| … | |
| **WRIGHT:** | **Yeah.  I know where Garden City, their fucking deals at.** |
| CHS: | Oh yeah, yeah. |
| **WRIGHT:** | **We could go steal one.** |
| STEIN: | Lock it. |
| CHS: | Yeah. |
| **WRIGHT:** | **And just fucking haul it off and pack it full or shit, and take it back and set it.** |

*Id*. at 84-85.

Although the defendants ultimately put off for another meeting the choice between using

---

**Earth, too"**).  After re-marking a map with potential targets, Wright directed Stein to send the map to his email account, so that he could "get on that computer right there and print it."  *Id*. at 83-84.

[12] When the CHS referred to a possible target as "all Muslim," defendant Wright responded enthusiastically:  **"That's it.  We don't wanna kill nobody else."**  Transcript, 1D17, at 53, attached as Ex. I.

cars or dumpsters for the attack, the defendants did decide to set off the blast at prayer time, to

ensure that they would kill as many Muslims as possible inside the complex's mosque:

| | |
|---|---|
| ALLEN: | Whenever it's busiest. |
| CHS: | Whenever it's the busiest. |
| STEIN: | Well I wish I knew all the prayer times in that fucker. |
| ALLEN: | Yeah. |
| **WRIGHT:** | **There's gotta be a list.** |
| … | |
| ALLEN: | We can find the prayer times online. |
| … | |
| **WRIGHT:** | **Yeah, but you, and all the people that are in them other buildings are going to be over there praying… Oh hell yes, you'll have everybody in that whole complex in that prayer room, I guarantee you that.** |
| ALLEN: | Probably some guys out here on the sidewalk facing East. |
| CHS: | Oh, yeah. |
| **WRIGHT:** | **(laughing)** |
| ALLEN: | Gotta pray to the East |
| (laughter) | |
| ALLEN: | Towards Mecca.  Or it don't do you no good. |

*Id*. at 97-98.

Further, as an additional means by which to ensure that the attack fully conveyed the

Crusaders' anti-Muslim message, defendant Wright advocated for expanding the group's plans to

include murdering the landlord who owned the Mary Street apartment complex (even though he is

white) because he had rented to Muslims:

| | |
|---|---|
| **WRIGHT:** | **-any of you people rent to these motherfuckers we're going to start knocking you all off.** |
| CHS: | Yeah, that's what I mean, I (unintelligible) |
| STEIN: | What would be even better is if it's all done on the same day. |
| **WRIGHT:** | **Yeah.  And he was visiting (overlapping)-** |
| STEIN: | You blow his goddamn complex to fucking pieces and take his fucking head off at the same time. |
| **WRIGHT:** | **I wonder if he visits the complex ever.** |
| STEIN: | Oh, fuck him. |
| CHS: | Oh, his office is on you know, south Main Street.  Uh- |
| **WRIGHT:** | **It would be nice to get him there when the fucking truck went off.** |
| STEIN: | Yep. |

> **WRIGHT:**   **Take em all out with his guns.**

*Id*. at 71 to 72.

Later in the meeting, after picking a target and a plan for the attack, Defendant Wright

expressed hope that the plot would "wake people up" and inspire others to take similar violent

action against Muslims to get them out of American society.  As defendant Wright explained:

> **WRIGHT:**   **Waking people up.  We can't do it ourselves.  We're gonna have to have**
> **all of these fucking people involved with us.**
> ALLEN:   Yeah, I know.
> **WRIGHT:**   **I mean the only way to get 'em involved is to wake 'em up and.**
> CHS:   So what, I mean,
> STEIN:   This is just a beginning.
> ALLEN:   That's what this is all about, trying to get people to wake up.
> **WRIGHT:**   **That's it.**

*Id*. at 130.  The group ended the meeting after agreeing to hold several more planning sessions to

prepare for the attack.

>        c.  *September 2, 2016 Meeting at Wright's Business*:

During this meeting, which lasted approximately six and a half hours, the defendants made

an important revision to their plan of attack:  instead of filling dumpsters or cars with explosives

near the target complex, they would put the explosives in smaller metal trash cans with false

bottoms, then position the cans around the complex to create a stronger, shaped charge.  Defendants

Allen and Wright talked through the new plan:

> ALLEN:   You'd wanna do this. You'd wanna build a false bottom in it. Then
> you'd wanna build something like this over it, and put your charge
> right here. And then on this side, the face of it, you know what I'm
> talking about here? It would be here, then if you go down and [UI]
> below, you know what I'm saying? Then put a plastic bag in there as
> a liner, that way the blast is gonna go that way, instead of just straight
> up. But this would be, this, that's what, how you make the charge.
> **WRIGHT:**   **[OV] Oh, I see what you're saying.**
> ALLEN:   [OV] Yeah. Even if you just come back in like this…

| | |
|---|---|
| **WRIGHT:** | **[OV] Shape it to where it blows that direction.** |
| ALLEN: | Yeah. |
| **WRIGHT:** | **Once it starts going that way…** |
| ALLEN: | It's going. |
| **WRIGHT:** | **Yeah, it's not stopping.** |
| ALLEN: | [OV] Then if you stop this metal out right here, it's gonna make it just go right that way. |
| **WRIGHT:** | **Yeah. Cause it's a path of least resistance.** |
| ALLEN: | Yeah. |

Transcript, 1D23, at 111-12, attached as Ex. J. Wright estimated that they would need trash cans that were a size of approximately **"eighteen inch square. Four foot tall"** to carry out the plot in this fashion. Ex. J, at. 112. As Wright succinctly put it, **"We want the roof to fall in on them. If, if the blast doesn't kill them, the fucking roof does."** *Id*. at 200.

After agreeing on this new strategy, Wright, Allen, and Stein spent a considerable amount of time calculating the specific measurements of the different chemicals they needed to manufacture homemade explosives for the attack. *See, e.g*., *id*. at 168-175 (multi-page discussion among Wright, Stein, and Allen to calculate specific quantities of chemicals needed for different sized bombs). During one exchange, defendants Wright, Stein, and Allen discussed building multiple, 150 pound bombs that they could fit into the trash cans they anticipated using:

| | |
|---|---|
| STEIN: | Where's the triple beams? At your house? |
| **WRIGHT:** | **Yeah, they're in my house.** |
| STEIN: | Um, and the aluminum powder's at your house? |
| ALLEN: | No, it's mine. |
| STEIN: | Uh, those two things we need like ASAP, so that, so I can weigh it up and find out exactly how much aluminum powder we're gonna need versus how big we want to make it. Like, if we make two of them, a hundred fifty pounds… |
| **WRIGHT:** | **[OV] Then yeah [UI]** |
| STEIN: | [OV] …that's three hundred pounds of material, that's for the one building. |
| **WRIGHT:** | **Yeah.** |
| STEIN: | One in front, one in back. |
| ALLEN: | A hundred pounds apiece? |

| STEIN: | A hundred and fifty apiece. |
|---|---|
| ALLEN: | Is that what you want to try? |
| STEIN: | Well that's what I, that's just what I put down. I mean, it's not in concrete, it's just… |
| ALLEN: | All depends on the can. [UI] I mean… |
| **WRIGHT:** | **[OV] Yeah.** |
| STEIN: | [OV] Well, yeah, but… |
| **WRIGHT:** | **[OV] Depends on how much we can get in the can.** |

*Id.* at 139-140.

A short time later, when the discussion turned to how to ignite the explosives inside the trash cans, Wright and Allen explained that they were prepared to start work on making a blasting cap for this purpose:

| STEIN: | Well, what are we planning on using? A blasting cap? |
|---|---|
| ALLEN: | Well, we ain't gonna get them probably in time [banging sound]. What do you think?  I doubt it.  So we can make a blasting cap up. But we need to test them. |
| STEIN: | That's what you need a hot plate and shit for? |
| ALLEN: | Yeah. |
| **WRIGHT:** | **And we've got all that now.** |
| ALLEN: | Yeah. |
| **WRIGHT:** | **It got here the other day.** |

*Id.* at 150.

Finally, at this meeting the CHS mentioned a purported black-market source (actually the undercover FBI employee) who could obtain weapons and explosives for the group.  Although defendants Wright and Allen favored manufacturing their own explosives, both for cost reasons and out of concern that the source might be law enforcement in disguise, the group ultimately agreed that it was worth engaging with the source as a backup plan, in case their experimental explosives did not work.  As they discussed what to ask the source to obtain for them, Wright explained:

| **WRIGHT:** | **Blasting caps would be the biggest deal though cause from what I've seen on that, making them is the hardest part, I think, of the explosive, is the blasting cap.** |
|---|---|

CHS:              To make it? Is it hard?

**WRIGHT:**       **No, you can do it. But it's, it's the hardest part, I think. Because it's the most unstable. Cause it's so easy to set it [UI].**

*Id.* at 249.  As a sort of insurance policy to preclude a set-up, Wright advocated that the Crusaders try to pay for the source's explosives with homemade methamphetamine, instead of cash.[13]  *Id.* at 28 (Wright: **"But I like the idea of trading drugs instead of money…. Cause then that's gonna keep us from getting set up."**).  Before the meeting ended, the group created a list of items for the CHS to talk to the source about, including C4, blasting caps, hand grenades, and a 40 millimeter mortar.

d.   *September 11, 2016 Meeting at Wright's Business*:[14]

By the September 11, 2016, meeting, Wright and Allen had finally obtained all of the ingredients and materials they needed to start making homemade explosives.  *See* Source Report, September 11, 2016, attached as Ex. A.  At the start of the meeting, the CHS gave Wright a mortar and pestle to use in preparing component ingredients.  Wright and Allen commented to the CHS that they now had everything they needed to start making "it."

Wright and Allen indicated that they wanted to start conducting experiments to make the explosives during this meeting, but Stein kept diverting the group's attention to other issues.  Late in the meeting, the group agreed that they would be ready to carry out their attack on the Mary Street apartment complex and mosque in approximately thirty days.  The CHS was asked whether he had located trash cans to use in the attack.  When the CHS responded in the negative, Wright

---

[13] Wright also engaged in a lengthy discussion, primarily with Stein, about making methamphetamine to use for the trade.  During this conversation, Wright indicated that he previously had both manufactured and dealt methamphetamine, but that he had never been caught.  Transcript, 1D23, at 13-22, 55 to 59.

[14] Due to a malfunction with the CHS's recording device, this meeting was not audio recorded.  Of the meetings described in this section, this is the only meeting for which an audio recording does not exist.

pulled out a wad of cash and offered it to the CHS to pay for the trash cans.  The CHS agreed to look for trash cans that fit the group's specifications, and he said he would call Wright and Allen to help him transport the cans once he found some.

The meeting ended because Allen's girlfriend showed up at G&G.  Wright did not trust her, so he insisted that the group finish the meeting at another time.

e.  *September 18, 2016 Meeting in Sublette, Kansas*:

The Crusaders' September 18, 2016, meeting opened with significant news from defendants Wright and Allen:  in the time since the group's last meeting, they had successfully manufactured HMTD, a highly volatile explosive that is used in blasting caps to ignite other, larger explosives. Wright and Allen bragged to Stein and the CHS that they had made three batches of the chemical at G&G, following instructions they found on Youtube.  Transcript, 1D25, at 5 to 8, attached as Ex. K.  Wright estimated that they had produced sixty grams of the substance.  Ex. K at 6 (Wright: **"Oh, I would guess there's oh, sixty grams in."**)  Wright and Allen described how, at one point, Allen lit a small amount of the substance on fire, and it immediately caused a huge flame that burned the hair off of Allen's finger:

| | |
|---|---|
| CHS: | Did it really burn your… |
| **WRIGHT:** | **Fuck… it was like** |
| ALLEN: | I just lit it with a Bic lighter and it burnt all the hair off my finger.  It was like, and then it was gone, dude. |
| (overlapping) | |
| **WRIGHT:** | **But it was like, whoosh, whoosh.** |
| ALLEN: | I mean it was fast as… |
| **WRIGHT:** | **It was probably a fire this big around.** |
| CHS: | (laughs) |
| **WRIGHT:** | **And the shit would just disappear.** |

*Id*. at 6.  Wright described that, even with just the combustion of a tiny amount a few feet away from him, he could feel the force it created:

| | |
|---|---|
| **WRIGHT:** | **I mean I felt the percussion of it and I was standin' pro'bly from he, me to him and he did it right in front of me.** |
| CHS: | Man, you're lucky your clothes didn't catch on fire. |
| **WRIGHT:** | **It was, it, but it was instantaneous…** |
| ALLEN: (overlapping) | But dude, I didn't, it was just a fuckin', it wasn't even as big… |
| **WRIGHT:** (overlapping) | **Fuck** |
| ALLEN: | … as big as my pinky nail. |
| CHS: | (unintelligible) |
| ALLEN: | Yeah. |
| **WRIGHT:** | **I would guess if you crushed up an aspirin and half of it might have been what he set [off].** |
| CHS: | That's. |
| STEIN: | Oh fuck. |
| ALLEN: | Yeah. |
| **WRIGHT:** | **I mean it was nothin', man.** |

*Id*. at 8-9.  Based on the success of this experiment, Allen stated that he thought the group could use these homemade explosives for their attack.  Defendants Wright, Stein, and Allen then discussed how best to cause the initial ignition of the homemade explosives, in order to set off a larger bomb during their attack:

| | |
|---|---|
| STEIN: | But my, but my question… what, what actually does the ignition part because… |
| ALLEN: | Flame… and |
| **WRIGHT:** | **Or electronic, we're, that's why we're gonna try, electronic.** |
| STEIN: | That's gotta be impact, you can take a fuckin' torch to that shit, dude and fuckin' (makes noise) |
| **WRIGHT:** | **You can pro'bly take a hammer** |
| STEIN: | And it would just melt. |
| ALLEN: | Oh no, I'm talking about, yeah, yeah, yeah, for that stuff, yes. |
| STEIN: | Right. |
| ALLEN: | But if it's mixed with uh, if we mix it up right, this will set it off. |
| STEIN: | Okay. |
| ALLEN: | That's why I'm making' this up. |
| **WRIGHT:** | **And compress it.** |
| ALLEN: | Well, I know.  But |
| **WRIGHT:** | **It'd have to be compressed.** |

*Id*. at 7-8.  Recognizing that the group had taken an important step toward carrying out their attack,

Wright then commented that he would feign ignorance if the experiments were ever discovered by anyone outside the group:

| | |
|---|---|
| **WRIGHT:** | **I'm gonna go, fuck, I don't know what he [Allen] was doin' in there. (laughs)** |
| ALLEN: | Well, I shoulda stopped by, we'll stop by on the way home.  'Cause it's still all layin' out on the fuckin' counter. |

*Id*. at 10.

After spending some time discussing Wright and Allen's homemade explosives, the group's attention turned to a second development significant to the group's plans:  the possibility of a group meeting with the black-market "source" who could get them additional weapons and explosives. Defendant Allen noted that the group might not need to purchase explosives given the success of his and Wright's experiments at G&G.  *Id*. at 14 (Allen:  "If this other thing works out, we won't need 'em anyway").  Defendants Wright and Allen both expressed concern that meeting with this source could get them caught.  *Id*. at 12 (Wright:  **"They could possibly get us caught."**). Ultimately, though, the group decided that the opportunity was too good to pass up.  They agreed that the CHS would ask the source to meet with only one or two members of the Crusaders, but that all four Crusaders would meet with the source if that was the only way to get the materials they wanted:

| | |
|---|---|
| ALLEN: | Yeah, tell 'em we need to do whatever they wanna do |
| **WRIGHT:** | **That's it, yeah.** |
| ALLEN: | Just tell 'em our side of it, you know, we'd rather not have a meeting, but. |
| **WRIGHT:** | **Yeah, but.** |
| CHS: | Right.  Right. |
| **WRIGHT:** | **We'll do what we got to do.** |
| … | |
| STEIN: (overlapping) | Well, we ain't, we ain't gonna pass up the opportunity if they're here. |
| **WRIGHT:** | **That's right, yeah.** |
| CHS: | 'Cause this is like, pro'bly the first, the way I understand it, this'll be the |

|  |  |
|---|---|
|  | meeting, first meeting, you know?  And then things can happen quick. (unintelligible) |
| STEIN: | You, you just relay some of our concerns and our thoughts. |
| ALLEN: | Yeah. |
| STEIN: | … see what they say… |
| **WRIGHT:** | **They say tough shit, then we'll do it [the meeting].** |
| … |  |
| STEIN: | And, you know, I could, I could see this, I, I might even be the same way.  I-is, if I'm getting ready to, you know, move in to some business transactions with some new people that I don't know, never met, I might wanna see the f-, I wanna, I like to look people in their fuckin' eyes… |
| (overlapping) |  |
| ALLEN: | I understand. |
| **WRIGHT:** | **I understand that.** |
| STEIN: | …'cause I can tell a lot by that.  You know? |
| CHS: | See, and what I'm thinkin' down the line even, I mean this fuckin' could be… |
| **WRIGHT:** | **Yeah.** |
| STEIN: | You know what I mean. |
| CHS: | …HUGE. |
| **WRIGHT:** | **Yeah, I agree.** |
| ALLEN: | I understand. |
| STEIN: | Look you straight in the eye, talk 'til you fuckin,' you know?  And |
| ALLEN: | Tell 'em how we feel and see what they say. |
| **WRIGHT:** | **Yeah.  We'll do what we gotta do, yeah.** |
| (overlapping) |  |
| … |  |
| CHS: | All right, man. |
| **WRIGHT:** | **We'll do what we gotta do.** |

*Id.* at 34, 36-39.  After reaching this decision, the group adjourned for the evening.  Several days

later, on September 25, 2016, Stein and the CHS met with the FBI's UCE on behalf of the

Crusaders and with the stated purpose of obtaining explosives and automatic weapons.

> 4. <u>October 11 and 12, 2016:  When Allen's Arrest Drew Unwanted Law Enforcement Attention to the Crusaders, Wright Attempted Damage Control by Lying to the FBI</u>

On October 11, 2016, defendant Allen was arrested on a domestic violence charge as he and

defendant Wright left G&G together.  The officers also initially detained Wright, but they let him

go after he refused to allow them to search G&G for explosives.  Even so, the attention from law

enforcement rattled Wright, who had already been suspicious of Allen's girlfriend.  When the CHS

called Wright that evening, Wright, paranoid and panicky from his earlier contact with law

enforcement, informed the CHS that Allen's girlfriend had told the police about the Crusaders'

experiments with explosives at G&G:

> **WRIGHT:** **[H]e [the officer] goes well she [Allen's girlfriend] says that he's making bombs and I go (overlapping conversation) no I don't know nothin' about that.  And he goes well in your shop.  I go no there ain't nothing in my fucking office but work stuff.**
> CHS:    Oh fuck.
> **WRIGHT:** **I know.  And I'm like and that's when he said well I wa can, can you let us go look in there and I go no I can't do that.**

Transcript, ID51 Track 244, at 4, attached as Ex. L.  Wright then stated that he wanted to distance

himself from KSF and from the Crusaders to avoid getting caught:

> **WRIGHT:** **I'm like you know what I'm just out of the group and I deleted everything and I'm done.  I don't know nothin' and that's the way I want to keep it.**
> …
> **WRIGHT:** **Yeah, I'm done so I would just suggest the same thing for now.**
> CHS:    Right.
> …
> **WRIGHT:** **[B]ut I'm wondering if my, my thing is if she's [Allen's girlfriend] gonna implicate me…**

Ex. L at 7.  Wright, who reiterated several times how much his exchange with the police had scared

him, ended the call after repeatedly denying all wrongdoing to the CHS.

The next morning, defendant Wright arrived at G&G to find officers executing a search

warrant there for explosives.  Wright responded by going to the Liberal Police Department to try to

get information about the status of Allen's arrest and the G&G search.

At the station, Wright agreed to a voluntary joint interview conducted by Special Agents

from the FBI and the KBI.  During the interview, Wright was told that lying to the FBI is a federal

crime.  Despite this warning, Wright repeatedly denied knowing anything about KSF, Curtis Allen,

or manufacturing explosives at G&G:

| | |
|---|---|
| FBI SA: | And you don't have any idea why we need a search warrant for your business office. |
| **WRIGHT:** | **No.  Other than what the cop said last night.** |
| FBI SA: | Which is? |
| **WRIGHT:** | **He said that he was, his, [Allen's] wife told them that he was making bombs… is what the cop told me and I go, not in my office he's not.** |
| FBI SA: | What do you know about that? |
| **WRIGHT:** | **What do I know about what?  Just what I told you.  The cop told me.** |
| FBI SA: (overlapping) | Do you know anything additional about Curtis [Allen] and the bombs. |
| **WRIGHT:** (overlapping) | **No, I.** |
| FBI SA: | So you don't know anything else about Curtis Allen? |
| **WRIGHT:** | **No.** |
| FBI SA: | Nothing at all? |
| **WRIGHT:** | **Not personally.** |
| … | |
| FBI SA: | You ever attend any kind of group meeting with Curtis Allen? |
| **WRIGHT:** | **No.** |
| FBI SA: | He never invited you… |
| **WRIGHT:** | **Not that I know of.** |
| FBI SA: | … to a meeting with a group called Kansas Security Force. (Interrupted) |
| **WRIGHT:** | **No.  He's (interrupted)** |
| FBI SA: | You're not a member of a militia? |
| **WRIGHT:** | **No.** |
| … | |
| FBI SA: | So what is, so what questions do you have for me…that you think you need to know from us.  Before we do a search warrant and find explosives at your place of business. |
| **WRIGHT:** | **You're, (sigh) if they are, I don't have a clue about it.** |
| FBI SA: | We just offered you an opportunity.  I didn't ask you a question, other than. |
| **WRIGHT:** | **I understand what you did, but I am not hiding anything.** |
| FBI SA: | What do you want to know? |
| **WRIGHT:** | **Nothing.** |
| FBI SA: | Ok. |
| **WRIGHT:** | **I want to know why I can't open my business and conduct business?** |
| FBI SA: | Gavin, don't lie to me. |
| **WRIGHT:** | **I'm not lying to you.** |

Transcript, 1A68 at 14 to 16, attached as Ex. M.  Faced with Wright's clear efforts to mislead the

FBI about the Crusaders' plans for violent action, the agents terminated the interview a short time later.

>   5.   Search Warrant at G&G

The October 12, 2016, search warrant executed at G&G revealed several pieces of evidence that corroborate Wright's and Allen's account of their efforts to manufacture explosives there. Significantly, agents found a possible detonator believed to contain HMTD. Agents also found a black thermometer, bamboo chopsticks with a white substance, hydrogen peroxide 3%, hydrogen peroxide 35% (food grade), possible urea, and possible urea fertilizer. All of these items and substances can be used in the production of improvised explosive devices. Agents used a chemical testing tool to test the white substance on the bamboo chopsticks. The white substance tested positive for hexamine, an ingredient in HMTD. A yellow binder and paperwork labeled "The Anarchist Cookbook" was also found inside G&G.

>   6.   The Strength of This Evidence Weighs Strongly Against Defendant Wright's Pre-
>         Trial Release

Taken together, the weight of the evidence against defendant Wright strongly favors pretrial detention. Despite the defendant's portrayal of himself in his motion as a mere ignorant bystander to his co-defendants' murderous intentions, the defendant's own recorded words reveal otherwise. The defendant not only expressed a desire to kill Muslims living in Garden City, but he also took an active role in planning and carrying out an attack against the Mary Street apartment complex and mosque that was designed to inspire similar violence across America. He also volunteered unique and important skills as an electrician, speaking of obtaining remote circuits, talking of obtaining dynamite, and speaking of symtech (SEMTECh) , showing that he was not just "going along," but instead, was adding significantly to the

seriousness of the plot.  Over a period of months, defendant Wright offered up his business office at G&G as a private location in which the Crusaders could put their anti-Muslim hatred into violent action without risk of discovery.  Significantly, in September, 2016, he and defendant Allen successfully manufactured and tested homemade explosives there, as evidenced by both Wright's own recorded statements and the physical evidence officers later found inside G&G.  Moreover, even after defendant Allen was arrested, defendant Wright continued to advance the conspiracy by lying to the FBI about its existence.  Accordingly, the overwhelming evidence against defendant Wright strongly supports his pretrial detention.

### B. The Remaining § 3142 Factors Also Support Defendant Wright's Pretrial Detention

The remaining § 3142(g) factors further support detaining defendant Wright pending trial.  The government acknowledges that the defendant has family ties to Southwest Kansas, and that he has lived within the state of Kansas for most of his life.[15]  Even so, the charges pending against Wright are serious, and they expose him to the possibility of a life sentence. *See Cisneros*, 328 F.3d at 618 (recognizing that a district court may consider a defendant's "knowledge of the seriousness of the charges against [him]" as a factor favoring detention). Moreover, while the defendant does not have any officially documented criminal history, during Crusaders meetings he bragged about his prior involvement in the manufacture and sale of methamphetamine.  *See* Transcript, 1D23, at 13-22, 55 to 59, attached as Ex. J.

Finally, the defendant presents a serious danger to the community.  Despite the

---

[15] In his memorandum, defendant states that the government "yet admits Mr. Wright poses no flight risk." Doc. 150-1 at 20; *see also* Doc. 150-1 at 38.  This is incorrect.  The government conceded that Mr. Wright has substantial ties to the community and he has no history of criminal convictions.  Nevertheless, the government submits that the defendant's exposure to a life sentence, along with the overwhelming evidence against him, makes him a substantial risk of flight.

defendant's efforts in his motion papers to portray himself as tolerant of all people, his own

recorded statements reveal otherwise.  In addition to the recordings cited above, on September 2,

2016, Wright revealed during a Crusaders planning meeting that he "about killed a nigger this

morning" for taking a wrong turn onto G&G's property:

| | |
|---|---|
| STEIN: | The complex [on Mary Street] is shaped like a U and then that… |
| **WRIGHT:** | **Sand niggers…** |
| STEIN: | [OV] That one building is right in the middle… |
| **WRIGHT:** | **[OV] they're all fucking sand niggers.** |
| STEIN: | Where it, where it used to be the mosque right here. |
| **WRIGHT:** | **I about killed a nigger this morning.** |
| … | |
| **WRIGHT:** | **The motherfucker drove through my yard. I was outside yelling at him.** |
| CHS: | Drove through your…? |
| **WRIGHT:** | **Fuck yeah! Drove through the ditch. [OV] Fuck, yelled at the black mother fucker, and then he comes inside, and I'm going Curtis [Allen] we're going to have to go, we're going.** |
| STEIN: | Mm-hmm. I think so. |
| **WRIGHT:** | **[OV] He comes in and goes, "We're sorry, I'm sorry, sir. I didn't…" [chuckles]** |
| ALLEN: | [UI] He was just test driving that vehicle, I bet. |
| … | |
| ALLEN: | So he drove in through the ditch and up the hill [OV]? |
| **WRIGHT:** | **No, he drove in, turned this way, and up through the ditch and around and back out to the driveway. When he, when I yelled at him right there where he was stopped by the mailbox, he had just came out of the ditch and back up onto the road. And I was like, "What the fuck are you doing you, dumb mother fucker?"** |
| ALLEN: | [UI] mother fucker. [UI] |
| **WRIGHT:** | **Well, he gets out, and I thought, "It's on, Curtis [Allen]." [chuckles] And I told Curtis [Allen], "It's going, I'm going in to get my gun and I'm gonna shoot that black mother fucker."** |
| STEIN: | [UI] Who was it, a cockroach? |
| ALLEN: | No [UI] |
| **WRIGHT:** | **No, he was a nigger.** |
| STEIN: | No? |
| **WRIGHT:** | **Big black mother fucker though.** |

Transcript, 1D23, at 39-41, attached as Ex. J.  These recordings, coupled with the ample

evidence of the defendant's plans to take violent action against innocent people in Garden City, more than satisfy the government's burden of establishing that the defendant presents an on-going danger to the community.  Moreover, Wright's conduct after Allen was arrested—in particular, his decision to both try to distance himself from the conspiracy and to lie to law enforcement about its existence—reveal him to be both calculated and thoughtful, and therefore more dangerous now that he has been arrested and is aware of the evidence against him.

### C. Defendant Wright's Release Plan Will Not Ensure the Safety of the Community

The government respectfully submits that there is no condition or combination of conditions that will reasonably assure the safety of the community should the defendant be released.  Even so, to the extent that the Court must consider the defendant's proposed release plan, the government submits that it is woefully inadequate to protect the community defendant Wright planned to attack less than one year ago.  As an initial matter, the defendant's proposal that he live with his mother in Deerfield, Kansas—less than 16 miles from Garden City—is not an adequate means of reducing the threat he would pose to his former targets.

Additionally, the strict electronic monitoring outlined in the defendant's motion would not alleviate the threat he presents.  The defendant's plan proposes that a non-governmental GPS monitoring company will notify federal, state, and local law enforcement agencies in Southwest Kansas if the defendant were to violate specified locational boundaries.  However, as the Court is well aware, these law enforcement agencies are responsible for protecting the public across vast, rural areas of land with only limited manpower and resources.  Accordingly, the defendant's proposal would both place an undue burden on these agencies (which would be required to consolidate limited resources to locate the defendant in a large, rural area) and put the surrounding

community at risk.  In sum, the defendant's proposed release plan does not address in any serious

way the risk he presents to the community.

### D.  Defendant Wright Identifies No Change in Circumstance that Warrants His Pretrial Release

Finally, defendant Wright's motion identifies no change in circumstance that would render

pre-trial release appropriate here.  While the defendant correctly notes that a large volume of

evidence has been provided to him in discovery since he was initially detained, that evidence

provides no support for his pre-trial release; indeed, to the contrary, as described above, the

evidence reveals defendant Wright to have been a key figure in the Crusaders' anti-Muslim plot to

bomb an apartment complex and mosque in Garden City.  Additionally, none of the family

circumstances listed in the defendant's motion—his immediate family's re-location to a town 16

miles outside of Garden City; the closure of his business, G&G; his ex-wife's medical conditions;

or the care of his teenage son by another family member—provides a sufficient basis for releasing

him pre-trial.[16]  Given the strong weight of the evidence against the defendant, the seriousness of

the offenses with which he is charged, the risk of flight and danger to the community that he

presents, and the statutory presumption favoring detention in this case, the defendant's motion

should be denied.

---

[16] The defendant's motion makes clear that he does not plan to resume caring for his minor son even if he is released. *See* Wright Mot. For Bond, at 36 (Doc. 150-1) ("Even if released, [Wright] will not be lifting the power of attorney unless and until resolution of this case because he does not wish to bring turbulence to his minor child's already turbulent life.").

## V.   CONCLUSION

For the reasons given above, the government respectfully requests that the defendant's

motion for bond be denied and that the defendant be ordered detained pending trial of this matter.

Respectfully submitted,

THOMAS E. BEALL
United States Attorney

*Anthony W. Mattivi*

ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

*David P. Cora*

DAVID P. CORA
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 514-7259
David.Cora@usdoj.gov

*Risa Berkower*

RISA BERKOWER
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0150
Risa.Berkower@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the  27th  day of September, 2017, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*Anthony W. Mattivi*

Anthony W. Mattivi