## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       *Plaintiff,*

  vs.                              Case No. 16-10141-03-EFM

GAVIN WAYNE WRIGHT,

       *Defendant.*

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Gavin Wright's motion for bond. The matter has been fully briefed and the Court held a hearing on the motion on October 4, 2017. After careful consideration of the parties' arguments and all of the facts of record, the Court concludes that Wright should remain detained pending trial. Accordingly, the Court denies Wright's motion for bond (Doc. 150).

### I.      Factual and Procedural Background

On October 19, 2016, the Grand Jury charged Wright with conspiring to use a weapon of mass destruction in violation of 18 U.S.C. §§ 2 & 2332a(a)(2)(A). On October 21, 2016, Wright waived his right to a detention hearing. U.S. Magistrate Judge Gwynne Birzer accepted the waiver and granted the Government's motion for detention. Wright has been held in custody ever since.

The Government filed the Second Superseding Indictment on March 16, 2017.   The indictment brought two new charges against Wright: conspiracy against rights in violation of 18 U.S.C. § 241, and knowingly and willfully making materially false, fictitious, and fraudulent statements to the FBI in violation of 18 U.S.C. § 1001.   Wright filed this present motion for bond on September 13, 2017.[1]

## II.     Jurisdiction

This criminal case involves three defendants each charged with conspiring to use a weapon of mass destruction, in violation of 18 U.S.C. §§ 2 & 2332a(a)(2).   Defendant Allen was separately charged, in Count IV of the Second Superseding Indictment, with unlawful possession of firearms after having previously been convicted of a "misdemeanor crime of domestic violence," in violation of 18 U.S.C. §§ 922(g)(9) & 924(a).   The Government alleges that Allen was found to be in possession of firearms after having been convicted under Section 5.10.025(a)(1) of the Wichita Municipal Code.

On May 23, 2017, the Tenth Circuit held in *United States v. Pauler*[2] that a misdemeanor violation of a municipal ordinance does not qualify as a "misdemeanor crime of domestic violence" as that term is defined in the relevant statutes.[3]   The following day, Allen filed a motion to dismiss Count IV for failure to state an offense.   In light of *Pauler*, this Court granted Allen's motion to dismiss on August 14, 2017.   The Government timely filed its notice of its intent to appeal this Court's order dismissing Count IV on September 12, 2017.

---

[1] *See* 18 U.S.C. § 3145(b) ("If a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.").

[2] 857 F.3d 1073 (10th Cir. 2017).

[3] *Id.* at 1078.

The interlocutory appeal raises an interesting jurisdictional question: Does this Court have jurisdiction to continue hearing and deciding other issues while the interlocutory appeal is pending?  At the hearing, the Government argued that when an appeal is taken as to a part of the case, the Tenth Circuit obtains jurisdiction only over that part of the case; the remainder of the case remains properly with the District Court.  Having reviewed the relevant case law, the Court agrees.

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control *over those aspects of the case involved in the appeal*."[4]  "The district court does not regain jurisdiction over those issues until the court of appeals issues its mandate."[5]  But an interlocutory appeal does not divest the District Court of jurisdiction to continue deciding other issues in the case.[6]  Because Wright's motion for bond is unrelated to the Government's interlocutory appeal, this Court has jurisdiction to hear and decide this present matter.

### III.    Legal Standards

A detention hearing may be reopened "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a

---

[4] *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (citing *United States v. Hitchmon*, 587 F.2d 1357 (5th Cir. 1979)) (emphasis added).

[5] *United States v. DeFries*, 129 F.3d 1293, 1303 (D.D.C. 1997).

[6] *See Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1231 (10th Cir. 2017) (concluding that District Court had jurisdiction to proceed to the merits even though a preliminary injunction order was pending on appeal); *see also United States v. Gagan*, 95 F. App'x 941, 947 (10th Cir. 2004); *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003) ("However, an interlocutory appeal does not completely divest the district court of jurisdiction. 'The district court has authority to proceed forward with portions of the case not related to the claims on appeal . . . .' ") (quoting *May v. Sheahan*, 226 F.3d 876, 880 n.2 (7th Cir. 2000)); *Moltan Co v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1174 (6th Cir. 1995) ("[A]n appeal from an interlocutory order does not divest the trial court of jurisdiction to continue deciding other issues in the case.") (internal quotation marks omitted).

material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person in the community."[7]  The District Court's review of a Magistrate Judge's order of detention is de novo, meaning this Court must ultimately decide the issue of detention or conditions for release without deference to the Magistrate Judge's conclusion.[8]  Under the Bail Reform Act, the Court must order an accused's pretrial release, with or without conditions, unless it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."[9]  Detention can be based on a showing by the Government of either: (1) that, beyond a preponderance of the evidence, the defendant poses a risk of flight; or (2) that, by clear and convincing evidence, the defendant poses a risk to the safety of any person or the community.[10]

"[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court must take into account the following factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . [or] a Federal crime of terrorism . . . ;

(2) the weight of the evidence against the person;

---

[7] 18 U.S.C. § 3142(f)(2).

[8] *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003).

[9] 18 U.S.C. § 3142(e).

[10] *Cisneros*, 328 F.3d at 616.  Wright argues that flight risk must be demonstrated by clear and convincing evidence, as opposed to the lesser standard of preponderance of the evidence.  In making this argument, Wright cites to *United States v. Motamedi*, 767 F.2d 1403, 1409–16 (9th Cir. 1985) (J. Boochever, concurring and dissenting in part).  However, this proposition is clearly contrary with Tenth Circuit precedent.  "The government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or to the community by clear and convincing evidence."  *Cisneros*, 328 F.3d at 616 (internal citations omitted).  *See also United States v. Rico*, 551 F. App'x 446, 446 (10th Cir. 2014) (quoting *Cisneros*, 328 F.3d at 616); *United States v. Becker*, 338 F. App'x 781 (10th Cir. 2009) (quoting *Cisneros*, 328 F.3d at 616).

-4-

(3) the history and characteristics of the person, including—

    (a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.[11]

Congress has also created a rebuttable presumption that detention is appropriate in cases where, such as here, the defendant has been charged with certain offenses such as conspiring to use a weapon of mass destruction.[12]

## IV.   Discussion

Wright has been charged with one count of conspiring to use a weapon of mass destruction in violation of 18 U.S.C. §§ 2 & 2332a.  Under the Bail Reform Act, once probable cause has been established that certain crimes were committed, a rebuttable presumption is established that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."[13]

The Act includes as "presumption" crimes any offense listed in 18 U.S.C. § 2332b(g)(5)(B) that is punishable by a maximum term of imprisonment of ten years

---

[11] 18 U.S.C. § 3142(g).

[12] 18 U.S.C. § 3142(e)(3).

[13] 18 U.S.C. § 3142(e)(3).

or more.[14]   The first count charged against Wright—conspiring to use weapons of mass destruction (18 U.S.C. § 2332a)—qualifies for the presumption under § 3142(e)(3)(C). Additionally, the Supreme Court has established that a grand jury indictment conclusively determines the existence of probable cause.[15]   Therefore, the indictment satisfies the Government's preliminary burden to show probable cause for Wright, establishing the presumption of detention.

"Once a presumption is invoked, the burden of production shifts to the defendant, but the burden of persuasion regarding risk-of-flight and danger to the community always remains with the government."[16]  "The defendant's burden of production is not heavy, but some evidence must be produced.  Even if a defendant's burden of production is met, the presumption remains a factor for consideration by the district court in determining whether to release or detain."[17] Regardless of whether the presumption applies, the Government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community.[18]

A.     **Wright's Burden to Rebut the Presumption of Dangerousness**

Here, Wright has satisfied his burden of producing some evidence tending to demonstrate that he is not dangerous and he is not a flight risk.  Regarding Wright's flight risk, Wright

---

[14] 18 U.S.C. § 3142(e)(3)(C).

[15] *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) (citing *Ex Parte United States*, 287 U.S. 241, 250 (1932)) ("By contrast, the Court has held that an indictment, 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry.").

[16] *United States v. Villapudua-Quintero*, 308 F. App'x 272, 273 (10th Cir. 2009) (quoting *United States v. Stricklin*, 932 F.2d 1353, 1354–55 (10th Cir. 1991)) (quotations omitted).

[17] *Id.* (quoting *Stricklin*, 932 F.2d at 1355) (quotations omitted).

[18] *See Cisneros*, 328 F.3d at 616.

-6-

pointed to the fact that he is a "life-long member[] of [his] communit[y] with substantial ties to the area."[19]  Wright has lived in Kansas nearly his entire life; he owns a business in the state, and many of his close family members live here, including two of his three children.  While this evidence does not convince the Court that Wright poses *no* risk of flight, his burden at this stage is very light.[20]  Accordingly, Wright's substantial community ties constitute "some evidence"[21] and Wright has met his burden of production.

To show that he would not be a danger to the community if released, Wright directs the Court to his criminal history (or, more aptly, his lack thereof).  Wright insists that he has no history of violence.  Although he was found to be in possession of multiple firearms and ammunition, Wright argues that he was not a prohibited person at the time of his arrest and he was merely exercising his Second Amendment rights.  In addition, Wright submitted an unusually comprehensive release plan designed to assure the Court that he would not violate the terms of release.  Again, Wright's burden at this stage is light, and this evidence is sufficient to satisfy his burden of production.

**B.      Government's Burden of Persuasion to Show Dangerousness**

The Government must produce sufficient evidence to persuade the Court, by clear and convincing evidence, that there are no conditions of release that will reasonably assure the safety of the community if Wright is released.  After considering the evidence, the Court concludes that the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of detention.

*1.      Nature and Circumstances of the Offense Charged*

---

[19] Doc. 26 at 19.

[20] *See Villapudua-Quintero*, 308 F. App'x at 273.

[21] *See id.*

The first factor for the Court to consider is the nature and circumstances of the offense charged.[22]  Wright has been charged with conspiring to use a weapon of mass destruction against people and property within the United States.  Specifically, the Government alleges that Wright and his co-defendants planned to use an improvised explosive device to destroy an apartment complex and mosque in Garden City, Kansas.  The complex contains more than 100 units and is home to many Muslims of the Somali refugee community.   The group, known as "the Crusaders,"[23] intended to accomplish this goal by obtaining four vehicles, filling them with explosives (made from aluminum powder and ammonium nitrate, amongst other components), and parking them at the four corners of the apartment complex to create a large explosion. Simply put, these allegations against Wright indicate a strong threat to society.

Additionally, this factor specifically directs the Court to consider whether the charges include a crime of violence, a Federal crime of terrorism, or involve a firearm, explosive, or destructive device.[24]   The charges against Wright possess all but one of those elements (the charges do not involve a firearm).  Accordingly, this factor overwhelmingly weighs in favor of detention.

   2.   *Weight of the Evidence against Wright*

---

[22] 18 U.S.C. § 3142(g)(1).

[23] According to the Government, the FBI learned in 2016 that the three defendants, who were members of the Kansas Security Force ("KSF") militia, had formed a splinter group that came to be known as "the Crusaders." The Government alleges that the Crusaders were planning to bomb an apartment complex in Garden City, Kansas. The Crusaders' stated purpose for the attack was to kill Muslims and put an end to Muslims living in Southwest Kansas.

[24] 18 U.S.C. § 3142(g)(1).

The second factor for the Court to consider is the weight of the evidence against Wright.[25]   This factor also weighs in favor of detention, as the evidence overwhelmingly suggests that Wright is a danger to the community.   At the hearing, the Government introduced evidence in the form of recorded conversations, text messages, and proffer of what the undercover FBI employee ("UCE") and confidential human source ("CHS") would testify to.   In these conversations, Wright expressed extreme hatred and threatened violence against Muslims.   Without going into unnecessary detail, Wright expressed his desire to kill Muslims via a variety of different methods.   For example, in one meeting, a member of the Crusaders suggested that they should burn down mosques.   Wright responded: "Yeah, during prayer time."   In another conversation, Wright suggested that the group go to "downtown San Antonio and just start f*cking shooting people."   "Middle Eastern people" he specified, " 'cause they're all over, over there, Muslim people, just start f*cking weeding 'em out!"   Additionally, Wright advocated for killing a landlord in Garden City because the landlord rented to Muslims.

Not only did Wright make threats, but he sought to build and purchase weapons and explosives, including grenades, dynamite, blasting caps, and electronic detonation devices. During regular meetings conducted at Wright's business, G&G Mobile Home Center ("G&G"), the Crusaders purchased equipment and gathered chemicals and other materials to start making homemade explosives.

At a July 2016 meeting, Allen exclaimed the purpose of the Crusaders' plans: "killin' people and going to prison for life."   As the conversation progressed, Wright (a former electrician) explained that he had access to dynamite that the group could use in an attack:

---

[25] 18 U.S.C. § 3142(g)(2).

| CHS: | Can electricians really buy dynamite? |
|---|---|
| WRIGHT: | Oh yeah. |
| CHS: | I didn't know that. |
| Wright: | Yup, I can, I can get it.  I mean I don't have a license, |
| CHS: | Right. |
| Wright: | but I know a guy that does.  (giggles).  And I can get, matter of fact, I've got a whole bunch of M-80's at home. |

Allen responded that he had already started gathering aluminum powder to manufacture homemade explosives.   Allen and Wright then discussed potential methods to set off an explosion:

| Allen: | We'll make our own. |
|---|---|
| CHS: | Yeah, well, that's what I was . . . |
| ALLEN: | I got that other sh*t coming.  That uh, ammonium nitrate. |
| WRIGHT: | Syntech?  Oh. |
| ALLEN: | No the uh aluminum powder. |
| . . . | |
| WRIGHT: | Can you build a circuit, on a bomb? |
| ALLEN: | I bought 'em already. |
| WRIGHT: | Huh? |
| ALLEN: | I already bought a bunch of 'em years ago, push a button, squibs. |
| WRIGHT: | Oh ok, so they're like little remote circuits. |
| ALLEN: | Yeah. |
| WRIGHT: | Oh okay.  That would set off the plastics? |
| ALLEN: | Yeah. |

Then, in September 2016, Wright downloaded manuals from the internet to make homemade explosives.  That same month, Wright and Allen conducted an "experiment" at G&G to make a blasting cap that could be used to trigger a larger explosion.  And after the UCE was introduced, the Crusaders attempted to buy a variety of explosives and other weapons to help carry out their planned attack.

Wright argues that this evidence is taken out of context.  He insists that the evidence, viewed as a whole, shows that he was not motivated or prepared to take violent action against any member of his community.  For example, Wright expressed his desire to cut ties with the

Crusaders immediately after he was released from custody on October 11, 2016.[26]   While speaking with the CHS, Wright stated: "I'm just cutting ties for now.   I don't want to even be in the group, 'cuz I don't know what's going to happen."   And Wright asserts that it was not until after he dissociated from the Crusaders that Stein allegedly met with undercover FBI agents to purchase firearms and explosives.

Wright also insists that the evidence shows that he had no intent to take any unlawful action.   After his arrest, he conveyed to the CHS: "I don't know nothin' and that's the way I want to keep it."   He then expressed that the allegations regarding the homemade explosives were fabricated:

> WRIGHT:      . . . They should throw [him or her] in jail because whatever [he or she is] telling them is a fucking lie.
> . . .
> WRIGHT:      [Allen] was making f*ckin' IEDs is what the cop said!  He goes "do you know what an IED is?"  I go, "I watch the f*ckin' news, yeah.  I'm not stupid."
> CHS:            Yeah.
> WRIGHT:      I mean, they do 'em over there in Iraq and Iran and—and Afghanistan all the time.  I hear about it all the f*ckin' time.  Yeah, I know what it is.  Do I know how to make one?  F*ck no!  Have I seen anybody make one?  F*ck no!
> . . .
> CHS:            I wonder what the f*ck they would want [Allen] for even though, I mean, he's—
> WRIGHT:      Well, it's the sh*t that [he or she is] making up, man.  I'm telling you.  They need to arrest [him or her].

According to Wright, these conversations show his subjective intentions: he believed that what he had been a party to was mere puffery and the venting of frustration—not that he was involved

---

[26] Wright was arrested on October 11, 2016, after the Liberal Police Department responded to allegations that Allen had committed acts of domestic violence against his girlfriend.  During their response, law enforcement uncovered some information relating to homemade explosives.  This information led to Wright's arrest, at which point an officer told Wright that someone had informed law enforcement that Allen was making bombs.  For reasons unknown, Wright was then released.

in a legitimate, serious plot to hurt others.  Thus, according to Wright, he is not an actual threat to the community.

However, Wright's argument requires the Court to make broad assumptions about his subjective intent.  The same evidence could reasonably be interpreted to conclude that Wright was simply "covering his tracks" after law enforcement became privy to the Crusaders' plans.  The Government advocates for the latter interpretation, based on Wright's post-arrest conduct.  The morning after his arrest, Wright was interviewed by the FBI and KBI.  Despite being warned about perjury, Wright repeatedly denied any knowledge about KSF, Allen, or manufacturing explosives at G&G.  Yet the Government has produced evidence that (1) Wright was a member of the KSF; (2) Wright was a close associate with Allen; and (3) substances used in the production of improvised explosive devices were found at G&G that same day, including a possible detonator believed to contain HMTD (an explosive organic compound), a black thermometer, bamboo chopsticks with a white substance, possible urea, and possible urea fertilizer.  Accordingly, Wright has been charged with knowingly and willfully making materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the FBI, in violation of 18 U.S.C. § 1001.

The Court is inclined to agree with the Government.  As the Supreme Court said in *Noto v. United States*,[27] "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action."[28]  Here, the evidence shows that Wright did more than simply vocalize his desire to murder Muslims.   He took an active role in planning an actual attack on actual

---

[27] 367 U.S. 290 (1961).

[28] *Id.* at 297–98.

people.  He offered his business as a meeting place, he used his computer to find potential targets using Google Earth, he offered to buy dynamite for use in the attack, he downloaded bomb-making manuals, and he tested components for an explosive device.    By taking action, as opposed to merely expressing his reprehensible beliefs, Wright crossed the line from "abstract teaching" to "preparing a group for violent action and steeling it to such action."

"At this stage of the criminal proceedings, of course, the government need not offer all of its evidence."[29]  The evidence in the record, however, is sufficient to persuade the Court that it is strong as to the charges against Wright.    Accordingly, the weight of the evidence clearly indicates that Wright is a danger to the community.

      *3.*     *Wright's History and Characteristics*

The third factor requires the Court to consider Wright's history and characteristics, including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."[30]  This factor also indicates that Wright is a danger to the community and weighs in favor of detention.

Although Wright has no criminal history to speak of, the Government offered recordings of Wright bragging about manufacturing and selling methamphetamine, claiming he was "smarter and didn't get caught."  Wright's character also raises numerous red flags.  As detailed above, Wright has expressed an extreme hatred for Muslims, a fact that Wright does not contest.  His hatred does not appear to be limited to Muslims, as Wright was also recorded boasting that

---

[29] *Cisneros*, 328 F.3d at 618.

[30] 18 U.S.C. § 3142(g)(3)(A).

-13-

he "about killed a n*gger this morning," in reference to an African American individual who drove through Wright's yard. Furthermore, Wright's conduct after his arrest—in particular, his decision to both try to distance himself from the conspiracy and to lie to law enforcement about its existence—reveal him to be both calculated and thoughtful.

Although not as clear-cut as the other factors, the Court concludes that this factor suggests that Wright is a danger to the community.

### 4.    *Nature and Seriousness of the Danger to the Community*

Finally, the fourth factor requires the Court to consider the nature and seriousness of the danger to any person or the community that would be posed by Wright's release.[31] Wright has demonstrated interest in committing actual violence against members of his community and has shown a lack of concern about the likelihood of killing civilians through the use of weapons of mass destruction, firearms, and other means. Accordingly, this factor suggests that Wright would pose a grave danger to the community if released, and weighs in favor of detention.

### 5.    *Balancing the Factors*

All four factors weigh in favor of detention. Even in light of Wright's proposed release plan, discussed in more detail below, the Court concludes it cannot ensure the safety of the community. The charges against Wright include serious acts of violence and mass murder. The evidence suggests that Wright was deeply involved in the planning of these atrocities, and intended to carry out the plan to fruition. In the eyes of the Court, there are very few charges more serious than a charge of planning to commit an act of terrorism, because that conduct undermines the very fabric of our society.

---

[31] 18 U.S.C. § 3142(g)(4).

Accordingly, the Government has shown by clear and convincing evidence that there are no conditions of release that will reasonably assure the safety of the community if Wright is released.

**C.      Government's Burden of Persuasion to Show Risk of Flight**

The Government may also show, by a preponderance of the evidence, that there are no conditions that will reasonably assure Wright's appearance in Court as required.    After considering the evidence, the Court concludes that the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of detention as well.

*1.      Nature and Circumstances of the Offense Charged*

The first factor—nature and circumstances of the offense charged—strongly suggests that Wright is a flight risk.  As discussed in more detail above, the charges against Wright are some of the most serious charges that have come before this Court.  Wright has been charged with a "crime of violence" under the Bail Reform Act, and he is facing a potential life sentence.[32]  The possibility of such a long sentence gives Wright a strong incentive to flee if released.[33] Therefore, this factor weighs strongly in favor of detention.

*2.      Weight of the Evidence against Wright*

The second factor—weight of the evidence against Wright—also suggests that Wright would be a flight risk.  Wright presented little evidence tending to suggest that he is not a flight risk.  He only demonstrated that he has strong family ties to Kansas and no criminal history.  Faced with the possibility of spending the rest of his life in prison, this evidence is not enough to

---

[32] 18 U.S.C. § 2332a.

[33] *E.g.*, *United States v. Kelley*, 2008 WL 821951, at *5 (D. Kan. 2008) (determining defendant was a flight risk "particularly in light of the fixed and substantial length of sentence possibly facing the defendant").

reasonably assure the Court of his appearance. However, Wright did submit an unusually comprehensive release plan designed to assure the Court that he would not violate the terms of release.

Under the proposed plan, Wright would live in Deerfield, Kansas with his mother and step-father (about a 25-minute drive from Garden City). He would be outfitted with a GPS ankle monitor for 24-hour monitoring. With prior permission from the U.S. Probation Office, Wright would be allowed to travel: (1) to and from the federal courthouse in Wichita, Kansas; (2) to stay overnight in a trailer owned by Wright's family near Wichita when court scheduling would make it practically unreasonable to travel back-and-forth from Deerfield; (3) for activities related to his work at D&H Homes; and (4) to check on his home in Beaver County, Oklahoma. Wright would be required to notify the U.S. Probation Office prior to entering Garden City limits.

Should Wright violate any movement restrictions, the GPS monitoring company will immediately notify the Kearny County Sheriff's Department, which has offices in Lakin, Kansas (eight miles from Deerfield), and the Finney County Sheriff's Department, which has offices in Garden City (16 miles from Deerfield). The monitoring company will also immediately notify the FBI office in Garden City, Kansas.

While Wright's counsel should be commended for putting so much thought and effort into this release plan, the Court is not persuaded that the plan would reasonably assure Wright's appearance or guarantee the safety of the community. As the Government pointed out, the plan does not adequately safeguard against the possibility of Wright simply cutting off the monitor and fleeing. Of course law enforcement in Lakin and Garden City would be notified immediately, but those departments may not have adequate resources to quickly apprehend a fugitive as dangerous as Wright. As the Government pointed out in defendant Stein's bond

hearing last February, the Finney Count Sheriff's Department is responsible for a 1,099 square-mile area, but only maintains two or three deputies on shift at any given time.  Similarly, the FBI office in Garden City is only staffed by two agents during business hours.  Should Wright abscond, it is unreasonable to believe these departments could quickly and successfully apprehend him.  Wright's plan therefore fails to reasonably assure the Court of his appearance in subsequent hearings.

As discussed above, the weight of the evidence offered in support of the charges against Wright is significant, giving him many reasons to flee the state if he is released pending trial. The Government has demonstrated that federal law enforcement obtained a great deal of information about Wright's alleged illegal conduct through recordings, the CHS, and the UCE. The proferred evidence indicates that the Government's case against Wright is relatively strong, making potential convictions and imprisonment a significant possibility.

Thus, given the weight of the evidence against Wright, this factor weighs heavily in favor of detention.

3.      *Wright's History and Characteristics*

Turning now to the third factor, Wright's history and characteristics do not necessarily indicate that he is a flight risk.  Wright has significant ties to the State of Kansas, including a child that he is responsible for.  The Government concedes as much.  The Government's arguments focused exclusively on Wright's exposure to a life sentence, along with the weight of the evidence against him.  Thus, this factor does not weigh in favor of detention.

4.      *Balancing the Factors*

Here, two of the three factors weigh in favor of detention.[34]  However, the lengthy potential prison sentence and the weight of the evidence against Wright far outweigh Wright's ties to Kansas.  While Wright successfully met his burden of production in the face of the presumption of detention, the presumption remains a relevant factor and that it weighs in favor of detention.[35]  The Court recognizes that Wright wants to be on pretrial release so he can take care of his family and business.  But the Court also has an obligation to keep defendants in custody if they may become fugitives.  Wright faces serious charges and a potential life sentence.  The Court therefore concludes that Wright is a flight risk, and the Court cannot reduce Wright's risk of nonappearance to an acceptable level even with restrictive conditions.

Accordingly, the Government has shown by a preponderance of the evidence that there are no conditions that will reasonably assure Wright's appearance in Court as required.

### V.      Conclusion

Upon de novo review of the parties' arguments, the § 3142(g) factors, and the record in this case, the Court concludes that pretrial detention is warranted.  In reaching this determination, the Court has considered Wright's proposed release plan.  However, the Court is not persuaded that the proposed conditions will reasonably assure Wright's appearance as required and the safety of the community.

---

[34] The fourth factor is not relevant to the risk of flight inquiry.  *See* 18 U.S.C. § 3142(g)(4) (stating that the fourth factor for the Court to consider is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release").

[35] *United States v. Johnson*, 123 F. App'x 377, 379 (10th Cir. 2005) ("Even if the presumption is overcome, the presumption remains a factor in the district court's detention decision.").

**IT IS THEREFORE ORDERED** that Wright's Motion for Bond (Doc. 150) is hereby **DENIED.**

**IT IS SO ORDERED.**

Dated this 20th day of October, 2017.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE