IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>  Plaintiff, )<br>   )<br>vs. )<br>   )<br>CURTIS WAYNE ALLEN, )<br>PATRICK EUGENE STEIN, and )<br>GAVIN WAYNE WRIGHT, )<br>  Defendants. )<br>              ) | Case No. 16-CR-10141-EFM |

**DEFENDANTS' RESPONSE
TO GOVERNMENT'S MOTION TO PRECLUDE DEFENDANTS'
WITNESS DR. AMY COOTER FROM TESTIFYING
AND FOR *DAUBERT* HEARING**

COMES NOW the defendant, Gavin Wayne Wright, by and through his appointed counsel Kari S. Schmidt and Tyler J. Emerson of Conlee Schmidt & Emerson, LLP, and joined by co-defendants Curtis Wayne Allen and Patrick Eugene Stein, and moves this Court to deny the Government's Motion to Preclude Defendants' Witness, Dr. Amy Cooter, from Testifying and For a *Daubert* Hearing (Doc. 201) because her testimony is based on a reliable foundation, is relevant to a fact-in-issue without being unduly prejudicial to the Government, and would not confuse the jury. In support of his motion, Mr. Wright states and asserts as follows:

**ARGUMENT**

**I.**  **Dr. Cooter is an expert in the fields relevant to the issue.**

In this case, Dr. Cooter clearly is an expert in the field of sociology, and she has clear, academic expertise and experience in the prepper/survivalist and militia sub-communities. She is a Doctor of Sociology at Vanderbilt University in Nashville, Tennessee. Her current studies involve "the motivations and values of American militias and white nationalist groups. She is the

1

first academic to perform ethnographic research on this community and one of very few academics to study them through direct interviews."[1] During her research for her dissertation, she personally embedded with members of these American sub-cultures.[2] She received her bachelor's degree in sociology and psychology from Vanderbilt University in 2005 and her doctorate from the University of Michigan in 2013. Her dissertation was titled "Americanness, Masculinity, and Whiteness: How Michigan Militia Men Navigate Evolving Social Norms." This information is available on her CV, a copy of which has been provided to the Government.

## II.     Dr. Cooter's testimony is admissible because it is relevant, will assist the jury to determine a fact-in-issue, and will not confuse the jury.

In accordance with the federal rules of evidence, evidence is relevant if it:

> ha[s] *any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed. R. Evid. 401 (emphasis added). Generally, all evidence is admissible if it is relevant. Fed. R. Evid. 402. Relevant evidence may be excluded

> If its probative value is substantially outweighed by the danger of unfair prejudice, confusion *of the issues*, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403 (emphasis added).

Assuming a witness is qualified "as an expert by knowledge, skill, experience, training, or education," her testimony, including *but not limited to* opinions, is relevant if "(a) the expert's scientific, technical, or other specialized knowledge will help the [jury] to understand the

---

[1] Entman, Liz. *Bundy acquittal, Trump loss may inspire future militia action: Vanderbilt expert*. Vanderbilt University News Online, Oct. 28, 2016 (available at: <https://news.vanderbilt.edu/2016/10/28/250563/>)(last accessed: Jan. 18, 2018).

[2] Staff, *Sociologist: How to understand militias*. MSNBC Online, Oct. 31, 2013 (available at: <http://www.msnbc.com/rachel-maddow-show/sociologist-how-understand-militias>)(last accessed: Jan. 18, 2018).

evidence or to determine a fact in issue; (b) the testimony is based on *sufficient* facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

### A.     *United States v. Stone* is distinguishable on its facts.

The Government relies on *United States v. Stone*, 2012 U.S. Dist. LEXIS 10846 (E.D.Mich. 2012) for the proposition that "'how conspiracy theorists view' events that are significant to those conspiracy beliefs and theories – under Federal Rules of Evidence 702 and 403 because the testimony would not be relevant and would confuse the jury." Govt's Mot. To Preclude Defendants' Witness, Dr. Amy Cooter, from Testifying and For a *Daubert* Hearing,, *United States v. Wright*, No. 6:16-CR-10141 (D. Kan. Jan. 10, 2018), Doc. No. 201 at 2 ("Govt Motion"). However, the Government's faith in the Eastern District of Michigan is misplaced.

In the first instance, it ought to be considered that in *Stone*, it was the Government – and *not* the defendant – that proposed expert testimony "about conspiracy subcultures, beliefs and theories; and theories such as 'stigmatized knowledge,' . . . the role of the internet in spreading conspiracy belief literature and thought," and "significant events in conspiracy belief and how conspiracy theorists view these events." *Stone*, 2012 U.S. Dist. LEXIS 10846 at ** 3-4. It was the *Government*, not the defendant, that felt that such expert testimony would help the jury to understand the defendant's motive, which it alleged would make it *more* probable that he would enter an agreement with others to achieve the aims of such a conspiracy. *Id*. at **5.

Second, however, the Government was not actually offering expert testimony that would make it more or less probable that the defendant in that case would enter the criminal agreement or that he shared the aims of such conspiracy. Instead, a fair reading of the case suggests that the Government proffered such evidence in order to explain *why* the defendant engaged in the

3

unlawful conduct. The Government's proffer of expert testimony *presumed* that the defendant engaged in criminal conduct, and its expert would merely be going into a detailed explanation of *why*. In this way, the Government did *not* offer the expert testimony to help the jury decide a fact-in-issue (*i.e. whether* he had requisite intent or motive). In this case, Mr. Wright is not offering Dr. Cooter's testimony to *mitigate* pre-determined criminal conduct. Instead, Mr. Wright proffers Dr. Cooter's testimony as evidence that he did not, in fact, engage in such an offense because he lacked the requisite intent.

The Government also relies on other non-binding authority: the Sixth Circuit's decision in *United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012)(the district court's decision in *United States v. Amawi* was quoted in *Stone*, and is available at 552 F.Supp.2d 669 (N.D. Ohio 2008)). However, that case relied on the same basic theory: the proponent offered the evidence not to explain *whether* a person had a requisite intent, but *why* he had the intent that he had. In this case, Dr. Cooter's testimony will be helpful to the jury to answer the question *whether* Mr. Wright had the requisite intent, and not simply explaining *why* he did.

### B.   Even assuming, *arguendo*, that *United States v. Stone* is not distinguishable on its facts, it is inapplicable because the district court judge applied the wrong standard to determine whether the evidence was admissible.

The Government misplaces its faith in *Stone* for a second reason: that court unlawfully applied the wrong standard by which to determine admissibility. The *Stone* court in that case held that "[i]t is neither *necessary nor sufficient* that Defendants believe in conspiracy theories to be found guilty of Seditious Conspiracy." *Stone*, 2012 U.S. Dist. LEXIS 10846 at **9. In the court's opinion, "[t]he absence of fit between [the expert]'s proposed testimony and the issues is exemplified by some of the topics covered" in the Government's motions and during the hearing which covered the history of FEMA detention centers; the standoffs at Ruby Ridge and Waco,

4

and the Oklahoma City and 9/11 terrorist attacks. *Id*. at **10-11. The court wrongfully dismissed such information intended by the proponent to help the jury understand the defendant's state of mind. Instead, the Michigan court decided that because the "Government does not allege that Defendants were *involved*" in detention centers, Ruby Ridge, Waco, OKC, 9/11, and the like, that expert testimony explaining how such events and their place in the American zeitgeist was "not relevant to the facts alleged in the indictment," even though in any criminal conspiracy, state of mind and defendant's *scienter* is *always* a fact-in-issue.

    The court in the *Stone* case was, to put it plainly, wrong. First, the district court expressly states that a defendant's state of mind, including his assumptions, motives, and beliefs, is "neither necessary nor sufficient . . . to be found guilty." This is wrong, if for no other reason than the defendant's state of mind is *always* necessary, and *never* sufficient to be found guilty of a crime, unless such a crime lacks an element of *scienter*. But it is wrong for another reason. Rule 702 has absolutely *no* requirement that the proceeds of expert testimony, such as opinions, be "necessary" or "sufficient" for the jury to make an ultimate determination of guilt or innocence. The question this Court must ask is not whether Dr. Cooter's testimony regarding Mr. Wright's state of mind is necessary or sufficient for the jury to render a verdict. Instead, the question this Court must ask is simply whether her testimony has "*any* tendency to make . . . *any* fact [in issue] . . . more probable or less probable." Fed. R. Evid. 401.

    Second, Mr. Wright's state of mind is *clearly* a fact in issue and evidence having any tendency to explain his state of mind – including expert testimony explaining his *cultural* background through which he would filter his thoughts – is admissible under Rule 401. Mr. Wright is charged with conspiracy. And in the Tenth Circuit, "[t]he elements of the crime of conspiracy are: (1) the existence of a *conspiracy* ([an agreement, *infra*] either express or

5

understood); (2) the defendant *knew* the essential objectives of the conspiracy; and (3) the defendant *knowingly and voluntarily* participated in the conspiracy. To find existence of, and participation in, a conspiracy, a reasonable jury must be able to find 'that the conspirators had a *unity of purpose* or a *common design and understanding*' to commit the [underlying] criminal offense alleged." *United States v. Young*, 954 F.2d 614, 618-19 (10th Cir. 1992). At the heart of a criminal conspiracy lies an agreement. *Ingram v. United States*, 360 U.S. 672, 677-678 (1959). Whether there is an "agreement" is dependent on whether there is a "'*meeting of the minds* in the common design, purpose, or objects of the conspiracy.'" *United States v. Anderson*, 981 F.2d 1560, 1564 (10th Cir. 1992). In sum, the crimes of conspiracy *are* "crimes of the mind." They specifically target state of mind, and come dangerously close to criminalizing thought and speech. Therefore, *any* evidence bearing on Mr. Wright's state of mind *must* be in issue.

So how is the jury supposed to know whether there was a "meeting of the minds" between the conspirators, when alleged co-"conspirators" may be innocent by virtue of not being sincere conspirators, such as when law enforcement officers go undercover? Intent merely refers "to the state of mind with which [an] act is done or omitted." *Young*, 954 F.2d at 619. And "[m]otive is what prompts a person to act, or fail to act." *Young*, 954 F.2d at 619. In other words, evidence of *motive* (or lack thereof) is evidence that makes it more or less likely that Mr. Wright would (or did) enter an agreement, and it is evidence that makes it more or less likely that Mr. Wright would (or did) *share* criminal objectives of such an agreement with others, and it is evidence that makes it more or less likely that Mr. Wright knowingly engaged in otherwise-lawful conduct in order to perform his obligations under the agreement, as opposed to engaging in such lawful conduct for a different and lawful purpose. If the Government asserts that his otherwise-lawful speech and conduct was for *unlawful* purposes, but a cultural expert's

testimony puts his speech and conduct into the context whereby they are rightly contextualized as *common, and lawful* because the Government (and the jury) applies its *own* cultural norms instead of Mr. Wright's, it bears on whether he *sincerely* entered an agreement and whether he *sincerely* shared a desire that the aims of such agreement be achieved.

In other words, evidence of motive has a tendency to make the fact whether Mr. Wright had the requisite intent, both to *enter* the agreement to commit unlawful acts, and *intent* to commit the unlawful acts with others, more or less likely. The Michigan court applied its own contrived "necessary or sufficient" standard, instead of the "any tendency" standard required by Rule 401 and, by extension, Rule 702. The Michigan court unlawfully applied the wrong standard to determine that such evidence is irrelevant to the issues of this case, and it is therefore inapplicable and holds very little persuasive power.

      **C.**    **Dr. Cooter's testimony would be helpful to the jury to decide facts-in-issue.**

What Dr. Cooter's expertise, though, is not in finding out motive, but in "translating" norms from one culture or sub-culture to another. The jurors can use her like a court-room translator to find out what Mr. Wright *meant* or *intended* through his speech and conduct, since his sub-communities engage in behavior that appears suspicious to outsiders. The veil of our own communities' standards creates assumptions that another person's conduct and actions carry a particular character because we weigh them against what *we* believe they mean. A New Yorker who sees a person with a Glock 19 strapped to his belt might believe such a person presents a clear-and-present danger, while a western Kansan sees the same thing and calls it Tuesday. In the same way, a person who belongs to a militia might have strong feelings about immigration and the role of the government, but in those communities, any alleged actions are often fantasy. A prepper may be prone to owning guns and testing explosive knowledge for when SHTF (and the

7

law becomes inapplicable anyway) Dr. Cooter's testimony can aid in "sussing out" the difference between sincerity as it relates to such speech and conduct, and "jest."

First, Dr. Cooter's testimony provides cultural context for the conduct and speech, and whether such conduct and speech amounts to an "agreement." The fact of the matter is that conduct means different things to different people. For instance, the "Hook 'em Horns" hand signal is "[o]ne of the world's most recognizable hand signals."[3] However, while it is a symbol of community, camaraderie and brotherhood among alumni of the University of Texas, it is recognized and famous among Italians as a vulgar insult.[4] A very similar hand gesture is used among fans of rock and roll as a means of supporting their favorite musicians. However, the "rock on" hand gesture could easily be mistaken as a message of romantic love to members of the Deaf and Hard-of-Hearing communities if the thumb in the "Hook 'em Horns" hand gesture is slightly out of place.[5]

A Longhorn fan, a KISS fan, an Italian and a Deaf person meet at a crossroads and each uses the gesture. Without a person to explain the cultural differences, an average juror could believe that the Texas fan intends to insult the Italian, or that the Italian intends to tell the Deaf person how much he cares, or that the KISS fan intends to express a shared love of musical sound with the Deaf person, or that the Deaf person intends to express his love of Longhorn football to everybody. Expression of ideas – and acquiescence to such thoughts – is cultural. And

---

[3] University of Texas at Austin, *History and Traditions*, University of Texas at Austin Webpage (available at: <https://www.utexas.edu/about/history-and-traditions>)(last accessed: Jan. 19, 2018).

[4] Marchetti, Silvia. *Italian hand gestures everyone should know*. CNN Online, May 29, 2015 (available at: <http://www.cnn.com/travel/article/experts-guide-to-italian-hand-gestures/index.html>)(last accessed: Jan. 18, 2018).

[5] Ehrbar, Ned. *Gene Simmons wants to trademark "devil horns" hand gesture*. CBS News Online, June 15, 2017 (available at: <https://www.cbsnews.com/news/gene-simmons-trademark-devil-horns-hand-gesture/>)(last accessed: Jan. 18, 2018).

sometimes, a cultural expert is needed in order to explain how people different from the juror speak to each other to determine whether they are sincere in what they are saying, or have a particular motive or intent in what they are doing.

### III.     Defendant's expert witness notice is not deficient under Fed. R. Crim. P. 16(b)(1)(C).

In the first instance, this constitutes both unfair surprise and premature objection. The Government has had Mr. Wright's Notice of Expert Testimony since November 1, 2017 (Doc. 171). Waiting over two months to object to the sufficiency of such notice, and to do so two months before trial, places an undue burden on Mr. Wright . The Government has had ample opportunity and has sufficient time hereafter to locate and engage expert witnesses of its own if it desires to rebut any testimony that Dr. Cooter may give.

Furthermore, as to the Government's assertion that "[i]n spite of repeated requests, the government has not received notice of Dr. Cooter's opinions in, for example, any expert-witness reports," the Government's argument is disingenuous at best. The Government has created this problem of its own accord by failing to provide all discovery to Mr. Wright in a timely manner. Had the Government done so, Mr. Wright and his counsel would have had fair opportunity to review all discovery materials, in light of the fullness of the discovery to then make a determination of which materials were to be presented to Dr. Cooter and do so, permitting Dr. Cooter sufficient time with those materials to form an opinion and to generate reports or documents thereof and Mr. Wright sufficient time to present those to the Government. The Government continues to provide discovery materials to Mr. Wright, one of the latest sets being post-marked as late as January 4, 2018.

Additionally, the Government has had complete and fair notice that CJA budget funds to compensate Dr. Cooter for her time in review of such evidence has not, until today, January 22,

2018, been made available. The Government certainly had notice that Mr. Wright did not have access to such funds on or before the expert witness disclosure date of November 1, 2017. As the Government and this Court well know, Mr. Wright was appointed counsel in accordance with the Criminal Justice Act. It would be inequitable and unreasonable for the Government and this Court to believe that Dr. Cooter should not be compensated for her time in reviewing such materials. And until there were funds available, it was not reasonable to expect that she would spend what may be very ample time reviewing the discovery materials and drafting her own reports on the matters at hand. All of this to say, the fact that Dr. Cooter has not prepared, nor been given fair opportunity by both the courts and the Government to prepare, any reports or statements of opinion, arises not out of any deficiency on Mr. Wright's part or Dr. Cooter's part, but has arisen out of the Government's inefficiency in providing discovery to Mr. Wright and having knowledge without objection that Mr. Wright had not received the necessary funds to properly engage Dr. Cooter. To hold the Government's failures against Mr. Wright would be inequitable, unreasonable and unduly prejudicial, and a miscarriage of justice.

Furthermore, Mr. Wright's notice is sufficient under Rule 16(b)(1)(C). The Rule states:

> The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if-
>
> > (i)  the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or
> >
> > (ii) the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.

Fed. R. Crim. P. 16(b)(1)(C). Nowhere does Rule 16 require Mr. Wright to have provided such reports or opinions to the Government by a particular deadline, as might be required had the corollary Rule 26 in the Federal Rules of Civil Procedure been applicable. The reason for this is

that Rule 16(b)(1)(C) "is to prevent unfair surprise at trial and to permit the government to prepare rebuttal reports and to prepare for cross-examination at trial," while understanding that in criminal proceedings – when a liberty interest is at stake – as compared to civil proceedings, this rule must necessarily be interpreted broadly in the interests of justice, and not in any technical way. *See United States v. Lindemuth*, 2017 U.S. Dist. LEXIS 190433 at *4-5 (D. Kan. Nov. 17, 2017).

The Government cites *Lindemuth* for the proposition that the notice already provided is insufficient on its face. However, the Government's interpretation of *Lindemuth* is faulty. In the first instance, it is unclear how much prejudice would have resulted to the government in such case. The expert witness deadline in that case was October 24, 2017, and the defendant did not disclose the identity of his expert until 17 days thereafter. *Id*. at *2-3. There is no way to determine therefrom whether the actual notice occurring less than three weeks after the initial expert notice deadline would result in the unfair surprise Rule 16 is meant to prevent. For all we know, trial could have been set for November 15, 2017 – a mere three days after actual notice was given. In such instance, the delay may have been unduly prejudicial to the government. But there is no way to know from the district court's opinion when trial was set, such that unfair surprise could be determined. The operation of Rule 16 does not create *per se* unfairness simply because some opinions are received *after* initial notice is given. In fact, the Government appears to agree with this, as it made requests *after* the deadline for opinions and reports, and did not object immediately to Mr. Wright's notice that any and all reports and opinions would be provided "once finalized," the obvious implication being that they would not be available until *after* the notice deadline. Doc. 171.

11

Furthermore, the expert disclosure in *Lindemuth* did not just use generalities of topics *the expert would testify to*. The defendant failed to even *identify* an individual person who would testify as an expert until several days later:

> [W]hen the deadline to provide notice of expert witnesses arrived on October 24, 2017, . . . Mr. Lindemuth filed a Designation of Expert Witness and Offer of Proof with a Disclosure of Expert Testimony. But this disclosure *did not name the expected expert*. . . . In his Disclosure of Expert Testimony, Mr. Lindemuth disclosed the topics, generally, that [an] expert witness was expected to address in his testimony. . . . Later, Neil Sader . . . offered to testify as an expert witness on a pro bono basis. Once Mr. Sader agreed to do so, Mr. Lindemuth filed a Supplemental Designation of Expert Witness, and it named Mr. Sader as the expert witness who would testify about the topics disclosed. . . . Mr. Lindemuth filed this supplement 17 days after the October 24 deadline for serving notice of expert witnesses had passed.

*Id*. at *2-3.

In this case, the Government has had fair notice since November not only of the topics that *an* expert in the specified areas would testify to, but also *identified* that expert by name: Dr. Amy Cooter. The Government was also provided a copy of her curriculae vitae, which provided information regarding not only her background qualification, but also identified several of her published works which are available online, and which specifically dealt with the topics provided for in Mr. Wright's expert notice. The Government has had more than enough opportunity to locate and engage rebuttal expert witnesses based on Dr. Cooter's publicly available works, and is now only waiting on Dr. Cooter's specific opinions. There has been absolutely no unfairness to the Government to this point, except perhaps the unfairness it has brought on itself.

Rule 16 also provides broad remedies beyond merely prohibiting a party from introducing such testimony. Instead, a court may issue an order specifying a time that such evidence must be delivered to the opposing party, and all other "just terms and conditions." Fed. R. Crim. P. 16(d)(2)(A). However, in this case, Mr. Wright was never required by Rule 16 or any

order to provide expert opinions and reports by any particular date. And the Government had fair notice of this and ample opportunity to object. Mr. Wright's notice specifically states that "[a]ny and all reports related to this case will be provided *once finalized*." Doc. 171 at 1. Neither this Court nor the Government objected to such notice at the time. To do so now would render injustice done in the name of efficiency, and provide a windfall to the Government. Had the Government objected to the notice, it had ample opportunity to provide this Court its objection and obtain a remedy. After all, this Court held a status conference two weeks later, on November 15, 2017, at which it issued a scheduling order. (Doc. 182). At the time of that status conference, the Government failed to object to the notice provided by Mr. Wright of Dr. Cooter's testimony, and this Court did not raise the issue *sua sponte*. This Court then held another status conference on December 1, 2017, at which it issued another scheduling order. (Doc. 187). Once again, the Government failed to object to the notice provided by Mr. Wright of Dr. Cooter's testimony, and this Court did not raise the issue *sua sponte*.

      Simply put, the time for unfairness and prejudice to the Government has not yet passed, but it has been delayed in no small part by the Government's own actions. The fact that the Government made "repeated requests" merely for Dr. Cooter's *opinions*, and made no objection to any other part of Mr. Wright's notice, indicates that the Government's objection is contrived and will ultimately *not* render the unfair surprise that Rule 16 is *actually* dedicated to preventing, so long as such opinions are made available to the Government within a reasonable period of time prior to trial.

      Respectfully submitted,

/s/ Kari S. Schmidt
KARI S. SCHMIDT, #11524
Tyler J. Emerson, #26006
Conlee Schmidt & Emerson, LLP

>200 W. Douglas, Suite 300
>Wichita, Kansas 67202
>T: (316) 264 - 3300
>F: (316) 264 - 3423
>E: karis@fcse.net
>E: tyler@fcse.net
>*Attorneys for Gavin Wright*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2018 I electronically filed the foregoing response with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all interested parties.

>/s/ Kari S. Schmidt
>Kari S. Schmidt