# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

v.               Case No.  **16-CR-10141-EFM**

CURTIS WAYNE ALLEN *et al.*,

        Defendants.

## GOVERNMENT'S SENTENCING MEMORANDUM, AND, IN THE ALTERNATIVE, MOTION FOR UPWARD DEPARTURE AND/OR VARIANCE

STEPHEN R. MCALLISTER
United States Attorney

ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

RISA BERKOWER
MARY J. HAHN
Trial Attorneys
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0150
Risa.Berkower@usdoj.gov

## TABLE OF CONTENTS

BACKGROUND ……………………………………………………………………………2

ARGUMENT…..…………………………………………………………………………..2

I.    Proper Application of the U.S. Sentencing Guidelines Results in a
Guidelines Range of Life Imprisonment for Each Defendant………………………………4

    A.  U.S. Sentencing Guidelines for Count One…...…………………………………………4

        1.  Because the Defendants Were Convicted of Using a "Destructive Device"
in Violation of 18 U.S.C. § 2332a, U.S.S.G. §§ 2K1.4 and 2A1.5
Govern the Base Offense Level for Count One …………………….....………..4

        2.  Defendants' Argument that U.S.S.G. § 2M6.1 Should Be Used to
Calculate the Base Offense Level Is Contrary to the Text, Structure, and
Binding Commentary of the Guidelines…...……………………………..……...7

        3.  The U.S.S.G. § 3A1.4 Terrorism Enhancement Squarely
Applies to Each Defendant ………...…………………………………………..11

            i.      Under Tenth Circuit Precedent, Judges May
Find the Facts Supporting Sentencing Enhancements
by a Preponderance of the Evidence …………………...……12

            ii.    Ample Record Evidence Establishes that the Terrorism
Enhancement under U.S.S.G. § 3A1.4 Applies ………………..16

        4.  The Hate Crime Enhancement Under U.S.S.G. § 3A1.1
Applies to All Three Defendants………………………………….............…………..26

        5.  The Trial Evidence Established that Defendant Wright Obstructed
the Federal Investigation by Concealing Material Evidence…….…………….28

        6.  Defendant Stein Served as an Organizer of the Conspiracy……………………29

    B.  U.S. Sentencing Guidelines Applicable to Count Two Results in the
Same Guidelines Range of Life Imprisonment as Count One……….…………...…….31

II.     The Statutory Sentencing Factors Enumerated in 18 U.S.C. § 3553 Strongly
        Favor Life Imprisonment…………………..…………………..……………….……...33

        A. Life Sentences Are Warranted By the Nature and Circumstances
           of the Defendants' Offenses …………………..………………….…..…..……… 34

        B. The Defendants' History and Characteristics Strongly Favor Life Sentences………….38

              1.  Defendant Allen ………………..…………………..…………………..40

              2.  Defendant Stein ..………………..…………………..………………….41

              3.  Defendant Wright…………………..…………………..…………………46

        C. Life Sentences Will Appropriately Reflect the Seriousness of the Offenses………….....47

        D. Life Sentences Will Appropriately Promote Respect for the Law………….....................49

        E. Life Sentences Will Provide Just Punishment, Afford Adequate
           Deterrence, and Protect the Public……..……..…………………..…………………..50

        F. Life Sentences Will Not Result in Sentencing Disparities…………..……………….51

III.    If the Court Does Not Apply U.S.S.G. § 3A1.4's Terrorism Enhancement,
        Either An Upward Departure or an Upward Variance to Life Imprisonment
        Is Necessary and Appropriate…………………..…………………..……………….52

        A. The Facts Warrant an Upward Departure Pursuant to
           U.S.S.G. § 3A1.4 Application Note 4 ……….…………………..……………….52

        B. The Section 3553a Sentencing Factors Strongly Support
           an Upward Variance to Life Imprisonment…...…………………..………………….54

CONCLUSION…..…………………..…………………..…………………………………….55

APPEARS NOW the United States of America, by and through its undersigned attorneys, and respectfully submits this Sentencing Memorandum and, In the Alternative, Motion for Upward Departure and/or Variance.  The defendants stand before the Court convicted of a conspiracy to use a weapon of mass destruction to commit a mass murder that would send both a message and a threat:  that Muslims are not welcome in America, and, unless the U.S. Government changed its immigration policies, more carnage would follow.  The government agrees with the United States Probation Office (USPO) that the base offense level for each defendant is 33, and that their adjusted total offense level should be treated as 43, resulting in a Guidelines recommendation of life imprisonment.  The government further submits that, even if the Guidelines range were not life, the factors enumerated in 18 U.S.C. § 3553(a), as well as an upward departure specifically contemplated by the Guidelines for offenses involving the intimidation of a civilian population, all support imposing the maximum penalty of life imprisonment.

Life sentences are appropriate in this case.  The defendants planned to blow up an apartment complex located at 312 West Mary Street and kill scores, if not hundreds, of Somali Muslim tenants.  Their goal was not only to commit mass murder, but also to incite other groups to "wake up" and commit other acts of violence against Muslims, against landlords who rent to Muslims, and against the U.S. government, and to spread the hateful message that Muslims should be, in the words of Defendant Stein, "eradicated" from the United States.  The heinousness of this crime is amplified by the defendants' plan to attack the victims in their homes and as they prayed at the mosque in the apartment complex, thereby violating the sanctuary that should protect every home and every place of worship in this country.

## BACKGROUND

This Court is well acquainted with the testimony of the witnesses, the hours of recordings of the defendants planning to commit these crimes, and the numerous physical exhibits (including the defendants' manifesto, maps of the target, thousands of pages of explosives recipes, anti-Muslim fliers, an HMTD detonator, ingredients for homemade explosives, and 300 pounds of fertilizer) entered as exhibits during the government's case at trial. The government hereby incorporates all of the record evidence considered by the jury in their finding the defendants' guilt beyond a reasonable doubt, as well as the USPO's recitation of the facts in the Presentence Reports (PSRs). This Court may also rely on evidence that was not admitted into the record during trial but is nevertheless relevant for the purposes of sentencing. *See United States v. Ryan*, 236 F.3d 1268, 1272 (10th Cir. 2001) (holding that evidence excluded at trial may be considered by the court at sentencing).

## ARGUMENT

All relevant sentencing considerations warrant life sentences for these defendants. To calculate the defendants' sentences, this Court must start by correctly calculating the defendants' Guidelines range. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) ("District courts *must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.") (internal quotation marks and alterations omitted). Here, the government respectfully submits that the correct starting point for determining the base offense level for Count One is U.S.S.G. § 2K1.4, with a cross reference to U.S.S.G. § 2A1.5, as recommended by the USPO. Although the USPO did not provide a detailed analysis for Count Two, the government submits that the base offense level for Count Two is governed by U.S.S.G. § 2H1.1, with a cross

reference to U.S.S.G. § 2A1.5.[1]  Thus, for both Counts One and Two, the base offense level for each defendant is 33.

This Court must also apply all relevant enhancements and adjustments.  For Counts One and Two, all three defendants should receive the twelve-level terrorism enhancement under U.S.S.G. § 3A1.4 and the three-level hate crime enhancement under U.S.S.G. § 3A1.1; defendant Wright should receive an additional two-level enhancement for obstruction; and defendant Stein should receive the two-level enhancement for his role as an organizer of the conspiracy.  Applying the correct base offense level and all relevant enhancements results in a Guidelines range for each defendant of life imprisonment – sentences that are also reasonable under 18 U.S.C. § 3553.

Should the Court decline, for any reason, to apply the U.S.S.G. § 3A1.4 terrorism enhancement to Counts One and Two, then the defendants' Guidelines range would result in recommended sentences of less than life imprisonment.  Should the Court make such a determination, the government would request, in the alternative, that the Court nonetheless impose a life sentence either through an upward departure pursuant to U.S.S.G. § 3A1.4 Application Note 4, or as an upward variance from the Guidelines range.  For the reasons given below, life imprisonment is reasonable and necessary punishment for the defendants' egregious crimes.

---

[1] Defendant Wright was also convicted of obstruction of justice in Count Three.  However, because Counts One and Two result in the Guidelines range of life imprisonment, the Guidelines calculation for Count Three does not affect their ultimate sentence.  To the extent that the Court has any questions about the analysis of Count Three, the government hereby incorporates the arguments it raised in its response to Defendant Wright's objections to the PSR for this count.  Wright PSR Addendum, ¶¶ 213-16 (summarizing the government's responses to the defendant's objections to this count).  In addition, Defendant Allen raised an objection about one of the terms of supervised release recommended by the USPO.  The government indicated in its response to this objection that it would be willing to narrow the scope of that term, and hereby incorporates by reference its analysis of that issue.  Allen PSR Addendum, ¶¶ 220-21.

I.      **Proper Application of the U.S. Sentencing Guidelines Results in a Guidelines Range of Life Imprisonment for Each Defendant**

The USPO based its Guidelines analysis on Count One of the Superseding Indictment.  The government will first explain the reasons that this Court should find that the USPO's calculation of the Guidelines range of life imprisonment, including all of the applicable enhancements, for Count One is correct.  *See* Part I.A, *infra.*  The government will then provide an analysis of the Guidelines for Count Two, which likewise results in a Guidelines range of life imprisonment, to assist the Court in addressing any questions about this count.  *See* Part I.B, *infra.*

A.  **U.S. Sentencing Guidelines for Count One**

1.  **Because the Defendants Were Convicted of Using a "Destructive Device" in Violation of 18 U.S.C. § 2332a, U.S.S.G. §§ 2K1.4 and 2A1.5 Govern the Base Offense Level for Count One**

The Defendants were convicted of conspiring to use a weapon of mass destruction, specifically, a "destructive device" as defined by 18 U.S.C. § 2332a(c)(2)(A), to destroy an apartment building and mosque and to kill the residents and their guests.  *See* Second Superseding Indictment, Count One (ECF 89) (charging the defendants with using a "destructive device").  As explained more fully below, U.S.S.G. § 2K1.4 governs the base offense level for defendants convicted of using a destructive device to destroy property.  U.S.S.G. § 2K1.4, App. Note. 4.  Applying § 2K1.4, the defendants' base offense level is 33.

The Sentencing Guidelines require the sentencing court to determine the offense guidelines by referring to the Statutory Index (Appendix A).  *See* U.S.S.G. § 1B1.2.  The Statutory Index identifies three Guidelines provisions that may apply to convictions of 18 U.S.C. § 2332a: U.S.S.G. § 2A6.1 (Threats or Harassing Communications) (which all parties agree is not applicable in this case); § 2K1.4 (Property Damage by Use of Explosives); and § 2M6.1 (Nuclear, Biological, and

Chemical Weapons and Materials, and Other Weapons of Mass Destruction).  Where, as here, a statutory provision covers a variety of conduct, the Statutory Index identifies multiple offense guidelines, and the sentencing court determines which offense guideline provision is "most appropriate" for the offense conduct charged in the count for which the defendants have been convicted.  U.S.S.G. §1B1.2 App. Note 1.

Title 18, Section 2332a covers the use of four different types of weapons of mass destruction: (1) "destructive devices," i.e., conventional weapons;[2] (2) biological weapons; (3) chemical weapons; and (4) radiological weapons.  *See* 18 U.S.C. § 2332a(c)(2)(A)-(D).  The government urges the court to adopt the PSR's recommendation that § 2K1.4 be selected as the "most appropriate" guideline for the defendants' convictions for their conspiracy to use destructive devices, i.e., the first type of weapon of mass destruction identified in § 2332a.

By its plain terms, U.S.S.G. § 2K1.4 applies to "property damage by use of explosives," which is precisely the conduct of which the defendants were convicted.  The commentary to U.S.S.G. § 2K1.4 expressly confirms that this provision applies here.  Application Note 1 to U.S.S.G. § 2K1.4 defines "explosives" to include any "destructive device."  *See also* U.S.S.G. Commentary, Statutory Provisions (identifying 18 U.S.C. § 2332a as one of the statutory provisions covered by this guideline).

Courts interpreting the guidelines applicable to convictions under § 2332a have likewise agreed that U.S.S.G. § 2K1.4 governs where, as here, the defendants are convicted of the use of a

---

[2] 18 U.S.C. § 2332a (use of weapons of mass destruction) states that a weapon of mass destruction means, among other things, a "destructive device" as defined in 18 U.S.C. § 921(4). Section 921(4) defines a destructive device as, among other things, an explosive, incendiary, or poison gas bomb, grenade, rocket, missile, mine, or similar device, or large bore weapon which expels a projectile by means of explosive or propellant.

destructive device.  *See, e.g.*, *United States v. Aref*, No. 04-cr-402, 2007 WL 804814, at *3 (N.D.N.Y. Mar. 14, 2007); *United States v. Wright*, No. 1:12-cr-238, 2012 WL 5507254, at *17 (N.D. Ohio Nov. 14, 2012); *cf. United States v. Aldawsari*, 740 F.3d 1015, 1020-21 (5th Cir. 2014) (applying U.S.S.G. § 2K1.4 to conviction of defendant convicted of 18 U.S.C. § 2332a(a)(2) for attempting to use a bomb).

Pursuant to U.S.S.G. § 2K1.4, if the "offense was intended to cause death or serious bodily injury," the sentencing court must apply the higher of either the applicable provisions within U.S.S.G. § 2K1.4, or "the most analogous guideline from Chapter Two, Part A (Offenses Against the Person)." U.S.S.G. § 2K1.4(c)(1).  The evidence at trial overwhelmingly proved that the defendants conspired and intended to commit mass murder.  The defendants planned to detonate their bomb at prayer time, to kill as many Muslims as possible inside the complex's mosque (*see, e.g.*, Gov't Trial Exs. 16mm-oo, 127r); planned to add fragmentation to the bomb to maximize its lethal effects (*see, e.g.*, Gov't Trial Ex. 15s ("screws, nails, and ball bearings"), 127dd ("ball bearings" and "sheet rock knife blades"); and intended to level the entire apartment complex (*see, e.g.*, Gov't Trial Exs. 127xxx-yyy).

In their objections, none of the defendants disputed that, if U.S.S.G. § 2K1.4 applies, the USPO correctly found that the defendants intended to commit mass murder and that U.S.S.G. § 2A1.5 (Conspiracy to Commit Murder) is the most analogous guideline to the defendants' offenses of conviction.  *Cf. United States v. Nichols*, 169 F.3d 1255, 1272 (10th Cir. 1999) (applying the first-degree murder provision as the "most analogous" guidelines provision to bombing of the Murrah building).  Thus, the defendants' base offense level for Count One is 33.

### 2. Defendants' Argument that U.S.S.G. § 2M6.1 Should Be Used to Calculate the Base Offense Level Is Contrary to the Text, Structure, and Binding Commentary of the Guidelines

The defendants invite this Court to ignore the plain text of § 2K1.4 and its commentary and instead apply U.S.S.G. § 2M6.1.  This Court should decline this invitation because the defendants' arguments contravene the longstanding rules of construction for the Guidelines and are contrary to the text, commentary, structure, and history of the guidelines provisions applicable to 18 U.S.C. § 2332a.

When interpreting the applicability of a Guidelines provision, sentencing courts are required to review the language of the guideline and "the interpretive and explanatory commentary provided by the Sentencing Commission."  *United States v. Robertson*, 350 F.3d 1109, 1112 (10th Cir. 2003) (internal quotation marks omitted); *see also, e.g.*, *United States v. Martinez*, 602 F.3d 1166, 1173-74 (10th Cir. 2010).  As the Supreme Court has held, and as the Tenth Circuit has repeatedly affirmed, the "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Stinson v. United States*, 508 U.S. 36, 38 (1993); *see also, e.g.*, *United States v. Murphy*, 901 F.3d 1185, 1190 (10th Cir. 2018) (quoting *Stinson*); *United States v. Morris*, 562 F.3d 1131, 1135 (10th Cir. 2009).  Even where a sentencing court might disagree with the Sentencing Commission's commentary, it is still binding unless the "guideline language *in itself* . . . dictates a result different from what the application note prescribes."  *Martinez*, 602 F.3d at 1175 (emphasis added); *see also Morris*, 562 F.3d at 1135 ("[A] guideline and its commentary are inconsistent only when following one will result in violating the dictates of the other." (internal quotation marks omitted)).

Among other things, the commentary may "interpret [a] guideline or explain how it is to be applied," U.S.S.G. § 1B1.7; *see also Stinson*, 508 U.S. at 41, and may provide "concrete guidance" about how courts should apply the guideline in practice. *Stinson*, 508 U.S. at 41. The Supreme Court has cautioned sentencing courts that failure to follow such commentary "would constitute an incorrect application of the sentencing guidelines." *Id.* at 42-43 (internal quotation marks omitted); *see also id.* at 45 (holding that the authoritative weight of the commentary to the guidelines is analogous to "an agency's interpretation of its own legislative rules").

In their objections to the draft PSRs, the defendants effectively conceded that the commentary to U.S.S.G. § 2M6.1 unambiguously excludes the use of "destructive devices" from its coverage. Instead, they rely on the assertion that the text of the guideline conflicts with the commentary. Although the defendants make slightly varying arguments about the text of U.S.S.G. § 2M6.1, most of their arguments distill down to their assertion that the phrase "weapon of mass destruction" necessarily encompasses all types of weapons identified in 18 U.S.C. § 2332a, including "destructive devices." Yet the defendants cite no authority for this claim, and nothing in the "guideline language in itself . . . dictates a result different from what the application note prescribes." *Martinez*, 602 F.3d at 1175; *see also Stinson*, 508 U.S. at 42. The commentary is therefore authoritative and binding, and § 2M6.1 does not apply to the defendants in this case.

Although U.S.S.G. § 2M6.1 includes several references to "a weapon of mass destruction," the phrase "weapon of mass destruction" is not defined in the text of the guideline itself. Instead, Application Note 1 of the commentary supplies the definition for weapon of mass destruction as used in this guideline: "Weapon of mass destruction has the meaning given that term in 18 U.S.C.

§ 2332a(c)(2)(B), (C), and (D)."[3]   U.S.S.G. § 2M6.1, App. Note 1.  Significantly, this definition omits "destructive devices," the type of weapon of mass destruction identified in 18 U.S.C. § 2332a(c)(2)(A) – and, importantly, the type of weapon at issue in this case.  In other words, the commentary's definition limits the scope of U.S.S.G. § 2M6.1 to only three types of weapons of mass destruction: (1) biological weapons; (2) chemical weapons; and (3) radiological weapons.  The Tenth Circuit has held that commentary serving such a definitional function is binding.  *See Martinez*, 602 F.3d at 1173-74, 1178.

Moreover, the commentary to U.S.S.G. § 2M6.1 is entirely consistent with the text and the structure of the Guidelines applicable to 18 U.S.C. § 2332a.  The Statutory Index identifies both U.S.S.G. § 2K1.4 and U.S.S.G. § 2M6.1 as applicable guidelines, and the definitions provided in the commentary to these two guidelines – U.S.S.G. § 2K1.4 applies to "destructive devices" identified in § 2332a(c)(2)(A), and U.S.S.G. § 2M6.1 applies to the remaining three types of weapons (i.e., biological, chemical, and radiological weapons) identified in 18 U.S.C. § 2332a(c)(2)(B)-(D) – provide guidance on how to harmonize the application of these two guideline provisions.  Indeed, the defendants' argument – that U.S.S.G. § 2M6.1 categorically applies to all weapons of mass destruction, including destructive devices– would render the Statutory Index's inclusion of U.S.S.G. § 2K1.4 a nullity.

---

[3] 18 U.S.C. § 2332a(c)(2)(B)-(D) states that "weapon of mass destruction" means:

> (B)     any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors;
>
> (C)     any weapon involving a biological agent, toxin, or vector (as those terms are defined in section 178 of this title); or
>
> (D)     any weapon that is designed to release radiation or radioactivity at a level dangerous to human life.

For these reasons, the courts that have considered the defendants' argument that U.S.S.G. § 2M6.1 applies to offenses involving destructive devices have rejected it.  *See Aref*, WL 804814, at *3 ("Section 2M6.1, which is the higher guideline, does not apply because the definition of weapon of mass destruction in Application Note 1 excludes the subsection of 2332a that is charged."); *Wright*, 2012 WL 5507254, at *17 (rejecting the government's argument that § 2M6.1 should apply to convictions for the use of conventional weapons).  None of the defendants has cited a single case supporting that contrary position.[4]

The government's interpretation is also consistent with the history of U.S.S.G. § 2M6.1 and U.S.S.G. § 2K1.4.  Prior to 2001, U.S.S.G. § 2K1.4 applied to convictions under 18 U.S.C. § 2332a for property damage caused by the use of explosives, including destructive devices.  In 2001, U.S.S.G. § 2M6.1 was amended to address "a sense of Congress that guideline penalties are inadequate for certain offenses involving the importation and exportation of *nuclear, chemical, and biological weapons*" and to "incorporate  offenses at 18 U.S.C. § 175, relating to *biological* weapons, and 18 U.S.C. § 229, relating to *chemical* weapons."  2001 U.S.S.G. Appendix C, amendment 633 (emphasis added).  In other words, U.S.S.G. § 2M6.1 was amended to address the exact types of weapons of mass destruction that its commentary says it covers.  Nothing in the history of this amendment suggests that U.S.S.G. § 2M6.1 intended to supplant U.S.S.G. § 2K1.4's preexisting coverage of the use of destructive devices.

In their objections, the defendants cited to the Tenth Circuit's decision in *United States v.*

---

[4] In their objections, Defendants Allen and Stein claimed that the decision in *Aref* has limited value because it analyzed a conviction under § 2339A.  However, they failed to mention that the analysis of the guidelines for § 2339A is controlled by the underlying offense, and that the underlying offense in *Aref* was § 2332a.  *See Aref*, 2007 WL 804814, at *3.

*Armijo*, 651 F.3d 1226 (10th Cir. 2011), as an example where the Tenth Circuit has held that commentary to the Guidelines conflicted with the text of the guideline. *Armijo* is inapposite because its holding has nothing to do with the guidelines for § 2332a. Rather, *Armijo* addressed whether the defendant's prior state manslaughter conviction qualified as a "crime of violence" under the then-current version of U.S.S.G. § 4B1.2. The defendant's state manslaughter conviction only required that he "recklessly cause[d]" another person's death. The application note to U.S.S.G. § 4B1.2 identified manslaughter as a crime of violence. The Tenth Circuit held that because the phrase "crime of violence" in the text of the guideline could encompass only those crimes with the required *mens rea* of "purposeful or intentional" behavior, it was "simply untenable" to interpret the application note as encompassing crimes with a *mens rea* of recklessness. *Armijo*, 651 F.3d at 1236. In other words, in *Armijo*, a direct conflict existed between the plain language of the guideline and the application note. But the defendants here fail to identify any such conflict with the plain text of § 2M6.1 that could warrant this Court disregarding Application Note 1.[5]

### 3. The U.S.S.G. § 3A1.4 Terrorism Enhancement Squarely Applies to Each Defendant

As the USPO correctly recommended, the twelve-level terrorism enhancement under U.S.S.G. § 3A1.4 applies to each of the defendants. This Court should accept the USPO's use of this enhancement here because it is clear, under any evidentiary standard, that the defendants' purpose for the bombing falls squarely within U.S.S.G. § 3A1.4's scope: the defendants wanted to

---

[5] In their objections, the defendants raised several additional arguments concerning their base offense levels, none of which has merit. Specifically, Defendant Wright assumed that U.S.S.G. § 2M6.1(a)(4)(B) "implied" that the phrase weapons of mass destruction must include destructive devices based on a misreading of the applicable statutes, *see* Wright PSR Addendum ¶ 193; Defendant Stein argued that application of U.S.S.G. § 2K1.4 would violate his due process rights based on a misapplication of U.S.S.G. § 2M6.1, *see* Stein PSR Addendum ¶ 212; and Defendants Wright and Stein argued that the rule of lenity should apply, despite the lack of any ambiguity in the text and commentary of the guidelines, *see* Stein PSR Addendum ¶ 211, Wright PSR Addendum ¶ 194. The government here incorporates the arguments it raised in its response to these objections to the PSR.

kill Muslims to influence the U.S. Government to change its immigration policies, and to "wake up" others to carry out similarly-minded violence if the government failed to do so.  Given this purpose, as explained below, this terrorism enhancement applies here.

Section 3A1.4 of the Sentencing Guidelines states:  "If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," a twelve-level upward adjustment (or an increase to a minimum base offense level of 32) shall be applied, and "the defendant's criminal history category . . .  shall be Category VI."  A "federal crime of terrorism" has a two-part definition:  It is an offense (1) "that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A); and (2) that is a violation of one of a number of enumerated statutory provisions in 18 U.S.C. § 2332b(g)(5)(B).

In their objections, the Defendants did not dispute that 18 U.S.C. § 2332a, which is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), satisfies the second part of the definition of a federal crime of terrorism.  Instead, they argued that the §3A1.4 terrorism adjustment should not apply to their convictions for two reasons: (1) the Defendants claimed that, as a matter of law, the facts supporting this sentencing enhancement must be found by a jury beyond a reasonable doubt, rather than a judge by a preponderance of the evidence; and (2) the Defendants claimed that they were solely motivated by an intent to kill and intimidate Muslims, not to intimidate or coerce the government.  This Court should reject both of these arguments.

> i.   **Under Tenth Circuit Precedent, Judges May Find the Facts Supporting Sentencing Enhancements by a Preponderance of the Evidence**

The Tenth Circuit has repeatedly held that a sentencing court may find facts by a

preponderance of the evidence and apply those facts to the guideline calculations, as long as the district court treats the Sentencing Guidelines as discretionary. *United States v. Riddle*, 731 Fed. App'x 771, 784 (10th Cir. 2018); *United States v. Hall*, 473 F.3d 1295, 1312 (10th Cir. 2007); *United States v. Gillespie*, 452 F.3d 1183, 1190 n.2 (10th Cir. 2006). This is true even where those facts might substantially increase a defendant's sentence. *See, e.g.*, *United States v. Redifer*, 631 Fed. App'x 546 (10th Cir. 2015); *United States v. Olsen*, 519 F.3d 1096 (10th Cir. 2008) (no enhanced level of proof needed when applying a murder enhancement cross referenced to a perjury conviction); *United States v. Smith*, 208 F.3d 1187 (10th Cir. 2000) (no need for proof beyond a reasonable doubt when proving prior convictions resulting in a sentence of life imprisonment); *United States v. Constantine*, 263 F.3d 1122 (10th Cir. 2001) (binding precedent within the Tenth Circuit forecloses the application of a higher standard of proof).

Although the Tenth Circuit has not yet addressed the evidentiary standard required to establish the terrorism enhancement under U.S.S.G. § 3A1.4, other courts have found that a preponderance of the evidence is the appropriate standard of proof. *See*, *e.g.*, *United States v. Chandia*, 675 F.3d 329, 338 (4th Cir. 2012) (rejecting defendant's argument that due process requires clear and convincing evidence standard and holding that "a preponderance of the evidence is the appropriate standard of proof for establishing the requisite intent for the terrorism enhancement"); *United States v. Garey*, 546 F.3d 1359, 1365 (11th Cir. 2008) (same); *United States v. Graham*, 275 F.3d 490, 518 & n.19 (6th Cir. 2001) (same); *see also United States v. Awan*, 607 F.3d 307, 312 (2d Cir. 2010) (applying the preponderance standard); *United States v. Arnaout*, 431 F.3d 994, 1002 (7th

Cir. 2005) (same).[6]

In his sentencing objections, Defendant Allen argued that this Court should disregard the Tenth Circuit's longstanding precedent and find that a jury, not a judge, must find the facts supporting the terrorism enhancement, and that the evidentiary standard should be beyond a reasonable doubt. Defendant Allen cited no controlling law for these propositions, and instead relied solely on dicta in decisions of the Tenth Circuit and opinions of dissenting justices of the Supreme Court. *See, e.g.*, *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014); *Jones v. United States*, 135 S. Ct. 8 (2014) (Scalia, J., dissenting from the denial of certiorari). Such dicta and dissents do not, however, create controlling law.

Although the Tenth Circuit has, in dicta, addressed the possibility of applying a clear and convincing standard for the "extraordinary" or "dramatic" case, *see, e.g.*, *United States v. Ray*, 704 F.3d 1307, 1314 (10th Cir. 2013); *Olsen*, 519 F.3d at 1105, the Tenth Circuit has repeatedly rejected such constitutional challenges and has "never applied such an enhanced standard of proof." *Redifer*, 631 Fed. App'x at 562; *see also United States v. Magallanes-Torres*, 386 Fed. App'x 766, 770, at *4 (10th Cir. 2010).

The defendants' reliance on *United States v. Cleaver*, 163 Fed. App'x 622 (10th Cir. 2005), and *United States v. Dowell*, 430 F.3d 1100 (10th Cir. 2005), is likewise misplaced. In each of these cases, the Tenth Circuit examined whether the jury had found beyond a reasonable doubt that the terrorism enhancement applied. However, the sentences in those cases were imposed before the

---

[6] The Ninth Circuit requires that where a sentencing enhancement "has an extremely disproportionate effect on the sentence relative to the offense of conviction," the sentencing court must find the facts underlying the enhancement by clear and convincing evidence. *United States v. Tankersley*, 537 F.3d 1100, 1106 n.5 (9th Cir. 2008) (assuming, without deciding, that the clear and convincing standard applied to the terrorism enhancement). The Ninth Circuit's clear-and-convincing requirement appears to be an outlier among the circuits and, in any event, is not the law of this Circuit. Regardless, given the evidence submitted at trial, the government would prevail, even in the Ninth Circuit.

Supreme Court's decision in *Booker v. Washington*, 543 U.S. 220 (2005), and, as a result, the district courts had treated the Sentencing Guidelines as mandatory.  Under those circumstances, the Tenth Circuit found (and the government conceded) that the district courts had committed error, but the Tenth Circuit nevertheless upheld the sentences because the juries had found the requisite facts beyond a reasonable doubt.  *Cleaver*, 163 Fed. App'x at 630-31; *Dowell*, 430 F.3d at 1109-11.

Neither case established – or even suggested – that, absent a *Booker* violation, a jury must find beyond a reasonable doubt the facts supporting the terrorism enhancement.  Indeed, in *Booker*, the Supreme Court stated: "[E]veryone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the Guidelines binding on district judges."  *United States v. Booker*, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."); *see also*, *e.g.*, *United States v. Bustamante*, 454 F.3d 1200 (10th Cir. 2006) (stating that Tenth Circuit precedent "unequivocally establish that, so long as the district court applies the Guidelines in an advisory, rather than a mandatory, fashion, it may rely on facts found by a judge to be true based on a preponderance of the evidence"); *Chandia*, 675 F.3d at 338-39 (holding that, "post-*Booker*, the due process clause does not require the district court to find uncharged conduct by a heightened standard of proof before using it as a basis for determining a defendant's sentence" and applying the preponderance standard to the terrorism enhancement) (internal quotation marks omitted).  Post-*Booker*, there simply is no binding Supreme Court or Tenth Circuit caselaw that alters the longstanding precedent of this Circuit that a sentencing judge may find facts by a preponderance of the evidence.

Although Tenth Circuit law establishes that the government need only prove the facts that trigger the terrorism enhancement by a preponderance of the evidence, the government respectfully submits that the evidence – including hours of recordings replete with the defendants' discussions about using the bombing to incite others to rise up against the government and the defendants' own manifesto addressed to the United States Government – establishes that the terrorism enhancement is appropriate in this case even if a higher evidentiary standard were applicable.  *See Olsen*, 519 F.3d at 1106-07.

> ### ii.       Ample Record Evidence Establishes that the Terrorism Enhancement under U.S.S.G. § 3A1.4 Applies

There is no doubt that one of the defendants' goals was to kill as many Muslims as they could by bombing the Mary Street Apartments.  Contrary to the defendants' claims, however, their goal to commit mass murder is not mutually exclusive with their goal to commit acts of terrorism. As this Court is well aware, the defendants talked at length about their shared anger toward the government, especially its immigration policies allowing Muslims into this country.  During their recruitment and planning meetings, the defendants discussed – and then explicitly documented in a manifesto – that they planned to use the bombing to retaliate against the government, to warn the government to change its policies, and to "wake up" others to commit more violent attacks if the government did not change its immigration policies and stop Muslims from entering the country. *See, e.g.*, Gov't Trial Ex. 15gg; Gov't Trial Ex. 101.  For these defendants, their plan to bomb the Mary Street Apartments was simply the first of a series of terrorist attacks.

As Dan Day testified, the group decided that the bombing would be just the first step in their plan to "take the government back" and to "wake people up."  Dan Day, Trial Tr. 4/4/2018, at 93-94; *see also* Dan Day, Trial Tr. 3/29/2018 pm session, at 62 (testifying that the goal of the

conspiracy was "not just kill Muslims but the – get the government to quit bringing 'em in, not – get the ones out, to retake the government").[7]  Defendant Allen's ex-girlfriend, Lula Harris, likewise testified that Defendant Allen told her that the group was planning an attack to "wake people up because they were going to put a sign on a government facility . . . . that if stuff like – or stuff like this would keep happening if they kept bringing in the refugees and the Muslims."  Lula Harris Trial Tr. 3/26/2018 at 191.  In other words, the defendants not only wanted to bomb the apartment building as a means to kill Muslims, but also as a warning to the government that bombings and other horrific acts of violence would continue if the government refused to change its immigration policies.

The recorded words of the defendants themselves make clear that their conspiracy had a political motive.[8]  From the very beginning of the conspiracy,[9] when Patrick Stein drove Dan Day to the first recruitment meeting in Brody Benson's field, Stein made clear that he believed violence was necessary to retaliate against the government's support of the entry of Muslims into this country:

> I mean there is a select few I have brought in, and we're gonna have kinda little convention of the heads and uh see what comes out of the meeting tonight and go from there. Uh dude and after the Orlando deal, I mean you-you know . . . I [have] been trying to wait patiently and ya know what I am more convinced now than ever there is absolutely nobody-nobody gonna do anything to change anything in terms of

---

[7] All citations to trial transcripts are to the Real-time transcripts provided during trial.  Some of the Real-time transcripts do not have page numbers.  Where no page numbers are provided in the transcripts, the government has cited to the page number of the PDF file for that date's daily transcript.

[8] Although the defendants expressly identified their intent to influence government policy and to retaliate against the government, a sentencing court can base its finding on direct and circumstantial evidence and "need not wait for the defendant to confess a specific intent to influence the government" before finding the terrorism enhancement applies. *United States v. Wright*, 747 F.3d 399, 419 (6th Cir. 2014).

[9] After an extensive set of *James* hearings, this Court found that the government had provided sufficient evidence to establish that the conspiracy began on June 14, 2016, when Defendant Allen arrived at the meeting.

government or LEO's or anything else and until somebody or somebody's finally say fuck it we're gonna take care of it ourselves, it ain't gonna change dude. ***And-and after seeing what they are doing after the Orlando thing, I guarantee its God damn false (unintelligible) I guarantee it has been orchestrated by that cunt bitch Hillary and that nigger. There is too much evidence that already proves that. Um I'm sick and tired of seeing our own fucking people get slaughtered by our own fucking government dude. Period, and it's gotta come to a stop somewhere, sometime, somehow, someway. And this morning I don't know why, can't even answer it God damn (unintelligible) and I went into organization mode. . . .*** Oh it'll get worse before it's done and over with, no question. Absolutely it will, but gotta start somewhere. I'm tired sitting on my ass being patient seeing this shit go down and happen all over this God damn country and absolutely nothing gets done about it. Nothing. Zero, nada, zilch. Yeah so what the mother fuckers who did it they're dead big fucking deal. We bring more of those mother fuckers in by the plane load every day. I mean ya know, we get one or two here and there and they bring in two three hundred. I mean fuck it.

Gov't Trial Ex. 13f (emphasis added).  When Stein started recruiting others, he expressly told them that he planned to commit violence because "[w]e know the god damn feds ain't gon do shit. *They're part of it*."  Transcript 1D7, 6/14/2016 Meeting, at 67 (emphasis added), attached as Exhibit 1.  He repeatedly blamed the federal government for bringing in Muslims "by the plane load."  *See, e.g.*, Gov't Trial Ex. 13g ("I'm fuckin' tired of it dude. They're bringing these motherfuckers in by the plane load.").

As the defendants began to develop a concrete plan to commit violence, they debated numerous targets before settling on 312 West Mary Street.  Notably, during these planning meetings, the defendants discussed attacking many potential targets with an explicit link to the government.  For example, they discussed attacking mayors, city council members, governors, chiefs of police, sheriffs' department officers, all of whom (in the defendants' minds) were responsible for bringing Muslims to this country.  *See* Special Agent Amy Kuhn, Trial Tr. 4/10/2018, at 174-75; Gov't Trial Ex. 14lll (Stein: "[C]ity and county officials who are, are directly

involved with bringing these motherfuckers in here, they know they're coming in, they're helping

facilitate it, make it happen.  They're a fucking target too in my mind."); 14qqq (mayor and city

commissioners); 15vv (mayor and city council members); Transcript 1D16, 8/8/2016 Meeting, at

158 (chiefs of police and sheriff's department officers), attached as Exhibit 2; Gov't Trial Ex. 22h

(city council members who are helping Muslims come into the country); Gov't Trial 15vv (judges,

mayors, and city council members); *see also* Gov't Trial Ex. 15jj (Allen stating "[W]e need to do

something that almost shuts the state down."); Exhibit 2, at 123 (Stein discussing targeting the state

power grid because "[y]ou take out the fucking power grid in a state and that state shuts down,

done").  During the August 8, 2016 planning meeting, Wright declared: "Park the bomb next to the

fucking Senate and blow the whole fucking building up."  Exhibit 2, at 116.  In fact, as they

discussed what their first step should be, Stein identified the "most immediate threat" as "our

government."  *See* Exhibit 2, at 81.

Although they ultimately settled on the Mary Street apartments, the overtly political nature

of some of the targets they discussed (city council members, county commissioners, mayors,

governors, law enforcement officials, the U.S. Senate building) is strong evidence that they

intended not only to kill Muslims but also to attack and influence the government and its

institutions.  *See, e.g.*, *Wright*, 747 F.3d at 409-10 (noting that the defendants' discussions about

bombing government buildings supports a court's finding that the terrorism enhancement applies);

*United States* v. *Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (holding enhancement is

warranted where the defendant planned to attack public utilities in order to create civil strife and to

make demands on the government afterwards).

To ensure that their message would be clear, the defendants drafted and planned to publish a

manifesto.[10]   *See, e.g.*, Gov't Trial Ex. 15p and 15q (Defendant Allen stating that they needed to

publish a manifesto because bombing Muslims alone would not be sufficient unless "it wakes enough

people up in the country where other like-minded people start to understand things"); 15w:

(Defendant Wright agreeing with Allen about the need to draft a manifesto to explain their message).

All three defendants explicitly discussed, understood, and agreed that the goal of the manifesto was

to incite others to commit acts of violence against Muslims and against the government:

|  |  |
|---|---|
| STEIN: | I think before that we need to figure out what are we trying to accomplish by doing a manifesto?  That's what I want to know. |
| ALLEN: | We are going to try to trigger the other likeminded people across the nation to fucking stand up and start doing the same thing we are doing. |
| CHS: | Exactly. |
| STEIN: | Against the UN . . . . or the . . . . |
| ALLEN: | Muslims. |
| STEIN: | . . . . Cockroaches. |
| ALLEN: | Muslims and Government. |
| WRIGHT: | Yep. |

Exhibit 2, at 114-15; *see also, e.g.*, Exhibit 2 at 65 (Allen stating that the manifesto needed to inspire

others so that "they'll be like, this is what we need to be doing, or we've got to start doing this", and

Stein responding by acknowledging that such a manifesto could cause "an uprising" and "a civil

war").

The very words of the defendants' manifesto establish the direct link between the defendants'

intent to retaliate against the government and their conspiracy to bomb the Mary Street Apartments.

Not only is the manifesto addressed to "the U.S. Government," it explicitly states that the defendants

believe that the government was failing to enforce the nation's borders and that the conspiracy was

---

[10] This Court found, during the *James* hearing, that the manifesto "is part of their overall conspiracy."  Trial Tr. 3/26/2018, at 325.

aimed at retaliating against immigration policies that allowed Muslims into this country. As stated in their draft manifesto, and as the three defendants discussed repeatedly at G&G planning meetings:

> This manifest is for the U.S. Govt. and for the American People. For the last several years many people and groups throughout the country has tried to "wake up" the American people!! Wake them up to our teranycal [sic] Govt. Most of this has gone to no avail. . . . With this document, we are going to attempt "a forced wake up call." American people, you have to wake up while there still might be time to stop our Govt from totally selling this country out. We must come together as a people and nation [and] . . . not just demand but reinstate our constitution. It must be understood by all just what our government is up too [sic]. Don't be fooled by the words "conspiracy theory" or "domestic terrorist." All this is a word game, "brainwashing" by our govt. Standing up for the Constitution is not domestic terrorism. Its actually govt terrorism. Not enforsing [sic] our borders. Illegally bringing in Muslims by the thousands. . . .

Gov't Trial Ex. 101;[11] *see, e.g.*, Gov't Trial Ex. 15p (Aug. 8, 2016 meeting), 15q, 15w, 15kk, 15pp, 16aaa (Aug. 14, 2016 meeting), 16lll, 127ll (Sept. 2, 2016 meeting), 127pp.

The manifesto goes on to call for changes to the government: it exhorts like-minded government officials to "take action now!" and directly threatens other government officials, declaring: "[Y]ou have been warned. Stop your actions now."

To the extent that Defendants Wright and Stein disclaimed that they saw or endorsed the content of this manifesto, the evidence at trial directly contradicts those claims. As Dan Day testified, Defendant Allen hand-wrote this manifesto during one of the planning meetings at G&G, and then each of the defendants discussed and contributed his own ideas about its contents at subsequent meetings. *See, e.g.* Dan Day, Trial Tr. 3/29/2018, at 61, 64, 67; Gov't Trial Ex. 15-RR (Allen asking

---

[11] The same notebook containing the manifesto also contains notes that appear to be precursors to the manifesto, identifying, among other things "Muslims-Landlords" and **"Names of all Govt. employees – you will pay!"** Gov't Trial Ex. 101 (emphasis added). It also refers to "names of sympathizers," and then references "S.O., police, companies-landlords." *Id.*

for paper to write the manifesto).  For example, during the September 2, 2016 meeting, Defendant Stein reviewed and edited the manifesto, telling Allen to add the word "refugee."  This edit is reflected in Government Trial Exhibit 101 (showing the word "Refugees" in the margin with an arrow showing where it would be inserted into the text).  *See also* Gov't Ex. 127pp (Allen agreeing with Stein's edits to add "refugees/illegal immigrants"); 127lll (Stein asking Allen to add "more about the Muslims").[12]  Similarly, when Stein mentioned that the manifesto did not explicitly mention blowing up mosques, Wright responded, "[i]t's just Muslims."  Gov't Ex. 127ddd.

Notably, after reviewing its contents, neither Wright nor Stein told Allen to delete the manifesto's references to the government, or disputed that the manifesto correctly stated their shared goal of inciting others to rise up against the government and of intimidating officials to change the government's policies.  Of course, this is hardly surprising because the content of the manifesto is entirely consistent with the defendants' agreed purpose to issue the manifesto to incite violence against "Muslims and Government," (Exhibit 2, at 114-15), and their plan to use the manifesto to inspire others to take action against the government's alleged failure to enforce the borders and the Constitution.  Gov't Trial Ex. 15pp (discussing that the manifesto should focus on the Constitution and border protection; Stein declaring the manifesto should include that "[w]e want our borders reinstated"; Wright declaring that the manifesto should state that "[W]e're tired of the un-lawlessness. . . . And we're going to take matters into our own fucking hands.").  Moreover, like defendant Allen, both defendants Wright and Stein blamed the federal government for allowing

---

[12] In his objections, Stein asserted that a single out-of-context reference during a call with Dan Day on August 14, 2016, suggested that he did not share his co-defendant's political motives.  The government disagrees with Stein's characterization of that phone call.  In any event, the recording of Stein reviewing and editing the draft manifesto took place on September 2, 2016, after Stein's call with Day.  Stein never once suggested that he disagreed with the manifesto's political message, and, instead, fully participated in the discussions about its content.

Muslims into this country.  *See, e.g.,* Exhibit 2, at 162 (Wright stating that Muslims "couldn't get here if it wasn't for our government"); Gov't Trial Ex. 13h (Stein stating that "They're bringing them in by the fuckin' plane load every god damn day. That god damn nigger in the fuckin' White House is making sure of it. We just found out Garden City is a main fuckin' hub that they're bringing them in to-dispersing them from there."); Gov't Trial Ex. 22h (Stein responding to the question about who is bringing Muslims to the country: "[T]he fuckin' nigger in the white house, dude, I'll tell you that right now. . . . And his cabinet and congress and senate!").

The defendants expressly linked the publication of the manifesto with their plans to use a weapon of mass destruction.  Dan Day, Trial Tr. 3/29/2018, at 59 (testifying that the purpose of the manifesto was to incite other militia members to start other bombings); *id.* at 127 (testifying that Stein stating that he wanted the manifesto to be issued so that the government would understand that the bombing occurred because, in his opinion, Muslims were taking over the government); Gov't Ex. 15kk (Allen indicating that publishing the manifesto would ensure that their bombing would not be dismissed as "some fucking nut—fucking redneck with a fucking--with a fucking goddamn hundred pounds of fertilizer").  The defendants debated at length the timing of the publication, ultimately deciding that the most effective way they could convey their message would be first to commit the bombing, then send the manifesto to the media for publication, with additional threats of bombings if the media did not publish it.  Dan Day, Trial Tr. 3/29/2018, at 63; *see also, e.g.*, Gov't Ex. 15kk (Allen stating that "What we're going to have to do is something that's going to be big enough to where when we drop the manifesto off at all these radio stations, newspapers, and everything [UI]. When they look at it they're going to be like, holy fuck we got to print this tomorrow."); Gov't Ex. 16zz (defendants discussing blowing up the house of a landlord, and Allen suggesting putting the

manifesto in the mailbox); 16bbb, 16ccc (deciding to issue the manifesto right after the bombing); Gov't Ex. 16lll (discussing that they might bomb mosques and threaten to bomb one of the landlords if the media did not print the manifesto); 127ttt (discussing issuing the manifesto after blowing up the mosque so that the explosion would already be on the national news when the manifesto was issued); 127zzzz (discussing how they would threaten the media with additional bombings if the media did not publish the manifesto).

And, as the defendants discussed, if the U.S. government and others helping Muslims did not heed their warning in the manifesto and in the attack itself, they (and other like-minded people) would commit more bombings.[13]  *See also, e.g.* Dan Day, Trial Tr. 3/29/2018, at 127 (testifying that the purpose of publishing the manifesto was "[t]o get the message out if the next demand or whatever in the manifesto wasn't met, they were going to do another target"); Gov't Trial Ex. 15uu (discussing issuing the manifesto with a list of mosques and threatening that if things did not change in a month, they would bomb another mosque on the list); 15bbb (Allen stating that they need to be ready for another attack shortly after the first bombing, in case their demands are not met); 16lll (Wright stating

---

[13] Other draft manifestos were found in Defendant Allen's house.  Gov't Ex. 35.  One draft manifesto is addressed to "Mr. President" and states:

> [T]he KSF is watching, we are taking down names.  Names of people in Congress, the house of representatives, both state & federal.  We are going to one day hold every single elected official responsible for their action.  Mark our words Mr. President.  Everyone will be held accountable for their oath to the Constitution.

*Id.*.  Defendant Allen then quoted Abraham Lincoln as saying "We the people are the rightful masters of both Congresses [sic] and the courts, not to overthrow the Constitution *but to overthrow the men who pervert the Constitution*."  *Id.* (emphasis added).  Defendant Allen then called upon "every American to hold our elected officials accountable for this mess we now must sort out." *Id.*

In another draft, Defendant Allen wrote "[o]ver the last few years, the mainstream media & Govt has been telling you, veterans, Christians, & assorted groups are domestic terrorists.  I am basically all the above.  And I am a threat to no person. . . . . *In the near future you will see certain actions to reinstate our Constitution.  And you will also see the Govt & media telling you we are domestic terrorists*.  Please do not fall for this.  We the people have to take back control of our Govt." *Id.* (emphasis added).

that the manifesto would send the message that "[T]his is what's gonna happen if you don't [wake up]"; Allen stating that the manifesto would send the message that if the defendants did not see "immediate results" after their attack, "things are going to get fucking bad").

In their objections to the draft PSRs, the Defendants did not seriously dispute that the recordings contain hours and hours of their vitriolic complaints about the government and its immigration policies. Instead, they asked the Court to ignore that evidence, and they asserted that their conspiracy to bomb the apartments and kill Muslims was somehow completely segregated from their anger towards the federal government that, in their view, unlawfully allowed those very same Muslims to live in this country. This claim is not credible. The trial testimony of Dan Day and Lula Harris, the many hours of recordings from planning meetings, and the defendants' own manifesto clearly establish that they intended for the bombing of the Mary Street Apartments to serve as the defendants' retaliation against the government's immigration policies and as a call to others to engage in violence if the government did not change those policies.

Nor does it matter whether, as some of the defendants contended, their primary goal was to kill and intimidate Muslims and their landlords. Although the government disagrees with the defendants' characterization of their motives, as a matter of law, it is not necessary that influencing the government be the defendant's sole purpose for the terrorism enhancement to apply. *See*, *e.g.*, *Wright*, 747 F.3d at 408 ("Nor is it necessary that influencing the government be the defendant's ultimate or sole aim."); *United States v. Jayyousi*, 657 F.3d 1085, 1114–15 (11th Cir. 2011) (concluding that a defendant who provided material assistance to terrorist organizations, but claimed that his goal was to assist an oppressed group of Muslims, is eligible for the enhancement regardless of his purportedly benign motive).

25

Moreover, to the extent that any defendant claimed that he did not personally share the political goal of his co-conspirators, the terrorism enhancement does not require that the defendant possess a subjective personal desire to influence the government. Although the government must prove that the defendant had the specific intent to commit a federal crime of terrorism, it is sufficient that the defendant knew of the conspiracy's goals and continued to participate in the conspiracy to promote its goals. *See, e.g.*, *Awan*, 607 F.3d at 317 (vacating and remanding for resentencing because district court erred in finding that § 3A1.4 could not apply where the defendant provided material support to a terrorist organization but claimed to be personally motivated solely by desire for prestige and personal gain); *Wright*, 747 F.3d at 418. As the Second Circuit has noted, "[a] hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics." *Awan*, 607 F.3d at 317.

Here, the defendants openly and repeatedly discussed for hours their intent to bomb the apartments to "wake up" others to commit violent acts if the government did not change its immigration policies, and each and every one of the defendants continued to support the conspiracy to bomb the Mary Street Apartments. Therefore, the USPO correctly applied the terrorism enhancement under Sentencing Guidelines § 3A1.4.

### 4. The Hate Crime Enhancement Under U.S.S.G. § 3A1.1 Applies to All Three Defendants

The USPO appropriately provided a three-level hate crime enhancement to the sentence of all three defendants pursuant to U.S.S.G. § 3A1.1. The hate crime enhancement applies to any offense of conviction, including terrorism-related convictions, where the jury finds beyond a

reasonable doubt that the defendant selected his victims because of their race, religion, national origin, or other protected characteristics.  *See, e.g.*, *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 153 (2d Cir. 2008) (applying hate crime enhancement to terrorist bombing of an embassy); *see also United States v. Houghtaling*, 390 Fed. App'x 604, 606 (7th Cir. 2010) (applying hate crime enhancement where the defendant threatened a federal judge in part because he believed that her husband was Jewish); *United States v. Horsting*, 204 Fed. App'x 441, 445 (5th Cir. 2006) (applying the hate crime enhancement to a defendant convicted of assault with a deadly weapon in a federal prison where the assault was racially motivated).

Here, the defendants' convictions of Count Two necessarily establishes that the jury made that finding beyond a reasonable doubt and provides a sufficient factual basis for applying the hate crime enhancement to the defendants.  Indeed, throughout their objections, Defendants Allen and Stein repeatedly conceded that their participation in the conspiracy to use a weapon of mass destruction was motivated because of the religion practiced by their intended victims.  *See, e.g.*, Allen Objections 11 ("Here, the evidence was overwhelming that Mr. Allen's intent was to target the residents at 312 West Mary Street.  His motive for doing so was because they were Muslims, and he perceived Muslims as a threat."); Stein Terrorism Enhancement Objection 1 ("Patrick Stein contends that his actions and motive in regard to his conviction to use a weapon of mass destruction was simply to kill the Muslim residents of the Mary Street Apartments.")  In light of the jury's finding beyond a reasonable doubt that the defendants were motivated by race, religion, and national origin when they targeted the tenants of the Mary Street Apartments, and based on the overwhelming record evidence of their bias motive (as well as Allen and Stein's own admissions), the hate crime enhancement applies.

### 5.  The Trial Evidence Established that Defendant Wright Obstructed the Federal Investigation by Concealing Material Evidence

The USPO correctly provided a two-level increase to Defendant Wright's offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1.[14]  The evidence at trial demonstrated that Defendant Wright sought to conceal evidence material to the investigation.  As the USPO documented, shortly after Defendant Allen's arrest on October 11, 2016, Defendant Wright accessed a storage unit he maintained.  PSR ¶ 51.  Less than two days later, on October 13, 2016, Defendant Wright returned to the storage locker in the middle of the night.  PSR ¶ 55.  During a subsequent search of the unit, FBI agents recovered many materials related to making explosives – including a handwritten recipe for HMTD; aluminum powder; three binders of instructions on how to make explosives; a digital scale; and hobby fuse, identical in physical characteristics to the fuse attached to the HMTD detonator recovered at G&G.  *Id.*

There is no serious question that these items were part of the conspiracy.  Lula Harris testified that the binders and the blue milk crate holding these items had previously been located at the home she shared with Allen.  In addition, D.J. Fife, a physical scientist and forensic examiner for the FBI, conducted a latent fingerprint examination of the printed manuals about manufacturing explosives seized from the milk crate found in storage unit.[15]  *See* Fife Report, attached as Exhibit 3, at 49-55.  Both defendants Wright and Allen's fingerprints were found on the documents in the milk crate.

---

[14] Defendant Wright was convicted of making materially false statements to the FBI about his knowledge of and participation in the plot.  Although the USPO based the obstruction enhancement, in part, on these false statements, and the government did not object to that finding in the draft PSR, the government now respectfully bases its argument about the obstruction enhancement on Defendant Wright's concealment of evidence only.

[15] This Court excluded the results of this latent fingerprint examination because it held that the government had not timely disclosed Fife's report.  However, the defendants have been in possession of this report since December 2017, and this Court may consider this evidence at sentencing.

In his objections, defendant Wright continued to claim, as he did during trial, that someone else could have accessed the unit and hidden those materials.  This claim is not credible.  Trial testimony established that prior to his arrest, defendant Wright paid for the unit; the manager of the storage facility had never seen anyone other than defendant Wright inside that storage unit; the defendant's brother had turned the storage unit over to defendant Wright several months earlier; his brother did not access the storage unit on October 11 or 13, 2016; his brother never gave the access code to any person other than the defendant; and many materials related to the conspiracy – including materials that previously were in the possession of Curtis Allen, that the co-conspirators had ordered online as part of the conspiracy, and that contained numerous fingerprints from defendants Wright and Allen – were found inside the unit.[16]  *See* Lula Harris, Trial Tr. 3/26/2018, at 180-85; Kay Burtzloff, Trial Tr. 4/9/2016, at 267, 269; Garrett Wright, Trial Tr. 4/12/2016, at 96-98.

Defendant Wright's attempts to conceal this evidence is squarely covered by § 3C1.1.  *See* U.S.S.G. § 3C1.1 App. Note 4(D) (noting that attempting to conceal evidence material to an official investigation is covered by § 3C1.1).

### 6.   Defendant Stein Served as an Organizer of the Conspiracy

Defendant Stein objected to the application of the role enhancement under U.S.S.G. § 3B1.1.  The USPO properly applied this enhancement.

> A two-level adjustment under § 3B1.1(c) applies whenever "the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five participants and that is not otherwise extensive]."   U.S.S.G.  §  3B1.1(c).

---

[16] Defendant Wright's attempt to conceal this evidence is consistent with his attempts to cover his tracks in other ways, such as lying to federal agents and deleting from his computer the pinned Google earth maps of potential targets and the thousands of pages of manuals and other online information about explosives that he printed.  *See* Gov't Trial Ex. 15fff.

Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction. *See [United States v.] Cruz Camacho*, 137 F.3d [1220,] at 1224-25 [10th Cir. 1998] (finding the defendant had a "leadership role" when the defendant recruited and directed coconspirators). To qualify as an organizer, however, no control is necessary. *United States v. Egbert*, 562 F.3d 1092, 1103 (10th Cir. 2009); *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997); *see also United States v. Tejada-Beltran*, 50 F.3d 105, 112 (1st Cir. 1995) (noting that the "disjunctive usage" of leader or organizer "cannot be written off as linguistic happenstance" and that "[w]hile the term 'leader' implies the exercise of some degree of dominance or power in a hierarchy, and also implies the authority to ensure that other persons will heed commands . . . the term 'organizer' has a different connotation"). Instead, a defendant may be deemed an organizer under § 3B1.1 for "devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." *Valdez-Arieta*, 127 F.3d at 1272; *see also Tejada-Beltran*, 50 F.3d at 112 ("The key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.").

*United States v. Wardell*, No. 06-1108, 2010 U.S. App. LEXIS 543, at *66-67 (10th Cir. Jan. 7, 2010).

The evidence at trial established that shortly after the June 2016 terrorist attack at the Pulse Nightclub in Orlando, Florida, Stein called a meeting of militia members for the purpose of recruiting others to conduct an attack against Muslims. *See, e.g.*, Gov't Trial Ex. 13f (Stein talking on the phone on his way to the meeting: "[T]here is a select few I have brought in"); Brody Benson, Trial Tr. 3/26/2018 at 68 (testifying that the purpose of the meeting was "a recruitment to carry out an offensive action"). Stein was recorded telling the others who were present that he believed it was time to start killing Muslims. Stein said that, after the nightclub shooting, "a switch flipped" and he had gone into "organization mode." Stein wanted to brainstorm ideas for an attack, and to find out who was with him and who was against him. The group then discussed specifics of how best to attack and kill Muslims.

30

Although defendant Stein has attempted to cast defendant Allen as the ringleader, Stein told Dan Day that he organized the meeting and, in fact, that he had repeatedly called defendant Allen to get him to commit to attending the meeting, but that defendant Allen did not return his calls.  Gov't Trial Ex. 13c.  Ultimately, defendant Stein was able to talk to Allen and convince him to come to attend the meeting.  Exhibit 1, at 34 (Stein speaking to Allen: "Got a meeting over here at eight o'clock, West of Hutch. Uh out here by Brody's. Gonna start putting a plan together."); *see, e.g.*, *Mandhai*, 375 F.3d at 1248 (recruiting a single person is sufficient to qualify as an organizer). Defendant Stein therefore fits the *Wardell* definition of organizer.  As a result, the two-level role enhancement is appropriately applied.

### B. U.S. Sentencing Guidelines Applicable to Count Two Results in the Same Guidelines Range of Life Imprisonment as Count One

The USPO used Count One as the basis for its analysis of the defendants' Guidelines range and chose not to calculate the Guidelines range for Count Two.  As a result, none of the parties provided an analysis of Count Two in their responses to the draft PSRs.  For the convenience of the Court, the government provides this analysis of the Guidelines applicable to Count Two, which, like Count One, results in a Guidelines range of life imprisonment.

*Base Offense Level.*  The base offense level for Count Two is governed by U.S.S.G. § 2H1.1 (Civil Rights).  Under § 2H1.1(a)(1), the sentencing court applies "the offense level from the offense guideline applicable to any underlying offense," i.e., any conduct established by the offense of conviction that would violate federal, state, or local law.  Here, the applicable offense guideline is § 2A1.5 (Conspiracy to Commit Murder), and the defendants' base offense level for Count Two is 33.

*Terrorism Enhancement Under U.S.S.G. § 3A1.4.*  The terrorism enhancement under

U.S.S.G. § 3A1.4 likewise applies to Count Two.  Although 18 U.S.C. § 241 is not specifically

enumerated as a federal crime of terrorism in 18 U.S.C. § 2332b(g)(5)(B), courts have repeatedly

held that the domestic terrorism enhancement does not require that the offense of conviction be

specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B).  *United States* v. *Fidse*, 862 F.3d 516, 522

(5th Cir. 2017); *Mandhai*, 375 F.3d at 1248; *United States* v. *Graham*, 275 F.3d 490, 516 (6th Cir.

2001).  Rather, the enhancement is triggered where the defendant has, as one purpose of his

substantive count of conviction or his relevant conduct, the intent to promote a federal crime of

terrorism.  *See, e.g.*, *United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (applying

enhancement to a white supremacist convicted of obstructing justice and soliciting a crime of

violence where his solicitation was intended to promote a federal crime of terrorism); *see also*

*Awan*, 607 F.3d 113 ("[A]n offense is "intended to promote" a federal crime of terrorism when the

offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism");

*Arnaout*, 431 F.3d at 1002 ("[Section] 3A1.4 must be considered when a defendant is convicted of

a federal crime of terrorism . . . or when a defendant's felony conviction or relevant conduct has as

one purpose the intent to promote a federal crime of terrorism."); *Mandhai*, 375 F.3d at 1248

(holding that "if [the defendant's] purpose is to promote a terrorism crime, the enhancement is

triggered"); *Graham*, 275 F.3d at 516, 518 ("A defendant who intends to promote a federal crime

of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead

the phrase implies that the defendant has as one purpose of his substantive count of conviction or

his relevant conduct the intent to promote a federal crime of terrorism.").  Here, where the jury

convicted the defendants of a federal crime of terrorism in Count One, there can hardly be a

question that the defendants' conspiracy in Count Two was "intended to promote" the federal crime

of terrorism of 18 U.S.C. § 2332a.

*Remaining Adjustments.*  The analysis of the other adjustments applicable to Count One – the three-level hate crime adjustment for each of the defendants; the two-level obstruction enhancement for Defendant Wright; and the two-level role adjustment for Defendant Stein – are also applicable to Count Two.

*     *     *     *     *

Applying the above analysis, defendant Allen's adjusted offense level is 48; defendant Stein's adjusted offense level is 50; and defendant Wright's adjusted offense level is 50.  Pursuant to Chapter 5, Part A, Comment 2, any adjusted offense level higher than 43 should be treated as an offense level of 43.

## II.      The Statutory Sentencing Factors Enumerated in 18 U.S.C. § 3553 Strongly Favor Life Imprisonment

 The life sentence provided for by the USPO's correct calculation of the Guidelines is also reasonable under the statutory sentencing factors enumerated by Congress in 18 U.S.C. § 3553. Under Section 3553, a sentencing court must ensure that a defendant's sentence balances several factors.  18 U.S.C. § 3553(a).  The sentence must account for the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the applicable Guidelines range; the need for unwarranted sentencing disparities among similarly situated defendants; and the need for restitution to the victims.  *Id.*  The sentence imposed must also "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense," as well as "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and afford the defendant necessary educational training, medical care, or other treatment.  *Id.*  While the sentencing court must consider each of

these factors, "the court need not rely on every single factor—no algorithm exists that instructs the district judge how to combine the factors or what weight to put on each one." *United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018).  Rather, "sentencing courts can and should 'engage in a holistic inquiry of the § 3553(a) factors.'"  *Id*. (quoting *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014)).

Based upon the extensive record in this case, the Section 3553(a) factors strongly support the same sentence provided for by the Guidelines: a term of life imprisonment for each defendant.

### A.  Life Sentences Are Warranted By the Nature and Circumstances of the Defendants' Offenses

The jury in this case convicted all three defendants of extremely serious offenses:  a conspiracy to use a weapon of mass destruction at 312 West Mary Street, in Garden City, Kansas, and a civil rights conspiracy for targeting this building because they wanted to kill its Somali-Muslim residents.  The jury also convicted defendant Wright of lying to the FBI in a matter involving domestic terrorism.  Standing alone, on the barebones terms of the Indictment, these charges constitute serious offenses that warrant considerable punishment.  However, when considered in the full context of the extensive record in this case, the nature and circumstances of these offenses warrant the maximum statutory punishment of life imprisonment.

As the Court is well aware, overwhelming evidence at trial established the extremely serious nature of the defendants' crimes.  The defendants spent months developing a plan to bomb an apartment complex that would kill as many men, women, and children as possible.  *See* Dan Day Trial Tr. 4/2/18 at 154-158.  On multiple occasions, they tried to recruit others to join them.  *See, e.g*., Brody Benson Trial Tr. 3/26/18 at 66-89; Dan Day Trial Tr. 3/29/18 (am session) at 51-73, 86-103; Dan Day Trial Tr. 3/29/18 (pm session) at 5-28; Gov't Trial Ex. 13a, 13b, 13c, 13f, 13g, 13h,

34

13j, 13l, 13n (audio clips from Benson field meeting); Gov't Trial Ex. 22b-o, 22r (audio clips from first Lakin meeting); Gov't Trial Ex. 14b, 14c, 14e-n, 14p-u, 14x-z, 14aa-hh, 14jj, 14kk, 14mm-ww, 14yy, 14zz, 14aaa-iii, 14lll, 14mmm, 14ooo-uuu (audio clips from second Lakin meeting). They carefully selected 312 West Mary Street as their target, planned the attack, and honed its details. *See, e.g.*, Gov't Trial Ex. 15aa (pinning multiple prospective targets on google maps), 15j (debating 312 West Mary St), 16i (Somali mall), 16tt-uu (landlord and his family), 16Q (adding 305 West Mary St), 127u (312 West Mary St). They planned to plant bombs around the corners of the building so that the blast would bring it to the ground and kill everyone inside. *See, e.g.*, Gov't Trial Ex. 16u-w, 16kk, 127bb-cc, 127ee, 127jj. Defendants Allen and Wright manufactured homemade explosives to use in the attack. *See, e.g.*, Gov't Trial Ex. 17a (first experiment at G&G)); 127aaa-bbb, 127ooo (defendants agreed to test explosives to ensure success); 129b (tested blasting cap), 129i (test of blasting cap with homemade HMTD powder "blew up pretty good"). To ensure that they could get what they needed to carry out the attack, the defendants also pursued explosives a second way—through someone they believed to be a black-market source (actually an undercover FBI agent), and to whom they provided an explosives shopping list. *See, e.g.*, Gov't Trial Ex. 187a (explosives shopping list); Gov't Trial Ex. 127oooo, 17f, 17i, 17k ("we'll do what we got to do"), 129o (seek blasting caps and C4 from "Brian"), 129s (also continue to work on homemade explosives because "everything's worked so far"), 129t (continue to build and test explosives even if they work with "Brian"). Throughout the course of the conspiracy, not one of the defendants wavered in his commitment to carrying out this attack or balked at killing scores of

innocent people and putting many others in harm's way.[17]  *See* Dan Day Trial Tr. 4/2/18, at 154-

158 (describing defendants' commitment to the conspiracy throughout months of planning). The

record is clear that these defendants conspired to use a weapon of mass destruction to commit mass

murder and were intent on carrying out their plan until law enforcement stopped them.  There are

few provisions in the federal criminal code that outlaw conduct more egregious than what these

defendants did.

And yet, significantly, the trial evidence also shows that the nature and circumstances of

this offense are particularly egregious, and warrant the maximum statutory punishment:  the

defendants conspired not just to commit mass murder, but to commit a mass hate crime murder.

The defendants picked the Mary Street building as their target because it housed Muslim

immigrants from Somalia who were openly practicing their faith in America.  *See, e.g.,* Dan Day

Trial Tr. 3/29/18 (pm session), at 116 ("They wanted to attack during the Muslim prayer hour. . . .

They figured that would be the time when they could get the most Muslims inside the mosque at

one time.")  The defendants planned this attack to send a very specific message:  Muslims are not

welcome in America, and as long as the U.S. Government allowed Muslims to come to the United

States, the defendants would carry out more attacks.  Indeed, in one telling exchange during a

planning meeting at G&G, the defendants could not have made this goal any clearer:

| | |
|---|---|
| STEIN: | I wanna be alive to go do it again. |
| WRIGHT: | See, I wanna be here to change shit not fucking just kill Muslims. |
| STEIN: | Well. |
| WRIGHT: | You know I mean?  That's the whole point but. |
| STEIN: | **Part of changing shit**… |
| WRIGHT: | (overlapping) I understand that. |
| STEIN: | … **is killing every fuckin one of 'em**. |

---

[17] Indeed, absent the happenstance of Dan Day having met Patrick Stein and reporting him to the FBI, or defendant Allen's girlfriend contacting local police to report a domestic violence incident, law enforcement would never have known anything about the defendants' plans.

ALLEN:              Not dying for it.

Gov't Trial Ex. 16ddd (emphasis added).

To accomplish their goal and ensure their message would be heard loud and clear, they chose this bombing to kill as many Muslims as they could. *See*, e.g., Gov't Trial Ex. 127xxx, Dan Day Trial Tr. 4/2/18, at 152 ("Success was blowing up the mosque in the apartment complex and killing all of the Muslims that lived there."). Indeed, to ensure maximum death and destruction, the defendants planned to detonate their bombs at prayer time, when many of the complex's residents would be praying inside a small mosque located on the property. *See, e.g.*, Gov't Trial Ex. 16mm-oo, 127r. They planned to include fragmentation in their bombs, for maximum casualties. *See, e.g.*, Gov't Trial Ex. 15s ("screws, nails, and ball bearings"), 127dd ("ball bearings" and "sheet rock knife blades"). Their manifesto, addressed to the U.S. Government, was designed both to make their demands known, and to inspire other, similar hate crimes if the U.S. Government did not stop allowing Muslims to enter the United States. *See, e.g.*, Gov't Trial Exs. 101 (manifesto); 127qq ("this is our call to action"). The evidence clearly demonstrated the defendants' hatred of Muslims and their willingness to target Muslims in a mass murder to convey their message.

Taken in this full context, the defendants' crimes cut to the heart of core ideals upon which this nation was founded: equality and tolerance for the beliefs of others. Indeed, equality and freedom from religious persecution are enshrined in the very words of our country's founding documents. By planning a mass murder to send a message of intolerance, the defendants turned their backs on what it means to be American. These facts render the nature and circumstances of this offense especially egregious, and strongly support a maximum punishment of life imprisonment.

Finally, for purposes of this sentencing factor, it is of no moment that this conspiracy to bomb innocent men, women, and children failed.  As the Tenth Circuit explained in *United States v. Nichols*, Congress made clear that, for punishment purposes, there should be no distinction between a conspiracy to use a weapon of mass destruction and the use of such a weapon:

> The fact Mr. Nichols was convicted of conspiring to use an explosive weapon of mass destruction, and was in fact acquitted of the substantive charge, does not alter our conclusion. Section 2332a makes no distinction between a person who uses a weapon of mass destruction or conspires to use one. The statute provides in pertinent part:
>
>> A person who uses, or attempts or conspires to use, a weapon of mass destruction ... shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or for life.
>
> 18 U.S.C. § 2332a(a) (1994). Congress did not create different punishments for the conspiracy or underlying substantive offense, leading to the inference it viewed the two as equivalent in consequence and severity. This is especially so because Congress normally treats conspiracy as a crime punished by no more than five years of imprisonment. See 18 U.S.C. § 371 (1994). **The legislature's special treatment strongly suggests we should not distinguish between using an explosive weapon of mass destruction or conspiring to do so in determining the proper punishment in this case**.

169 F.3d 1255, 1273-74 (10th Cir. 1999) (emphasis added).  Given this authority, the government respectfully submits that law enforcement's success in stopping the defendants' crimes does not detract from the nature and circumstances of these offenses strongly favoring a maximum punishment.

### B.  The Defendants' History and Characteristics Strongly Favor Life Sentences

The history and characteristics of each defendant also support a maximum punishment here, as provided for by the Guidelines.  As an initial matter, none of the defendants have expressed even the slightest bit of remorse for their criminal actions.  During the conspiracy, as the trial evidence made clear, none of the defendants wavered at all in their determination to carry out this attack, and they continued to pursue it until law enforcement stopped them.  Even after other militia members

refused to join the conspiracy because an unprovoked attack on Muslims is wrong, the defendants nevertheless set up their own group to carry out their plan.  Throughout the conspiracy, they celebrated their violence, not hesitating to self-identify as "terrorists."  *See* Gov't Trial Ex. 14r (Allen), 15y (Wright), 18l (Stein).

Indeed, even after defendant Allen's arrest on unrelated domestic violence charges, defendant Wright voluntarily met with the FBI and lied to mislead investigators, and defendant Stein delivered 300 pounds of fertilizer to the UCE to be made into a bomb for the attack.  And now, even at this late date, and despite the evidence against them, in their PSR objections, defendant Stein still claims that Dan Day is a liar who entrapped him; defendant Allen still maintains that, despite being the author of the defendants' manifesto, he had no political motive for his crime; and defendant Wright still asserts that he neither intended to carry out the bombing, nor did he purchase chemistry equipment to use in manufacturing homemade explosives (despite financial records proving that he did).  Given these defendants' utter lack of contrition for their plans to murder scores of innocent civilians in their homes and in their house of worship, a maximum sentence is warranted.

In addition to this, due to the nature of the evidence in the record, the Court is uniquely well positioned to have a clear picture of each defendant's character.  Over the course of a multi-week trial, the Court heard extensive audio recordings of the defendants speaking their minds when they thought no one was listening.  This evidence is significant, not only for purposes of establishing the seriousness of the charged crimes, but also as a window into each of their individual characters. The evidence is clear:  each of these defendants was steadfast in his determination to commit mass murder to spread a message of hatred and intolerance.  Given this evidence, as well for as the

reasons explained below, these defendants' history and characteristics weigh heavily in favor of life sentences.

### 1. Defendant Allen

Nothing in defendant Allen's personal background or character mitigates his conduct here. He grew up in an intact home, graduated high school, attended some college classes, and has not reported a history of substance abuse. PSR ¶ 96-108. Although he served in the military, he was discharged while on AWOL status. PSR ¶ 114-115. The USPO determined that "the defendant is not presently under the care of a professional, nor taking any prescription medication for any mental health related issues." PSR ¶ 106.

At the same time, defendant Allen's prior contacts with law enforcement reveal a history of disrespect for the law.[18] Starting at age 24, defendant Allen has been arrested eight times for a variety of domestic violence, failure to appear, and driving offenses, including driving while intoxicated. For two of these early arrests, defendant Allen was placed on diversion. Yet despite completing diversion (twice), defendant Allen continued to re-offend, and two of his later arrests resulted in misdemeanor convictions, including a municipal domestic battery conviction. Under applicable law at the time, this domestic violence conviction prohibited him from possessing any firearms. Regardless, defendant Allen continued to obtain firearms, and at the time of his arrest in this case he possessed 21 firearms, 14 of which he stored at a friend's house to avoid detection. Although the law has since changed since the time of defendant Allen's arrest on this point,

---

[18] It is wholly proper for the Court to consider all of the defendant's prior contacts with law enforcement, including those that do not result in a conviction, in its assessment of the defendant's character under § 3553(a). *See United States v. Mateo*, 471 F.3d 1162, 1167–68 (10th Cir. 2006) (explaining that a district court may use information such as law enforcement contacts to draw conclusions about the defendant's character); *United States v. Counce*, 618 Fed. App'x. 418, 420 (10th Cir. 2015) ("[A] district court is not prohibited from using information unscored by the Guidelines to "draw conclusions about characteristics relevant to sentencing factors enumerated in 18 U.S.C. § 3553(a).").

defendant Allen's determination to circumvent applicable law to amass more than twenty firearms, despite knowing of his status as a prohibited person and having previously gone through two separate diversion programs, shows a consistent history of disrespect for the law.

Finally, and significantly, the evidence in this case makes clear that defendant Allen understood full well the gravity of the planned bombing, yet did not flinch in doing everything he could to carry the attack to fruition.  In a recruitment meeting on July 18, 2016, in which he and defendant Stein attempted to convince two other militia members to join them in their attack on Muslims, defendant Allen bluntly explained what they were planning to do:  "probably killing people and going to prison for life."  Gov't Trial Ex. 14c.  Defendant Allen's own cold-blooded assessment of the significance of these actions, even at the early stages of the plot, is telling, and it warrants the exact punishment he predicted.  Nothing in defendant Allen's character or personal background counsels otherwise.

### 2.  Defendant Stein

Defendant Stein's personal history and character also do not support leniency.  With regard to his childhood and upbringing, defendant Stein was raised in an intact home; his parents have been married for sixty years.  PSR ¶ 98.  Although the defendant's mother abused alcohol until he was eleven years old, the defendant stated during his PSR interview that "he did not suffer from abuse or trauma as it relates to his parents."  PSR ¶¶ 100-101.  The defendant graduated from high school and completed some community college classes.  PSR ¶ 128-129.  Defendant Stein has been treated periodically for alcohol abuse and has admitted to a history of regular methamphetamine use and occasional marijuana use.  PSR ¶¶ 123-126.  However, in a December 2016 (post-arrest) assessment by Substance Abuse Center of Kansas, Inc., the defendant reported that he had

consumed no alcohol since February 2016 and no methamphetamine since June 2016—meaning, the defendant asserted that he had not used alcohol at all during this conspiracy, and that he had not used methamphetamine since its initial days.  PSR ¶ 126. The defendant also reported a mental health history of anxiety and depression, but that he had not received professional treatment for these conditions since 2014, prior to the start of this conspiracy.  PSR ¶¶ 117-122.  These facts are not sufficiently extreme to support a sentence lower than the Guidelines.  *See United States v. Browning*, 252 F.3d 1153, (10th Cir. 2001) (noting, in dicta, that a downward departure due to a "disadvantaged upbringing" is prohibited under the Guidelines unless the record supports a finding of  "exceptionally cruel . . . psychological and emotional abuse constituting a form of sadistic torture"); *cf. United States v. Corchado-Aguirre*, 2015 WL 10383207, at *13 (D.N.M. Aug. 31, 2015) ("If the Court were to give substantially lower sentences to every criminal defendant who, despite having the requisite *mens rea* and being competent, suffered from some mental illness . . . a large portion of law breakers would no longer be punished for breaking the law.").

At the same time, defendant Stein's criminal history shows disrespect for the law.  He has been arrested ten times in his adult life.  PSR ¶¶ 83-96.  While most of these arrests were for minor offenses and did not result in convictions, at age 29 he was convicted of attempted burglary, a state felony.  That conviction was expunged by the State of Kansas in 2007.  PSR ¶ 85.  However, despite having being granted this second chance at a clean slate, the defendant committed the instant offenses.

Most importantly, abundant evidence presented in this case established defendant Stein to be ideologically driven to undertake vigilante violence against Muslims in the name of patriotism, regardless of the consequences.  Gov't Trial Ex. 13f ("Stein:  I'm tired of waiting on somebody else

to do something.  Whether it will be, you know, fruitful or worth whatever . . . whatever it is, I'm gonna have to pay.").  Defendant Stein never wavered in his support of the attack; indeed, as he wrote in a series of enthusiastic text messages to "Brian" (the UCE), whom he believed would help him facilitate the bombing, he and his co-defendants had "the will, determination, and dedication second to none" to carry out their plan.  Gov't Trial Ex. 111b-111c.  Each time he met with "Brian," defendant Stein seemed happy and excited, including when he drove "Brian" to view the Mary Street Apartments in person.  *See, e.g*., "Brian" Trial Tr. 4/4/18, at 283 (first meeting), "Brian" Trial Tr. 4/5/18, at 9 (third meeting); Gov't Trial Ex. 49 (video of defendant Stein driving with "Brian" to 312 W. Mary St. during second meeting); *see also* Gov't Trial Ex. 19j (defendant Stein responding "Sweet.  Sweet. You know, that's one of the reasons that I'm glad to, you know, have you." in response to "Brian" telling him that the bomb would take out the entire apartment complex).

Chillingly, defendant Stein's view of himself as a patriot, whose actions and plans were both necessary and justified to influence government policy and "save" the country from Muslims, remained unaffected by his arrest.  In phone calls to his mother shortly after his arrest, defendant Stein told her, "[W]e were fucking infiltrated," (Gov't Trial Ex. 47a) and asserted "I was doing it for the Country, and you know that!"  FBI Interview of Patrick Stein, Oct. 14, 2016, at 29 (attached as Exhibit 4).  The day of his arrest—the same day he delivered to "Brian" 300 pounds of fertilizer to be built into a bomb—defendant Stein made clear, during a post-*Miranda* interview with FBI agents, that he viewed himself as a true patriot who had done nothing wrong:

| | |
|---|---|
| SA SMITH: | Well then let's start there.  Why are we here? |
| STEIN: | Because I'm a patriot bro.  I love my country.  I love the people in it. |
| SA SMITH: | I'm listening. |

| STEIN: | I'm a fucking Christian.  And I don't like it when people want to kill my people. |
| SA SMITH: | I'm listening. |
| STEIN: | That's all they want to do. |
| SA SMITH: | They being? |
| STEIN: | Cockroaches. |
| (long pause) | |
| SA SMITH: | Muslims. |
| STEIN: | Cockroaches. |
| SA SMITH: | Okay, cockroaches. |
| (long pause) | |
| STEIN: | That's what, that's what they are. |
| . . . | |
| SA KUHN: | You said you're a patriot. |
| STEIN: | Yeah. |
| SA KUHN: | You're not a criminal. |
| STEIN: | No. |
| SA KUHN: | So explain that to me.  Explain how…(interrupted) |
| STEIN: | How do you explain to me that we have enemies within our borders (pause) that are sworn to kill every fucking one of us? And we're not allowed to do anything about it. |
| SA KUHN: | Who are these enemies? |
| STEIN: | You know who they are, don't. |
| SA KUHN: | I'm not patronizing you. |
| STEIN: | We don't need to play games, okay? |
| . . . | |
| SA KUHN: | I'm not.  You said cockroaches, right? |
| STEIN: | Yes. |

Exhibit 4, at 15, 22.  As the interview continued, defendant Stein asserted several times that the FBI

agents, by arresting him instead of supporting his efforts, were failing to uphold their duty to

defend the nation from its enemies:

| SA SMITH: | So, the why, the why for attacking the apartments (interrupted) |
| STEIN: | No, the why because Muslims or Islam, their cult, it's not a religion dude. |
| SA SMITH: | However we're gonna phrase it.  All of the above, the why, that's what I'm interested in. |
| STEIN: | Those are the domestic enemies dude.  That you took an oath to defend our Constitution against.  That's what I'm saying. |

44

|  | They're the same god-damn people our boys have been fighting over in the Middle-East for years. |
|---|---|
| SA SMITH: | I'm listening. |
| STEIN: | I just told ya. |
| SA SMITH: | So…(interrupted) |
| STEIN: | So why ain't you going after them? |
| . . . | |
| STEIN: | No dude, if we thought alike, this wouldn't be happening. You'd be shaking my hand and saying thank you my friend, my fellow citizen for having the balls and the guts to stand for our country before we lose it. . . . |
| . . . | |
| STEIN: | Dude I was ready, I'm I'm… |
| SA SMITH: | Yeah, I know, you're still ready. |
| STEIN: | Absolutely I am. |
| SA SMITH: | Don't think we're not.  Don't think we're not. |
| STEIN: | Dude, you're taking…(interrupted) |
| SA SMITH: | But what you've done…(interrupted) |
| STEIN: | you're taking down the very fucking people who are willing go fucking give their life to save yours.  Do you not get that? |
| SA SMITH: | I do get that. |
| STEIN: | You should because your job is that. |

Exhibit 4 at 36-37, 55, 69; *see also* Exhibit 4 at 31 ("STEIN:  You don't give a fuck about your country bro.  Or the people that live in it.").   Throughout the interview, defendant Stein also reaffirmed his determination to "do what's right for our country," including by dying:

| STEIN: | I'm telling you dude.  It's the Constitution.  It's the people in the country.  It's my country. |
|---|---|
| SA SMITH: | That's why you're doing this? |
| STEIN: | That's why I'm a patriot.  That's why I'm willing to die for country. That's why I'm willing to do what's right for our country. |
| SA SMITH: | Which inc…(interrupted) |
| STEIN: | I'm not out here to destroy our country.  Or our people.  It's quite the opposite.  I am more than ready to do everything I can to save this nation from going over the cliff that we're teetering on dude. Teetering on it.  All it would take is just somebody (blows) blow on it and over the cliff we go.  And once we go over the cliff, there ain't no getting' her back.  It's gone.  Is that what you want for your country man? |

Exhibit 4 at 33.  At one point, one of the FBI agents questioned whether he was just "all talk. . . a

patriot in talk." Stein responded angrily: "Bullshit. You god-damn right I do. I plan to or would have planned to. By all fucking means ne… you know, possible, necessary." Exhibit 4 at 88. Even after his arrest, sitting with FBI agents, at no point did the defendant waver in asserting that his actions were those of a true patriot, or in his determination that he was ready to do whatever was necessary, in his view, to "defend" the country from Muslims.

Taken together, the Court has a stark picture of defendant Stein's history and character. His unwavering ideological determination to carry out his vision of "patriotism" renders him a real, on-going danger to the public. He has already been granted a second chance, after expungement of his state felony conviction in 2007. His upbringing and history of substance use and mental health issues (most of which the defendant indicated to USPO were resolved prior to the start of the instant offenses) are not of a severity that counsels leniency. Defendant Stein's history and character, made clear to the Court through the extensive record in this case, warrant the maximum available sentence of life imprisonment.

### 3. Defendant Wright

Defendant Wright's personal history and characteristics do not warrant a lesser sentence. In his PSR interview with the USPO, defendant Wright "reported no abuse or trauma during his formative years" and "no history of mental illness." PSR ¶¶ 101, 113. Although his parents divorced when he was 14 years old, "he never heard his parents argue or fight, except for one night he overheard an argument, and his father moved out the following day." PSR ¶ 101. The defendant did not finish high school, but he received vocational training as an electrician, held several professional licenses, held a security clearance to perform electrical work at Fort Riley Military Base, and was consistently employed throughout his adult life. PSR ¶¶ 118-128. He has

no prior arrests or convictions.[19]  PSR ¶¶ 91-98.  In sum, nothing in defendant Wright's personal history provides any explanation or mitigation for the crimes he committed.

At the same time, the record reveals defendant Wright to have been a vital, unflinching member of this conspiracy to commit mass murder.  More than once, the trial evidence showed defendant Wright advocated for a bomb that would create maximum death and destruction.  *See, e.g.*, Gov't Trial Ex. 127dd (Wright advocating for adding "ball bearings" and "anything that will kill and maim" to the bomb); 127xxx ("WRIGHT:  We want the roof to fall in on them. If, if the blast doesn't kill them the fucking roof does.").  Defendant Wright's determination to carry out the plot continued even after defendant Allen's arrest:  the very next day, he voluntarily sat down with FBI and KBI agents and repeatedly lied to them to throw them off the conspirators' trail.  *See* Gov't Trial Ex. 138 (Wright FBI interview).  Taken together, the record reveals that defendant Wright wanted to kill scores of innocent people in the Mary Street Apartments and did everything he could to facilitate that goal.[20]  Defendant Wright's character justifies a maximum punishment.

### C.  Life Sentences Will Appropriately Reflect the Seriousness of the Offenses

The details of the defendants' plans for the bombing, as reflected in the record evidence, show this offense to be extremely serious, warranting considerable punishment.  In addition to this, the numerous statements submitted to the Court from residents of the Mary Street building and from the surrounding community show the tremendous impact of this offense on its intended

---

[19] However, the government notes that in the audio recordings made by Dan Day during this conspiracy, defendant Wright professed knowledge of how to manufacture methamphetamine and experience in selling narcotics.  *See* Gov't Trial Ex. 127-B (Wright discussing sourcing for meth "back when I was dealing"); Order, ECF 166, at 13 (finding that the government offered recordings of Wright "bragging about manufacturing and selling methamphetamine, claiming he was 'smarter and didn't get caught.'").

[20] Although Defendant Wright claimed in his objections, as he has throughout this case, that his phone call to Dan Day indicated his intent to withdraw from the conspiracy, the trial evidence demonstrated that that this call was simply Wright's attempt to cover his trail.  *See* Order, ECF 166, at 10-12.

targets and on Garden City as a whole.  Residents of the Mary Street building remain scared for

their lives.  When the defendants' plot came to light, one resident was so afraid he moved out of the

building, and he remains too scared to pray at his mosque.  *See* Letter from H.W. ("To this day, I

am still scared and worry a lot.  I don't even pray at the mosque, I pray at home.").  Another tenant,

a father with a family, says that the plot "left us with constant fear and terror," and that he and

others have suffered from night terrors that persist through the present day.  *See* Letter from A.M.S.

("[T]o this day I get night terrors.  I wake up in the middle of the night screaming.  When I

informed my friends about my night terrors, many of them told me that they experienced the

same.").  Although the defendants were stopped before they could physically harm the innocent

people who lived at the Mary Street building, their crime instilled the exact kind of fear among

their intended targets that they had hoped to create.

In addition, this crime deeply affected community trust in Garden City.  Due to the beef

processing plants in Southwest Kansas, Garden City has long been a diverse community with

residents from many cultures, including Somali immigrants.  The owner of the Mary Street

building, a long-time businessman in Garden City, wrote in a letter to the Court,

> When my wife [A.B.] and I began our business in 1983, limiting who could rent from us
> due to what they believed was and still is unheard of.  They are people and need a place to
> live just like anyone else.
>
> If you have never had a chance to speak with a Somali person you have missed out.  We
> have gotten to know our tenants over the course of the years.  We have never felt threatened
> by them or in danger.  The thought of you hurting or killing any one of these people is
> deeply disturbing to us all.

*See* Letter from Garden Spot Rentals.  Heartbreakingly, for some victims, the defendants' crimes

upended years of this kind of community building.  A.M.S. reports that "[t]his incident caused us to

be suspicious of everybody who lives in the area, including some of our neighbors."  *See* Letter

from A.M.S.  The pastor of Garden Valley Church explained, "[i]t takes years to build bridges, seconds to destroy them.  The bombing plot of 2017 has had a tremendous effect on our community here in Garden City."  *See* Letter from Garden Valley Community Church.  The impact of the defendants' crimes on both their intended targets and the larger community warrants a maximum punishment.

### D.  Life Sentences Will Appropriately Promote Respect for the Law

Life sentences for the defendants' egregious crimes are necessary to adequately promote respect for the rule of law.  The record establishes that the defendants viewed their planned bombing as justified and necessary to change U.S. Government immigration policies.  This vigilantism clearly runs contrary to our nation's bedrock rule of law principles.  Yet, when the defendants explained their intentions during several recruitment meetings in June and July, 2016, not one of these prospective recruits reported the defendants to the authorities.  Only Dan Day had the necessary respect for the law to come forward and notify the authorities about the defendants' plans.  Indeed, had Dan Day not provided information to the FBI about these defendants, law enforcement would have been entirely in the dark about their plot, placing the public at great risk.  Special Agent Amy Kuhn Trial Tr. 4/11/18 at 31-34, 36-37 ("Q: Now if you didn't have Dan in the room, how would you know what was going on in there?  A:  We would not have known if Dan was not there.  Q:  Is it fair to say that you might have been left in the dark until you felt a bomb go off?  A:  Absolutely.").  Maximum sentences here will promote the respect for the law that was clearly lacking among the defendants and their peers.

### E.  Life Sentences Will Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public

For many of the same reasons discussed above with regard to the other Section 3553(a) factors, the Court should sentence the defendants to life imprisonment to ensure just punishment, to deter others from similar crimes, and to protect the public from the defendants in the future.  These defendants were ideologically motivated to plan the mass murder of scores of innocent people. They intended to use the Mary Street Apartments bombing to inspire other, similar attacks nation-wide.  *See, e.g.*, Gov't Trial Ex. 127qq ("This is our call to action.  All these people in these militias are like all over. They'll be like, "Goddamn, it's starting.").  They also intended to carry out additional attacks themselves.  *See, e.g.*, Gov't Trial Ex. 16ddd ("STEIN: I wanna be alive to go do it again."); "Brian" Trial Tr. 4/5/18, at 116 (explaining that Stein asked him to help with future attacks).  None of the defendants have expressed remorse for their crimes, and none have accepted responsibility.  Defendant Stein, even after his arrest, professed himself a "patriot" ready to die for his beliefs.  Exhibit 4 at 69.  The defendants' sentences must protect the public from the on-going threat to public safety that these defendants present—and will continue to present in the future.  As several Circuits have recognized, this consideration necessitates substantial punishment, because "terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003); *United States v. Ressam*, 679 F.3d 1069, 1090-91 (9th Cir. 2012) (reversing sentence of defendant who planned to place bombs at LAX airport as substantively unreasonable on this ground) (citation and quotation marks omitted); *Jayyousi*, 657 F.3d at 1117-19 (same).  Accordingly, life sentences are warranted here.

The Court's sentences should also send a strong deterrent message to other individuals who share the defendants' radical views and who may consider acting on them.  As the Court will recall from the trial record, the defendants met several times with others who shared their hatred of Muslims in an attempt to recruit them to join the bombing conspiracy.  While these potential recruits to the plot ultimately did not join it, not one of these individuals—to whom the defendants' goal of mass murder had been made abundantly clear—reported the defendants to the authorities.  Moreover, the defendants had hoped their bombing of the apartments would "wake up" others and inspire them to commit similarly-motivated acts of violence against Muslims, landlords, and government officials.  The Court's sentences should send a strong deterrent message to those who espouse hate-filled ideologies and who may consider taking similar violent action.  Imposition of life sentences for these defendants will send that message.

### F.  Life Sentences Will Not Result in Sentencing Disparities

Finally, the requested sentences will not result in a sentencing disparity across defendants convicted of similar crimes.  A Fifth Circuit case presenting many similar facts, *United States v. Aldawsari*, 749 F.3d 1015 (5th Cir. 2014), is particularly instructive.  In that case, the defendant decided to plan an ideologically-driven bombing in the Dallas, Texas area.  *Aldawsari*, 749 F.3d at 1016.  He spent several months acquiring nearly all of the chemicals needed to manufacture piric acid, an explosive.  *Id*.  He also compiled a list of potential targets to attack.  *Id*.  His plans failed only because law enforcement became aware of his plans and arrested him.  After trial, the district court sentenced him to life imprisonment, a sentence which the Fifth Circuit affirmed.  *Id*. at 1021.

Here, the defendants' conspiracy was far more advanced than Aldawsari's plans:  these defendants had selected a target, planned the details of the attack, successfully manufactured and

tested explosives, and selected a date for the bombing.  Accordingly, sentencing the defendants to

life imprisonment will not result in unwarranted sentencing disparities among similarly situated

defendants.  *See also United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) (reversing 30-year

post-trial sentence for American citizen who conspired to, but did not succeed in, carrying out

terrorist attacks on U.S. soil as overly lenient, noting "We should not require that a defendant do

what McVeigh and Nichols did in order to receive a life sentence.").

**III.**   **If the Court Does Not Apply U.S.S.G. § 3A1.4's Terrorism Enhancement, Either An Upward Departure or an Upward Variance to Life Imprisonment Is Necessary and Appropriate**

As explained above in Part I.A.3, the Government agrees with the USPO that U.S.S.G.

§ 3A1.4 squarely applies to these defendants, and that, as a result, their base offense levels for

Counts One and Two should be increased by twelve levels.  The Government further agrees with

the USPO that the final offense level is 48 for Defendant Allen, 50 for Defendant Stein, and 50 for

Defendant Wright.  However, should the Court choose not to apply U.S.S.G. § 3A1.4, the

government respectfully submits that a substantial upward departure is still warranted under

U.S.S.G. § 3A1.4 Application Note 4 in order to fully account for the full extent of the defendants'

offense conduct, and that the Section 3553(a) enumerated sentencing factors still strongly favor life

sentences for each of the defendants.

**A.  The Facts Warrant an Upward Departure Pursuant to U.S.S.G. § 3A1.4 Application Note 4**

In Application Note 4 to U.S.S.G. § 3A1.4, the Sentencing Commission provides for an

upward departure in "cases in which . . . (B) the offense involved, or was intended to promote, one

of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was

to intimidate or coerce a civilian population, rather than to influence or affect the conduct of

government by intimidation or coercion, or to retaliate against government conduct."  U.S.S.G. § 3A1.4 App. Note 4.  In such cases, the upward departure may not exceed the top of the guideline range that would have resulted if the terrorism adjustment had been applied.

The Guidelines state that commentary regarding departures from the Guidelines should be "treated as the legal equivalent of a policy statement." U.S.S.G. § 1B1.7; *see also Stinson*, 508 U.S. at 43.  This commentary "adds an *encouraged*, structured upward departure in § 3A1.4 (Terrorism) for offenses that involve terrorism but do not otherwise qualify as offenses that involved or were intended to promote 'federal crimes of terrorism' for purposes of the terrorism adjustment in § 3A1.4." United States Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 637 (effective November 1, 2002) (emphasis added); *see* 18 U.S.C. § 3553(b) (stating that the court may consider the official commentary of the Sentencing Commission when determining whether to depart from a guidelines range).

To qualify for the upward departure delineated in Application Note 4, the defendant must (1) be guilty of an offense that "involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. 2332b(g)(5)(B)," which includes 18 U.S.C. § 2332a, and (2) have the motive "to intimidate or coerce a civilian population."  U.S.S.G. § 3A1.4(a) App. Note 4; *see also United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (holding that a bombing of an abortion clinic intended to intimidate civilians qualified for an upward departure under this note).

Here, the evidence overwhelmingly established that the goal of the conspiracy was to intimidate the residents of 312 West Mary Street and the Muslim community as a whole.  Even two of the defendants acknowledged that this case presents "the exact fact pattern" imagined by Application Note 4.  *See* Defendant Allen Objections to the Draft PSR, at 12; *see also* Defendant

Stein Terrorism Enhancement Objections at 3 (acknowledging that his conduct falls within this application note).  Accordingly, should the Court conclude that the defendants' conduct does not fully satisfy the requirements of U.S.S.G. § 3A1.4 (which it does), the Court should grant an equivalent upward departure pursuant to that provision's Application Note 4 to a maximum Guidelines range of life imprisonment.

### B.  The Section 3553(a) Sentencing Factors Strongly Support an Upward Variance to Life Imprisonment

Finally, life imprisonment is the appropriate and necessary sentence for these defendants pursuant to the Section 3553(a) factors, regardless of their final Guidelines range.  For the same reasons given above in part II, a term of life imprisonment is necessary, sufficient, and not greater than necessary to properly account for each of the Section 3553(a) factors.  Of particular concern to the government are the seriousness of the offense, which continues to have a deep, lasting impact on the victims' sense of security in their homes and at their mosque; the need to ensure that these defendants – who planned multiple attacks and have been unwavering in their commitment to kill Muslims and punish the government for its immigration policies – can never threaten the safety of the public again; and the need to send a strong deterrent message that violence against the government or against any person – of any race, religion, or national origin, and especially in their homes and their places of worship – will not be tolerated.

## <u>CONCLUSION</u>

For the reasons given above, the government respectfully recommends that the Court impose a term of life imprisonment for each defendant.

Respectfully submitted,

STEPHEN R. MCALLISTER
United States Attorney

*Anthony W. Mattivi*

ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

*Risa Berkower*

RISA BERKOWER
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0150
Risa.Berkower@usdoj.gov

*Mary J. Hahn*

MARY J. HAHN
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0921
Mary.Hahn@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the   29th   day of October 2018, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*Mary J. Hahn*
Mary J. Hahn