## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| *Plaintiff*,   ) | |
| )  | |
| vs.   ) | Case No. 16-10141-03-EFM |
| )  | |
| GAVIN WAYNE WRIGHT,   ) | |
| *Defendant*.   ) | |
| _____) | |

### DEFENDANT'S SENTENCING MEMORANDUM

The federal sentencing guidelines are subservient to the federal sentencing statute, 18 U.S.C. § 3553(a). This Court is bound only to the statute. In this way, "the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [the Court] may not presume that the Guidelines range is reasonable. . . . [The Court] must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Therefore, this Court is bound to follow Congress' mandate and to sentence according to the statute, even if the statute's requirements are broader than the guidelines sentence.

In 2005, the Supreme Court of the United States "instructed district courts to read the United States Sentencing Guidelines as 'effectively advisory.'" *Kimbrough v. United States*, 552 U.S. 85, 90 (2007)(citing *United States v. Booker*, 543 U.S. 220, 244 (2005)). In 2007, the Supreme Court held that the Guidelines serve as merely "one factor among several [that] courts must consider in determining an appropriate sentence." *Id*. The other factors cited by the Supreme Court are outlined in 18 U.S.C. § 3553(a). *Id*. And since *Booker*, the standard controlling both a sentence itself under § 3553, and the method by which it is calculated under

the guidelines, is "reasonableness." *Id*.; *see also United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006).

Congress mandated that when handing down a sentence in a criminal case, "[t]he court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the [following] purposes:

. . .

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a). To determine whether a sentence is sufficient and necessary to fulfill these objectives, this Court must "consider [i] the nature and circumstances of the offense and [ii] the history and characteristics of the defendant." *Id*. This Court must consider all of "the kinds of sentences available" by statute that may properly effectuate § 3553(a) purposes, even if the "kinds of sentence . . . established [by] the guidelines" permit or encourage only imprisonment. *Gall*, 552 U.S. at 59 (where the facts applied to the § 3553(a) factors justified a variance from the recommended guideline sentence).

The issue in this case is what sentence is sufficient but only reasonably necessary to fulfill the foregoing statutory policies set forth by Congress as it relates to Mr. Wright alone. A guideline sentence is unreasonable if it is not limited to what is necessary to effectuate the purposes listed in § 3553(a) because it goes beyond the scope of the statute. Furthermore, while Mr. Wright was convicted of conspiring with others and while certain evidence was admissible

to prove criminal liability – such as statements and conduct of others – this Court may not sentence Mr. Wright as a member of a conspiratorial class. Sentencing is an individualized exercise, and so this Court must look at *Mr. Wright's* statements and *Mr. Wright's* conduct in the course of the offense to determine an appropriate sentence. For sentencing purposes, this Court may not hold his co-conspirator's statements and conduct against Mr. Wright. The ends of justice as defined by § 3553(a) are best served and require a downward variance from the guideline recommended by United States Probation.

## I.       § 3553(a) REQUIRES THIS COURT TO DEPART AND VARY FROM THE GUIDELINES TO ACHIEVE THE SENTENCING PURPOSES OF THE BAIL REFORM ACT.

It must be stated unequivocally: Mr. Wright was not convicted of using a weapon of mass destruction, nor was he convicted of attempting to use a weapon of mass destruction. He was convicted of *agreeing with others* to use a weapon of mass destruction. Mr. Wright was not convicted of committing an act against civil rights, nor was he convicted of attempting to commit an act against civil rights. He was convicted of *agreeing with others* to commit an act against civil rights. And Mr. Wright was convicted of making false, fictitious and fraudulent statements which remain unproven to be material. Agreements and statements. At the end of the day, what Mr. Wright has been convicted of amounts to nothing more than speech.

The Supreme Court has held for a century that all injury to the First Amendment is outweighed by the danger presented by a conspiracy. *Goldman v. United States*, 245 U.S. 474, 477 (1918); *Dennis v. United States*, 341 U.S. 494, 511 (1951). But no court has ever held that criminalized conspiracy presents *no* injury to the First Amendment, but merely that such injury is outweighed by other interests. As the Supreme Court stated, the question "is whether *the words used* . . . create a clear and present danger." *Dennis*, 341 U.S. at 503 (emphasis added). But at the

end of the day, this Court must remember that Mr. Wright was convicted for crimes against his state of mind and his words.

### A.     The guideline range overstates the seriousness of the offense conduct, promotes disrespect for the law, and provides for an unjust punishment for the offense.

How should this Court measure the seriousness of Mr. Wright's conduct? The best objective evidence for the seriousness of the offenses themselves are the mandatory minimum sentences, if any, that Congress requires courts to impose for such conduct. In this case, Congress deems that a conviction under 18 U.S.C. § 2332a(a)(2) carries a minimum prison sentence of only a "term of years," unless it results in the death of a victim. A conviction under 18 U.S.C. § 241 carries no mandatory minimum, but a maximum of only ten years. A conviction under 18 U.S.C. § 1001 carries no mandatory minimum, but a maximum of only five to eight years. The offenses of conviction carry – in aggregate – a mandatory minimum of only *some* term. Not one year. Not five years. Not twenty years. Certainly not life. A prison sentence of mere time served may sufficiently reflect the seriousness of the offense under the right circumstances, which are present in this case with this defendant.

Furthermore, this Court should look at other recent sentences for similar conduct. On its Weapons of Mass Destruction web page, the FBI touts the following sentencing victories in cases involving § 2332a conduct since just last month (September 2018):

> - A Fort Polk soldier was sentenced to less than 12 years for manufacturing and using a chemical weapon that resulting in injury to two persons. U.S. Attorney, *Fort Polk soldier sentenced to more than 11 years for illegally manufacturing, using a chemical weapon*. United States Department of Justice Website, Sept. 25, 2018[1];

---

[1] Available at: < https://www.justice.gov/usao-wdla/pr/fort-polk-soldier-sentenced-more-11-years-illegally-manufacturing-using-chemical-weapon> (last accessed: Oct. 29, 2018).

- The FBI touts a mere 20-year sentence for a man planning to use a weapon of mass destruction on behalf of ISIS. U.S. Attorney, *Massachusetts Man Sentenced to 20 Years in Prison for Planning ISIS Inspired Attack*. United States Department of Justice Website, Sept. 5, 2018[2].

Not to mention the variety of other cases in which defendants were given lesser sentences:

*United States v. Abu Khalid Abdul-Latif*, 11-CR-00228-01-JLR (W.D. Wash. 2013)(18 years for planning to use WMDs); *United States v. Walli Majahidh*, 11-CR-00228-02-JLR (W.D. Wash. 2013)(17 years for planning to use WMDs); *United States v. Sayyed*, 18-CR-00090-AKK-HNJ (N.D. Ala. 2018)(15 years, lifetime post-release supervision). The history of sentencing in similar cases suggests that life imprisonment – even 20 years imprisonment – unduly overstates the seriousness of the offenses of conviction. In fact, as of 2011, just over 10% of individuals convicted in association with "terrorism" were sentenced to 15 years or longer, suggesting the circumstances under which most people receive long sentences go beyond mere agreement to commit terrorism. *See* Laguardia, Francesca, *Terrorists, Informants, and Buffoons: The Case for Downward Departure as a Response to Entrapment*, 17 Lewis & Clark L. Rv. 171, 190 (2013).

But more importantly, this Court must look at the conduct Mr. Wright was actually convicted of engaging in. And perhaps most importantly, this Court must look at the conduct of Mr. Wright in comparison to his co-defendants. All evidence presented at trial accurately demonstrates that Mr. Wright was late to the game in this case. The first time any evidence places him in the vicinity of his co-defendants was at a meeting in mid-July 2016 at which *many* people expressed similar thoughts of fear and aggression. But by that time, co-defendant Stein had already attempted to recruit others. By that time, paid FBI informant Dan Day had gone on his ride-along with Stein. By that time, Stein had been talking to co-defendant Allen. No

---

[2] Available at: < https://www.justice.gov/usao-ma/pr/massachusetts-man-sentenced-20-years-prison-planning-isis-inspired-attack> (last accessed: Oct. 29, 2018).

evidence suggests that Mr. Wright knew of, participated in or was even present during Stein's conduct up to the time of the meeting at Trish Burch's home in mid-July.

This Court heard uncontroverted testimony from Lee Raynor that during the summer of 2016 while Mr. Wright was meeting with Stein, Allen and paid informant Day, he was continuing to conduct business with members of the Somali Muslim community in Liberal, Kansas. This Court heard uncontroverted testimony from Mr. Raynor that Mr. Wright "butted heads" with Stein, and that according to Mr. Wright, Stein was full of hate. Mr. Raynor also testified that Mr. Wright continued to do business with Dr. Hussainy, a well-reputed doctor and Muslim in Liberal. This Court saw photographs and heard law enforcement testimony that almost all print-outs of the Anarchist's Cookbook and explosives recipes were found in co-defendant Allen's office at G & G – not Mr. Wright's office. There is no evidence that Mr. Wright ever had specific knowledge of Stein's conversations with the FBI undercover employee. The evidence is uncontroverted that Mr. Wright never met with any FBI undercover employees, though Stein did. There is no evidence that Mr. Wright agreed with the final form of the manifesto written by co-defendant Allen. There is no evidence that Mr. Wright ever saw it.

Furthermore, unlike his co-defendants, Mr. Wright voluntarily withdrew from the conspiracy upon learning of how far it had actually gone by October 2016. This Court heard the entirety of the recorded phone call on the evening of October 11, 2016 between Mr. Wright and the paid FBI informant, Dan Day. This Court heard Mr. Wright unambiguously tell Day all of the following that night:

- "I'm just cutting ties for now. I don't want to even be in the group."

- "I just told [co-defendant Stein] that I'm quitting everything right now."

- "I don't want to talk to nobody. I don't need to be involved in this."

- "I'm just out of the group and I deleted everything and I'm done."

- "I want to help the Liberty Restoration Committee and try to change this fuckin' country but that's not how I want to change it. You know what I mean?

- "I wanted to try to get with the Liberty Restoration Committee and let them know the whole point behind all this but I'm not gonna be part of that."

- "I want to be part of changing this country constitutionally, but I don't want to be involved in that."

Mr. Wright's withdrawal must be given hefty weight in formulating a sentence for him.

And it was not until the next day – *after* Mr. Wright told Stein he no longer wanted to be contacted by Stein – that co-defendant Stein moved forward on his own meeting the FBI undercover employee. Mr. Wright came to the table late, and left early. And his specific conduct during the course of the conspiracy clearly distinguishes him from his co-defendants in these matters. This Court must consider Mr. Wright's personal conduct when formulating his sentence, and a lesser sentence than his co-defendants is clearly warranted. Objectively, this Court must sentence Mr. Wright in light of the seriousness of *his* offense conduct – not his co-defendants. This finding must be individualized and tailored to him. The corollary to § 3553(a)(2)(A) is that when a sentence is excessive in light of the seriousness of the offense conduct, it only serves to promote disrespect for the law and provides unjust punishment.

> **B.** **The guideline range will have almost zero deterrent effect.**

The second purpose that sentencing must achieve is to provide deterrence against similar criminal conduct in the future. Courts recognize two different forms that ought to be considered by this Court: general deterrence and specific deterrence. General deterrence is best defined as the message a court may send via a particular sentence to others contemplating similar conduct that serious consequences will result. Specific deterrence is the deterrent effect that a particular

sentence will have on the defendant in question: will it keep him from engaging in the same conduct, or *any* criminal conduct, in the future? "If either is eliminated or minimized, the deterrent effect is proportionately minimized." *United States v. Morgan*, 635 Fed. Appx. 423, 450 (10th Cir. 2015).

As for general deterrence, it is difficult to imagine that a particular sentence against Mr. Wright will stymie the proliferation of similar crimes and conduct in the future because perpetrators and would-be perpetrators have planned, plotted and even carried out violent crimes of this nature in *increasing* numbers *despite* sentences against them. For the use or planning to use a weapon of mass destruction alone, this nation has seen a sharp *increase* since the 9/11 attacks. On the FBI's own website, it hosts a section specifically called "WMD News" where it provides links to updated news stories regarding thwarted crimes implicating weapons of mass destruction defined by 18 U.S.C. § 2332a. Federal Bureau of Investigation Website, "What We Investigate" Web Page, Weapons of Mass Destruction[3]. On October 29, 2018, a cursory look at the FBI's website touts arrests, charges, convictions, and sentences of 20 years or less in several § 2332a cases. But more so, a guideline sentence for a conspiracy to attack people based on their religion, ethnicity, or country of origin will do little to stem the tide of similar planned violence.

The incidences of anti-Muslim violence – both planned and perpetrated – has only *increased* since 9/11. Shane, Scott. *Homegrown Extremists Tied to Deadlier Toll Than Jihadists in U.S. Since 9/11*. New York Times Online, June 24, 2015[4]. Studies demonstrate that since President Trump was elected in 2016, the rate of anti-Muslim violence surpassed the rate of anti-

---

[3] Available at: < https://www.fbi.gov/investigate/wmd> (last accessed: Oct. 29, 2018).

[4] Available at: < https://www.nytimes.com/2015/06/25/us/tally-of-attacks-in-us-challenges-perceptions-of-top-terror-threat.html?_r=0> (last accessed: Oct. 29, 2018).

Muslim violence that occurred in even the immediate aftermath of the September 11 attacks. Kishi, Katayoun, *Assaults against Muslims in U.S. surpass 2001 level*. Pew Research Online, Nov. 15, 2017[5]; Underwood, Alexia, *What most Americans get wrong about Islamophobia*. Vox Online, Apr. 6, 2018[6]; Williams, Jennifer. Since President Trump took office, this nation has seen an unprecedented increase in civil rights violence of various stripes. *White American men are a bigger domestic terrorist threat than Muslim foreigners*. Vox Online, Oct. 2, 2017[7].

Intellectual honesty requires this Court to confront a certain reality. As long as the White House with impunity calls Islam "a dangerous threat," and paints average Americans as "victims of horrendous attacks by people that believe only in Jihad," a mixed signal gets sent. The President warns Americans that radical Muslims are "trying to take over our children." The Commander-in-Chief exonerates violent extremists in Charlottesville as "good people," while claiming that Muslims "by and large" want to "subjugate" the rest of the world. Candidate Trump opines that "Second Amendment people, maybe there is" something you can do. As recently as last week, President Trump intentionally stoked Islamaphobia again, Tweeting that "unknown Middle Easterners are mixed in" the South American migrant caravan. Reuters, *Trump on Twitter (Oct 22): Caravan, Immigration Laws, Fake news*. Reuters Online, Oct. 22, 2018[8]. As recently as today, October 29, 2018, President Trump Tweeted stated that "some very bad people" are mixed into the migrant caravan, and stating unequivocally that "[t]his is an

---

[5] Available at: < http://www.pewresearch.org/fact-tank/2017/11/15/assaults-against-muslims-in-u-s-surpass-2001-level/> (last accessed: Oct. 29, 2018).

[6] Available at: < https://www.vox.com/2018/4/6/17169448/trump-islamophobia-muslims-islam-black-lives-matter> (last accessed: Oct. 29, 2018).

[7] Available at: < https://www.nytimes.com/2015/06/20/us/tally-of-attacks-in-us-challenges-perceptions-of-top-terror-threat.html?_r=0> (last accessed: Oct. 29, 2018).

[8] Available at: <https://twitter.com/realDonaldTrump/status/1056919064906469376> (last accessed: Oct. 29, 2018).

invasion of our Country and our Military is waiting for you!" (Donald J. Trump, Tweet by @realDonaldTrump Twitter Account, 7:41 AM 29 Oct 2018[9]).

As long as the Executive Branch condemns Islam and commends and encourages violence against would-be enemies, then a sentence imposed by the Judicial Branch does little to deter people generally from engaging in such conduct if they believe they are protecting their countries from enemies identified by their own Commander-in-Chief. The speaker with the best bully pulpit in the world is never sanctioned for spreading fear and advocating harm. And so far, every indication is that this has resulted in *greater* conduct of this nature – not less. General deterrence under these circumstances is simply a pipe dream.

But what about specific deterrence against Mr. Wright? His personal characteristics and experience through this process have and continue to have a positive impact on deterring him not only from engaging in *similar* criminal conduct in the future, but also prompt him to avoid *any* criminal conduct. His history suggests that avoidance of criminal activity is a hallmark of his character. Mr. Wright's criminal history speaks to this. Probation gave him a criminal history score of zero, not because any crimes are old enough to avoid being calculated here, but because he has zero criminal history. Prior to this case, he had no arrest record. Furthermore, he has absolutely no *civil* record implicating violent or criminal behavior. Mr. Raynor testified that Mr. Wright carried a gun, but never had a round chambered. The guns he owned were lawfully acquired, owned and used. Prior to this incident, Mr. Wright was a wholly law abiding individual, and a relatively non-violent individual at that.

Additionally, this Court received testimony and evidence bearing on Mr. Wright's propensity to follow through on the agreements he was convicted of making. This Court heard

---

[9] Available at: <https://twitter.com/realDonaldTrump/status/1056919064906469376> (last accessed: Oct. 29, 2018).

uncontroverted testimony that Mr. Wright made his home available to not only an immigrant, but a man Mr. Wright believed to be Muslim. This Court heard uncontroverted testimony that Mr. Wright did business in Liberal, Kansas with a high-reputation couple known in the community to be Muslim. This Court heard uncontroverted testimony that Mr. Wright did business with members of the Somali Muslim refugee community in Liberal, Kansas. And, ultimately, when faced with the scope of the agreement he had entered, Mr. Wright unequivocally and voluntarily withdrew, stating that he wanted to change America constitutionally, "but not like that."

This Court heard this in a recorded phone call between Mr. Wright and the paid FBI informant, Dan Day. This Court also heard testimony from Day regarding that conversation which it may be tempted to rely on. However, this Court would be generous in finding suspect Day's impressions of that phone conversation. To the extent this Court gives Day's testimony any weight at all, it should not forget Day's demeanor during the testimony: frequently remembering everything when government attorneys examined him, often forgetting things when defense counsel examined him, frequent hesitations, regularly resorting to platitudes about saving children and his new-found faith instead of answering questions directly, providing deflections instead of responding to defense counsel's questions about how well he knew Mr. Wright and relying only on the response "I knew him."

As it relates to the phone call in question, Day testified the only reason Mr. Wright said those things was because Day believed that Mr. Wright thought he was being recorded and did not want to get caught, choosing to merely "lay low" instead. However, absolutely no evidence corroborates Day's version of events that day. Mr. Wright spoke with co-defendant Stein stating he wanted no more communication with him. Mr. Wright said the same thing to Day. No evidence suggests that Mr. Wright communicated with Stein or Day the next day. No evidence

suggests Mr. Wright failed to delete the communication applications from his phone. Though Mr. Wright has been convicted of entering into a conspiracy, his own words in that recorded phone call demonstrate beyond a preponderance that as soon as he realized the extent to which others were willing to go that he withdrew and wanted nothing more to do with it. While late in the game, Mr. Wright's withdrawal ought to be taken into account and any conduct or statements by his ex-conspirators should not be held against him at sentencing.

Furthermore, Day testified he had absolutely no evidence or relationship with Mr. Wright on which to base that impression. So this Court should listen to Mr. Wright's statements in that context. Having been put through this trial – both literally and figuratively – the deterrent effect of the consequences Mr. Wright has experienced to date is extraordinarily high. With each passing day, it will become higher and higher. For this reason, Mr. Wright will certainly be deterred from engaging in not just similar, but *all* criminal behavior in the future.

> **C.      The guideline range will not protect the public from further crimes of the defendant because with the exception of this one incident, Mr. Wright has committed no crimes or criminal acts which the public must be protected from.**

With the exception of this one incident, Mr. Wright does not have enough criminal history to suggest that the public would require further protection from him. If anything, his personal history – both criminal and personal – dictate that the conduct of this offense was out of the ordinary given his character and personal history. Prior to this incident, Mr. Wright had no criminal history *at all* – too old for the guideline calculation or otherwise. Furthermore, Mr. Wright had no *violent* history to speak of – criminal or otherwise. Mr. Wright has no record of domestic violence, assault, or abuse. During pre-trial detention, Mr. Wright has had no issues regarding his behavior toward other inmates. While in pre-trial detention, Mr. Wright

successfully completed an anger management course[10]. Furthermore, it must be reiterated again, Mr. Wright was convicted of speech-as-conduct. None of his conduct during this case suggests that he presents a threat to others outside of the circumstances of this one incident.

Furthermore, age and support network decrease his risk of recidivism. His brother is his long-time business partner. His mother and step-father provide strong ties to a community that he does not wish to cause injury to – either physical or mental. Mr. Wright's history and character demonstrate that this incident was out of character for him. Having been through the criminal justice system, detained in jail and convicted, the risk of recidivism is extraordinarily low for Mr. Wright, and so it is unfair to say that he must be kept in prison for the rest of his life to protect other members of society.

**D.     The guideline range sentence may provide some further educational and correctional care in an effective manner, but the balance in what he would receive is outweighed by what he already has.**

## II.     VARIANCES AND DEPARTURES.

**A.     The proposed guidelines criminal history score unduly overstates Mr. Wright's criminal history.**

According to the pre-sentence report, Mr. Wright's true criminal history score is zero, which would give him a criminal history Category I. However, the terrorism enhancements artificially inflate his criminal history to a Category VI. In this case, a criminal history Category VI is substantively unreasonable. "[S]ubstantive reasonableness addresses whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008). "[T]he automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an

---

[10] Certificate attached as Ex. 1.

instrument to have genuine analytical value, it is fundamentally at odds with the design of the

Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a

defendant who has had no criminal history a fictional history of the highest level of seriousness."

*United States v. Jumaev*, 12-CR-00033-JLK (D. Colo. July 18, 2018)(Memorandum Opinion and

Order on Sentencing, Doc. 1920); *United States v. Mehanna*, 09-CR-10017-GAO (D. Mass.

April 12, 2012).

      A downward departure is requested in conformance with the U.S.S.G., which clearly

states:

> If reliable information indicates that the defendant's criminal history category
> substantially over-represents the seriousness of the defendant's criminal history or the
> likelihood that the defendant will commit other crimes, a downward departure may be
> warranted.

U.S.S.G. § 4A1.3(b)(1); *see also United States v. Robertson*, 662 F.3d 871, 879 (7th Cir. 2011).

### B.     U.S. Probation's base offense level calculation for Group 1 (Counts 1 and 2) applies an improper base offense guideline.

      U.S. Probation calculates a joint offense level of 50 as it relates to the counts in Group 1.

However, Probation has utilized an improper method of calculating the base offense level.

Specifically, Probation used U.S.S.G. § 2A1.5 which is the guideline for conspiracy or

solicitation to commit murder and which provides for a base offense level of 33. The correct

guideline is § 2M6.1(a)(2) for unlawful activity involving nuclear material, weapons, or

facilities, biological agents, toxins, or delivery systems, chemical weapons, or other weapons of

mass destruction; attempt or conspiracy which provides for a base offense level of 28.

      This Court hands down a Constitutional sentence only by correctly calculating the

guideline sentence for the offenses of conviction. *See Gall*, 552 U.S. at 50. The guidelines set

forth the roadmap for correctly calculating a guideline sentence range in the General Application

Principles (Section 1, Part B). First, this Court must consult the Statutory Index of the Guidelines Manual to determine which guideline(s) are applicable for the offense of conviction. U.S.S.G. § 1B1.2. This Court is not permitted to use any analogous guidelines unless there is no corresponding guideline for the offense of conviction, or otherwise explicitly required by the guidelines. § 1B1.2(a)(Only "[f]or statutory provisions not listed in the Statutory Index, use the most analogous guideline"). In this case, the Statutory Index lists three guidelines that may apply to Mr. Wright's Group 1 convictions under 18 U.S.C. § 2332a(a)(2). Those guidelines are U.S.S.G. §§ 2A6.1, 2K1.4 and 2M6.1. Because more than one guideline is listed in reference to § 2332a, this Court must "determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2, Application Note 1. Section 1, Chapter B of the U.S.S.G. does not define exactly how courts do that, it is traditionally accepted that that the guideline with the highest-resulting base offense level is utilized.

In this case, § 2M6.1(2) provides the highest facial base offense level of 28. However, U.S. Probation and the Government contend that § 2M6.1 is entirely inapplicable, *infra*. Instead, the Government contends that § 2K1.4 applies as the next-highest facial base offense level of 24. However, within § 2K1.4, the Government uses the cross-reference in sub-section (c) to send this Court down the "most analogous guideline" rabbit hole. The Government, however, takes an illogical route in order to find § 2M6.1 inapplicable, to move this Court to § 2K1.4, simply to get this Court to § 2K1.4(c), so that the Government can move this Court to take *yet another leap* to get to an analogous guideline at § 2A1.5, which facially applies to conspiracy to commit murder and coincidentally carries a base offense level of 33. However, the Government engages in logical contortions of circus proportions to get there.

15

Specifically, the Government suggests that § 2M6.1 is inapplicable because it applies *only* to biological, chemical and radiological weapons. For support, the Government moves this Court to effectively hold that the commentary notes to the Sentencing Guidelines are superior to the Sentencing Guidelines themselves. This, of course, is a logical contortion. Specifically, the Government suggests that application note 1 should limit the plain language of § 2M6.1. Application Note 1 states that the phrase "weapon of mass destruction" has the meaning given in 18 U.S.C. § 2332a(c)(2)(B), (C) and (D). Respectively, sub-section (B) concerns chemical weapons ("any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors"). Sub-section (C) concerns biological weapons ("any weapon involving a biological agent, toxin, or vector"). And sub-section (D) concerns nuclear or radiological weapons ("any weapon that is designed to release radiation or radioactivity at a level dangerous to human life"). Meanwhile, the excluded sub-section (A) concerns so-called conventional weapons ("any destructive device").

There is, however, a problem with the Government's gyrations beyond holding the application notes above the guidelines themselves. Specifically, the Government fails to address a simple phrase in the plain-language of § 2M6.1: "or other weapons of mass destruction." The guideline headings are not merely for identification purposes: they are substantive in and of themselves. Excising section headings would leave courts with no identification of the types of offense conduct at issue in connection with a particular guideline. So, this Court must read the title of § 2M6.1 and any other guideline as substantive.

Chapter M, Subsection 6 is specifically titled: "Nuclear, Biological, and Chemical Weapons and Materials, *And Other Weapons of Mass Destruction*." § 2M6.1 is specifically

titled: "Unlawful Activity Involving Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or Delivery Systems, Chemical Weapons, *or Other Weapons of Mass Destruction*; Attempt or Conspiracy." The Government's proposed interpretive rule – raising the commentary above the guidelines themselves – results in an ambiguous and illogical result. Specifically, if the phrase "weapons of mass destruction" means *only* nuclear, biological and chemical weapons, then what does the Sentencing Commission mean when it identifies a guideline as being applicable to nuclear, biological and chemical weapons "*And Other* Weapons of Mass Destruction?" *See* U.S.S.G. § 2M6. What does the Sentencing Commission mean when it identifies a guideline as being applicable to activity involving nuclear weapons, biological agents, toxins or delivery systems, chemical weapons "*or Other* Weapons of Mass Destruction?"

If the Government's theory on guidelines interpretation is correct, then, it also makes the language of the guideline itself – not just the heading – ambiguous and illogical. In § 2M6.1, the Sentencing Commission clearly contemplates that an offense may "involve[] a threat to use a [i] nuclear weapon . . ., [ii] a chemical weapon, [iii] a biological agent, toxin, or delivery system, [iv] *or a weapon of mass destruction.*" § 2M6.1(a)(4)(emphasis added). If the Government is correct that § 2M6.1 is limited only to offenses in which a nuclear, chemical, or biological weapon was involved, then the last category – "or a weapon of mass destruction" – is superfluous. Alternatively, if the plain-language of the guideline itself is to have meaning, then this Court must put the Government to proving what the Sentencing Commission intended when it used phrases such as "other weapons of mass destruction" alongside the three categories set forth in the application note to § 2M6.1. The burden is on the Government now to prove what types of weapons exist outside of nuclear, biological and chemical weapons that are *not* "destructive devices" that § 2M6.1 would apply to. The Government cannot do this.

17

Under codes of construction, every word is presumed to have meaning. What this Court has, then, are two competing theories of guidelines interpretations. The Government's theory is that the commentary works to *subvert* the plain language and implications of the guidelines themselves, while Mr. Wright's theory is that the commentary is merely interpretive and cannot be used to interpret the guideline in a way that creates ambiguity, inconsistency or thwarts the plain implications of the guideline language itself. The case law is consistent with Mr. Wright's position. *United States v. Morris*, 562 F.3d 1131, 1135 (10th Cir. 2009) ("[C]ommentary issued by the Sentencing Commission to interpret or explain a guideline is binding and authoritative unless it . . . is inconsistent with, or a plainly erroneous reading of, that guideline"). The Sentencing Commission clearly anticipates that there are weapons of mass destruction that are *not* nuclear, biological or chemical in nature that § 2M6.1 would apply to. The question, then, is what are those "*other* weapons of mass destruction?" What is the Government's answer?

Ultimately, this Court must decide between two competing theories. The statutory definition of "weapons of mass destruction" includes destructive devices, nuclear weapons, biological weapons and chemical weapons. The § 2M6.1 commentary defines weapons of mass destruction by referencing the sub-parts of § 2332a that refer only to nuclear, biological and biological weapons. But § 2M6.1 itself refers to nuclear weapons, biological weapons, chemical weapons and "other weapons of mass destruction." What does "other weapons of mass destruction" refer to if not weapons of mass destruction that are not nuclear, biological or chemical *i.e.* destructive devices?

The Government's theory requires this Court to take multiple steps. First, this Court is asked to hold that the Application Note supersedes the plain language of the guideline itself, even though doing so creates a redundancy or ambiguity with respect to the "other weapons of

mass destruction" language in the guideline itself. Next, the Government asks this Court to find therefore that § 2M6.1 does not apply to weapons of mass destruction convictions under 18 U.S.C. § 2332a, even though § 2M6.1 is the only guideline to § 2332a in the Statutory Index that actually refers to weapons of mass destruction offenses. The Government *then* asks this Court to take *another* step and find that instead, § 2K1.4 applies because it uses the word "explosives" once in the heading, and the commentary defines "explosives" for § 2K1.4 purposes as "destructive devices" (yet not as that phrase is defined in § 2332a. The Government *then* asks this Court to take *yet another step* and apply sub-section (c), which requires this Court to take *another step* to go searching for the "most analogous guideline" in a completely different chapter of the guidelines. All of this, the Government asks, to get Mr. Wright a base offense level of 33.

Mr. Wright requests a simpler approach. § 2M6.1 says "weapons of mass destruction." It uses the phrase "other weapons of mass destruction" along with nuclear, biological and chemical weapons. Mr. Wright asks this Court to give meaning to the substantive phrase "other weapons of mass destruction." He recognizes that both theories present logical inconsistencies. The Government's theory requires this Court to abandon the idea that "other weapons of mass destruction" has substantive meaning given the inconsistency created by the Application Note. Mr. Wright's theory requires this Court to give meaning to the phrase "other weapons of mass destruction" despite the Application Note. But Mr. Wright's interpretation carries two virtues the Government's does not. First, it requires less logical maneuvering and warping of common sense to achieve a particular objective because it has the highest base offense level of the three guidelines set out in the Statutory Index (the Government does not get to 33 without going to the Conspiracy to Commit Murder guideline, because § 2K1.4's highest guideline is a mere 24).

But second, Mr. Wright's theory has the virtue that it benefits from one final rule of statutory interpretation created for this very scenario: the rule of lenity. *United States v. Onheiber*, 173 F.3d 1254 (10th Cir. 1999)(rule of lenity applies to U.S.S.G.). Mr. Wright's theory is no less reasonable than the Government's. Arguably, the Government's theory is no less reasonable than Mr. Wright's. In such instances when mutually exclusive theories both suffer from (or create) logic and reasonableness problems, the only correct answer under codes of criminal statutory and guideline construction require this Court to use the theory or definition that creates the lesser burden on the defendant. In this case, Mr. Wright's theory provides him with a level 28 base offense level. Because 28 is less than 33, the rule of lenity (and simply going back to the statute itself) provides this Court with a clear means of resolving the ambiguity. It must do so in favor of Mr. Wright and apply § 2M6.1 and not § 2K1.4.

**C.    The 12-level terrorism enhancements on all counts are arbitrary, capricious and unduly prejudicial because they raise the guidelines range and criminal history to such extents that the ultimate sentencing ranges are antithetical to the purposes set forth in 18 U.S.C. § 3553(a).**

The terrorism enhancements "take[] a wrecking ball" to the initial guidelines calculations. *United States v. Jumaev*, 12-CR-00033-JLK (D. Colo. July 18, 2018) (Memorandum Opinion and Order on Sentencing, Doc. 1920 at 9). In this case, the enhancements automatically send Mr. Wright's guideline calculation into the maximum for Count 1 and beyond the maximum for Counts 2 and 3 without regard to his personal history or characteristics, and without regard to his actual offense conduct. The enhancements have the function, then, of subrogating the commands of the § 3553(a) which require this Court to take not only the offense conduct, but also Mr. Wright's history and characteristics into consideration as potentially mitigating factors in sentencing. "There is no rational basis for concluding that all individuals labeled as 'terrorists'

and all crimes of 'terrorism' are equal. 'Gradation of offenses' is an important value in criminal law. . . . The requirement to view any terrorist as every terrorist goes against the basic principles of sentencing and the factors set forth in 18 U.S.C. § 3553." *Id*. at 22-23.

In addition to artificially inflating Mr .Wright's criminal history from a Category I to a Category VI, it arbitrarily enhances his guideline sentence by 12 points. There appear to be no empirical studies or other justifications for the increase, either. *Kimbrough v. United States*, 552 U.S. 85, 94 (2007). In this way, the terrorism enhancements not only fail to account for the sentencing factors set forth in § 3553(a), but actually work to subvert the statute. The guidelines are not binding on this Court, but 18 U.S.C. § 3553(a) is. To that extent, this Court must use its discretion and find these factors weigh against the guidelines-based life sentence.

### D.     Imperfect Entrapment and Government Manipulation.

Mr. Wright contends that all of co-defendant Stein's arguments regarding imperfect entrapment and government manipulation apply to him as well, as asks this Court to take those into consideration when determining his sentence.

### CONCLUSION

In conclusion, Mr. Wright moves this Court to sentence him to time served. His time in pretrial detention is sufficient to achieve the sentencing purposes of § 3553(a) without exceeding what is necessary to achieve those objectives. The offenses for which Mr. Wright is convicted carry no mandatory minimums, and Mr. Wright's conduct warrants a shorter sentence for engaging in conduct that amounts closer to mere words than even attempt. As for deterrence, no sentence this Court imposes will deter others. However, Mr. Wright's history prior to his arrest suggests that his conduct was an aberration from his normal character – a result of choosing his

friends poorly, and a lesson learned harshly. As it is an aberration, the public likely requires little protection from Mr. Wright – the man who regularly did business with the Somali Muslim community, and who gave a place to live to a single father he believed to be an immigrant Muslim. Last, while Mr. Wright has been an active and complimentary member of anger management while in pre-trial detention, his experience and training to date outweigh the benefit of further occupational training or education he might receive during a term of imprisonment. Furthermore, Mr. Wright's personal characteristics and strong ties to family and community have made his pre-trial detention a strong lesson, and make further confinement merely retributive as opposed to protective or rehabilitative. Mr. Wright recognizes that what he moves this Court for is likely an exception to the general rule in cases like this. However, time served has done the job that further imprisonment would do, and therefore makes further imprisonment unnecessary to effectuate the purposes of sentencing. Because a sentence beyond time served is unnecessary, it would be unjust.

> Respectfully submitted,
>
> /s/ Kari S. Schmidt
> Kari S. Schmidt, Sup. Ct. No. 11524
> /s/ Tyler J. Emerson
> Tyler J. Emerson, Sup. Ct. No. 26006
> 200 W. Douglas, Suite 300
> Wichita, Kansas 67202
> P: (316) 264 – 3300
> F: (316) 264 – 3423
> E: karis@fcse.net
> E: tyler@fcse.net

CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of October, 2018, I electronically filed the above memo with the Clerk of the Court by using CM/ECF which will send a notice of electronic filing to all parties with an interest in this case.

/s/ Kari S. Schmidt
Kari S. Schmidt, Sup. Ct. No .11524

**ATTACHMENT 1**



## Certificate of Completion

is hereby granted to

GAVIN WRIGHT

to certify that he/she has completed to satisfaction
18 SESSIONS OF

ANGER MANAGEMENT FOR THE TWENTY-CENTURY

Granted: SEPTEMBER 15, 2018

DR. MARLENE LEMMER BEESON AND JONATHAN PADEN