Exhibit A

Case 6:16-cr-10141-EFM   Document 470-1   Filed 1/0/20/18   Page 2 of 62
Case 3:10-cr-00475-KI   Document 529-1   Filed 12/08/14   Page 1 of 61

1

1                 IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,        )
                                      )
4               Plaintiff,            ) No. 3:10-cr-475-KI
                                      )
5         vs.                         ) October 1, 2014
                                      )
6    MOHAMED OSMAN MOHAMUD,           ) Portland, Oregon
                                      )
7               Defendant.            )
     ------------------------------

8

9

10

11

12

13

14                        **SENTENCING**

15              TRANSCRIPT OF PROCEEDINGS

16        BEFORE THE HONORABLE GARR M. KING

17        UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

Case 6:16-cr-10141-EFM   Document 470-1   Filed 11/30/18   Page 3 of 62
Case 3:10-cr-00475-HZ   Document 529-1   Filed 12/03/14   Page 2 of 61

2

```
 1                          APPEARANCES

 2   FOR THE PLAINTIFF:    Pamala R. Holsinger
                           Ethan D. Knight
 3                         Assistant United States Attorneys
                           U.S. Attorney's Office
 4                         1000 S. W. Third Avenue
                           Suite 600
 5                         Portland, OR  97204

 6   FOR THE DEFENDANT:    Lisa Hay
                           Stephen R. Sady
 7                         Deputy Public Defenders
                           Federal Public Defender's Office
 8                         101 S. W. Main Street
                           Suite 1700
 9                         Portland, OR  97204

10                         Steven T. Wax
                           Attorney at Law
11
     COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
12                         United States District Courthouse
                           1000 S. W. Third Avenue, Room 301
13                         Portland, OR  97204
                           (503) 326-8186
14

15

16

17

18

19

20

21

22

23

24

25
```

Case 6:16-cr-10141-EFM   Document 579-1   Filed 11/20/18   Page 4 of 62
Case 3:10-cr-00475-HZ   Document 270-1   Filed 12/03/14   Page 3 of 61

3

1                    P R O C E E D I N G S

2              THE COURT:  Good morning, everyone.

3              MR. SADY:  Good morning, Your Honor.

4              THE COURT:  All right.  Mr. Knight, would you

5     call the case, please, and introduce the people at

6     counsel table.

7              MR. KNIGHT:  Thank you, Your Honor.  We're

8     present in the matter of United States versus Mohamud

9     Osman Mohamud.  This is Case No. 10-cr-475, Ethan Knight

10    and Pam Holsinger appearing on behalf of the United

11    States.

12             The defendant is present, in custody, with

13    counsel Steve Wax, Steve Sady, and Lisa Hay.  And we're

14    present today, Your Honor, for sentencing in defendant's

15    case.

16             THE COURT:  All right.  Thank you, Mr. Knight.

17             Now, I would discuss this with you.  The Court is

18    familiar with the facts and the law on this case.  We

19    tried the case back in last -- the previous January.

20    We've had a number of motions.  I think everybody knows

21    most of the information that's out there and that is

22    relevant to the sentencing today.

23             Now, the Court must determine the advisory

24    guideline range.  And the presentence report calculates

25    the total offense level as 43, criminal history category

Case 6:16-cr-10141-EFM   Document 470-1   Filed 11/20/18   Page 5 of 62
Case 6:16-cr-00475-FTM   Document 529-1   Filed 12/03/18   Page 4 of 61

4

1    as 6, and the advisory guideline range as a life

2    sentence.

3         Now, do you have any problems with that, anyone?

4    I believe that's the correct advisory guideline range as

5    it sits, before any variance.

6         MR. SADY:  Your Honor, we have provided an

7    alternative analysis under the guidelines that results in

8    a guideline range of 121 to 151 months, as reflected on

9    the face sheet of the presentence report.

10        THE COURT:  Okay.  Well, I received that.

11        Mr. Knight?

12        MR. KNIGHT:  We believe that is accurate, Your

13   Honor.  Thank you.

14        THE COURT:  Okay.  Then we have no issue on that.

15        All right.  Now, neither party raised any

16   objections that will affect the guideline calculations,

17   and all arguments will be considered under Section 3553

18   factors.  These factors include the nature of the offense

19   and the history of the defendant, for the sentence to

20   reflect the seriousness of the offense and to provide

21   just punishment, to adequately deter criminal conduct by

22   others, and to protect the public from future crimes of

23   the defendant.

24        Now, the defendant recommends a sentence of 10

25   years in prison.  The Government recommends a sentence of

Case 6:16-cr-10141-EFM   Document 479-1   Filed 11/20/18   Page 5 of 62
Case 6:16-cr-00475-FM   Document 570   Filed 11/08/18   Page 6 of 62

5

 1    40 years if the Court concludes that the circumstances

 2    warrant a 3553 variance from a life sentence.  I do

 3    believe a variance is warranted, and I've spent a great

 4    deal of time considering the arguments in favor of a

 5    longer or shorter sentence.

 6              So the recommendation of the Government, given

 7    the Court's statement, at this point is what?

 8              MR. KNIGHT:  Is 40 years, Your Honor.  Thank you.

 9              THE COURT:  Thank you.

10              All right.  I'll hear argument.  I understand,

11    Mr. Knight, you're going to start.

12              MR. KNIGHT:  Thank you, Your Honor.

13              Your Honor, we stand here today almost four years

14    since the defendant was arrested in this case, and during

15    that time the parties have litigated every conceivable

16    and some inconceivable aspects of the case.  But really,

17    until today, we haven't confronted collectively or

18    addressed what this case is about and its true meaning.

19              This is a case and a crime that is at once

20    horrific and sad.  And we now need to address the issues

21    that it lays bare and address why a substantial prison

22    sentence is indeed appropriate in this case.

23              Now, the Government, Your Honor, today will speak

24    relatively briefly.  I'll cover three different areas

25    that I think address the Court's concerns and the

Case 6:16-cr-10141-EFM   Document 570-1   Filed 12/03/18   Page 7 of 62
Case 6:16-cr-00141-EFM   Document 529-1   Filed 12/03/18   Page 6 of 61

6

1    sentencing factors, but more importantly, try and

2    understand and address the essence of the challenge we

3    face; and that is fashioning a correct sentence for a

4    crime of this unique nature.

5          First, Your Honor, I'll address some of the

6    salient facts and the nature of the offense itself,

7    understanding, of course, that the Court is familiar with

8    the underlying crime and what occurred.

9          Second, I will touch on the meaning of the

10    guidelines and some of the comparable cases and how they

11    inform the factors under 3553(a).

12          And finally and most importantly, I'll talk about

13    the nature and characteristics of the defendant in light

14    of the seriousness of this offense and what it means for

15    the Government's recommendation in this case.

16          First, Your Honor, and at the outset I want to

17    talk about the facts of the case.  What we have often

18    glossed over is that at its essence, this case is an

19    extraordinary act of violence.  The jury rejected the

20    defense of entrapment.  Although the defense has

21    repeatedly raised the issue in subsequent pleadings about

22    the role of the FBI, we need to confront the fact that

23    this man made a decision to take human lives.  It's an

24    extraordinary decision.  It's a sad decision.  And there

25    is no way around it when looking at the facts of this

Case 6:10-cr-00475-FFM   Document 520-1   Filed 12/03/14   Page 7 of 61

1    case, and they inform much of what happened and much of
2    what we should do today.

3         There are, of course, a number of factors and
4    facts that the Court is familiar with from the trial
5    about this investigation.  A few are worth mentioning to
6    frame and put into context why this is an extraordinary
7    act of violence.

8         Despite what many want to believe, the truth is
9    this defendant had made a decision about what course he
10   wanted to take long before he first met with the FBI.  We
11   know that his contacts with terrorists overseas were
12   substantial and not insignificant.  And, more
13   importantly, it was the ideology, the words and the
14   framework that provided the basis of his acts of violence
15   that existed long before the FBI intervened.

16        I want to speak briefly about the FBI's role in
17   the undercover operation.  There are many mileposts that
18   the defendant followed in his road to November 26th,
19   2010.  Perhaps most noteworthy, though, is his first
20   meeting with the undercover agents.  Within a half an
21   hour, this man told a man he had never met before, who he
22   believed to be an al-Qaeda operative here in Portland,
23   that he wanted to detonate a truck bomb.  We're often
24   dismissive of this fact, as if it is simply part of the
25   orchestrated plot of the FBI.  But it was his decision

Case 6:16-cr-10141-EFM   Document 529-1   Filed 12/03/18   Page 8 of 61

1  that was so quick and is so unnerving that we need to

2  place it in context.  This was his choice, and his

3  subsequent choices would speak to this choice.

4          Along the way he selected the target at which he

5  wanted to detonate this bomb.  This was not the idea of

6  law enforcement.  It was his target.  So when the

7  criticism is this was orchestrated for spectacular

8  effect, we need look no further than the defendant, who

9  wanted precisely that, who wanted to see as many dead and

10  injured as possible.  It was his choice.  The road to

11  this decision is paved with the defendant's choices.

12          As he got closer to the attack itself, the

13  defendant remained calm.  And the Court has seen the

14  videotapes.  And in many ways it's what he didn't say

15  that is the most distressing and speaks to the

16  seriousness of this crime.  The absence of trepidation,

17  remorse, or concern about what he believed to be mass

18  murder should give us all pause.

19          He never backed away.  He was given multiple

20  opportunities to back out, even though in many respects

21  that's not the role of an al-Qaeda operative played by

22  the FBI, yet they told him repeatedly, "You don't have to

23  do this."  And he moved forward, up and until

24  November 26th, even when confronted with what he would

25  likely see:  the body parts, the death.  It was all very

Case 6:10-cr-00475-FM   Document 470-1   Filed 11/20/18   Page 10 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/08/14   Page 9 of 61

9

1   real to him.

2         Your Honor, there are two issues that have been

3   raised repeatedly in criticism about this case and in

4   this case that I want to address now.  There has been a

5   subtext that this was not real; that this was, of course,

6   a fake bomb; and, as such, we should not take it perhaps

7   as seriously as we might.

8         Your Honor, in these cases law enforcement does

9   its best -- and we should hope that these cases never

10  become real.  To that degree, the FBI has done its job in

11  ensuring it did not become real.

12        But there is something else here.  This case, all

13  the evidence we saw, the bomb in the truck, the lives of

14  the people flashing before the eyes of the defendant,

15  they were all real to one man:  the defendant.  So while

16  we can minimize in some ways the fact that this was an

17  FBI-built bomb and these were FBI agents playing al-Qaeda

18  operatives, to the man sitting before the Court today

19  awaiting sentence, he believed, expectantly, that this

20  was all real.

21        We have to ask ourselves when we look at these

22  cases, then, what kind of real do we want?  Do we want

23  the real that exists in the mind of the defendant, the

24  dead bodies that exist in the mind of this defendant, and

25  the real that is a bomb supplied by the FBI?  Or do we

Case 6:16-cr-10141-EFM   Document 479-1   Filed 1/30/18   Page 11 of 62
Case 3:10-cr-00475-FLM   Document 529-1   Filed 12/08/14   Page 11 of 62

10

1    want the real, where the defendant meets the right

2    people, as he characterized it?  The FBI did its job.

3    And the fact that this was real to this defendant is of

4    extraordinary significance.

5            There is another issue that's raised almost

6    rhetorically; and that is, couldn't this defendant have

7    been given some other choice or some other option?

8            Now, in our courts of law, Your Honor, juries

9    apply the law to the facts and they don't answer these

10   rhetorical questions.  But today we should.  The

11   suggestion has been made that at some point the FBI or

12   someone should have intervened to steer the defendant a

13   different direction.

14           There are a couple problems with this question.

15   The first is that in a literal sense, an examination of

16   the facts tells us very clearly the FBI did attempt to

17   steer this defendant in another direction.  They gave him

18   options at the outset.  They told him repeatedly, "You

19   don't have to do this."

20           But what's more striking, of course, is that what

21   does it say about this case if it is a criticism to ask,

22   why didn't the FBI attempt to talk this man out of

23   committing mass murder?  Indeed, the question, why didn't

24   the FBI or why didn't law enforcement intervene and give

25   this defendant another choice, is not really a question.

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 12 of 62
Case 3:10-cr-00475-HZ   Document 529   Filed 12/08/14   Page 12 of 62

11

1    It's a statement.  It's a form of denial.

2         It is understandably an audible grasping at

3    straws to say, did this really have to happen?  Because

4    it is much easier to take a step back and look at this

5    case and believe it is about policy, believe it is about

6    a defective recording device, than to have to confront

7    the painful truth in front of us today:  This man wanted

8    nothing more than to kill.  And it is sad and it is

9    striking, and there is no way any longer for us to

10   navigate around that truth.

11        Your Honor, the second area I'd like to cover for

12   the Court today addresses the guidelines and comparable

13   cases as they inform this Court in this decision.

14        Now, as the Court has noted, the presentence

15   report is simply a presentence report that calculates the

16   guidelines.  And the Government is well aware and

17   understands, of course, that the Court's assessment of

18   the facts and the circumstances of this defendant truly

19   speak to the factors in 18 USC 3553(a) in determining

20   what an appropriate sentence may be.  But the guidelines

21   do tell us something.  While they are simply advisory,

22   they speak to the reasons we are here today on this

23   serious of a case.

24        The recommended guideline sentence of life is

25   there for a reason.  It tells us much about these crimes

Case 3:10-cr-00475-EJM   Document 479-1   Filed 12/20/18   Page 13 of 62
Case 3:10-cr-00475-EJM   Document 529   Filed 12/03/48   Page 13 of 62

12

and what they mean to society.  The existence of a

terrorism enhancement, which is also found in the PSR,

tells us about this case and what it means.

        The defendant has argued that it overcalculates

and overestimates the defendant's criminal history.  But

really what the terrorism enhancement tells us and what

this case tells us is these crimes are different.  They

have a different impact on society and they play a

different role.  They are at once utterly part of our

conscience and at the same time utterly destabilizing.

They affect our behavior in ways that the predictable and

the mundane do not, and they are meant to do one thing:

to scare and to terrorize people.  And that is precisely

what this defendant wanted to do.

        Speaking briefly, Your Honor, about the

comparable cases that may inform this Court's decision in

assessing 18 USC 3553(a), the Government will simply say

this.  The Court is well aware of other cases that it may

consider in assessing what is a fair and reasonable case

under the sentencing factors.

        The Government has made an effort to underscore

cases that are similar to this defendant's out of an

effort to ensure fairness in the system.  Cases where the

defendants have pushed the button of a bomb supplied by

the FBI in a similar manner to this defendant provide the

Case 3:10-cr-00475-FFM   Document 529-1   Filed 12/08/14   Page 13 of 62

13

1    best guideposts for that; and those cases, in a pretrial

2    setting, consistently yielded sentences in the 25- to

3    30-year range, which we've indicated.  And that should

4    help inform the Court's larger assessment of the many

5    issues at play in this case.

6           Finally, Your Honor, I'd like to turn to what in

7    many ways is the most difficult factor confronting the

8    Court, and that is the nature and characteristics of this

9    defendant in the broader context of the seriousness of

10   the offense.  This is a personal assessment.  The

11   Government understands that.  The Government also

12   understands that when imposing sentence, an individual

13   who sits before the Court should not have their life

14   defined by one single act.  Yet the defendant should, in

15   this context, be judged by that act, and that's why we're

16   here today.

17          Much has been offered to this Court about the

18   defendant, through the trial and through pleadings; and

19   now we need to confront those issues and put them in the

20   proper context.

21          First, Your Honor, we need to understand the role

22   mitigation plays.  Mitigation is profoundly different

23   than statements that elicit empathy and sadness; and

24   there are many of the latter in this case, but very few

25   of the former.

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 15 of 62
Case 3:10-cr-00475-FJZ   Document 529   Filed 12/03/14   Page 145 of 61

14

1           There is much to be sad about in this case.  The

2    choices this man has made have profoundly disrupted his

3    family.  They are violent.  And in many respects, he has

4    cast aside his own potential.

5           These things, however, are not mitigation.  This

6    is a man who had many opportunities, who by the

7    defendant's own admission, his own witnesses, had

8    enormous potential and intelligence.  Again, this is not

9    mitigation.  He is not one who steps before this Court

10   without the support of family, with limited intellectual

11   abilities, with limited opportunities.  This is not

12   mitigation.  It is something for all of us to mourn

13   collectively, because it's a loss of this defendant

14   through his own choice, but it does not mitigate his

15   sentence, nor should it.

16          There are a number of factors about this

17   defendant that the Court undoubtedly will need to

18   consider.  His youth has been brought up repeatedly

19   throughout this case.  Many people who come before this

20   Court are young men.  Indeed, according to the

21   defendant's own expert at trial, many people who commit

22   acts of terror are young men.  So youth, while something

23   that certainly is part of this defendant, should be

24   placed in the proper context.

25          His age is often thrown into discussions as if to

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 16 of 62
Case 3:10-cr-00475-FZ   Document 529-1   Filed 12/03/14   Page 15 of 62

15

suggest that he was lost, and this crime was somehow an act of youthful indiscretion or borne out of age or immaturity.

Undoubtedly, this is a difficult age. And for many who come before the Court, they are doing things that they may not have done otherwise. But to suggest for a moment -- for a moment that this crime was a case of youthful indiscretion or borne out of immaturity is, of course, sheer fantasy. This defendant did not commit an act of youthful indiscretion nor are our courtrooms filled with young men in similar positions. He quite literally attempted to fill the streets of this city with dead bodies. That is not an act borne out of youth or immaturity. That is a heartless action meant to hurt, and that is different.

We should consider what we've heard about this defendant throughout the case. He is not low functioning. He is quite intelligent. He comes to this court with many gifts that many young men do not have. And again, while that should cause us some pause that he has made the choices to put his life in this position, it is not a form of mitigation. And we should also respect the words of his parents along those lines for what he has put them through.

Now, many witnesses came forward in trial, and

Case 6:16-cr-10141-EFM   Document 479-1   Filed 11/30/18   Page 17 of 62
Case 3:10-cr-00475-FM   Document 529   Filed 12/09/14   Page 16 of 61

16

1    statements have been provided about this defendant.  It

2    has been suggested that he was simply malleable and at

3    the hands of older undercover agents who were guiding

4    him.  The facts belie this claim, and so does common

5    sense, Your Honor.

6            The night before the defendant made this choice,

7    despite numerous opportunities to walk away, he was at

8    the mall laughing, talking about the greatest day of his

9    life.  He was not seeking solace and guidance from the

10   undercover agents he claimed entrapped him.  He was not,

11   by any measure, having second thoughts about the crime he

12   would commit.  He was eerily calm, an impression that was

13   left on the undercover agents and all who dealt with him,

14   until suddenly it was not real.  And only then did this

15   defendant break that calm veneer and lash out in violence

16   at the time of his arrest.

17           The Government has read and considered the

18   defendant's apologies and claims to the Court, and we

19   sincerely hope that those are indeed true and that this

20   defendant has indeed, for the long term, renounced

21   violence.  We hope that's the case.  Time will tell.  But

22   we should, however, place into context what the defendant

23   chose to do on that day.

24           Our system in many ways is based, in imposing a

25   sentence, not simply on all the statutory factors we know

Case 6:16-cr-10141-EFM   Document 479-1   Filed 1/30/18   Page 18 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/03/14   Page 17 of 62

17

so well, but really on the twin pillars of the value of
human life and choice.  And when we look at this case in
that light, this defendant is truly peerless in his
rejection of that value in making his own choices.

The last moment this man stepped free on
November 26th, 2010, he tried to take as many lives as
possible.  It is a crime without comparison.  And that's
why, while the Government undoubtedly recognizes that it
is asking this Court to impose a significant sentence,
this defendant has given us no choice and compelled the
Government and we believe lays the ground for this Court
to follow the only reasonable choice left, and that is to
impose a sentence of 40 years in this case.

Thank you.

THE COURT:  All right.  For the defense.

MR. SADY:  May it please the Court, we have a
profoundly different view of what constitutes mitigation,
about what this Court's function is in performing the
analysis of the statutory factors for imposing a sentence
that is sufficient but not greater than necessary to
accomplish the goals of federal sentencing.

In looking at mitigation, we are not asking -- as
the Government is defending the FBI's actions, we are not
asking the Court to criticize or congratulate the FBI.
This sentence, under the *Gall* standard from the Supreme

Case 6:16-cr-10141-EFM   Document 470-1 Filed 12/20/18   Page 19 of 62
Case 3:10-cr-00475-TJL   Document 529-1 Filed 12/08/14   Page 19 of 62

18

```
 1    Court, focuses strictly on the individual.  And this is
 2    an individual who, under controlling Supreme Court law
 3    and Ninth Circuit law, the Court has an obligation to
 4    consider, as an encouraged basis for a lower sentence,
 5    imperfect entrapment.
 6            It sounds strange to talk about imperfect
 7    entrapment because there's no question we are accepting
 8    at sentencing the verdict of the jury.  He is guilty.  He
 9    was not having a complete defense to the charge based on
10    entrapment.  But the Court is compelled under the
11    controlling case law to say, okay.  Was imperfect
12    entrapment, just like other imperfect defenses, worth
13    considering in mitigation?  And that area is one that the
14    Court should be looking at because it's required by law
15    and it's required by common sense.
16            When we have somebody who, under the law of
17    entrapment, he had no capacity, no wherewithal to perform
18    these crimes on his own -- that's without question.  We
19    have from the presentence report where -- and from the
20    evidence that the Court heard that prior to the contact
21    with the undercover operatives, there was no plan, no
22    attempt to commit an act of domestic terrorism; that
23    during the period of time where there was massive
24    surveillance, no evidence of trying to prepare, of trying
25    to plan an act of domestic terrorism; and, in fact,
```

Case 6:10-cr-00475-EFM   Document 479-1   Filed 12/30/18   Page 20 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/30/18   Page 20 of 62

19

1   during the process, from the classified information

2   protected material that the Court received from the FBI,

3   that there was -- the FBI assessed that Mohamud would not

4   make any attempts to conduct terrorist attacks without

5   the undercover operatives.

6          Under those situations -- those situations, it's

7   not a defense, but it's certainly something that common

8   sense tells us that that is a mitigating fact, a fact

9   that calls for a lower societal response.

10         The Government offers that youth is irrelevant.

11  I remember my youth.  I remember how I felt about the

12  passions and the way -- the influences that I could have

13  and the risks during that period of time.  And it's not

14  from people's individual experiences.  We know it from

15  the Supreme Court decision in *Simmons* and *Gall.*  We know

16  it from the testimony that you heard from Dr. Cauffman,

17  that these are very significant -- that youth is very

18  significant.  And we also know that he was a particularly

19  immature 18-year-old, just turned 18-year-old when he

20  first was being contacted by Bill Smith.  And later when

21  he's -- eight months later when he's contacted by the

22  agents, he's still -- he's a student, wearing braces, no

23  driver's license.

24         The immaturity and susceptibility to influence of

25  a person that age is a significant factor.  And we're not

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 21 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/03/14   Page 21 of 62

20

questioning that prior to that time he had been involved
in communications and writings of a radical nature.  But
we also know that during the same period of time, another
factor that you look at in entrapment, which is the
vulnerability from going off the deep end on drugs and
alcohol -- the Government offers that, oh, well, it was a
little recreational activity off in college.  Not at all.

What we provided to the Court is that eight-page
drug and alcohol assessment.  The Court saw all of the
series of text messages.  Those reflect really
problematic involvement with drinking to passing out, to
vomiting; and this was going on right up to the time, to
a week before November 26th.

And, of course, no inkling of that comes across
on the tapes.  No inkling of that comes across, of the
unwillingness to actually be a martyr, that he's
eventually talked out of.  The Government emphasizes how
he was not showing anything on the tapes.  He was
suppressing that.  He was suppressing his own feelings
about what was going on and expressed relief when the
issue of martyrdom was taken off the table.  Because
remember, the testimony from the agents, from the third
meeting on, they wanted to keep him on track to get -- to
carry out his plan.  They admitted that during the
testimony, that they wanted him, after the third meeting,

Case 6:16-cr-10141-EFM   Document 470-1   Filed 11/20/18   Page 22 of 62
Case 3:10-cr-00475-FTM   Document 529-1   Filed 12/08/14   Page 22 of 62

21

1    to continue on.  And they did so by giving him tasks to

2    accomplish, small tasks to accomplish, and then rewarding

3    him greatly when he accomplished those tasks.

4            Another aspect of the imperfect entrapment is the

5    type of inducements that they gave to him.  And one of

6    them basically was the appeal to faith.  The Government

7    wants to talk about the July 30th meeting.  I'd go back

8    about five days earlier when there is that -- he has

9    turned them down, said, "I can't help the brothers."  And

10   silence.  Then they send him that key e-mail:  "We

11   believe that Allah has a purpose for you here."  And that

12   appeal to religion permeates what we heard, all of those

13   uses of praises of Allah, of appealing to the social

14   justice, of the -- of making him -- presenting the

15   activity as one that was a virtuous thing instead of a

16   horrible thing, as it truly was.

17           There were also the appeals to flattery, the

18   diamond in the rough arguments, this brilliant writer, if

19   only they could -- that they came so far to see him.  And

20   we also note that all of this type of thing is fiction.

21           Dr. Sageman, one of the great counterterrorism

22   experts in the country, was saying the danger of somebody

23   coming and recruiting and making this type of

24   blandishment to a young man to get him involved by giving

25   him these types of appeals to ego, to faith, it doesn't

Case 6:16-cr-10141-EFM   Document 479-1   Filed 1/30/18   Page 23 of 62
Case 3:10-cr-00475-HZ   Document 529-1   Filed 12/08/14   Page 23 of 61

22

1    happen.  It's a unicorn.  He says, "I've looked all over

2    the history of counterterrorism, and I found no situation

3    where this type of recruitment actually occurs."

4           And we also have the element of isolation, that

5    he was actively discouraged from being with his parents.

6    He was actively discouraged from living in the same house

7    as his prosocial roommates and instead was given money to

8    get an apartment, to be isolated by himself.

9           We accept all of those tactics as lawful.  The

10   question for the Court is:  Does this lessen the

11   culpability?  Does this lessen the risk of future danger,

12   especially, as the Government just said, this is an

13   absolutely unique circumstance?  It's a unique

14   circumstance because it's never happened in the past.

15   And certainly with Mohamed, it would never happen in the

16   future.

17          And that gets us to the point of talking about

18   future dangerousness.  This Court has an unprecedented

19   record on one of the most important sentencing questions

20   that any Court faces.  Two extraordinarily well-qualified

21   psychiatrists have provided the Court with reports.

22   Dr. Kinzie, who has been a professor of psychiatry at the

23   Oregon Health Science University for -- for over 40

24   years, met with him 11 times.  He had -- underneath that

25   he had the testing from Dr. Grounds.  He came out with a

1    report.  And in that report he says no evidence of

2    antisocial personality or psychopathology.

3          In his 11 visits with him and his detailed

4    conversations with him and his access to all of the

5    discovery in the case, he sincerely -- he finds that

6    Mohamud sincerely rejects violence and has taken concrete

7    steps to distance himself from extremism.  And one of the

8    quotations from his report that I think is so important,

9    he had -- "He felt he had to harden himself in a bad way

10   to commit the offense and is relieved to express apology

11   and remorse."

12         And the factors that the Government says you

13   should not be considering -- his family support, his

14   intelligence, his prosocial aspects of his background --

15   he finds that with the "history of appropriate values and

16   behavior. . . combined with shame for accepting criminal

17   violence, make future involvement in this type of

18   behavior highly unlikely."

19         We very rarely have this type of concrete

20   psychiatric testimony based on full knowledge of the

21   facts, extensive interviewing with the client, to

22   alleviate concerns regarding future dangerousness.

23         We also have Dr. Marc Sageman.  He's the one who

24   testified after being flown in -- right after flying in

25   from Afghanistan, where he was doing threat assessments

Case 6:16-cr-10141-EFM   Document 470-1   Filed 11/20/18   Page 25 of 62
Case 3:10-cr-00475-FZ   Document 529-1   Filed 12/08/14   Page 245 of 62

24

1    for the United States government.  He has a long history

2    of being a premier counterterrorism expert, working for

3    government agencies.  And he also had seven hours of

4    interviewing with Mohamud.  He interviewed his parents.

5    And he's provided the Court with a report, and in that

6    report he saw no risk factors for future violence.

7           He found that he had given up on his extremist

8    ideology; that he seems transparent, heartfelt, and

9    sincere in his remorse; that he had matured in detention,

10   and his readings had helped him to understand how he got

11   there and what he needed to do.  And his conclusion, the

12   quotation:  "He is at very low risk of being dangerous in

13   the future, both in the criminal and political sense."

14          Again, very specific, not talking about

15   sentencing a stereotype.  We're talking about a specific

16   human being.  And in this specific human being, the

17   mitigation is his remorse, his building up of his better

18   self since he's been in custody.

19          And that gets us to the post-offense

20   rehabilitation.  When I first met Mohamed on the Saturday

21   after the event, he was in shock.  Cynthia Hamilton, the

22   investigator, and I met with him, we met the family, and

23   we started to develop a rapport with him.  And one of the

24   things that was so clear is that from very first time,

25   he's never articulated a justification for the horror

Case 6:16-cr-10141-EFM   Document 470-1   Filed 1/30/18   Page 26 of 62
Case 3:10-cr-00475-FZM   Document 529-1   Filed 12/08/18   Page 26 of 62

25

1   that he did.  He was able to express exactly an

2   understanding of why what he said and what he had done

3   was so terrible.  And in the early days, we saw him

4   practically every day because we were so concerned about

5   his safety, both from himself and from others in jail.

6           As we got to know him better and better and we

7   were hearing more and more about his -- how terrible he

8   felt about what he did, the December 22nd letter came

9   out.  And that December 22nd letter was so impactful for

10  him because he was able to just express his realization,

11  his knowledge, his acceptance that what he did was so

12  wrong and that how he had been swept up with it was so

13  inconceivable to him, and how he never wanted to be in

14  this type of position again, that just articulating and

15  writing out and thinking through what he wanted to tell

16  folks about how sorry he was for what he did, from then

17  you could just see him being a little bit lifted, as he

18  was able to say, "Okay.  I can accept I've done very,

19  very, very wrong.  Now what can I do to make my life

20  better?  What can I do to make myself a better person in

21  our society?"

22          And over the past four years with Mohamed, one of

23  the things that we have done is as we meet and discuss

24  the many legal issues in the case -- and it's a complex

25  one -- we've also engaged in very profound conversations

Case 6:16-cr-10141-EFM   Document 470-1   Filed 1/30/48   Page 27 of 62
Case 3:10-cr-00475-TMZ   Document 529-1   Filed 12/09/48   Page 26 of 61

26

1    about the readings that he's done.  The Court has, from

2    about a year ago, a list of about over 200 books that

3    he's read and the way he related those types of books to

4    his experience, a very wide range, but also getting more

5    and more engaged in critical thinking.  And more and more

6    one of the themes that we talk about is how the more you

7    learn, the more you learn that you don't know.

8         And I think certainty was tragically part of

9    youth thinking.  Certainly part of my youth thinking was

10   having a lot more certainty than was warranted by my

11   knowledge.  And I think that he has learned very much

12   from that.  In the past year he's continued to read.

13   He's been reading the autobiography of Gandhi.  He's been

14   reading about the -- he read Eric Hoffer's True Believer,

15   Anne Frank's diary, read Malcolm Gladwell on how the

16   brain works.  He's read Nicholas Kristof about Half the

17   Sky.

18        He's engaged in trying to figure out what he can

19   learn to try to make himself better in the future so that

20   some day he can do -- he can, in prison, be the best

21   person he can be; and when he is released, be the best

22   citizen he can be.

23        One thing that I think the defense team in

24   general has observed -- and I hope the Court has observed

25   at least reflections of that in his courtroom

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 28 of 62
Case 3:10-cr-00475-FFM   Document 529-1   Filed 12/03/14   Page 27 of 61

27

1    demeanor -- his openness, his manners, his humanness, his

2    humor, and his seriousness, these are all characteristics

3    that we've observed consistently over time.  He has great

4    potential to do good in the world, and we're proud of the

5    steps that he's taken to try to recognize the horror of

6    what he did and to use that recognition constructively to

7    make himself a better person.

8            He's worthy of this Court's consideration of

9    mitigation on the statutory factors, especially that the

10   specific deterrence has obviously been accomplished; that

11   the threat of future dangerousness is especially low;

12   that the factors of youth, vulnerabilities, that those

13   are all factors that favor a sentence that we have

14   requested as sufficient but not greater than necessary.

15           And with the Court's permission, Ms. Hay has

16   comments now.

17           THE COURT:  Ms. Hay.

18           MS. HAY:  Thank you.

19           Your Honor, like the Government, I'd like to

20   address both the person who is here before the Court and

21   the acts that brought him here.  Both of those have to be

22   discussed in the courtroom, with the family, with all of

23   us in the community.

24           When the Government spoke of Mohamed being eerily

25   calm, the Mohamed that they saw on the videotapes, that

Case 3:10-cr-00475-FJM   Document 529-1   Filed 12/08/14   Page 28 of 61

28

1    was the Mohamed that had already been in contact with

2    government agents for six months.  I want to remind the

3    Court that during the trial we heard testimony from all

4    kinds of people who knew this man in elementary school,

5    middle school, high school, people that knew him in

6    college.  We had students.  We had teachers.  We had

7    counselors, people of different races, people of

8    different faiths.  And, uniformly, they saw a different

9    Mohamed.

10          And I'll just give you the quotes that I pulled

11   out here:  He was very friendly to everyone.  And these

12   are from the trial.  He was fun loving, goofy.  He was

13   nice.  He was a very social, energetic kid, a happy

14   person.  Everybody thought he was friendly.  He was

15   respectful.

16          Nobody in all the people that we found, that the

17   Government found, said that this was a young man who was

18   violent or a danger, who had a hidden anger, who was

19   threatening.  And you can rely on those people who knew

20   him for all of this time to think that this is a young

21   man with a good core, a good heart.  And the difficulty

22   for us is understanding how he got to the point where he

23   did this act, where he pushed those buttons.  That's --

24   that's what the trial was trying to understand.  That's

25   what we are all still trying to understand.

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 30 of 62
Case 3:10-cr-00475-FLW   Document 529   Filed 12/03/14   Page 29 of 61

29

1           And it doesn't work to just say, well, he's --

2      he's eerily calm, he's obviously sociopathic, that he

3      would kill people.  That doesn't make sense, Your Honor,

4      because nothing supports that other than the acts he did

5      when he was with these agents.

6           The Government talks about a plan for mass

7      murder, that this was a man who was intending to kill

8      many people.  And yet during the trial, we saw no

9      evidence, other than what the Government could produce

10     during the course of his work with the agents, of any of

11     that kind of plan.  We saw that they were watching his

12     computer and found no evidence he was looking for bombs

13     to blow up in the United States.  He was not looking for

14     ways to kill people here.

15          What I want to get back to talking about is the

16     act itself and what he wanted, Your Honor, but that's --

17     that's the question.  The Government has jumped to the

18     end of the story again, that that's what Mohamed did.

19     But when you sentence a young man like this, you have to

20     understand who is the person who is here and understand

21     the act.

22          Your Honor, you and I have both raised children

23     through teenage years, into high school, into adulthood.

24     We know that one of the joys and the pains of teenagers

25     is they become ideological, they become so set on

1       something, so passionate, that we worry about them

2       because they're trying to find their identity, they're

3       trying to figure out what the structure is in their life.

4               And, Your Honor, the United States has seen other

5       people, other young people become radicalized the same

6       way that Mohamed became radicalized, people who became so

7       impassioned with the idea of protecting life in the

8       anti-abortion movement that they would put a bomb in a

9       clinic.  In this courthouse we've seen young people who

10      became so impassioned with environmental ideas that they

11      were willing to blow up businesses and burn mountains.

12              Young people do take on -- take on so much with

13      so much passion.  Some of them do go wrong.  And when the

14      Government says that we are talking about an immature

15      indiscretion or a childhood immaturity, that's not what

16      we're talking about.  Clearly what Mohamed did was a

17      terrible act.  He got involved in something horrible.

18      But that's not unique.  There are other young people who

19      have so become involved in the idea of what they think

20      they're fighting for -- Mohamed wasn't fighting to kill

21      people.  Mohamed, in all of his conversations with the

22      government agents, thought that there was a goal of

23      Islam, thought there was something he was doing on behalf

24      of his faith and people overseas.  He was misguided.  He

25      was wrong.  But he was believing in an ideology that the

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 32 of 62
Case 3:10-cr-00475-FLW   Document 529-1   Filed 12/08/14   Page 31 of 62

31

1    government agents fostered and helped him agree with.

2            When the Government says that the agents gave him

3    every opportunity to back up, we know from listening to

4    the trial testimony that they condoned the action and

5    then said, "But if you don't want to do it, you don't

6    have to."  That's different from saying, "Don't do this.

7    This is a horrible thing.  You would be a horrible young

8    man if you went through with this."

9            That's not what they said to him, Your Honor.

10   They put him in a context where they said to him, "This

11   is what Allah wants.  This is a wonderful thing you could

12   do for your faith and your people.  But if you don't want

13   to go through with it, you don't have to."  That's

14   different, Your Honor, than saying, "Don't do it."

15           Your Honor, we do want to hear -- the family

16   would like to speak to the Court because they also would

17   like to give you some information about their son, their

18   brother.  They want to tell you what they've seen that's

19   changed in him.  Because you heard in the trial what kind

20   of person Mohamed was before.

21           And I want to get back to addressing the act in a

22   moment.  But if I could introduce and call some of the

23   witnesses to let you hear from the family about how they

24   interact with Mohamed now, I'd like to take that chance.

25           THE COURT:  All right.  You may.

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 33 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 11/08/18   Page 33 of 62

32

1              Do you wish to have them take the witness stand?
2    Or can they do it at counsel table, whatever you desire.
3              MS. HAY:  Your Honor, I think with the reporting,
4    it would be better to have them at the witness stand, if
5    you would permit that.
6              THE COURT:  All right.
7              MS. HAY:  So I would call Mariam Barre first.
8              THE CLERK:  Please come forward.  Pull your chair
9    all the way forward, and please state your full name for
10   the record.
11             MS. BARRE:  My name is Mariam Barre.
12             MS. HAY:  Ms. Barre, I know this is difficult for
13   you, so I won't ask you many questions, but have you been
14   able to meet with your son while he's in custody over
15   these four years?
16             MS. BARRE:  Yes, I have.
17             MS. HAY:  How often are you able to meet with
18   him?
19             MS. BARRE:  Every week.
20             MS. HAY:  They have visiting every week?  And
21   most of those weeks, you can go there?
22             MS. BARRE:  Yes, we can go there, every weekend,
23   Saturdays and Sundays.
24             MS. HAY:  So when this case first started, how
25   did Mohamed look to you when you saw him in custody in

Case 6:16-cr-10141-EFM   Document 470-1   Filed 11/20/18   Page 34 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 11/20/18   Page 33 of 62

33

1    the very beginning?

2            MS. BARRE:  He looked very shocked and he was

3    very scared and --

4            MS. HAY:  You said he looked shocked and scared?

5            MS. BARRE:  Yes.

6            MS. HAY:  And was he crying when you saw him?

7            MS. BARRE:  Yes.

8            MS. HAY:  Over -- over the course of this time,

9    did he -- you kept visiting him at the Justice Center

10   across the street?

11           MS. BARRE:  Yes, we did, for two years.

12           MS. HAY:  And then after the trial, he was moved

13   out to the Sheridan facility; is that right?

14           MS. BARRE:  Yes, it is.

15           MS. HAY:  And what was different about visiting

16   at Sheridan?

17           MS. BARRE:  There are no words to express on that

18   feeling.  It was the first time in two years that I can

19   touch my son.

20           MS. HAY:  I think I could understand.  You said

21   it was the first time in two years that you could touch

22   your son?

23           MS. BARRE:  Yes.

24           MS. HAY:  And is that because they allow

25   person-to-person visits at that facility?

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 35 of 62
Case 3:10-cr-00475-FJ2   Document 529-1   Filed 12/03/48   Page 34 of 61

34

1          MS. BARRE:  Yes.  You're allowed to touch your

2     family.  And we touched, two years after, one time, and

3     it was happiness for me.

4          MS. HAY:  Let me just ask you if there's

5     something else that you would like to tell the judge

6     about your son before the judge imposes a sentence.

7          MS. BARRE:  Yes.  I waited for four years.

8          Your Honor, this boy is my eyes and my heart.

9     And he's young kid.  Give him chance, a second chance to

10    show people that he can do good.  If we don't have a

11    second chance, we would never have a government and life.

12    And every human being deserve a second -- a second chance

13    to show people that they can do better.  Don't take his

14    time and don't take his life.  He made a mistake.  But if

15    you don't give him chance, he can never learn.  So give

16    him chance, the way you want people to have a chance in

17    your life.  He deserve it, and he's a human being and

18    young, in youth.  So almighty God can give you mercy.  My

19    son can change the world, the way it works today.

20         MS. HAY:  Thank you.  Thank you, Ms. Barre.  I

21    know it's difficult.  I won't continue with the

22    questions.  I appreciate you taking the time.

23         THE COURT:  Do you wish to examine?

24         MR. KNIGHT:  No, Your Honor.

25         THE COURT:  All right.  You may be excused.

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 36 of 62
Case 3:10-cr-00475-FLW   Document 529-1   Filed 12/08/14   Page 35 of 61

35

1          MS. HAY:  Your Honor, I know Mohamed's father was

2     also hoping to speak.

3          THE COURT:  Okay.

4          THE CLERK:  Please pull your chair all the way

5     forward and state your full name for the record.

6          MR. BARRE:  My name is Osman Barre, and I'm

7     Mohamed's father.

8          MS. HAY:  Mr. Barre, we heard your testimony

9     during the trial.  I'm just going to ask you if -- if

10    during the time that Mohamed has been in custody you've

11    been able to visit with him.

12         MR. BARRE:  I visit him every weekend that I can,

13    unless I was traveling or I was sick.

14         MS. HAY:  And have you seen any changes in your

15    son over the four years you've been visiting him?

16         MR. BARRE:  I saw big change.  Because when he

17    was arrested, he was very young kid.  He was half the

18    size -- half of the size of what he is now.  So he

19    become -- in four years, he become a man.  He was just

20    teenager when they arrested him.  And he just had his

21    braces taken off.  And he was immature, with no filter.

22         And now I see a man who has matured, not only

23    better wise, but brain wise, and cares for his family,

24    himself, the community.  And he regrets what he did, and

25    he apologized to us, to everybody that he meet.  And

1    anywhere he was, whether he was in jail here or the

2    Sheridan one, everybody he was around admired him, and he

3    didn't have any trouble during that time.

4        MS. HAY:  Mr. Barre, what do you talk about with

5    Mohamed when you visit with him?

6        MR. BARRE:  Usually how to become better person,

7    what choices to make in life, how to use his time, to

8    exercise, read, you know, and even study and become --

9    you know, when you get out, that you can be a better

10   citizen.

11       MS. HAY:  And you say that he seems to have more

12   of a filter now or is more reflective?

13       MR. BARRE:  He was more immature, with no filter,

14   but now he seems really man with not only intelligence,

15   but he's well guided.  He thinks through everything that

16   he says or does.  He cares.  He calls his brother and

17   sister.  He gives them advice.  He tells them, "I made

18   bad choices.  Make sure you don't make, you know, even

19   close to those bad choices.  Become a better person."

20       His sister has become a better person because of

21   his advice.  She was a confused teenager.  Now she's a

22   well-grounded teenager.

23       MS. HAYS:  Is there anything else that you want

24   the judge to know about your son?

25       MR. BARRE:  Yes.  So I raised this son of mine,

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 38 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/08/14   Page 37 of 61

37

```
 1    and he's the simplest and humblest human being I ever
 2    met.  I'm not saying that because he's my son.  Anybody
 3    that knows Mohamed, Mohamed is very simple.  And he made
 4    bad choices.  And, you know, I would like to ask for him
 5    mercy and give him a chance to redeem himself, to show
 6    the world the real Mohamed that I know.
 7              MS. HAY:  Thank you, Mr. Barre.
 8              THE COURT:  All right.
 9              Anything?
10              MR. KNIGHT:  No, Your Honor.
11              MS. HAY:  Just one more, Your Honor.  I did want
12    to call Mohamed's sister, Mona Barre.
13              THE CLERK:  Please pull your chair all the way
14    forward, and state your full name for the record.
15              MS. MOHAMUD:  Mona Mohamud.
16              MS. HAY:  And Mohamed is your brother?
17              MS. MOHAMUD:  Yes, my older brother.
18              MS. HAY:  And how much older is he?
19              MS. MOHAMUD:  Four years.
20              MS. HAY:  And how old are you today?
21              MS. MOHAMUD:  I'm 19 years old.
22              MS. HAY:  So you're the same age Mohamed was --
23              MS. MOHAMUD:  -- when he was arrested.
24              MS. HAY:  How involved was Mohamed in your life
25    before his arrest?
```

Case 6:16-cr-10141-EFM   Document 470-1   Filed 11/20/18   Page 39 of 62
Case 3:10-cr-00475-FR   Document 529   Filed 12/03/14   Page 38 of 61

38

1              MS. MOHAMUD:  Every day, every single day he was

2     involved.  From the day I was born, me and my brother

3     have been side by side.

4              MS. HAY:  Can you tell us some of the things he

5     did with you when you were younger in school?

6              MS. MOHAMUD:  My brother would cook me food, walk

7     me to school, go over homework with me.  He was older.

8     He would challenge me, especially with my work, with

9     reading and writing.  I would read advanced for my age

10    because he would be working with his work and my work

11    together.

12             MS. HAY:  So what are some of the words that come

13    to mind when you want to describe your brother?

14             MS. MOHAMUD:  My brother is a phenomenal person,

15    he's very unique, and he's humble.  He has a gentle

16    heart.  He's very kind.  He's smart.  He's very funny.

17    He's just beloved.  He's genuine.

18             MS. HAY:  Have you been able to stay in touch

19    with him in some way while he's --

20             MS. MOHAMUD:  Well, he calls me almost every day.

21    We talk on the phone and sometimes I go to visits, yeah.

22             MS. HAY:  And what -- what does he tell you when

23    he calls you?

24             MS. MOHAMUD:  Advise me a lot.  I need a lot of

25    guidance, and he definitely guides me through a lot.  And

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 40 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/03/18   Page 39 of 61

39

 1   I talk to him just about everything, and he's definitely

 2   my shoulder through everything.

 3            MS. HAY:  Are you in school now?

 4            MS. MOHAMUD:  Yes.  I go to community college.

 5            MS. HAY:  And has that changed from four years

 6   ago when Mohamed was first arrested?

 7            MS. MOHAMUD:  Definitely.  I was -- I was kind of

 8   troubled.  I wasn't really doing what I was supposed to

 9   be doing in life.  And through my brother's help and

10   guidance and him talking to me through a lot, I've gone

11   back to school now and am trying to make something with

12   my life.

13            MS. HAY:  Is there anything you'd like the judge

14   to know about your brother?

15            MS. MOHAMUD:  Yes.  Throughout this four years,

16   he's never had, you know, the chance to have a

17   conversation with my brother.  And I know that in this

18   courtroom he's been painted in such an ugly light.  And

19   he's -- he's so different from what you guys hear in the

20   courtroom.  If he even had a conversation, a five-minute

21   conversation with my brother, he would see what an

22   amazing, phenomenal young man he is and how much he

23   deserves to live his life.  He has so much more life.  He

24   has so much more to learn, just like we all do.  We all

25   have so much more to learn.  None of us are done growing

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 41 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/08/18   Page 461 of 62

40

1    yet.  So he deserves it.  He deserves it.

2             MS. HAY:  Okay.  Thank you, Mona.

3             THE COURT:  All right.  Any questions?

4             MR. KNIGHT:  No, Your Honor.

5             THE COURT:  Okay.

6             Ms. Hay, further witnesses?

7             MS. HAY:  No, Your Honor.  I won't call further

8    witnesses about the kind of person Mohamed was and is

9    today.

10            I think you can hear his family has stayed

11   connected to him.  He has a support system that's

12   important for defendants to have.  They're going to stay

13   with him, help him continue growing, no matter what.  But

14   I think the kind of love and guidance that he was able to

15   give to his family is something that you can consider in

16   trying to understand what kind of person this is.

17            So, Your Honor, I want to discuss the act itself,

18   what the Government says to you, this was such a horrific

19   act that you must impose a draconian 40-year sentence on

20   this young man, who has never done anything like this

21   before, who has so many good qualities and

22   characteristics, and who has acted in such a way that is

23   so out of character for him during this time.

24            Your Honor, the Government talked about the

25   enormity of the bomb, the enormity of the loss of life.

1   But you will remember from the trial how much they

2   directed Mohamed in that, how they gave him money and

3   they told him to buy things.  I wanted to put up on your

4   screen the government agent's own testimony about the

5   bomb, just so that we can remember that the FBI picked

6   many of these things.

7        So the agent himself agreed that the FBI decided

8   the size of the truck to use.  Mohamed didn't know what

9   kind of truck.  The FBI picked that.  So when we talk

10  about the enormity of it, you have to decide how much of

11  that should be accounted to Mohamed and how much to the

12  FBI.

13       The FBI, according to Agent Youssef, decided the

14  size of the bomb.  They designed the bomb.  There were

15  six barrels that were supposed to explode in that truck,

16  and Mohamed had nothing to do with that.

17       What started as a bad statement by Mohamed, Your

18  Honor -- There's no doubt he said he had heard of

19  brothers with explosives using a truck.  That's what he

20  said.  And they took that idea that he had heard of --

21  and there's no doubt and we're not denying that he was

22  radicalized by jihadists on the Internet.  He had heard

23  that idea, but the FBI took that idea of an adolescent

24  and they built it into something enormous.

25       Your Honor, I have one more part of the

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 43 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 1/30/18   Page 43 of 62

42

cross-examination here, where the agent was telling

Mohamed how big the bomb would be.  He said, do you

remember -- he told Mohamed how big it would be.  And

Mohamed said, "Really?"  And he had no idea how big that

explosion would be.

They asked him how much bigger do you think the

explosion of Pioneer Square will be than that little test

explosion they did, and he had no idea.

Again, the FBI took an idea and they built it

into something enormous.  That doesn't mean Mohamed is

not responsible for his own ideas.  But, Your Honor, when

you weigh the act and you decide how much of this should

go into Mohamed's account, don't -- don't put the entire

enormity of that explosion in Mohamed's account, because

the testimony was clear, undisputed, that the FBI had a

role in that.  And we understand from the Government why

they did that.  But I want you to make sure that we don't

put too much on this young man's shoulders.

What he said in that initial meeting with the

agents, it's true what the Government said.  He was given

options, and he said, "I've heard of some brothers with

explosives in a truck."  That's what he told the first

agent.  He did.  He said that.  But, Your Honor, that

gets me to the next I think really important point when

we think about the sentence here.

Case 3:10-cr-00475-FM   Document 470-1   Filed 11/29/18   Page 43 of 61

43

1          One of the things we know about Mohamed from the

2     trial testimony is that what he wanted was to go

3     overseas.  That was undisputed in so many ways.  That's

4     what he had written about in those magazines that were

5     horrible, about being a sentry overseas.  He wanted to go

6     overseas.  There was a call to join the brothers.

7          And what the agents did when they first talked to

8     him is they confined the choices that he could make to

9     things that did not include going overseas.  So when the

10    Government says it was his choice, they're saying, among

11    the choices that the agents set out for him, he did say

12    an explosive and a truck, like the brothers.  But it's

13    the agents who told him, "You can't go overseas."

14          And, Your Honor, I have that quote, so we can

15    make sure we remember that.  This is Agent Youssef again.

16          One of the facts that came out from Mohamed was

17    his desire to go overseas.

18          They were talking about his longtime desires.

19          Yes.

20          It was clear.  He wanted to go to Yemen.  He

21    wanted to live in a Muslim land.  He told his father he

22    wanted to live in a Muslim land.

23          I then asked the agent, "There's no doubt in your

24    mind that that's what he wanted to do, was there, to go

25    over there?"  And the agent agreed.

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/03/18   Page 45 of 62
Case 3:10-cr-00475-EFM   Document 529-1   Filed 12/03/18   Page 445 of 612

44

1          So, Your Honor, the reason that's important is

2    today of course we read in the papers about other young

3    men who are trying to join ISIS or other organizations,

4    who want to go overseas.  And the Government has a way --

5    we have some cases in our materials -- of arresting them

6    at the airport.  That's a federal crime, to go overseas

7    and support a terrorist organization; and that has a

8    maximum of 15 years, Your Honor.  Fifteen years, Your

9    Honor.

10          That was an option available to the Government.

11   But when they said to this young man, "You can't go

12   overseas.  What do you want to do?," they didn't give him

13   that option.

14          And here's my last screen I wanted to show you.

15   I asked the agent, "You brought up the fact that Mohamed

16   could not travel overseas?"  And this was in the first

17   meeting, the first face-to-face meeting the agent had.

18          And he says, "Well, I asked him if he could

19   travel."

20          And then I said, "You told him it might be

21   difficult for him to support the cause overseas because

22   he can't fly."

23          And that agent said, "Yes."

24          And that was the very first meeting where they

25   then set out the options for Mohamed.  And that context

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 46 of 62
Case 3:10-cr-00475-EFM   Document 529-1   Filed 12/03/18   Page 45 of 62

45

1    is important, because everything that happened is based

2    on the choices Mohamed was given right there.

3            We're not denying that he should be punished for

4    his act.  It's an act he did on his own.  He made a

5    choice.  He followed through.  But the initial decision

6    about what he wanted to do was constrained and molded in

7    a way by the Government that made this -- the enormous

8    act follow.

9            If they had offered him the chance to go

10   overseas, we know, according to the agent, he would have

11   taken that.  That's what he wanted to do, and they knew

12   that.  So they didn't give him that chance, and we can

13   discuss why.  We're not here to talk about the FBI and

14   their tactics.

15           But again, when you think about the weight of the

16   act that Mohamed is being sentenced for, it's fair to

17   consider the context in which he made those decisions.

18   He made choices in a context created by the Government,

19   created by those agents, who made going overseas off

20   limits for him, even though they knew that's what he

21   wanted to do, and there is no dispute of that.

22           Your Honor, that's a 15-year sentence.  And I

23   think you can understand why the defense would come to

24   you and say a 10-year sentence is therefore reasonable.

25   Because the 15 years, if you understand that that's what

Case 3:10-cr-00475-EJM   Document 529-1   Filed 12/30/18   Page 47 of 62

```
 1    they could have done, then you need to take into
 2    consideration the nature of this young man, that this is
 3    not a young man who is standing before the Court -- and
 4    you will hear him speak.  He will not say, Your Honor,
 5    that he supports these kinds of causes today.  Unlike
 6    some defendants who are sentenced for these kinds of
 7    crimes, he is not going to be here spewing hate and anger
 8    about the United States.  He has taken responsibility.
 9    He's changed his understanding.  And you can consider
10    that when deciding if there is even additional
11    mitigation.
12            So, Your Honor, I agree with the Government that
13    we have to look at the young man and we have to look at
14    the act.  The Government has a different view of both of
15    those.  And I think a fair memory of what happened at the
16    trial would show you that the Government's description of
17    the act includes the FBI's own conduct, and we shouldn't
18    add that to the weight of the sentence imposed on
19    Mohamed.
20            Thank you, Your Honor.
21            THE COURT:  All right.  Do you have anything
22    further to present for the defense?
23            MR. WAX:  Yes, Your Honor.  I will wrap it up,
24    please, for Mr. Mohamud in a few minutes.
25            Mr. Mohamud did wrong.  Mr. Mohamud has been
```

Case 3:10-cr-00475-FFM   Document 529   Filed 11/03/14   Page 47 of 62

47

1   convicted of a crime.  He has been punished for the last

2   four years while he's been incarcerated.  He knows that

3   he is going to be punished some more.  The question, of

4   course, today is how much.  The question for you is how

5   to measure what is a just result.

6          I'm sure that all of us in the profession --

7   whether you as the judge or we as the lawyers -- have

8   read and studied any number of sources on just

9   punishment, deterrence, what is appropriate in

10  considering sentence.  I'm going to return and conclude

11  with some thoughts about that.  Before I do, there are

12  four or five specific points that I'd like to make and

13  comment on that Mr. Knight touched on.

14         One is a point that was made more clearly in the

15  Government's pleadings, and that is their suggestion that

16  Mr. Mohamud had spent a long time planning these acts,

17  and that in attempting to assess the danger that he

18  presents and how much specific deterrence is needed, the

19  Court should look at that long period and contrast it

20  with a short period of incarceration during which he made

21  some statements indicating his abandonment of and

22  repentance for the acts that he did.

23         I would respectfully submit that as you look at

24  what you have been presented, what you see is four years

25  of atonement, repentance, remorse by Mr. Mohamud, a far

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 49 of 62
Case 3:10-cr-00475-HZ   Document 529   Filed 12/08/14   Page 48 of 61

48

longer period than the period to which the Government
alluded as a lengthy period of planning.

Mr. Knight this morning suggested that it is
important for the Court to consider what was real.
Mr. Knight set up a dichotomy about what was real to
Mr. Mohamud as contrasted with what was real to the FBI.
I would respectfully suggest to Your Honor that that is a
false dichotomy; and it is a false dichotomy because the
"real" in this case the law requires to be assessed under
the notion of imperfect entrapment.  To suggest this
dichotomy between what was real to Mr. Mohamud and what
was real to the FBI is to reject what the law says you
must consider here, and that is the imperfect entrapment.

When Mr. Knight says that to ask the question, as
we did in our pleadings and as Ms. Hay just articulated,
why didn't the FBI give Mr. Mohamud a different choice,
he says -- Mr. Knight says that ignores the truth of the
choices.

Again, Your Honor, it seems to us that in saying
that, the Government is saying to you, ignore the
obligation to consider the notion of imperfect entrapment
as you weigh what is a just sentence.

Finally, Mr. Knight suggests that the material
that we have presented and those factors that we suggest
that you consider as mitigation are not mitigation.  He

Case 6:16-cr-10141-EFM   Document 479-1   Filed 12/20/18   Page 50 of 62
Case 3:10-cr-00475-KI   Document 529   Filed 12/03/14   Page 49 of 62

49

1    suggests to you that these are statements that elicit

2    sadness and that that is not mitigation.

3          Again, we believe that in making that argument,

4    the Government is asking the Court to ignore the body of

5    evidence that you have before you from the trial and from

6    the sentencing materials about the impact of context, as

7    Dr. Moghaddam put it so eloquently in his testimony and

8    in his report, to ignore the relevance of the

9    vulnerability that Mr. Mohamud had to the actions of the

10   agents.

11         Let me return and sum up, please, by a concept or

12   two that come from all of the three religions of Abraham,

13   if I may use that phrase.

14         This is a unique situation in some respects, Your

15   Honor.  Mr. Mohamud is a Muslim.  His lawyers include

16   people who are Christian and Jewish; the Court, a

17   Christian, a Catholic.

18         All three of these great religions, Your Honor,

19   teach us that no man should be judged by the least of his

20   acts.  And in judging Mohamed and in considering the acts

21   that he committed and weighing those acts in the context

22   of other cases that have been presented to you by the

23   Government and by the defense, we see a significant,

24   perhaps singular difference that links back to the

25   teachings of all the religions, because after all,

Case 6:16-cr-10141-EFM    Document 479-1    Filed 12/20/18    Page 51 of 62
Case 3:10-cr-00475-HZ    Document 529    Filed 12/08/14    Page 50 of 62

50

1    religion is, in some respects, at the core of this case.

2         And that singular difference, Your Honor, is I

3    think atonement and repentance.  As you look through the

4    statements of defendants in so many of the other cases

5    that the Government has brought, you find so many of the

6    people, whether young or less young, standing before the

7    Court at sentencing, adhering to the beliefs that led

8    them into the court into the first instance, not our

9    client, not Mr. Mohamed Mohamud.

10        From the outset, as you heard from the

11   psychiatric nurse in the jail, Mr. Mohamud was riven with

12   guilt and remorse.  Remarkable are the interactions

13   between Mohamed and Mr. Sady that led to the letter that

14   Mr. Mohamud wrote within three weeks of his arrest.

15        And not just "I feel bad," Your Honor.  "I want

16   to atone.  I want to make amends to the society that I

17   harmed," authorizing us, directing us to reach out to the

18   Government early on and to say to the Government, "How

19   can I help?  How can I help you, those people who are

20   prosecuting me, to prevent other young men from doing the

21   horrific and criminal acts that I committed?"

22        I think, Your Honor, that as you weigh and take

23   the measure of this young man before imposing sentence,

24   that that is something that speaks most loudly to all of

25   the legalisms -- acceptance of responsibility, imperfect

Case 3:10-cr-00475-EFM   Document 529-1   Filed 12/08/14   Page 51 of 61

51

1    entrapment -- and takes them and puts them into the
2    larger societal context of this sentencing.

3          This young man knows that what he did was wrong,
4    was criminal.  This young man has, for four years, sought
5    not just to make himself a better person, but to help his
6    society, to atone for what he did.  And I would urge you,
7    as you weigh all of the factors that you must before
8    imposing sentence on him, to please think about some of
9    those larger notions.

10         Thank you, Judge.

11         THE COURT:  All right, Mr. Wax.

12         Has the defense completed their presentation?
13   I'm not talking about the defendant at this point.

14         MS. HAY:  Other than the defendant, yes, Your
15   Honor.

16         THE COURT:  Okay.  Well, I think we can go ahead
17   at this point, unless somebody has a problem.

18         The Court has identified the points favoring a
19   lower sentence in its belief and the points favoring --
20   the points against a lower sentence.  I'll read these to
21   you.

22         Points favoring a lower sentence -- and this is
23   regarding the acceptance of responsibility under 3553.
24   Defendant wrote a letter a month after his arrest
25   renouncing his actions and past belief in violent

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 53 of 62
Case 3:10-cr-00475-FM2   Document 529-1   Filed 12/03/14   Page 52 of 61

52

1    extremism and also wrote a letter to the Court to be

2    considered during sentencing.  I hope this reflects a

3    true change of heart, but there's no real way to tell.  I

4    have also considered the information counsel provided in

5    their letters to the Court.

6         Now, the jury found that defendant was not

7    entrapped, but imperfect entrapment is available as a

8    defense.  And in this case, it weighs slightly in favor

9    of defendant in this case.  The Court realizes the agents

10   often reminded the defendant he could back out of the

11   plan if he had a change of heart, but that is balanced by

12   the Government's inducement through the agent's use of

13   praise and religious references.

14        Defendant's young age made him more vulnerable to

15   suggestion.  Two psychologists believed that the

16   defendant presents a low risk of future crimes.

17        The Court is not persuaded by defendant's

18   argument to reject the terrorism enhancement, which

19   shifts the criminal history category from 1 to 6, but

20   defendant's lack of criminal history weighs in his favor.

21        I've also reviewed the sentences imposed in the

22   other terrorism cases that the Government cited.  But I

23   am aware of the Circuit Court's cautions against

24   comparing various terrorism cases due to the variety of

25   circumstances within the cases.

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 54 of 62
Case 3:10-cr-00475-HZ   Document 529-1   Filed 12/03/14   Page 53 of 61

53

1           The following are the points against a lower
2      sentence, which the Court will consider:  Defendant
3      planned and attempted to commit an act of terrorism that
4      would have resulted in extraordinary tragedy.  It was
5      made clear to him that his actions would result in a
6      great deal of death and mutilation.  He expressed his
7      goal of causing as much damage as he could.  He pushed
8      the buttons actuating the bomb twice.  He had a
9      commitment to his plan and never once expressed any
10     change of heart, even though the agents gave him many
11     opportunities to back out.

12          The Christmas tree bombing was the defendant's
13     idea.  The Government agents were not familiar with
14     the -- with this community event prior to defendant's
15     suggestion.  Only 13 minutes into the first meeting,
16     Youssef asked the defendant what he would do, quote, for
17     the cause, end quote.  When the defendant said he could
18     do anything, Youssef presented five choices, which
19     included two innocuous ones, and the defendant chose
20     becoming operational and explained he wanted to put an
21     explosion together and had heard of brothers building and
22     detonating car bombs.

23          The intended crime was horrific.  The defendant
24     expected at least 10,000 people, including many children,
25     in the square.  He wanted everyone to leave either dead

Case 3:10-cr-00475-HZ    Document 529    Filed 12/08/14    Page 54 of 61

54

1    or injured.

2              This sentence needs to be long enough to deter

3    other potential or other terrorists.

4              The defendant became radicalized at age 15.  He

5    began e-mailing Samir Khan extensively and writing for

6    *Jihad Recollections* at age 17, while he was a high school

7    senior.

8              The Ninth Circuit recognizes -- this is the next

9    point.  The Ninth Circuit recognizes that terrorists,

10   even those with no prior criminal behavior, are unique

11   among criminals in the likelihood of recidivism, the

12   difficulty of rehabilitation, and the need for

13   incapacitation.

14             Mr. Mohamud, have you read the presentence

15   report?  Have you gone over that with your client --

16             THE DEFENDANT:  Yes.

17             THE COURT:  -- or with your lawyers?  I'm sorry.

18             THE DEFENDANT:  Yes.

19             THE COURT:  Have you discussed that presentence

20   report with your counsel?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Would you like to present any

23   information to the Court or to make any statement about

24   the presentence report or any other matter regarding your

25   sentence?

Case 6:16-cr-10141-EFM   Document 479-1   Filed 1/30/18   Page 56 of 62
Case 3:10-cr-00475-FM   Document 529-1   Filed 12/08/14   Page 55 of 61

55

1          THE DEFENDANT:  Yes.

2          THE COURT:  Hold the microphone closer to you,

3    sir.

4          THE DEFENDANT:  I'd like to make a statement

5    before you sentence me.  Thank you for giving me this

6    opportunity to speak, Judge.

7          The things that I said and did were terrible, and

8    I want to apologize to everyone, to the community, to

9    everyone who was there.

10          I also want to apologize to the Muslim community

11    for bringing this shame upon them.  I want everyone to

12    know that Islam does not preach extremist terroristic

13    hate and to kill innocent people.

14          The hardest part for me, Judge, really has been

15    having to go over the tapes and see myself and hear what

16    I was saying.  And I know that I can't change what

17    happened and I can't go back in time, even though I wish

18    I could.  But all I can do from here is try to be a

19    better person and be more peaceful and prosperous in my

20    life.  And I hope that in the future I can be a positive

21    influence to the community.

22          THE COURT:  All right.  Anything further?

23          THE DEFENDANT:  Thank you.

24          THE COURT:  Well, this is a sad case, but I have

25    considered the advisory sentencing guideline range as set

Case 6:16-cr-10141-EFM    Document 479-1    Filed 12/20/18    Page 57 of 62
Case 3:10-cr-00475-FLW    Document 529    Filed 12/03/14    Page 56 of 61

56

 1    forth in the presentence report and the factors pursuant

 2    to 3553(a).

 3           Prior to departure, the sentencing range exceeds

 4    24 months.  Therefore, I have selected a sentence within

 5    the guideline range that addresses the nature and

 6    circumstances of the offense and the history and

 7    characteristics of the defendant, that will reflect the

 8    seriousness of the offense, promote respect for the law,

 9    and provide just punishment for the offense and -- very

10    important -- afford adequate deterrence to criminal

11    conduct and to protect the public from further crimes of

12    the defendant.

13           It will be the judgment of the Court that the

14    defendant be committed to the Bureau of Prisons for

15    confinement for a period of 30 years.  Upon release from

16    confinement, the defendant shall serve a life term of

17    supervised release, subject to the standard conditions of

18    supervision adopted by this Court and upon the following

19    special conditions:  The defendant shall cooperate in the

20    collection of DNA, as directed by the probation officer,

21    if required by law.

22           The defendant shall have no contact with

23    individuals located outside the United States by

24    telephone, through online or other correspondence or

25    through a third party unless approved in advance by the

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 58 of 62
Case 3:10-cr-00475-FZ   Document 529-1   Filed 12/03/18   Page 57 of 61

57

1    probation officer.

2           The defendant is prohibited from accessing any

3    online computer service at any location, including

4    employment or education, without the prior written

5    approval of the U.S. probation officer.

6           The defendant is prohibited from using or

7    possessing any computer, including any handheld computing

8    device, any electronic device capable of connection to

9    any online service or any data storage media without the

10   prior written approval of the U.S. probation officer.

11   This includes, but is not limited to computers at public

12   libraries, Internet cafes, or other places of employment

13   or education.

14          The defendant shall participate in the U.S.

15   probation officer's computer monitoring program.

16   Participation in the program may include installation of

17   software or hardware on the defendant's computer that

18   allows random or regular monitoring of the defendant's

19   computer use; periodic inspection of defendant's

20   computer, including retrieval, copying, and review of its

21   electronic contents to determine the defendant's

22   compliance with the program; and restriction of the

23   defendant's computer use to those computers, software

24   programs, and electronic services approved by the U.S.

25   probation officer.

1              By the way, these conditions of probation were

2       submitted by probation and listed, and they'll be

3       furnished with the judgment order.

4              The defendant shall provide the U.S. probation

5       officer with truthful and complete information regarding

6       all computer hardware, software, electronic services, and

7       data storage media to which the defendant has access.

8              The defendant shall submit to a search of

9       defendant's computer, including any handheld computer

10      device, any electronic device capable of connecting to

11      online service or any data storage media, conducted by a

12      U.S. probation officer at a reasonable time and in a

13      reasonable manner, based upon reasonable suspicion of a

14      violation of a condition of supervision.  Failure to

15      submit to a search may be grounds for revocation.  The

16      defendant shall warn all individuals that have access to

17      defendant's computer that it is subject to search and

18      seizure.

19             The defendant shall not possess or consume

20      alcohol or enter an establishment where alcohol is the

21      primary item for sale.

22             The defendant shall participate in a mental

23      health treatment program approved by the probation

24      officer.

25             The defendant shall pay a fee assessment in the

Case 6:16-cr-10141-EFM   Document 470-1   Filed 12/20/18   Page 60 of 62
Case 3:10-cr-00475-HZ   Document 529   Filed 12/08/14   Page 59 of 62

59

1    amount of $100.  It's due immediately, in full.

2         I'm not ordering a fine, as the defendant does

3    not have financial resources nor appreciable earning

4    ability to pay a fine.

5         Mr. Mohamud, you are entitled to appeal under

6    certain circumstances.  A notice of appeal must be filed

7    within 14 days of the entry of judgment.  If you are

8    unable to pay the cost of an appeal, you may apply for

9    leave to appeal in forma pauperis.  If you so request,

10   the clerk of the court will prepare and file a notice of

11   appeal on your behalf.

12        Now, the defendant is currently in custody and is

13   not viewed as suitable for voluntary surrender.

14        Does the Government have any pending charges

15   which require dismissal or other resolution?

16        MR. KNIGHT:  Nothing else, Your Honor.

17        THE COURT:  Okay.  Now, there have been certain

18   recommendations requested by the defendant, which I am

19   granting.  And so pursuant to that, I strongly recommend

20   that the Bureau of Prisons designate the defendant to FCI

21   Sheridan so that he can remain in close proximity to his

22   parents and siblings.  If FCI Sheridan is unacceptable, I

23   recommend USP Atwater or USP Victorville because of the

24   defendant's extended family in California.  I also

25   recommend the residential drug and alcohol treatment

```
 1    program because of the defendant's substance abuse in
 2    high school and college.
 3              All right.  Any issues regarding the conditions
 4    or the form of the judgment?
 5              MR. SADY:  No, Your Honor.
 6              MR. KNIGHT:  No, Your Honor.
 7              THE COURT:  All right.
 8              As has been stated, this is a very sad case.
 9    This is a sad, sad case for everyone.  There are a lot of
10    factors that cause the Court to impose a sentence of 30
11    years.  I recognize it is a very long sentence.  I
12    recognize it is going to be some time before Mr. Mohamud
13    will be able to get out of prison and lead a life.
14              I wish you well when that occurs.  Good luck to
15    you.
16              THE CLERK:  This court is adjourned.
17
18
19              (Proceedings concluded.)
20
21
22
23
24
25
```

Case 6:16-cr-10141-EFM   Document 470-1   Filed 11/20/18   Page 62 of 62
Case 3:10-cr-00475-HZ   Document 529-1   Filed 12/08/14   Page 61 of 61

61

1                          --oOo--

2

3            I certify, by signing below, that the

4        foregoing is a correct transcript of the record

5        of proceedings in the above-titled cause.  A

6        transcript without an original signature,

7        conformed signature or digitally signed signature

8        is not certified.

9

10

11

         /s/ Nancy M. Walker                12-08-14
12       _____        _____
         NANCY M. WALKER, CSR, RMR, CRR     DATE
13       Official Court Reporter
         Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25