# UNITED STATES DISTRICT COURT
## District of Kansas

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                        Case No.   **16-CR-10141-EFM**

**CURTIS WAYNE ALLEN *et al*.,**

        **Defendants.**

### GOVERNMENT'S REPLY TO DEFENDANTS' RESPONSE TO NOTICE OF AUTHORITIES RELEVANT TO U.S.S.G. § 3A1.4 [Doc. 472]

    APPEARS NOW the United States of America, by and through its undersigned attorneys, and replies to the defendants' Response to Government's Notices of Additional Authorities [Doc. 472]. Defendants' response materially mischaracterizes the nature of the cases provided to the Court concerning the terrorism enhancement under U.S.S.G. § 3A1.4, and ignores the record evidence demonstrating the applicability of the enhancement in this case. Accordingly, for the reasons given below, the Court should apply U.S.S.G. § 3A1.4 to each of the defendants.

    As an initial matter, the defendants' response misconstrues the facts of the cases cited as relevant authority by the government in Doc. 470 and 471. While the defendants have attempted to link each of these cases to some sort of federal target, a close review of these cases reveals that any

such connection is either non-existent or entirely incidental, and formed neither the basis upon which the government argued for the terrorism enhancement to apply, nor the reason the sentencing court applied it to those defendants.[1]

Instead, taken together, these cases show that attacks on civilian populations are routinely understood by sentencing courts to warrant the terrorism enhancement, so long as the offense meets the definition of a federal crime of terrorism: an attack that is either to "retaliate against government conduct," or "calculated to influence or affect the conduct of government by intimidation or coercion," or both. 18 U.S.C. § 2332b(g)(5) (defining federal crime of terrorism); U.S.S.G. § 3A1.4 (adopting § 2332b(g)(5) definition). Significantly, this definition is agnostic as to the type of ideology espoused by the defendants. For this reason, it applies equally to both a white supremacist who wants to retaliate against government policies he views as overly lenient

---

[1] The government has already provided relevant case materials for several of these cases, as well as citations for published appellate court decisions, where available. *See* Government's Notice of Authority Relevant to U.S.S.G. § 3A1.4 (Doc. 470) (providing appellate citations for *United States v. Aldawsari*, *United States v. Garey*, and *United States v. Wright*, and attaching sentencing transcripts for *United States v. Mohamud* and *Aldawsari*); Government's Supplemental Notice of Authority Relevant to U.S.S.G. § 3A1.4 (Doc. 471) (providing appellate citation and government's appellate brief for *United States v. Crawford*). These materials make clear that the imposition of the terrorism enhancement in these cases did not depend on any incidental connection to a federal target; accordingly, to the extent the defendants' response asserts otherwise, the government incorporates by reference the facts as established in those previously provided materials. In addition, the government now provides the Court with additional materials pulled from the dockets of the cited cases, which provide additional support for applying the enhancement regardless whether any such connection to a federal target may exist. *See* Gov. Sent. Mem., *United States v. Shazad*, 1:10-cr-541 (S.D.N.Y.), attached as Ex. 1 (Times Square bomber researched and selected time and location of bomb target based on maximizing pedestrian traffic; no mention of a military recruitment center); Sentencing Trans., *United States v. Rahimi*, 1:16-cr-760 (S.D.N.Y.), attached as Ex. 2 (Chelsea bomber focused on civilian targets); Gov. Sent. Mem., *United States v. Suarez*, 4:15-cr-10009 (S.D. Fl.), attached as Ex. 3 ("the defendant took great delight . . . that he would be potentially maiming women, children, and unsuspecting beach goers"); Sentencing Trans., *United States v. Suarez*, 4:15-cr-10009 (S.D. Fl.), attached as Ex. 4 (defendant planned to detonate backpack bomb on crowded beach); Gov. Sent. Mem., *United States v. El Bahnasawy*, 1:16-cr-376 (S.D.N.Y.), attached as Ex. 5 (defendant "chose densely populated areas for the attack to maximize the carnage" and identified Times Square as "an ideal target because of the 'crowds of people' typically present"); Sent. Trans., *United States v. Abdulmutallab*, 2:10-cr-20005 (E.D. Mich.), attached as Ex. 6; *see also* Gov. Sent. Memo, *United States v. Mohamud*, 3:10-cr-475 (D. Or.), attached as Ex. 7 (defendant who targeted Christmas tree lighting ceremony selected target to kill "a lot of children" because he was looking for a "huge mass" that would slaughter people "in their own element with their families celebrating their holidays").

toward Muslims, and to a jihadist associated with a foreign terrorist organization who wants to retaliate against U.S. actions in the Middle East. *See, e.g., United States v. Crawford*, 714 Fed. App'x 27 (2d Cir. 2017) (white supremacist); *United States v. Aldawsari*, 749 F.3d 1015 (5th Cir. 2014) (Islamic jihadist).

Here, substantial evidence establishes that these defendants satisfy this definition: the defendants designed their attack to retaliate against U.S. government policies that they perceived to be too favorable to Muslims, as well as to try to intimidate the government into changing those policies by threatening follow-up attacks. And, although every court to have considered the issue has held that the terrorism enhancement applies even where retaliating against or influencing the government is not the defendant's ultimate or sole aim, *see, e.g.*, *United States v. Wright*, 747 F.3d 399, 408, 418 (6th Cir. 2014); *United States v. Jayyousi*, 657 F.3d 1085, 1114–15 (11th Cir. 2011); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir.2010), the record is replete with evidence here that retaliating against and influencing the government was in fact one of the primary objectives that the defendants sought to achieve by their bombing of the Mary Street Apartments.

This intent was clear from the outset of the conspiracy, starting with the first meeting called by defendant Stein in a field on June 14, 2016. Defendant Stein explained that he believed Muslims presented an imminent threat to the homeland because the U.S. government was allowing too many to come in, including through Garden City:

> STEIN: The fuckin' cockroaches in this country have got to go. Period. . . . They are the fuckin' problem in this country right now. They are the threat that we have in this country right now. . . . They're bringing them in by the fuckin' plane load every god damn day. That god damn nigger in the fuckin' White House is making sure of it. We just found out Garden City is a main fuckin' hub that they're bringing them in to- dispersing them from there.

Gov. Tr. Ex. 13H, attached as Ex. 8.[2] It was this viewpoint—and, significantly, the belief that "it's gotta come to a stop"—that motivated defendant Stein to initiate the conspiracy. *See* Gov. Tr. Ex. 13F, attached as Ex. 9 (Stein explaining that an attack on Muslims was necessary because the U.S. government was "bring[ing] more of them motherfuckers in by the plane load every day").

The evidence shows that, from the moment defendants Allen and Wright joined the conspiracy, they understood and agreed with this underlying purpose. Indeed, at a time when the defendants were still trying to recruit other militia members to join them in planning an attack—weeks before the defendants selected the Mary Street building as their target—they openly discussed this purpose. At a July 9, 2016 recruitment meeting, defendants Allen and Stein spoke of their desire to use the attack to address the "root" cause of Muslims' presence within the United States, which they identified as both the federal and local governments:

| | |
|---|---|
| [Militia member]: | You know you gotta get to the root. And that's where Dan's goin' in. |
| STEIN: | What are you call, what are you callin' the root? |
| [Militia member]: | Goin' in and gettin' information, where these people are comin' from, who's backin' em', who's bringin' em' in. That's where we outta be goin' after em'. |
| STEIN: | Well if the fuckin' nigger in the white house, dude, I'll tell you that right now. |
| [Militia member]: | I know. |
| STEIN: | And his cabinet and congress and senate! I mean. |
| [Militia member] (overlapping) | If I had the money. And the funding |
| STEIN: | There's your root. |
| [Militia member]: | We, we would take that root out. |
| STEIN: | If, if fuck I'd be . . . I'd be there in two fuckin' seconds if uh, if I had the equipment to do it. And the people. |
| . . . | |
| [Militia member]: | But going around and just shootin' Muslims and stuff, ain't gonna solve the problem, it's gonna get your ass in jail for. |
| ALLEN: | Well that's what I say we outta hit the, people that are doing it like |

---

[2] Because the Court does not have a transcript of the admitted trial exhibit audio clips, the government is attaching the transcripts cited in this filing as exhibits. These are the same transcripts used by the parties and the Court to adjudicate the admissibility of these audio clips at the *James* hearing.

> the city council members and the IMAMs.

Gov. Tr. Ex. 22H, attached as Ex. 10.

At the July 18, 2016 recruitment meeting, the defendants again discussed attacking the government for allowing Muslims into the country. As Defendant Allen tried to convince fellow militia-members to join the conspiracy, he candidly stated that he believed Muslims presented a threat to the rule of law, and asserted that he wanted to take action that would cause policymakers to "change their mind" about allowing Muslims into Kansas:

> ALLEN: By the Constitution, that's another thing that bothers me, they can't even be in this country. . . . Because you can't step into this country and openly say that I'm going to go against the Constitution of the United States. . . And they all have an ulterior motive. They're going, they're trying to do it in Amarillo right now they're trying to pass Sharia law. . . So it's freaking crazy. <u>And I guess, to make it a little bit short is I think we ought to be doing something. Even if we can just stop them and change their mind about bringing them in to this part of the country</u>. You know then fucking let some other idiot out there worry about them you know?
>
> . . .
>
> WRIGHT: Problem is I think it doesn't matter where they come, they're eventually going to get. . . . They're not going to stop until everybody believes what they do.

Gov. Tr. Ex. 14F, 14G, 14H, attached as Ex. 11 (emphasis added). Later on in the meeting, as the group brainstormed potential targets, defendant Stein suggested attacking local government officials for facilitating, on the local level, broader U.S. policies that allowed Muslims into the area:

> STEIN: Next [potential target] I got, city and county officials who are, are directly involved with bringing these motherfuckers in here, they know they're coming in, they're helping facilitate it, make it happen. They're a fucking target too in my mind. They're part of it.

Gov. Tr. Ex. 14III, attached as Ex. 12; *see also* Ex. 13 (proposed Gov. Tr. Ex. 14LL) (discussing beheading a city council-woman to influence other city officials to act to keep Muslims out of Garden City); Ex. 14 (proposed Gov. Tr. Ex. 14KKK) (proposing raping and beheading the

mayor's wife to send this message);[3] *see also* Gov't Sentencing Memo. at 18-19 (citing trial evidence that, during the course of the conspiracy, the defendants discussed as potential targets the U.S. Senate building, the electric power grid, mayors, judges, sheriff's deputies, and city and county commissioners). Indeed, as Defendant Allen concedes, the defendants' consideration of such governmental targets is strong evidence that the defendants' objective was to retaliate against the government. *See* D. Resp. at 7.

As this discussion continued, each defendant made clear that he understood that the attack would send the retaliatory message that current U.S. policies concerning Muslims presented an imminent, existential threat to the homeland:

> STEIN: Right. So and the thing that we got to keep in our fucking minds is this is all part of [President Obama's] master plan to take the fucking country over, that's why we're doing this shit. To save this country, to save the future of my kids, my grandkids, your kids and grandkids. That's what this is all about. That's why I have no bones with anybody whose helping facilitate this bullshit, because all it's doing is destroying this. . . (interrupted)
> ALLEN: Um hum.
> STEIN: . . . fucking country.
> ALLEN: That's the whole point of me being involved is it's the fucking country.
> WRIGHT: That's right I agree.
> ALLEN: This is not losing fucking. . . we're losing the whole country.

Gov. Tr. Ex. 14LLL, attached as Ex. 15.

This goal of using violence to retaliate against, and influence, governmental policies related to Muslims informed innumerable decisions the defendants made to advance this conspiracy. The defendants first met to plan the bombing on August 8, 2016, at defendant Wright's business, G&G

---

[3] These exhibits are included as "proposed" trial exhibits because, following the *James* hearing, the Court found that they were not admissible as co-conspirator statements under Fed. R. Evid. 801(d)(2)(E), and the government did not seek to use them under other theories of admissibility at trial. However, the government includes them here in light of the defendants' assertion in their Response that there is no evidence that they intended for their attack to retaliate against, or to influence, governmental policy.

Mobile Homes (G&G).  During this meeting, at which the defendants used Google maps to drop pins on prospective attack sites in Garden City (including the Mary Street building), defendant Allen expressed concern that a bombing, on its own, would not sufficiently convey the defendants' retaliatory message.  *See* Gov. Tr. Ex. 15P, attached as Ex. 16.  To ensure that this message would be heard clearly, defendant Allen proposed writing and distributing a manifesto, similar to the one written by the Unabomber.  *See id.*  ("ALLEN: Yeah, manifesto. . . . Yeah.  I think that's a fucking brilliant idea."); Gov. Tr. Ex. 15Q ("ALLEN: . . . if we do an attack like this it's not going to do nothing, really. . . But if we put out a manifesto, write up a fucking page . . . That's what we got to do.").  The defendants then discussed the benefits of a manifesto, and the ideas they wanted it to contain.  Defendant Allen explained that they should design the manifesto to convince others who shared the defendants' views to rise up and also retaliate against "Muslims and Government:"

| | |
|---|---|
| STEIN: | I think before that we need to figure out what are we trying to accomplish by doing a manifesto?  That's what I want to know. |
| ALLEN: | We're going to try to trigger the other like-minded people across the nation to fucking stand up and start doing the same thing we're doing. |
| CHS: | Exactly. |
| STEIN: | Against the UN—or the— |
| ALLEN | Muslims. |
| STEIN: | --cockroaches. |
| ALLEN: | Muslims and Government. |

Gov. Tr. Ex. 15GG, attached as Ex. 17; Gov. Sentencing Mem., Ex 2, at 5-6 (Doc. 449-2) (including extended portion of transcript in which defendant Wright responds to this exchange by agreeing with defendant Allen); *see also* Gov. Tr. Ex. 15JJ, attached as Ex. 18 ("ALLEN: We need to do something that almost shuts the state down.").  The message sent would be clear:  unless the U.S. government stopped allowing Muslims into the country, the defendants would continue to retaliate with other violent attacks.  All three defendants discussed the best way to phrase this

7

message, so that it would resonate with the largest number of people:

> STEIN: So what all-- what all do we want to include in the manifesto? That we want the fucking-- we want the cockroaches stopped.
> . . .
> ALLEN: We can't say in there-- say we want the government to kick all the fucking cockroaches out of the country.
> WRIGHT: No, no, no.
> STEIN: No, I'm saying stop bringing them in. That's what I'm talking about.
> WRIGHT: See, I think the un-lawlessness is the biggest issue. And then you don't have to point the finger--
> STEIN: We want our borders reinstated.
> WRIGHT: --we don't have to point the finger at Muslims. You know what I'm saying?
> STEIN: Should we focus on the Constitution?
> ALLEN: Yeah.
> WRIGHT: Yeah, I agree.
> STEIN: Dude, we can make a book on, on-
> ALLEN: That's what I'm saying, this thing is going to be big.
> STEIN: Write a fucking book on how the Constitution has been fucking trampled.
> . . .
> WRIGHT: And we're tired of the un-lawlessness. . . .
> ALLEN: I mean [UI]
> WRIGHT: And we're going to take matters into our own fucking hands.

Gov. Tr. Ex. 15PP, attached as Ex. 19; *see also* Gov. Tr. Ex. 15W, attached as Ex. 20 (defendant Wright asserting that the manifesto should identify the attack as on behalf of "We, the people"). Defendant Allen asked defendant Stein for a notepad and started handwriting the manifesto during the meeting. Gov. Tr. Ex. 15RR, attached as Ex. 21.[4] This discussion makes clear that the defendants wanted their bombing to send a strong message to the U.S. government that the defendants did not approve of current U.S. policies allowing Muslims into the country—"we're tired of the un-lawlessness"—and that they would continue to use violence in the future to change those policies—"we're going to take matters into our own fucking hands." Coupled with the bombing, their manifesto would ensure that this message was heard.

---

[4] As the Court will recall, Dan Day testified that defendant Allen started hand-writing the manifesto at this point in the meeting.

Over the subsequent weeks, as the defendants continued to plan the attack, they also continued to focus on the importance of conveying this message. They debated at length when to release the manifesto (before or after the bombing) to maximize its impact. *See* Gov. Tr. Ex. 16AAA, attached as Ex. 22. Defendant Stein argued that it should be sent out before the bombing: "the manifesto's got to be delivered first, first crack out of the box. . . . I just want the motherfuckers to know why it's happening." *Id*. Defendant Wright agreed that this would be the best way to ensure its publication: "I think if we do it after, they're gonna cover it up." *Id*. Defendant Allen took a different view, arguing that the manifesto should be sent out at the same time as the bombing, because, otherwise, "that night, it's already gonna destroy the manifesto. Because they're gonna put out there that we got domestic terrorism right here in Garden City." *Id*. Such timing, to defendant Allen, would smother the manifesto's larger message. *Id*. Throughout this debate, which continued for nearly eight pages of transcript, each defendant expressed his understanding that the manifesto would be an important piece of the overall attack.

At the September 2, 2016 G&G planning meeting, the defendants again focused on how best to convey their broader message. At one point, defendant Allen showed the group a handwritten draft, which all three defendants then edited together:

> STEIN: [O]riginally I thought we was talking about, you know, we was discussing mainly the Muslims and then bringing these motherfuckers into town and what have you, and we gonna get, you know, put the city council and the fucking renters, you know…
> ALLEN: Yeah.
> CHS: They'd be targets.
> ALLEN: I can add that in there. More about the Muslims. I added the Muslims in there.
> . . .
> STEIN: Uh, do you want to, do you want it, you know, illegal immigrants, or do we want it more focused directly. . .
> ALLEN: I already say Muslims in it. . .

9

      STEIN:       directly at the fucking Muslims?
      ALLEN:     No, we want it illegal immigrants.  Cause they're all over.
      STEIN:       Well, the refugees?
      ALLEN:     You know?
      STEIN:       . . . most people are not going to consider them illegal immigrants because they are considered refugees.
      ALLEN:     Well, we could put refugees slash illegal immigrants.
      . . .
      ALLEN:     This is our call to action.

Gov. Tr. Ex. 127LL, attached as Ex. 23, 127PP, attached as Ex. 24, 127QQ, attached as Ex. 25.

Although the FBI halted the defendants' planned bombing before it came to fruition, there is no evidence that the defendants ever wavered from their plans to use the bombing and manifesto to send a message to the government.  Significantly, when the FBI searched defendant Allen's office at G&G, agents found the handwritten manifesto that the defendants had discussed during the September 2, 2016 recorded meeting.  This manifesto, which was admitted at trial as Government Exhibit 101, could not be clearer in its message.  *See* Gov. Tr. Ex. 101, attached as Ex. 26 (digital color copy of manifesto).  It is directed to "the U.S. Govt" as a "forced wake up call." Just as the defendants planned, it expressed the view that current U.S. government officials were engaged in "Govt terrorism" by "illegally bringing in Muslims by the thousands" and "not enforcing our borders." It exhorted like-minded individuals to "wake up" and "take a stand."  It also reflected the edits the defendants had discussed on the recording.  *See* Gov. Tr. Ex. 127LL, 127PP, 127QQ (adding "Muslims," adding "refugees/illegal immigrants").  And, it threatened violence unless policy changes were made:

> <u>This Manifest is for the U.S. Govt.</u> and for the American people.  For the last several years many people and groups throughout the country has tried to "wake up" the American people!!  Wake them up to our teranycal [sic] Govt.  Most of this has gone to no avail. . . <u>With this document we are going to attempt "a forced wake up call."</u>  <u>American people, you have to wake up while there still might be time to stop our Govt. from totally selling this Country out</u>.  We must come together as a people and nation and not just demand but

> Reinstate our Constitution.  It must be understood by all just what our Govt is up too [sic].  Don't be fooled by the words "Conspiracy Theory" or "Domestic terrorist[.]"  All this is a word game, "Brainwashing" by our Govt.  Standing up for the Constitution is not Domestic Terrorism.  It is actually Govt. Terrorism.  <u>Not enforsing [sic] our Borders.  Illegally Bringing in Muslims by the thousands.</u>  Top US Officials being above the law. . . . We have to take a stand.  Take a stand before its too late too [sic]!  It might already be!  We are trying to do just that with this manifest!  We know whats [sic] going on!  This is a wake up call to everyone else.  All the people who care about this country.  Everyone who knows somethings wrong but have been afraid to admit it.  Any groups that believe in the Constitution.  It's time. . . . Well the time has come for us that do care to take a stand.  It's time to do what the Govt hopes we will never do!!  That's come together as a nation, as a people.  We must begin to make our voices heard while we still can. . . . <u>This is a call to action by all Americans.  Please do not just sit idle until we lose this once great nation</u>!!  Many things this Govt has & is doing to this Country.  Right now!!  <u>If you have anything to do with the sell out of this country, a govt official, a landlord of refugees/illegal immigrants, your homes, your business's [sic] and your families are at risk.  You have been warned.  Stop your actions now.  Any individual, any group, Anyone that cares about this Country, take action now.  It's your duty as an American, as a citizen, a vet, a public official.  Take Action now</u>!!

Gov. Tr. Ex. 101, attached as Ex. 26 (emphasis added).  Although the defendants' arrests meant that the manifesto was not finalized or transmitted,[5] its content readily broadcasts the message the defendants intended to send upon attacking the Mary Street building.  *See United States v. Wright*, 747 F.3d 399, 419 (6th Cir. 2014) (holding that a sentencing court can base its finding on direct and circumstantial evidence and "need not wait for the defendant to confess a specific intent to influence the government" before finding the terrorism enhancement applies).  Taken together, this evidence shows that the defendants had clearly defined goals as they planned the Mary Street bombing.  Through the bombing itself, the defendants certainly wanted to kill the building's residents and terrorize the Somali-Muslim population of Garden City, sending the message that Muslims were not welcome there.  But the evidence is equally clear that the defendants wanted the

---

[5] There is no indication in the record that the defendants intended to further alter the manifesto's content.  In fact, the defendants had discussed typing up a final draft on a manual word processor that they would then handle with latex gloves before mailing it out, to prevent law enforcement from readily tracing it back to them.

attack to send a larger retaliatory message to the U.S. government concerning policies that, they believed, allowed too many Muslims to enter this country.  Upon threat of further violence—which the defendants hoped other like-minded individuals would "wake up" and help them carry out— they demanded that the U.S. government change these policies.  Given this record, these defendants undeniably committed a federal act of terrorism.

For these reasons, as well as those provided in the government's Memorandum in Aid of Sentencing [Doc. 449], at oral argument on November 19, 2018, and in its notices of relevant authorities [Doc. 470 and 471], the Court should apply the terrorism enhancement in U.S.S.G. § 3A1.4 to the Guidelines calculation for each of the defendants in this case.

Respectfully submitted,

STEPHEN R. MCALLISTER
United States Attorney

*Anthony W. Mattivi*

ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

*Risa Berkower*

RISA BERKOWER
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0150
Risa.Berkower@usdoj.gov

*Mary J. Hahn*
MARY J. HAHN
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0921
Mary.Hahn@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the __3rd__ day of December 2018, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*Mary J. Hahn*
Mary J. Hahn